IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | | |
|---|---|---|
| CALVIN WESLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action: 6:24cv00032 |
| | ) | |
| THE CITY OF LYNCHBURG and | ) | |
| LPD OFFICER SETH REED, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT SETH REED'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, Sergeant[1] Seth Reed ("Sgt. Reed"), by counsel, respectfully submits this memorandum in support of his motion for summary judgment.

## INTRODUCTION

This case involves two incidents—separated by months—in which a trained police canine, or K-9, was deployed by a Lynchburg Police Department ("LPD") officer against the Plaintiff Calvin Wesley during the course of his arrests. The crux of his litany of claims is an excessive force claim against Sergeant Seth Reed, the K-9's handler. Wesley claims Sgt. Reed should not have let the dog bite him.

In both incidents, Wesley was wanted on an outstanding warrant, was resisting a lawful arrest, was loudly warned multiple times that if he continued to resist the dog would bite him, and nevertheless continued to resist arrest. Wesley is known on the street as "Big Man." He has had multiple run-ins with the police. Officers who have had to grapple with him attest that he is a very strong and violent man.

---

[1] Since the complaint was filed, Officer Reed was promoted to Sergeant.

In both incidents, Sgt. Reed deployed the K-9 in order to detain Wesley, Sgt. Reed ordered the K-9 to release as soon as Wesley was detained, Wesley's bite wounds were not life-threatening, and Wesley promptly received medical attention for his injuries.

Wesley claims Sgt. Reed used excessive force in deploying the K-9, assaulted and battered him, was grossly negligent, and maliciously prosecuted him following the first of the two incidents.

The undisputed material evidence shows that Sgt. Reed's behavior was objectively reasonable under the circumstances. In addition, he is entitled to qualified immunity. Accordingly, the Court should grant summary judgment in favor of Sgt. Reed on all claims against him.

<u>STATEMENT OF UNDISPUTED FACTS</u>

**The First Incident: March 11, 2021**

On the afternoon of March 11, 2021, then-Officer Seth Reed self-dispatched to a warrant call on Grace Street in Lynchburg, Virginia. (Reed Depo. at 26.)[2] The wanted subject was Plaintiff, Calvin Wesley, who was wanted on an outstanding domestic assault and battery warrant. (*Id.* at 31.)

In 2017, Sgt. Reed had occasion to arrest Wesley and had to chase Wesley on foot and then physically fight him for several minutes before another officer arrived to assist Reed. (*Id.* at 18–19.) During that altercation, Wesley bit Sgt. Reed's fingers—breaking the skin and leaving scars, attempted to disarm him, and grabbed and yanked his genitals repeatedly. (*Id.* at 19–20.) When the supporting officer arrived, Wesley injured her as well. (*Id.* at 20.) Both officers

---

[2] The transcript of Sergeant Seth Reed's sworn deposition testimony regarding this matter is attached hereto as <u>Exhibit 1</u>.

required medical attention. (*Id.*) Sgt. Reed was also aware of another alleged incident in November 2018 in which Wesley physically fought a fellow LPD officer. (*Id.* at 23.)

Due to Wesley's violent history with police, Sgt. Reed brought his trained police canine, LPD K-9 Officer Knox ("Knox") with him for officer safety. (*Id.* at 28–30.) Sgt. Reed spotted Wesley getting into the front passenger seat of an idling pickup truck parked in front of a house along Grace Street, across from the fire station. (*Id.* at 31.)  He and Knox approached the passenger side of the truck with another LPD officer, opened the door, informed Wesley that they had a warrant for his arrest, and ordered him to step out of the vehicle. (Reed Body Cam 1 01:00.)[3]

Wesley immediately challenged Sgt. Reed, saying "For what?" (*Id.*) The officers ordered him again to step out of the vehicle. (*Id.*) Wesley stepped out of the truck asking "For what?" and raised his hands toward the officers, who ordered him to place his hands on the vehicle.[4] (*Id.*) He disregarded their orders and persisted: "For what? For what? For what? I'm asking—can't y'all tell me for what?" (*Id.*) During his string of repetitive questions, one of the officers had restated that they had a warrant for his arrest, but Wesley again ignored this information and disregarded multiple orders to put his hands on the vehicle. (*Id.*) Wesley maintains that he did everything he was asked to do and did not resist at all. (Wesley Depo. 16:3-18:24.)[5] He also agreed that, to the extent his recollection of events differs from the body camera footage, the footage would be accurate. (*Id.* 20:10-21:8.)

---

[3] The body camera footage of Officer Reed from the March 11, 2021 incident is attached hereto as Exhibit 2.
[4] Sgt. Reed admittedly gave Wesley a conflicting order to place his hands behind his back. (Reed Depo. at 40-41.)
[5] The transcript of Calvin Wesley's sworn deposition testimony regarding this matter is attached hereto as Exhibit 3.

Meanwhile, more LPD officers arrived on scene. (*Id.*) Seeing this, Wesley finally turned toward the vehicle, saying, "Alright, look," and as officers approached and ordered him to put his hands behind his back, he instead placed his hands on the vehicle. (*Id.*) As one of the officers took hold of his left arm and attempted to put it behind his back, Wesley pulled away and again asked, "For what though?" and shouted, "Hey, wait a minute!" (*Id.*)

An officer forcefully put Wesley's left arm behind his back while pinning him in the hinge joint of the open passenger door of the truck to keep him from fleeing, while another officer grabbed ahold of his right wrist and attempted to put his arm behind his back. (*Id.*) At that point, Wesley became physically and verbally combative, pushing his body weight against the officers and attempting to wriggle out of their control while shouting at them. (*Id.*)

Wesley is a large and very strong man. In fact, he's known on the street as "Big Man." (3-11-2021 Incident Report, at 5).[6]  For over twenty seconds he fought against the officers and resisted being handcuffed, so Sgt. Reed loudly warned Wesley—twice—that if he kept fighting the officers, the "dog" would bite him. (Reed Body Cam 1 01:38.) They managed to get one of the handcuffs around Wesley's left wrist, but they could not secure his right wrist. (*Id.*) Wesley continued to fight the officers for nearly a minute, at one point twisting his upper body around and narrowly missing the officers' faces with his left elbow. (*Id.* 02:05) During the struggle, Wesley's shorts fell down, exposing his rear end. (*Id.*)

Due to Wesley's strength and active resistance, the officers were forced to execute a takedown in order to complete the arrest. (*Id.*) Wesley fought against their efforts, so Sgt. Reed ordered Knox to assist with the takedown, commanding Knox to "hier packen" ("come and take

---

[6]The LPD Incident Report for the March 11, 2021 incident (Case #2021-003502) is attached hereto as <u>Exhibit 4</u>.

hold" in German) and Knox complied, biting Wesley in the upper right hamstring where his shorts still covered his skin. (*Id.* 02:23) As Knox grabbed hold of Wesley, Wesley elbowed Sgt. Reed in the top of his arm, assaulting him. (*Id.*; Reed Depo. 101:14-103:12.)

Once on the ground, the officers surrounded Wesley and continued their attempts to handcuff him, but Wesley continued to resist. (Reed Body Cam 1 02:23) The officers loudly and repeatedly ordered him, "Give us your hand!" (*Id.*) When Wesley finally stopped resisting and put his hands behind his back, and before officers had completed handcuffing his right hand, Sgt. Reed ordered Knox to release, and Knox immediately complied. (*Id.* 02:39)  Then the officers placed the handcuff around Wesley's right wrist. (*Id.*)

One of the officers pulled up Wesley's shorts for him. (*Id.*) The woman sitting inside the truck in the driver's seat asked Sgt. Reed some questions about the reason for the arrest, and he politely answered them. (*Id.*) The woman was later identified as Bernice Perkins, Wesley's landlady. (Incident Report 3/11/21 at 3; Reed Depo. at 31.)

While Sgt. Reed was distracted, Knox lunged at Wesley, who was complaining loudly about his discomfort on the ground. (Reed Body Cam 1 03:19.)  Sgt. Reed promptly prevented Knox from biting Wesley again by yanking on his leash and ordering him to stop, while another officer controlled Wesley's legs. (*Id.*)  When Wesley finally calmed down, the officers assisted him into a seated position against the chain-link fence lining the front yard of the house. (*Id.*)

EMS arrived shortly thereafter and examined Wesley's wounds. (Smith Body Cam 00:45.)[7] Wesley had suffered some lacerations to the back of his right leg, a scrape on his left

---

[7] The body camera footage of Lt. Brian Smith from the March 11, 2021 incident is attached hereto as <u>Exhibit 5</u>.

elbow, and some scrapes on his hands. (*Id.* 02:03; UOF Inv. Report 3/11/21 at 4–5[8].) He was transported to the hospital where he received further treatment for his wounds. (UOF Inv. Report 3/11/21 at 4–5.)

Due to Wesley's actions, Sgt. Reed obtained criminal warrants for assault and battery on a law enforcement officer and for obstruction of justice, and Officer Bryant obtained a criminal warrant for obstruction of justice for resisting arrest and attempting to flee from a law enforcement officer. (Arrest Warrants 3/11/21.)[9]

### The Second Incident: December 20, 2021

On the night of December 20, 2021, Sgt. Reed and LPD Officer Collin Bryant ("Officer Bryant") responded to a domestic assault call at an apartment in Lynchburg, VA. (Reed Depo. at 108; Incident Report 12/20/21 at 6[10]; UOF Inv. Report 12/20/21 at 1[11].) The call came from Shana Wesley ("Shana"), Wesley's wife. (*Id.*) She reported that Wesley had been inside her residence and was threatening to punch and choke her and to leave drugs in her house in order to frame her for a possession of a controlled substance. (Incident Report 12/20/21 at 6.) He refused to leave her residence, but left on foot when she called the police. (Reed Depo. at 109.) The responding officers knew that there was an outstanding warrant for Wesley for violation of a protective order. (Reed Depo. at 104; Incident Report 12/20/21 at 6.)

When Officers Reed and Bryant finished interviewing Shana, they canvassed the area for a while but could not locate Wesley. (Reed Depo. at 109; Incident Report 12/20/21 at 6.) Then

---

[8] The LPD Use of Force Investigation Report for the March 11, 2021 incident is attached hereto as Exhibit 6.

[9] The arrest warrants obtained against Wesley for the March 11, 2021 incident are attached hereto as Exhibit 7.

[10] The LPD Incident Report for the December 20, 2021 incident (Case #2021-016418) is attached hereto as Exhibit 8.

[11] The LPD Use of Force Investigation Report for the December 20, 2021 incident is attached hereto as Exhibit 9.

both officers ran Wesley's information, discovering that there was a valid no-contact protective order between him and Shana, which he violated by being at Shana's home. (Incident Report 12/20/21 at 6.) While Sgt. Reed was surveying the area in his patrol vehicle, he spotted Wesley walking from Shana's apartment toward a neighbor's apartment. (Reed Depo. at 109; Incident Report 12/20/21 at 6.) Sgt. Reed called dispatch, and he and Officer Bryant approached on foot. (*Id.*)

As Officers Reed, Bryant, and K-9 Knox approached the neighbor's apartment on foot, they witnessed Wesley note their presence and immediately enter the neighbor's apartment, shutting the door behind him. (Reed Depo. at 110; Incident Report 12/20/21 at 6.) The neighbor was left standing on the front patio. *Id.* The officers approached and informed the neighbor that Wesley was wanted and that they needed to enter his residence to apprehend him. (Reed Body Cam 2 01:48.)[12] When the neighbor attempted to open the door he found that it was locked. (*Id.*) Sgt. Reed asked the man if he had any back windows, and he responded affirmatively but added that they are fifteen feet above the ground. (*Id.*)  Sgt. Reed responded that Wesley would jump that distance. (*Id.*) Someone inside then opened the door. (*Id.*) Sgt. Reed determined that Wesley had in fact jumped out of a window and asked a woman inside the apartment which window, and she pointed to a back window in the kitchen. (*Id.*) He asked her if Wesley had jumped all the way out, and she nodded affirmatively. (*Id.*)

Meanwhile, Officer Bryant heard branches breaking behind the apartment. (Incident Report 12/20/21 at 3.) He advised a backup unit of Wesley's presumed location while Sgt. Reed and Knox pursued Wesley into the woods behind the apartment complex. (*Id.*) From the front

---

[12] The body camera footage of Officer Reed from the December 20, 2021 incident is attached hereto as <u>Exhibit 10</u>.

patio, Officer Bryant could hear Sgt. Reed advising Wesley that he was wanted, and that if he ran the K-9 would bite him. (*Id.*)

As Sgt. Reed entered the woods behind the apartment into which Wesley had fled, LPD Officer Austin Rowland ("Officer Rowland"), who had just arrived on scene, joined him in pursuit. (Rowland Body Cam 01:06.)[13] Trailing Sgt. Reed and Knox, Officer Rowland was descending the hill behind the apartment complex into the woods when he tripped on a fallen tree and injured his left leg. (*Id.*; Rowland Injury Report[14].)  He continued his pursuit at a hobble. (Rowland Body Cam 01:21.)

Sgt. Reed shouted repeatedly to Wesley while giving chase that he was wanted, and that if he ran, the "dog" would bite him. (Reed Body Cam 04:16.) He warned Wesley five separate times. (*Id.*)  Wesley continued to flee. (*Id.*) As Sgt. Reed emerged from the woods into a clearing behind the apartment complex, Wesley was approaching the rear passenger door of an idling car parked in the middle of a road known as Westbrook Circle. (*Id.* 04:54; Incident Report 12/20/21 at 7.) Wesley was wearing a pullover sweatshirt and a black vest jacket. (Reed Body Cam 2 05:00; Incident Report 12/20/21 at 6.) Sgt. Reed released Knox and ordered him to apprehend Wesley. (Reed Body Cam 2 04:55.)

Knox ran Wesley down and grabbed hold of his sleeved right forearm as he was climbing into the car and pulled him out of the car, which then sped off. (*Id.*) Wesley proceeded to fight with Knox in the road, punching Knox in the head repeatedly with his left hand, in which he held his belt. (*Id.*) During the altercation with Knox, Wesley's pants fell down. (*Id.*)

---

[13] The body camera footage of Officer Rowland from the December 20, 2021 incident is attached hereto as <u>Exhibit 11</u>.
[14] Officer Rowland's Employee Injury/Illness Report from the December 20, 2021 incident is attached hereto as <u>Exhibit 12</u>.

Wesley repeatedly struck Knox on the head. Sgt. Reed ordered Wesley not to harm "the dog" and to get on the ground, but Wesley disregarded these orders and continued to fight Knox for nearly a minute. (*Id.*) As Sgt. Reed was preparing to physically apprehend Wesley, he observed the red light from Officer Rowland's Taser. (Incident Report 12/20/21 at 7.) Officer Rowland sternly ordered Wesley to get on the ground, and when Wesley saw the Taser, he finally complied. (Rowland Body Cam 02:45.)

Sgt. Reed then promptly ordered Knox, whose bite had slipped off the meat of Wesley's arm and onto the sleeve of his sweatshirt, repeatedly and sternly to release: "Aus! Nein!" (*Id.*) In less than twenty seconds Knox complied. (*Id.*) Officer Rowland put away his un-deployed Taser and grabbed hold of Wesley's left arm and attempted to put it behind his back. (*Id.* 03:15.) Around that time, Officer Bryant arrived on the scene and relieved the injured Officer Rowland. (*Id.*)

Officers on scene promptly called for EMS to respond to their location to examine Wesley's right forearm, which had suffered a deep laceration. (Incident Report 12/20/21 at 7.) He was promptly transported to the hospital for treatment. (*Id.*)  Officer Rowland was also transported to the hospital for his leg injury. (*Id.*) Due to Wesley's actions, Sgt. Reed obtained criminal warrants for obstructing justice by fleeing from a law enforcement officer and for maliciously causing bodily injury to Knox, and Officer Bryant obtained a criminal warrant for violation of a protective order. (*Id.*; Arrest Warrants 12/20/21[15].)

<u>PROCEDURAL POSTURE</u>

Wesley brings this action pursuant to 42 U.S.C. § 1983, as well as Virginia common law. (Complaint, ECF No. 1.) He claims Sgt. Reed violated his Fourth and Fourteenth Amendment

---

[15] The arrest warrants obtained against Wesley for the December 20, 2021 incident are attached hereto as <u>Exhibit 13</u>.

rights by (i) using excessive force in deploying a K-9 unit while apprehending Wesley for a misdemeanor warrant (Counts I and II), and (ii) maliciously prosecuting Wesley for felony assault and battery against a law enforcement officer following the incident on March 11, 2021 (Count III).   He further claims Sgt. Reed committed the state law torts of: (i) intentional infliction of emotional distress ("IIED") (Counts XII and XIII), (ii) civil assault and battery (Counts XIV and XV), and (iii) gross, willful, wanton and reckless negligence (Counts XVI and XVII).   Wesley seeks judgment against Sgt. Reed in the amount of ten million dollars ($10,000,000.00), as well as punitive damages from Sgt. Reed in such amount as proven at trial, costs and expenses (including reasonable attorney's fees), and injunctive relief.

In its Order entered June 13, 2025, this Court granted Sgt. Reed's motion to dismiss Counts XII and XIII for IIED.

ARGUMENTS

**I.    Standard of Review**

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Establishing the parameters for consideration of a motion for summary judgment, the Supreme Court has stated that:

> The judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  The mere existence of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.  The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find a preponderance of the evidence that the plaintiff is entitled to a verdict.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). To withstand a motion for summary judgment, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l., Inc.*, 916 F.2d 924, 930 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249-50).

## II.    Sgt. Reed is entitled to summary judgment on the excessive force claims because his uses of force against Wesley were objectively reasonable under the circumstances.

"All claims that law enforcement officials have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 389 (1989). The test set forth in *Graham* examines whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force. *See Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001). An officer's observations are highly relevant, but his subjective beliefs are not. *Bostic v. Rodriguez*, 667 F. Supp. 2d 591, 607 (E.D.N.C. 2009).

*Graham* directs a court evaluating an excessive force claim to consider (1) the severity of the crime at issue, (2) whether the suspect poses a threat to the safety of the officers or others, and (3) whether the suspect is resisting arrest or attempting to flee arrest. *E.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018) (citing *Graham*, 490 U.S. at 397); *Bellotte v. Edwards*, 629 F.3d 415, 425 (4th Cir. 2011). The test considers whether the totality of the circumstances justifies the force used during the seizure. *Jones v. Buchanan*, 325 F.3d 520, 527-28 (4th Cir. 2003). A court must also consider that officers often make "split second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397; *Jones*, 325 F.3d at 527. Importantly, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the

Fourth Amendment." *Graham*, 490 U.S. 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). This holds true even if police could "have handled the situation in a kinder and gentler manner." *Nadelin v. Martin*, 1998 U.S. App. LEXIS 29516, at *11 (4th Cir. Nov. 19, 1998).

### A.  The March 11, 2021 incident

With respect to this incident, Wesley claims Sgt. Reed used excessive force by deploying K-9 Knox against him. However, application of the *Graham* factors to Sgt. Reed's use of force during this incident weighs heavily in his favor.

The outstanding warrant for Wesley was domestic assault and battery, a misdemeanor. At first glance, it may seem that the first *Graham* factor weighs in Plaintiff's favor. *See M.Y.M. v. Chavis*, 582 F. Supp. 3d 323, 334 (E.D. Va. 2022) (noting that nothing about the commission of misdemeanors indicates a threat to officer safety). However, "this first *Graham* factor is intended as a proxy for determining whether 'an officer [had] any reason to believe that [the subject of a seizure] was a potentially dangerous individual.'" *Estate of Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 900 (4th Cir. 2016) (quoting *Smith v. Ray*, 781 F.3d 95, 102 (4th Cir. 2015)). Sgt. Reed had other reasons to believe Evans was dangerous and a threat to officer safety. Sgt. Reed not only had a prior encounter with Wesley in which he had been forced to go hands-on with him and had his fingers bitten and his genitals yanked by Wesley, but he was also aware of a prior incident where a fellow officer had to physically fight Wesley during an arrest. In other words, Wesley had a history of violently fighting police officers. Therefore, the first and second *Graham* factors weigh in Sgt. Reed's favor.

Regarding the third *Graham* factor—whether Wesley was resisting arrest or attempting to flee—there is no question from the body camera footage that when Sgt. Reed finally made the

decision to deploy K-9 Knox against Wesley, he did so because Wesley was actively resisting arrest. He was not only refusing to follow simple commands but was physically pulling away from the officers trying to restrain and handcuff him. Considering Wesley's history, his resistance was reasonably considered a threat to officer safety. *See Armstrong*, 810 F.3d at 901 ("Noncompliance with lawful orders justifies some use of force . . . the level of justified force varies based on the risks posed by the resistance."). It was reasonable for Sgt. Reed to use the K-9 in light of his personal knowledge that Wesley had in the past been violent and dangerous toward police officers, coupled with Wesley's noncompliant and belligerent behavior at the scene. *See Mickle v. Ahmed*, 444 F. Supp. 2d 601, 611 (D.S.C. 2006) ("[T]he use of police canines can (1) prevent officers from having to resort to deadly force and (2) protect the officers from being subjected to deadly force used against them by suspects attempting to avoid arrest.").

The security problem of a strong and highly resistant individual had become increasingly severe as Wesley refused to allow himself to be handcuffed and was wriggling and twisting out of the control of the officers, narrowly missing their faces with his elbow. Sgt. Reed had personal experience with Wesley and knew first-hand that he was a serious threat to officer safety, especially if he managed to get loose. And finally, Wesley was actively resisting arrest.

This was a volatile situation with a potentially dangerous individual. The circumstances were "tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396-97. In such circumstances, courts should "make allowances for on-the-scene decisions about the amount of force that is necessary, 'even if it may later seem unnecessary in the peace of a judge's chambers[.]'" *Maney v. Garrison*, 681 F. App'x 210, 221 (4th Cir. 2017) (quoting *Graham*, 490 U.S. at 396-97). Sgt. Reed reasonably utilized K-9 Knox to ensure the safety of all officers involved.

As for any delay by K-9 Knox in releasing his hold on Wesley after he was down on the ground, this is not the sort of delay that rises to the level of excessive force under current law. *See Zuress v. City of Newark*, 815 F. App'x 1, 7 (6th Cir. 2020) (finding an 11-second delay between the time the officer had another officer take his place securing the plaintiff, to when he started commanding the dog to release his bite, was reasonable); *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009) (finding a 5-10 second delay for the officer to call off the dog after the plaintiff was handcuffed was reasonable); *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009) (concluding it was reasonable for the defendant officer to wait on calling off the canine until the plaintiff was handcuffed and secured). Not only that, but Wesley was not yet secured in handcuffs when Sgt. Reed called off K-9 Knox, and Knox released almost immediately after Sgt. Reed ordered him to. Regardless, any delay by Knox in releasing his bite after receiving the order to release from Sgt. Reed is not a violation of Wesley's Fourth Amendment rights by Sgt. Reed. For a seizure to occur, an officer must terminate a person's freedom of movement "through means intentionally applied." *Brower v. Cty. of Inyo*, 489 U.S. 593, 597 (1989). While Sgt. Reed was working to get Knox to release his bite, any continued bite could not have been a "means intentionally applied." Sgt. Reed therefore cannot be liable under the Fourth Amendment for the time it took Knox to release his bite.

Wesley further argues Sgt. Reed is liable for excessive force because Sgt. Reed gave an order to Knox which resulted in Knox biting Wesley again after he was handcuffed. This allegation is flatly contradicted by the video evidence, which shows that Sgt. Reed called off Knox *before* both of Wesley's hands were in cuffs. Not only did he *not* order Knox to bite Wesley again, but he actively prevented Knox from biting Wesley again.

Accordingly, all three *Graham* factors, and the totality of the circumstances, weigh in favor of Sgt. Reed's use of force during the subject arrest. Therefore, the Court should grant summary judgment in favor of Sgt. Reed on Wesley's excessive force claim with regard to the March 11, 2021 incident.

### B.  The December 20, 2021 incident

Application of the *Graham* factors to Sgt. Reed's use of force during the December 20 incident also weighs heavily in his favor. Although Wesley was wanted on a nonviolent misdemeanor violation of a protective order, which would normally weigh in his favor in terms of the first *Graham* factor, the severity of the crime at issue is again merely "intended a proxy for determining whether 'an officer [had] any reason to believe that [the subject of a seizure] was a potentially dangerous individual.'" *Armstrong*, 810 F.3d at 900 (quoting *Smith v. Ray*, 781 F.3d 95, 102 (4th Cir. 2015)). Moreover, Sgt. Reed had plenty of reasons to believe that Wesley was a potentially dangerous individual. When Sgt. Reed witnessed Wesley climbing into the back of an unidentified driver's stopped vehicle, it was reasonable for him to believe that Wesley was a potential danger to said driver. The security problem of a strong and extremely violent individual had become increasingly severe as Wesley was attempting to enter an unknown citizen's vehicle. Sgt. Reed had personal experience with Wesley and knew first-hand that he was a serious threat not only to officer safety, but also citizen safety. Moreover, Wesley was actively resisting arrest by fleeing from the officers.

Sgt. Reed gave Wesley multiple clear warnings before deploying K-9 Knox that if he continued to run, "the dog" would bite him. And once Knox did bite, Sgt. Reed gave multiple orders to Wesley to get on the ground, which orders Wesley ignored.  Instead, he continued to fight Knox and punch him in the head repeatedly, no doubt exacerbating the severity of the bite.

Wesley further claims that Sgt. Reed unreasonably seized him when he allowed Knox to continue to bite Wesley "for several minutes." First, Wesley's allegation that Sgt. Reed allowed Knox to bite him "for several minutes" is flatly contradicted by the body cam footage. From the moment Wesley finally got on the ground to the moment Sgt. Reed began giving Knox the command to release was no more than 12 or 13 seconds. At that time Wesley had not even been fully hand-cuffed. This is not the kind of delay that rises to the level of an unreasonable seizure. *See Zuress*, 815 F. App'x at 7 (finding an 11-second delay between the time the officer had another officer take his place securing the plaintiff, to when he started commanding the canine to release his bite, was reasonable); *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009) (finding a 5-10 second delay for the officer to call off the canine after the plaintiff was handcuffed was reasonable); *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009) (concluding it was reasonable for the defendant officer to wait on calling off the canine until the plaintiff was handcuffed and secured).

Sgt. Reed began giving commands for Knox to release within 13 seconds of Wesley going to the ground, and before his free hand had even been cuffed by Officer Rowland. While it did take slightly over 20 seconds for Knox to fully release, he was off the meat of Wesley's arm and onto the sleeve after 5 seconds. Any delay in Knox releasing his bite after having received the order to release from Sgt. Reed is not a violation of Wesley's Fourth Amendment rights by Sgt. Reed. For a seizure to occur, an officer must terminate a person's freedom of movement "through means intentionally applied." *Brower v. Cty. of Inyo*, 489 U.S. 593, 597 (1989). While Sgt. Reed was working to get Knox to release his bite, the continued bite was not a "means intentionally applied." Sgt. Reed therefore cannot be liable under the Fourth Amendment for the time it took Knox to release his bite.

Accordingly, all three *Graham* factors, and the totality of the circumstances, weigh in favor of Sgt. Reed's use of force during the subject arrest. Therefore, the Court should grant summary judgment in favor of Sgt. Reed on Wesley's excessive force claim with regard to the December 20, 2021 incident as well.

**III.    Sgt. Reed is entitled to qualified immunity on the excessive force claims.**

Qualified immunity shields government officials from civil liability as long as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts use a two-pronged inquiry to resolve questions of qualified immunity. *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). The first asks whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation. *Id.* at 655-66. The second asks whether the right was clearly established at the time of the violation. *Id.* at 666. Courts have discretion to decide the order in which to decide these two questions. *Id.*

To the extent there is any question whether Sgt. Reed's use of force crossed constitutional boundaries, he is entitled to qualified immunity. Given the absence of authoritative case law, a reasonable officer in Sgt. Reed's position would not have known his decision to use Knox constituted excessive force. At worst, it was a legal gray area, to which qualified immunity applies. *See Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

"'Fourth Amendment jurisprudence has long recognized that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Dolgos*, 884 F.3d at 192 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The Fourth Circuit Court of Appeals has confirmed that officers are allowed to use proportionate force when a suspect resists lawful detention because deciding otherwise "would be inviting any

suspect who is unhappy about a [lawful arrest] to resist that [arrest] in the hopes that the officers will simply desist rather than risk liability." *Brown v. Gilmore*, 278 F.3d 362, 370 (4th Cir. 2002).

In an analogous case from the Sixth Circuit, *Zuress v. City of Newark*, police surveilled a known drug house looking for plaintiff's boyfriend, Grooms, who had an outstanding arrest warrant and was a person of interest in an armed robbery. 815 F. App'x 1, 2-3 (6th Cir. 2020). The canine-handling officer, Burris, received a tip that Grooms had arrived at the house, so Officer Burris and another officer, Officer Hunt, drove to it. *Id.* at 3. The officers saw Grooms' Jeep leave the residence, and the officers pulled it over. *Id.*

Once the Jeep stopped, Grooms fled. *Id.* Shortly thereafter, the remaining person in the Jeep drove away. *Id.* Another officer, Purtee, intercepted the Jeep in his cruiser. *Id.* Officers Burris and Hunt caught up, and pulled up behind Purtee. *Id.* Officer Purtee exited his vehicle and assumed a shooting stance. *Id.* Officer Purtee commanded the driver, plaintiff Zuress, to exit the vehicle. *Id.*

After three commands to exit, Zuress complied, but when she exited she was facing the officers. *Id.* Purtee ordered Zuress to turn around, but Zuress refused. *Id.* Purtee told Zuress to "turn away" five times before she initially complied, but she then turned back around to again face the officers. *Id.* Further, she disobeyed Officer Purtee's command to walk backwards towards him. *Id.* Instead, Zuress argued with Purtee, waved her hands around, and reached down towards her waistband, adjusting her shirt or pants. *Id.*

Officer Purtee warned Zuress he would deploy the canine if she did not comply. *Id.* One or two seconds after Purtee gave that warning, Officer Burris released his canine partner, Ike. At the same time, Officer Burris approached Zuress. *Id.* At about the time Burris made physical

contact with Zuress, canine Ike bit Zuress' arm and held his bite. *Id.* Officer Burris, Zuress, and Ike all fell to the ground, at which point other officers advanced. *Id.* Once the Jeep was confirmed to be clear of other occupants, another officer took Burris' place on top of Zuress to secure her while Burris moved to get Ike to release his bite. *Id.* Officer Burris struggled with Ike for 24 seconds before Ike released his bite. *Id.*

On these facts, Zuress claimed Officer Burris used excessive force in violation of the Fourth Amendment when he deployed the police canine and allowed the canine to continue to bite her after she had been subdued. *Id.* at 4. The Sixth Circuit panel, guided by the *Graham* factors, held Officer Burris' actions did not violate Zuress' Fourth Amendment rights. *Id.* at 7.

With respect to whether Zuress presented a threat to the officers, the panel noted the suspicious circumstances in which the officers encountered Zuress (traveling from a known drug house with a companion who fled, had an outstanding warrant, and was a person of interest in an armed robbery), Zuress was an "unknown quantity" and failed to follow commands, the officers did not know if she or others in the vehicle were armed, and, "perhaps most importantly," Zuress "was not complying with the officers' commands; she was arguing, waving her hands around, turning to face the officers, and even reached for her waistband where a weapon could have been." *Id.* at 5.

Regarding whether Zuress was resisting, the panel found Zuress' "repeated non-compliance—coupled with her arguing with the officers—put her conduct just over the line into the active-resistance category." *Id.* at 6. Only the severity-of-the-crime factor weighed in Zuress' favor (at most Zuress committed minor misdemeanors by driving away from the officers). *Id.* The panel found, however, that the paramount inquiry was whether the "totality of

the circumstances" justified the degree of force used. *Id.* Ultimately, the totality of the circumstances justified Officer Burris' use of the canine. *Id.* at 7.

Many of the circumstances in *Zuress* parallel those in the March 11, 2021 incident involving Wesley. The deputies encountered Wesley in a parked and idling vehicle. He was wanted for an outstanding warrant for assault and battery. While Wesley was not an "unknown quantity," he was known for having violently fought with officers in the past. Sgt. Reed did not know if he was armed, but he knew that he was dangerous. And, "perhaps most importantly," Wesley did not comply with the officers' commands. *See Armstrong*, 810 F.3d at 901 ("Noncompliance with lawful orders justifies some use of force . . . the level of justified force varies based on the risks posed by the resistance.") He argued, waved his arms, faced the officers when he was ordered to turn around and placed his hands on the vehicle, refused to comply with those orders, refused to be handcuffed, and was physically and verbally combative throughout.

To be sure, there are significant differences between *Zuress* and this case. In *Zuress*, the officers encountered the plaintiff during a criminal investigation; here, the officers were responding to a warrant call specifically for Wesley for a charge of assault and battery. Unlike in *Zuress*, the *Graham* severity-of-the-crime factor arguably weighs in Sgt. Reed's favor here. Regardless, this factor "is intended as a proxy" for determining whether the officer had reason to believe the subject of the seizure 'was a potentially dangerous individual.'" *Armstrong*, 810 F.3d at 900 (quoting *Smith v. Ray*, 781 F.3d 95, 102 (4th Cir. 2015)). Here, Sgt. Reed had reliable information—his own past experience—that Wesley was violent and dangerous toward police officers.

Another significant difference is that in *Zuress*, the handling officer struggled with his police canine for 24 seconds before he released his bite, whereas here Knox released quickly after Sgt. Reed ordered him to do so. Furthermore, Sgt. Reed warned Wesley twice that he would deploy Knox if Wesley did not follow commands, which was more warning than the officers gave in *Zuress*. *See Shockley v. Foster*, 2021 U.S. Dist. LEXIS 127382, at *18 (E.D. Va. July 7, 2021) ("use of a warning indicates the officers 'were trying to avoid unnecessary harm'"). Wesley had ample opportunity to avoid being bitten. He could have simply followed the officers' verbal commands to put his hands behind his back and allowed himself to be handcuffed. He repeatedly refused and resisted being handcuffed.

Finally, Sgt. Reed escalated his force from verbal commands when it was clear Wesley would not voluntarily comply, and de-escalated force when Wesley was secured. *See Unus v. Kane*, 565 F.3d 103, 120-21 (4th Cir. 2009) (finding the officers appropriately reassessed the need for force as the situation progressed). This was a volatile situation with a large, strong, and potentially dangerous individual. The circumstances were "tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396-97. In such circumstances, courts should "make allowances for on-the-scene decisions about the amount of force that is necessary, 'even if it may later seem unnecessary in the peace of a judge's chambers[.]'" *Maney v. Garrison*, 681 F. App'x 210, 221 (4th Cir. 2017) (quoting *Graham*, 490 U.S. at 396-97).

No reasonable officer in Sgt. Reed's position would have known he would be violating Wesley's Fourth Amendment rights by utilizing a K-9 to effect his arrest when he was actively resisting and/or fleeing and was known to be a violent and dangerous individual. Accordingly, Sgt. Reed is entitled to qualified immunity on the excessive force claims.

**IV.    Sgt. Reed is entitled to qualified immunity on the malicious prosecution claim.**

In order to succeed on a 42 U.S.C. § 1983 malicious prosecution claim, a plaintiff must prove that the officer "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (citing *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012)). A plaintiff cannot prevail if there was probable cause for his arrest. *Lucas v. Shively*, 31 F. Supp. 3d 800, 811 (W.D. Va. 2014).

As an initial matter, Wesley's malicious prosecution claim fails because there is evidence on the record that the criminal proceedings against him for assault and battery against a law enforcement officer (Sgt. Reed) were not necessarily terminated in his favor. Criminal proceedings have terminated in the plaintiff's favor when the "criminal case against the plaintiff has been disposed of in a way that indicates the plaintiff's innocence." *Snider v. Seung Lee*, 584 F.3d 193, 202 (4th Cir. 2009).  When charges are dismissed at the prosecution's request—or by *nolle prosequi*—malicious prosecution plaintiffs have the burden of proving that the *nolle prosequi* disposition was entered under circumstances which imply or are consistent with innocence of the accused."  *Nicholas v. Wal-Mart Stores, Inc.*, 33 F. App'x 61, 65 (4th Cir. 2002) (citing *Swick v. Liautaud*, 169 Ill. 2d 504, 662 N.E.2d 1238, 1243, 215 Ill. Dec. 98 (Ill.1996)). Wesley's charges were dismissed by the prosecution's motion for *nolle prosequi*,[16] and there has been no showing by Plaintiff that this dismissal of his charge was entered under circumstances which imply his innocence.

---

[16] *See* final paragraph of page 1 of the Order of the Circuit Court for the City of Lynchburg entered December 21, 2022, attached hereto as <u>Exhibit 14</u> ("Thereupon, the Commonwealth's Attorney, with the consent of the Court, says that he will not further prosecute the defendant upon the charge of assault & battery against law enforcement officer.").

Furthermore, as discussed above, the uncontroverted facts on the record establish that there was at least a reasonable basis for Sgt. Reed to believe that, due to Wesley's active resistance resulting in Wesley elbowing Sgt. Reed in the top of his arm, probable cause existed to charge Wesley for assault on a law enforcement officer. Accordingly, Sgt. Reed is entitled to qualified immunity. *See Sevigny v. Dicksey*, 846 F.2d 953, 956 (4th Cir. 1988).

**V.    Sgt. Reed is entitled to summary judgment on Wesley's state law claims.**

Wesley' assault and battery claims rise and fall with his Fourth Amendment excessive force claims. *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994). For the reasons discussed above, Sgt. Reed's use of force was reasonable under the circumstances and did not violate Wesley's Fourth Amendment rights. In any event, he is entitled to qualified immunity. Therefore, Wesley's assault and battery claims fail as a matter of law. *See Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009) ("A legal justification for the act being complained of will defeat an assault or battery claim. Importantly, Virginia recognizes that police officers are legally justified in using reasonable force to execute their lawful duties.").

Wesley's gross negligence claims similarly fail. A police officer enjoys "special protection" from tort liability when performing his duties in a lawful manner. *Bromwell v. Pankoke*, 2018 U.S. Dist. LEXIS 125076, at *18 (E.D. Va. July 25, 2018). "[I]n making an arrest under lawful authority, a police officer is within reasonable limits the judge of the force necessary under the circumstances, and he cannot be found guilty of any wrong, unless he arbitrarily abuses the power conferred upon him." *Parker v. McCoy*, 212 Va. 808, 813 (1972) (internal quotations and citations omitted); *see Njang v. Montgomery County*, 279 F. App'x 209, 216 (4th Cir. 2008) ("the jurisprudence governing Fourth Amendment excessive force actions also controls a party's actions for battery and gross negligence").

Here, Sgt. Reed neither acted "arbitrarily," nor did he act with a "complete neglect of the safety of another." *Frazier v. City of Norfolk*, 234 Va. 388, 393 (1987). His actions would not "shock fair-minded" individuals. *Griffin v. Shively*, 227 Va. 317, 320 (1984). Sgt. Reed acted with the specific goal of getting Wesley to the ground so officers could safely arrest him. Sgt. Reed ceased force when Wesley was subdued.

Additionally, Sgt. Reed is entitled to state law good faith immunity with respect to Wesley's tort claims. Virginia courts recognize immunity in tort for alleged unlawful actions taken by police officers if the officers acted under a mistake of law, in good faith, and with a reasonable belief in the validity of their actions. *See De Chene v. Smallwood*, 226 Va. 475, 479-80 (1984). As detailed above, Sgt. Reed's use of force was reasonable under the circumstances according to the existing case law. Therefore, Sgt. Reed is entitled to immunity under federal and state law.

<u>CONCLUSION</u>

For the foregoing reasons, Defendant Sergeant Seth Reed respectfully requests that the Court grant his motion for summary judgment and dismiss the Plaintiff's claims against him with prejudice.

SERGEANT SETH REED

By <u>/s/ John R. Fitzgerald</u>
Jim H. Guynn, Jr., Esq. (VSB # 22299)
John R. Fitzgerald, Esq. (VSB # 98921)
GUYNN WADDELL, P.C.
415 S. College Avenue
Salem, Virginia 24153
Phone: 540-387-2320
Fax:    540-389-2350
Email: jimg@guynnwaddell.com
           johnf@guynnwaddell.com
*Counsel for Defendants*

24

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of February, 2026, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

M. Paul Valois                          Steven D. McFadgen, Sr.
James River Legal Associates            McFadgen Law, PLC
7601 Timberlake Road                    3521 Campbell Avenue
Lynchburg, VA 24502                     Lynchburg, VA 24501
Phone: (434) 845-4529                   Phone: (434) 385-4579
Fax: (434) 845-8536                     FAX: (888) 873-1048
Email: mvalois@vbclegal.com             Email: muchmorelaw@gmail.com
*Counsel for Plaintiff*                 *Counsel for Plaintiff*

                                  /s/ John R. Fitzgerald
                                  Jim H. Guynn, Jr. (VSB #22299)
                                  John R. Fitzgerald (VSB #98921)
                                  GUYNN WADDELL, P.C.
                                  415 S. College Avenue
                                  Salem, Virginia 24153
                                  Phone: 540-387-2320
                                  Fax:    540-389-2350
                                  Email: jimg@guynnwaddell.com
                                         johnf@guynnwaddell.com
                                  *Counsel for Defendants*