1          IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF VIRGINIA
2               LYNCHBURG DIVISION
      ********************************************************
3   CALVIN WESLEY,

4       Plaintiff,

5   v.                   CASE NO. 6:23-cv-00012

6   CITY OF LYNCHBURG, et al.,

7       Defendants.

8      ********************************************************

9       VIDEORECORDED DEPOSITION OF SETH REED

10            November 6, 2023

11          10:00 a.m. - 3:12 p.m.

12           Lynchburg, Virginia

13

14

15            EVANS & COMPANY
             P.O. Box 11822
16        Lynchburg, VA  24506
            (434)239-2552
17

18

19

20

21

22

23

24

25   REPORTED BY:  Kimberly A. Henderson, RPR

```
 1        Videorecorded deposition of SETH REED, taken

 2   and transcribed on behalf of the Plaintiff,

 3   pursuant to notice and/or agreement to take

 4   depositions; by and before Kimberly A. Henderson, a

 5   Registered Professional Reporter and Notary Public

 6   in and for the Commonwealth of Virginia at Large;

 7   commencing at 10:00 a.m., November 6, 2023, at the

 8   Office of the Lynchburg City Attorney, 900 Church

 9   Street, 3rd Floor, Lynchburg, Virginia.

10   APPEARANCES OF COUNSEL:

11

12        JAMES RIVER LEGAL ASSOCIATES
          7601 Timberlake Road
13        Lynchburg, Virginia  24502
          434.845.4529
14        kthomas@vbclegal.com
     BY:  PAUL VALOIS, ESQUIRE
15             Counsel for the Plaintiff

16        MCFADGEN LAW PLC
          3831 Old Forest Road, Suite 6
17        Lynchburg, Virginia  24501
          434.385.4579
18        rebeccagibson@mcfadgenlaw.com
     BY:  STEVEN D. MCFADGEN, SR., ESQUIRE
19             Counsel for the Plaintiff

20        GUYNN, WADDELL, CARROLL & LOCKABY, P.C.
          415 S. College Avenue
21        Salem, Virginia  24153
          540.387.2320
22        jimg@guynnwaddell.com
     BY:  JIM H. GUYNN, JR., ESQUIRE
23             Counsel for the Defendants

24        Also Present:  Melissa Stephens, Videographer
                         Katie Thomas

25
```

Evans & Company

```
 1                    I N D E X

 2   WITNESS                                        PAGE

 3   SETH REED

 4      Examination by Mr. Valois                   6

 5

 6                    E X H I B I T S

 7
     Exhibit         3/11/2021 CAD Report           90
 8   Plaintiff's 10

 9   Exhibit         IBR Report                     93
     Plaintiff's 6
10
     Exhibit         LPD 3/11/21 Use of Force Report  99
11   Plaintiff's  7

12   Exhibit V-1     Video Recording                159

13   Exhibit         IBR                            164
     Plaintiff's 8
14
     Exhibit         12/20/21 Use of Force Report   167
15   Plaintiff's 9

16   Exhibit         Written Directive - Use of K-9  171
     Plaintiff's 2   Teams
17
     Exhibit         Written Directive Use of Force  176
18   Plaintiff's 1

19   Exhibit         12/20/21 Screenshot from Officer  185
     Plaintiff's 3   John Person's Body Worn Camera
20
     Exhibit         12/21/20 Video from Officer John  187
21   Plaintiff's     Persons' Body Camera
     V-4
22
     Exhibit         3/11/21 Dash Cam of Lieutenant  190
23   Plaintiff's     Smith
     V-5
24
     Exhibit         Video Clip From 12/20/21       194
25   Plaintiff's
     V-6
```

**Evans & Company**

| | | |
|---|---|---|
| Exhibit Plaintiff's V-7 | Video Clip From 12/20/21 | 198 |
| Exhibit Plaintiff's 4 | 3/10/21 CAD Report | 213 |
| Exhibit Plaintiff's V-8 | Video Clip | 224 |
| Exhibit Plaintiff's AUD-1 | Audio Recording of Trial | 240 |
| Exhibit Plaintiff's 5 | 5/30/21 CAD Report | 240 |
| Exhibit Plaintiff's 11 | 12/20/21 CAD Report | 243 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

 1   (10:00 a.m., November 6, 2023)

 2

 3               MR. VALOIS:  Good morning.  My name

 4   is Melissa Stephens, I'm the videographer.  The

 5   court reporter is Kim Henderson.  We're here today

 6   on behalf of Evans & Company Reporting.  Today's

 7   date is November 6, 2023, and the time is 10 a.m.

 8               This is the videorecorded deposition

 9   of Seth Reed, taken in the matter of Calvin Wesley

10   versus the City of Lynchburg, et al. Case Number

11   6:23-cv-00012.  This is for the United States

12   District Court for the Western District of

13   Virginia, Lynchburg Division.  This deposition is

14   being held at the law office of the Lynchburg City

15   Attorney at 900 Court Street, Third Floor, in

16   Lynchburg, Virginia.

17               Counsel, please introduce yourselves

18   for the record, after which our court reporter will

19   swear in the witness.

20               MR. VALOIS:  Paul Valois for the

21   plaintiff.

22               MR. GUYNN:  I'm Jim Guynn, I

23   represent the defendant.

24

25

```
 1                      SETH REED
 2           was sworn and testified as follows:
 3                  E X A M I N A T I O N
 4  BY MR. VALOIS:
 5           Q.   Could you identify yourself, sir?
 6           A.   My name is Seth Reed.
 7           Q.   What's your middle name?
 8           A.   I legally don't have one.  It was
 9  added after, but it's Colby.  But legally my name
10  is Seth Reed.
11           Q.   Okay.  And what's your current
12  address?
13           A.   3678 Long Island Road, Gladys,
14  Virginia 24554.
15           Q.   Are you married?
16           A.   Yes.
17           Q.   Do you have any adult children?
18           A.   No.
19           Q.   Do you have any adult relatives who
20  live in the Lynchburg Division of the Western
21  District of Virginia?
22           A.   Like family members?
23           Q.   Yes.
24           A.   Mother, father.
25           Q.   What are their names and where do
```

1  they live?

2          A.    Kenneth Roland Reed.  He lives at

3  1031 Wren Lane, Lynchburg, Virginia 24503.  My

4  mother, Diane Reed, same address, 1031 Wren Lane,

5  Lynchburg, Virginia 24503.  My sister, Amber

6  Johnson.  I'm not sure what her address is.  She

7  lives right down the street from my parents, off of

8  Wren Lane.  My other sister, Helene Vance.  She

9  lives in Lake Forest.  I'm not sure what her house

10  number is, she lives on Cuddington Lane.

11          Q.    All right.  Are you married?

12          A.    Yes.

13          Q.    Does your wife live in the Western

14  District?

15          A.    Yes.

16          Q.    What's her name?

17          A.    Cari Reed.

18          Q.    Okay.  And the reason I'm asking this

19  is I want to make sure none of these people end up

20  on a jury.

21          A.    Right.

22          Q.    That's why I'm asking.  I don't

23  really have that much of a personal interest in

24  your family.

25          A.    Yeah.

1          Q.    All right.  So have you ever given a
2    deposition before?
3          A.    I have not.
4          Q.    Okay.  I got -- in that case, we
5    better go over some preliminary stuff.
6                You understand a deposition is sworn
7    testimony?
8          A.    Yes, sir.
9          Q.    Just like court?
10         A.    Yes.
11         Q.    That you're under oath and subject to
12   perjury?
13         A.    Yes.
14         Q.    All right.  We have a court reporter
15   and a videographer.  To make it easier on the court
16   reporter, I'll try not to talk over you.  If you
17   could, try and let me finish my questions before
18   you start answering.
19         A.    Yes, sir.
20         Q.    It's harder to do than to say, but
21   I'm going to give it a shot.
22         A.    Okay.
23         Q.    We'll be taking breaks from time to
24   time.  I'm going to need a break in about an hour
25   and a half to move my car to some other location.

```
 1              A.    Okay.

 2              Q.    Because I couldn't find a spot.  If

 3   you need a break, let me know and we'll make that

 4   happen.

 5              A.    Yes, sir.

 6              Q.    All right.  You're going to hear

 7   objections from time to time.  Unless you're

 8   instructed not to answer by your counsel, you can

 9   answer notwithstanding the objection.

10              A.    Okay.

11              Q.    Unlike court, there's not going to be

12   a judge here to make a ruling on the objection.  So

13   you can go ahead and answer unless your attorney

14   instructs you not to answer.

15              A.    Okay.

16              Q.    What have you done to prepare for

17   this deposition?

18              A.    I looked over reports, and I watched

19   body camera footage, read policy.

20              Q.    Have you talked about your deposition

21   with anybody other than your counsel?

22              A.    No.  I was instructed by him not to.

23              Q.    Wise advice.

24                    Have you -- is there anything that

25   would render you unable to testify?
```

1          A.    No, sir.

2          Q.    You're not under the influence of any

3    drugs, or prescription drugs, or other drugs that

4    would impact your ability to give fair testimony?

5          A.    No.

6          Q.    Do you have any questions about the

7    deposition before we move forward with the

8    deposition?

9          A.    I don't believe so.

10         Q.    Can you tell us a little -- we're

11   going to get into your background for a little bit.

12              Can you tell us about your education?

13         A.    I was homeschooled through eighth

14   grade.  I transferred, I started high school in New

15   York State.  My family ended up moving from New

16   York State down here to Virginia after 911 just

17   because of the housing market increasing.

18              I finished out high school at LCA,

19   Liberty Christian Academy.  So I started like my

20   second semester, freshman year, graduated from LCA,

21   then went on to attend Liberty.  I got my

22   bachelor's degree, criminal justice, at Liberty

23   University.

24         Q.    Bachelor in science or bachelor in

25   arts?

1          A.    Bachelor in science.

2          Q.    Criminal justice?

3          A.    Yes sir.

4          Q.    Go ahead.  I'm sorry.

5          A.    That's all I had as far as --

6          Q.    Where were you from in New York?

7          A.    I lived in Duchess County, which is
8    like about an hour out of the city.  Prior to that
9    I lived in the State of Maine.

10         Q.    All right.  And so let's talk
11   about -- and have you had any postgraduate
12   education?

13         A.    Just my bachelor's.  No, sir.

14         Q.    All right.  Let's talk about
15   experience.

16               Where have you worked?

17         A.    Primarily, prior to law enforcement,
18   I worked in food service with my father.  I worked
19   in food service for about 14 years.

20         Q.    Where was that?

21         A.    It started in New York State, and
22   then down here I worked at the Master's Inn, which
23   is a -- it was a camp down in Altavista.  I cooked
24   down there.  My father had a catering business as
25   well that's no longer running.  I helped him cater.

1  We catered parties and weddings.  We were

2  contracted through West Manor as well as the

3  Trivium out in Forest, so we did all of their

4  special events and weddings.

5           And then we had a restaurant in

6  Forest off of 221 that I worked in the kitchen with

7  him there.  It was a bakery/cafe.  And then after

8  we were bought out by Runk & Pratt, I then went to

9  work for Runk & Pratt at Liberty Ridge on Candlers

10  Mountain Road.  I worked there, and then in 2015,

11  that's when I got hired with Virginia Beach Police

12  Department.

13           Q.   All right.  And what made you want to

14  become a police officer?

15           A.   I have a -- my aunt's -- it's kind of

16  like an uncle, he's not a real blood uncle.  He

17  worked in Boston in undercover narcotics.  So just

18  hearing his stories kind of pushed me in that

19  direction of going into law enforcement.

20           Q.   Okay.  And so you went to the academy

21  in Virginia Beach?

22           A.   Yes, sir.

23           Q.   Which academy did you --

24           A.   So they have their own academy.  I

25  was in Academy Class Number 59, which started in

1   January of 2015 and went through July, is when I

2   graduated the academy in 2015.  So they have their

3   own in-house academy.  It's not like a central

4   academy like they run here.

5         Q.    Why did you choose Virginia Beach?

6         A.    I was -- I had a professor at

7   Liberty, his name was Joel Cox.  He ended up

8   retiring from Virginia Beach.  He talked very

9   highly of it.

10         At the time I wanted to get on to

11   Lynchburg, Lynchburg was at max capacity as far as

12   officers when I initially applied back in 2013.  I

13   ended up getting hired, Virginia Beach was the

14   first department that hired me to put me through

15   the academy.

16         Q.    All right.  And how long were you

17   employed by Virginia Beach?

18         A.    I left there, I transferred here in

19   April of 2017, so two years and two months,

20   roughly, including the academy.

21         Q.    And what was your starting position

22   at Virginia Beach?

23         A.    I was just a police officer, patrol.

24         Q.    And what was your terminal position?

25         A.    That's what I left, I was just in

1  patrol.
2          Q.    All right.  In your time there, were
3  you ever reprimanded or disciplined?
4          A.    No, sir.
5          Q.    Were you ever investigated for any
6  uses of force in Virginia Beach?
7          A.    No, sir.
8          Q.    All right.  Were there any complaints
9  rendered about you in Virginia Beach?
10         A.    No.
11         Q.    All right.  And when you left
12  Virginia Beach, you left on good terms?
13         A.    Yes, sir.
14         Q.    And you left to come to Lynchburg?
15         A.    Correct.
16         Q.    Were you hired by Lynchburg before
17  you left Virginia Beach?
18         A.    Yes.
19         Q.    Who hired you in Lynchburg?
20         A.    I think Kevin Singleton was in
21  personnel and recruiting, and then I believe he
22  went back to the field, and then it was Kevin
23  Poindexter, who's no longer -- he's retired as
24  well.
25         Q.    And what was your initial position in

1  Lynchburg?

2           A.    I was a police officer, just came in

3  patrol.

4           Q.    All right.  Were you ever promoted in

5  Lynchburg?

6           A.    I'm still within the officer rank.

7  They have what's called, like they have a

8  probationary police officer for your first year,

9  and then you're technically a PO1, and then you get

10  PO2, and then PO3.  So I'm currently a PO3, which

11  is just under sergeant.

12           Q.    Have you ever been disciplined by

13  Lynchburg?

14           A.    We have a DOR system.  I haven't been

15  formally disciplined.  We have a DOR system.  If

16  they believe that you need to go over like a policy

17  or if you need to be refreshed on actual policy,

18  but I haven't been like verbally, or I haven't been

19  written up here.

20           Q.    Just a counseling?

21           A.    Yes, sir.

22           Q.    Was it a conduct, for conduct or

23  demeanor?

24           A.    It was for body camera.

25           Q.    Body camera?

1          A.   So the initial, it was probably a

2   couple of years ago, before we had -- we had in-car

3   cameras that we had to sync up our microphone to.

4   One case my microphone wasn't synced up.  Another

5   case, I was in the bathroom and forgot to turn my

6   body camera on.

7               So they did what's called a PTR,

8   Policy Training Review, pretty much stating that I

9   need to keep my body camera activated pretty much

10  all the time.

11         Q.   All right.  And is that the only

12  incident?

13         A.   Yes.

14         Q.   Have there been any complaints about

15  use of force against you?

16         A.   We were investigated, myself and

17  Officer Hendrix, back in whatever it was, I think

18  2018, when we were on the -- it was a Special

19  Investigations Response Teams, it's called the SIRT

20  team, or street crimes, whatever you want to refer

21  to it as.

22               A third party, not the actual

23  involved -- we initiated a traffic stop.  Suspect

24  didn't have a Fourth Amendment waiver, conducted a

25  search of him, then he started fighting with us.

1  We eventually took him into custody.  A third party

2  filed a use of force complaint on us, and then that

3  was unfounded.  The FBI investigated that, but we

4  never actually spoke to anybody in reference to

5  that.

6          Q.    Right.  It never went higher than a

7  referral to the agent?

8          A.    No, sir.

9          Q.    And the FBI declined to investigate?

10         A.    We never talked to them.  We were

11  just told it was unfounded.

12         Q.    Have you ever been fired from any

13  job?

14         A.    No, sir.

15         Q.    Have you ever been asked to resign

16  from any job?

17         A.    No, sir.

18         Q.    Never been suspended from any?

19         A.    No.

20         Q.    All right.  That's about it for

21  background stuff.  Let's start talking about Calvin

22  Wesley.

23         A.    Okay.

24         Q.    You -- when was your first

25  interaction with Calvin Wesley?

```
1              A.    It was 2017.

2              Q.    August 29th?

3              A.    I don't know the exact date.  The

4    year was 2017.

5              Q.    All right.  Describe what happened

6    with Calvin back then?

7              A.    We were investigating a motor vehicle

8    crash.  It was myself, Officer Collins, and then

9    another officer, Tigress Clements, I believe was

10   her name.  We investigated a three-car crash on

11   Fort Avenue.  The -- one of the involved parties

12   fled from the scene, Mr. Wesley, he was later

13   identified as.

14              And then we ended up, Officer Collins

15   and I were riding together in a vehicle, and then

16   we ended up observing him on Kemper Street, right

17   near Kemper and Park, that traffic light.  We

18   conducted -- we got out with him, called it out on

19   the radio, attempted to identify him.  He ended up

20   fleeing from us.  He fled down Fort Avenue.

21              There's an alleyway.  There's

22   a -- it's currently, like there's a dance studio.

23   It's kind of like where the road V's, there's a

24   dance studio, now there's a couple of businesses,

25   like more going towards like 7-Eleven.  He ran in
```

1  that alleyway.

2              Then there was a concrete wall at the

3  end of that alleyway.  He realized he had nowhere

4  to go.  He turned and faced me, and then that's

5  when I went hands-on with him.  At that point,

6  Officer Collins had not caught up to where we were.

7  We ended up fighting.  We went from the wall, like

8  he was initially trying to pull away from me.  We

9  ended up going to the ground.  Once when we were on

10  the ground, I could not get him in handcuffs at

11  all.

12              I ended up having him -- I was like

13  on my back, he was more so on my chest.  That's

14  when he -- the first time he grabbed my genitals.

15  He started pulling all my genitals at that point,

16  trying to get me, I guess to let --

17         Q.   By genitals do you mean your

18  testicles?

19         A.   My testicles, yes, sir.

20              I still did not let go of him at that

21  point, and then I felt a tugging at my taser.  He

22  had his hand like right around the handle of my

23  taser, trying to pull my taser out of the holster,

24  which I at that point yelled to Officer Collins,

25  who was with me at this point.  I instructed her,

```
 1   "He's trying to disarm me.  He's trying to pull my
 2   taser."  I don't remember exactly what I said.
 3                   She ended up deploying her taser on
 4   Mr. Wesley, which was not effective.  We ended up
 5   going hands-on with him again.  At some point
 6   during the scuffle, I don't remember exactly when,
 7   he ended up having my fingers, my left hand, inside
 8   of his mouth.  He was biting my fingers.  He ended
 9   up grabbing my genitals, my testicles again.
10                   And then we maintained control of him
11   until more officers arrived.  And it took multiple
12   officers before we could actually place him in
13   handcuffs.
14                   Q.   Did he break the skin on your
15   fingers?
16                   A.   Yes, sir.  I have scars on my
17   fingers.
18                   Q.   And did you -- you required medical
19   treatment?
20                   A.   Yes, sir.
21                   Q.   Was the other officer injured?
22                   A.   Yes.
23                   Q.   What's the other officer's name?
24                   A.   Jenna Collins.
25                   Q.   And he was arrested?
```

```
 1                A.   Yes, sir.

 2                Q.   So were you given leave for that?

 3                A.   I was not.

 4                Q.   Well, was that traumatic for you?

 5                A.   A little bit, yes, sir.

 6                Q.   Were you ever counseled for it?

 7                A.   I was not.

 8                Q.   It's kind of stuck with you?  You

 9    mentioned those incidents on body cam during both

10    of the more recent incidents; right?

11                A.   Yes, sir.

12                Q.   Well, that had to make you angry?

13                A.   What's that?

14                Q.   No man gets his testicles grabbed and

15    pulled without being angered; right?

16                A.   I wasn't very happy, no.

17                Q.   All right.  And it doesn't -- it had

18    to make you angry to get your fingers bit; right?

19                A.   Again, I don't like -- no one likes

20    getting injured.

21                Q.   Right.  Well, were you angry then?

22                A.   I don't recall exactly how I felt

23    back in 2017.

24                Q.   You still angry now?

25                A.   No.
```

```
 1                Q.    You didn't have any desire to
 2    retaliate?
 3                A.    No.
 4                Q.    On November 13th of 2018, there was
 5    another incident involving Brandon Clark?
 6                A.    Yes, sir.
 7                Q.    Did you know Brandon Clark?
 8                A.    Yes.
 9                Q.    Is he still in Appomattox?
10                A.    Yes, sir.
11                Q.    At the time he was an LPD officer;
12    right?
13                A.    Yes, sir.
14                Q.    Do you know why he left the force?
15                A.    He had family -- I don't exactly
16    know.  I knew it was family issues.  And then he
17    ended up moving to Texas, and then they moved back,
18    and then he got hired on with Appomattox.  But I
19    believe it was because of his family.
20                Q.    Right.  And he told you that Calvin
21    hit him in the face; is that right?
22                A.    I don't recall exactly what he told
23    me.
24                Q.    Do you remember telling other people
25    that Calvin hit him in the face?
```

Page 23

```
 1              A.    I know that they had physically
 2    fought.
 3              Q.    Specifically hitting in the face, do
 4    you -- that you had any information that on
 5    November 13th of 2018 that Calvin Wesley hit
 6    Brandon Clark in the face?
 7              A.    I know they physically fought, but I
 8    don't -- I can't say under oath that I told people
 9    that he got punched in the face.  I don't know
10    that.  I can't say what I said back then.  I can't
11    say that.
12              Q.    Well, let's break this into two
13    different --
14              A.    Okay.
15              Q.    -- let's break this into two
16    different parts.
17              First of all, do you have any
18    information that that happened, that he hit Brandon
19    Clark in the face?
20              A.    I know they got into a fight, yes,
21    sir.  I don't know --
22              Q.    Well, getting into a fight is a
23    different -- that's the answer to a different
24    question, whether they got into a fight.
25              A.    Okay.
```

1          Q.    The question, specific question, I
2    have is do you have any information that during any
3    fight, Calvin Wesley hit Brandon Clark in the face?
4          A.    I can't say that I was physically
5    told by Brandon Clark that he was punched in the
6    face by Calvin.
7          Q.    Were you told by anyone else that he
8    was punched in the face by Calvin Wesley?
9          A.    I know that I've been told by Officer
10   Godsie, because Officer Godsie was there, that they
11   physically fought.  But I cannot say under oath
12   whether or not he was -- I was told that he was
13   punched in the face.
14         Q.    By anyone?
15         A.    Correct.
16         Q.    All right.  Well, then why would you
17   tell other people that he was punched in the face?
18   Why would you tell your supervisors at the scene of
19   this incident that Calvin Wesley had punched
20   Brandon Clark in the face?
21         A.    I'm not -- I don't know.
22         Q.    Okay.  Now, Calvin was convicted of
23   assaulting you in 2017, and another officer.
24               Would that be the one you mentioned
25   that was with you?

```
 1              A.    Officer Collins, yes, sir.
 2              Q.    Okay.  He was convicted of both of
 3    those charges, and he did a year on those; right?
 4              A.    I don't know how much time he did.  I
 5    don't know how much time he served on those.
 6              Q.    But the charge against assaulting
 7    Brandon Clark was -- the prosecutors ended up
 8    dropping that charge.
 9                    Were you aware of that?
10              A.    I'm not aware of that.
11              Q.    All right.  Have you ever known
12    Calvin to be armed?
13              A.    No.
14              Q.    In fact, he has a felony record for
15    some theft crime in the 2000s.
16                    Are you aware of that?  You ever run
17    his record?
18              A.    I haven't.
19              Q.    Well, you're aware he's a felon?
20              A.    Yes.  I know he's a felon.
21              Q.    And in Virginia felons are not
22    allowed to --
23              A.    Possess firearms.
24              Q.    -- possess or transport a firearm; is
25    that correct?
```

```
 1              A.    Yes, sir.

 2              Q.    Okay.  He's never been armed during

 3  any of your previous encounters?

 4              A.    Correct.

 5              Q.    And you're not aware of any criminal

 6  weapons convictions that he's ever had?

 7              A.    I am not.

 8              Q.    Okay.  All right.  Let's see, where

 9  are we?  Let's move on to the incident on Grace

10  Street that occurred on March 11th, 2021.

11              A.    Okay.

12              Q.    That occurred at about 1:13 p.m.

13                    Does that sound right?

14              A.    Yes, sir.

15              Q.    The weather was clear?

16              A.    Correct.

17              Q.    All right.  How did you end up

18  responding there?

19              A.    I self-dispatched.  So the call was

20  dispatched, meaning so all of our -- most of our

21  radio traffic is dispatched over the air, so they

22  dispatched three officers to the warrant.

23  Certain -- so in our local system, Pistol, certain

24  individuals, they have alerts.

25                    So they have officer safety alerts,
```

1  send three, known to arrest, whatever, assault

2  on -- all the alerts in our system.  So they

3  dispatched three.

4                Typically when multiple units are

5  dispatched, I'll look up, I'll pull up the case to

6  see who the involved individual was.  And then when

7  I observed that it was Mr. Wesley, then I

8  dispatched myself to the case and then met up with

9  the officers involved.

10              Q.   Okay.  Nobody asked you to respond?

11              A.   No.

12              Q.   And nobody asked you to bring a dog

13  with you?

14              A.   Correct.

15              Q.   I'm going to come back to the whole

16  K-9 part after we do the --

17              A.   Okay.

18              Q.   -- incident.

19                So the -- you -- why did you choose

20  to respond to that particular case?

21              A.   Because I have one tool on our shift

22  that nobody else has.  I'm a K-9 officer.

23              Q.   And why did you elect to bring the

24  K-9?  Why did you choose to respond with the K-9 to

25  the scene that day?

1          A.    For officer safety.

2          Q.    All right.  So when you came there,

3    you weren't expecting to use the dog for tracking

4    or anything?

5          A.    I don't know what I was anticipating

6    using the dog for.

7          Q.    Well, I'm asking you what you

8    anticipated using the dog for?

9          A.    I didn't anticipate using the dog.  I

10   just had the dog there in case we needed to utilize

11   the K-9.

12         Q.    All right.  Well, I'm sorry, maybe I

13   misunderstood, but when I asked you why you

14   responded there, you said because you were the only

15   one that had that resource?

16         A.    Correct.

17         Q.    So the why is because you had the

18   dog; right?

19         A.    Yes, because I'm a K-9 officer.

20         Q.    Right.  So why would you elect to

21   bring the dog there is my question?

22         A.    For --

23         Q.    Why did you feel the need to bring

24   the dog?

25         A.    For officer safety reasons.

```
 1                Q.    To use --

 2                A.    Because Mr. -- I'm sorry.

 3                Q.    Oh, go ahead.

 4                A.    Just due to Mr. Wesley having a

 5     history with fighting the police.

 6                Q.    So you brought the dog there in case

 7     you needed to use it against Mr. Wesley?

 8                A.    Brought the dog there in case

 9     Mr. Wesley decided to fight the police, yes, sir.

10                Q.    And then in that case, to use, to

11     deploy the dog?

12                A.    If he fought the officers, yes, sir.

13                Q.    Well, let me go back.

14                      Your dog has multiple capabilities;

15     right?

16                A.    Yes, sir.

17                Q.    It has drug -- it does tracking,

18     certified in tracking?

19                A.    Yes, sir.

20                Q.    It's certified in drug detection?

21                A.    Yes, sir.

22                Q.    Certified in anything else?

23                A.    Area searches, article searches,

24     building searches.  So he's a narcotics patrol dog.

25     He's dual purpose.
```

Page 30

```
 1              Q.    So my question to you is you weren't
 2  bringing him there for any of those purposes?
 3              A.    I was bringing him there for officer
 4  safety reason.
 5              Q.    Okay.  But to be clear, because I'm
 6  trying to make a record here; all right?  My
 7  question to you is you were not bringing him there
 8  for any drug detection purposes?
 9              A.    Correct.
10              Q.    You weren't bringing him there for
11  any search function?
12              A.    Correct.
13              Q.    And you weren't bringing him there to
14  try and track down a subject?
15              A.    Yes, sir, correct.
16              Q.    Correct?  Okay.
17              So you got there.  As you got there,
18  you parked your car and removed the dog
19  immediately?
20              A.    Yes, sir.
21              Q.    And took the dog with you; right?
22              A.    Yes.
23              Q.    And your dog's name is Knox; is that
24  right?
25              A.    Yes, sir.
```

```
 1              Q.    And so you took Knox -- you parked on
 2   a side street and then took Knox to Grace Street;
 3   is that right?
 4              A.    Yes, sir.
 5              Q.    At which point you saw Calvin getting
 6   into the passenger side of a truck?
 7              A.    Yes, sir.
 8              Q.    And that truck belonged to his
 9   landlady?
10              A.    Yes.
11              Q.    Okay.  And he said he was going with
12   her to do some sort of work?  Do you remember?
13              A.    I don't remember what he --
14              Q.    The reason, the warrant that was
15   outstanding was a misdemeanor warrant?
16              A.    Yes, sir.
17              Q.    Did you know what the warrant was for
18   before you went out there?
19              A.    Yes, sir.
20              Q.    Okay.  What was it for?
21              A.    It was an assault and battery
22   warrant.
23              Q.    A domestic misdemeanor assault and
24   battery warrant?
25              A.    Yes, sir.
```

1          Q.    You aware that that charge was later
2    dismissed?
3          A.    I was not.
4          Q.    Do you routinely self-dispatch --
5          A.    Yes, sir.
6          Q.    -- to cases?
7          A.    So the --
8          Q.    Go ahead.
9          A.    So primarily my role as a K-9 officer
10   is to respond to higher risk cases, so they
11   typically don't dispatch me to larceny calls.  They
12   typically don't dispatch me to a normal patrol
13   aspect, so they typically dispatch me to more hot
14   calls or more serious calls.
15              So I'm typically just always
16   reviewing the computer, listening to the radio, and
17   then I'll make the determination which calls that I
18   primarily respond to.
19         Q.    Okay.  So you decide whether or not
20   to respond?  You're not dispatched by Lyncomm?
21         A.    Correct.
22         Q.    All right.
23         A.    If there's no other available units
24   in the city, they'll primarily dispatch me as a
25   backup unit.

```
 1              Q.    And if not, then you just respond on

 2   your own.

 3              But how many, about how many times

 4   does this occur, that you self-dispatch in a month,

 5   on average?

 6              A.    I have no idea.

 7              Q.    When was the last time?

 8              A.    We work roughly 12 to 15 days a

 9   month.  It just depends on from days and nights

10   how many.  It just really varies between the call

11   volume.  I self-dispatch, I would say, multiple

12   times throughout a shift.

13              Q.    Several times a shift?

14              A.    Yes, sir.

15              Q.    Okay.  All right.  The scene on Grace

16   Street, it's in front of a house; right?

17              A.    Yes, sir.

18              Q.    Kind of across the street from the

19   Guggenheimer, in there; right?

20              A.    Yes.

21              Q.    That's a pretty busy road, Grace

22   Street; right?

23              A.    Yes.

24              Q.    And it's a lot of traffic.  And when

25   you got there and got Calvin out, the scene kind of
```

1  became pretty loud.

2              Would it be fair to characterize it

3  that way?

4          A.  Yes.

5          Q.  Okay.  Lots of yelling, cops yelling,

6  Calvin yelling?

7          A.  Yes.

8          Q.  Some neighbor, some guy standing on

9  the porch yelling?

10         A.  Yeah.  That was behind us.

11         Q.  Yeah.  And the lady in the truck, the

12 landlady; right?  A lot going on?

13         A.  Yes.

14         Q.  A lot to distract you?

15         A.  Yes, there was a lot going on.

16         Q.  All right.

17             MR. VALOIS:  Katie, would you mind

18 cueing up the video?  This would be

19 exhibit -- Madam Court Reporter and Mr. Guynn, I

20 just want to explain the numbering system I'm

21 using.  All right.  I've numbered the paper

22 exhibits just Plaintiff's 1 through, I think, 11.

23 All right.  I've numbered, there's one audio

24 exhibit.  I've labeled it Exhibit AUD-1.  Then

25 there are several video exhibits.  I've labeled

1   them V-1, V-2, and that.

2              Katie, bring up, let's start with the

3   Exhibit V-1.  Katie, hit pause on that.

4              THE WITNESS:  Yes, sir.

5   BY MR. VALOIS:

6         Q.   Can you see that all right?

7         A.   Yes.

8              MR. VALOIS:  All right.  How are we

9   doing now?  Now, 30 seconds into this, just so

10  everyone knows, there's a 30-second delay for body

11  cam videos.  The audio is going to come on, and it

12  can be pretty loud.  I don't know what the volume

13  setting is right now, but I don't want to scare

14  anybody.

15             How about just for a test, Katie, why

16  don't you slide the timer over to like 31, 32

17  seconds and just hit play real briefly and let's

18  see how the audio is.

19             (Video playing.)

20             Are you capturing that?

21             THE VIDEOGRAPHER:  Do you want me to

22  swing and get that, or do you want him?

23             MR. VALOIS:  You know, I'm going to

24  have it as an exhibit.  I'll just let him work with

25  it.  Can you hear it, or is it being recorded

```
 1   audio-wise?
 2                  THE VIDEOGRAPHER:  I can hear it, yes
 3   sir.
 4                  MR. VALOIS:  All right.  Very good.
 5   Let's start from the beginning, please, Katie.  All
 6   right.  Katie, when I say pause, can you hit the
 7   spacebar?  All right.
 8                  (Video playing.)
 9                  MR. VALOIS:  Let's pause it right
10   there.
11   BY MR. VALOIS:
12        Q.   Now, Officer Reed, you've just
13   responded and that's your dog, Knox; is that
14   correct?
15        A.   Yes sir.
16        Q.   And you're on the side street heading
17   towards Grace Street?
18        A.   Yes sir.
19        Q.   And that's the stop sign straight
20   ahead in view here on the left; is that right?
21        A.   Yes sir.
22        Q.   And across the street, I said it was
23   the Guggenheimer, but it appears to actually be the
24   fire station?
25        A.   Yes.
```

1         Q.   Is that right, that's the fire

2  station?

3         A.   Yes sir.

4         Q.   At that corner?  All right.

5             MR. VALOIS:  Go ahead, Katie.

6             (Video playing.)

7             MR. VALOIS:  Pause right there.

8  BY MR. VALOIS:

9         Q.   You're giving him a command in

10  German, it appears.

11             What was the command that you just

12  gave the dog?

13         A.   It's fuss, so it's heel.

14         Q.   Heel?

15         A.   Yes sir.

16         Q.   And we just saw some other officers

17  coming up from behind you there.

18             Those are Lynchburg police officers?

19         A.   Yes sir.

20         Q.   Did you recognize those officers?

21         A.   Yes.

22         Q.   Who are those officers?

23         A.   It's Officer Thomas Hall to

24  my -- well, he'd be out of the camera frame, and

25  then it's Officer Collin Bryant.

```
 1              Q.   Okay.  And they're both headed in the
 2   same direction to serve this warrant?
 3              A.   Yes sir.
 4              Q.   They were dispatched, I take it?
 5              A.   I don't know exactly which officers
 6   were dispatched.
 7              Q.   All right.
 8              MR. VALOIS:  Go ahead, Katie.
 9              (Video playing.)
10              MR. VALOIS:  Pause it, Katie, please.
11   BY MR. VALOIS:
12              Q.   Now, that's the pickup truck with the
13   passenger door open, and you started running;
14   right?
15              A.   Yes, sir.
16              Q.   And let me back up before -- let
17   me --
18              MR. VALOIS:  Wait a second, Katie.
19   BY MR. VALOIS:
20              Q.   This is your body cam --
21              A.   Yes.
22              Q.   -- of the incident; is that correct?
23   Do you recognize it to be that?
24              A.   Yes.
25              Q.   Okay.  I should have asked that in
```

```
 1 | the beginning.
 2 |               You see the door open on that pickup
 3 | truck; did you just witness Calvin Wesley get into
 4 | that pickup truck?
 5 |         A.   Yes, sir.
 6 |         Q.   All right.
 7 |               MR. VALOIS:  Go ahead, Katie.
 8 |               (Video playing.)
 9 |               MR. VALOIS:  Pause it.
10 | BY MR. VALOIS:
11 |         Q.   Okay.  You can see at the top, the
12 | time is at the top in military time.  It says
13 | 13:13:27.
14 |               You see that?
15 |         A.   Yes, sir.
16 |         Q.   Okay.  You've arrived at the truck,
17 | and at this point you're going to ask Calvin to get
18 | out of the car, out of the truck; right?
19 |         A.   Yes, sir.
20 |               MR. VALOIS:  All right.  Katie, pause
21 | it, and then pause it at 106, see the timeline 106
22 | at the bottom down there?
23 |               (Video playing.)
24 | BY MR. VALOIS:
25 |         Q.   All right.  Within -- okay.
```

Page 40

```
 1              He's stepping out of the car, as
 2  instructed, within 2-and-a-half seconds, would you
 3  agree to that?
 4              A.   Yes, sir.
 5              MR. VALOIS:  Okay.  Katie, we're
 6  going to pause it again, and we're going to go
 7  ahead to 110.
 8              (Video playing.)
 9              MR. VALOIS:  All right.  Actually,
10  bring it up -- bring it from 105 and let's run it
11  to about 113.
12  BY MR. VALOIS:
13              Q.   There's a lot going on in this, and I
14  want you -- can you listen carefully to this when
15  she plays it, because there are other officers
16  giving commands, you're giving commands?
17              A.   Yes, sir.
18              Q.   And Calvin's talking.
19              (Video playing.)
20              MR. VALOIS:  Pause.
21  BY MR. VALOIS:
22              Q.   Okay.  Can we agree that within that
23  5-second span there, that he's being given
24  different commands by different officers?
25              A.   Yes, sir.
```

```
1              Q.   All right.  Somebody's telling him
2   put his hands on the truck.
3                   Was that you?
4              A.   That was Officer Hall, I believe, is
5   telling him that.
6              Q.   Somebody's telling him put his hands
7   behind his back?
8              A.   Yes, sir, that was me.  I said, "Put
9   your hands behind your back."
10             Q.   And then another officer said, "Put
11  your hands on the truck"; right?
12             A.   There was multiple commands given.
13             Q.   All right.
14                  MR. VALOIS:  All right.  Katie, let's
15  take it to, let's take it to 36, or 111.  I'm
16  sorry.  Hold on one second.  Take it from 111 to
17  115.
18                  (Video playing.)
19  BY MR. VALOIS:
20             Q.   Okay.  At 115 he's putting his hands
21  on the truck.
22                  You can see his right arm just went
23  on the top of the truck; right?
24             A.   Yes, sir.
25             Q.   Okay.  So within 2 seconds he's
```

Page 42

1  complying with the instruction to put his hands on

2  the truck; right?

3          A.   Yes.  He puts his hands on the -- or

4  one hand on the truck.

5          Q.   All right.  Officer already has his

6  left arm?

7          A.   Correct.

8          Q.   All right.

9          MR. VALOIS:  Go ahead and do it from

10  about -- Katie, slide it from about 112 to 118.

11          (Video playing.)

12  BY MR. VALOIS:

13          Q.   All right.  At 118 Calvin's pinned in

14  there.

15          Can we agree that he has two

16  uniformed, armed officers behind his back?

17          A.   Yes.

18          Q.   Can we agree that his front -- he

19  can't go anywhere, his front is pinned in by the

20  passenger door and the frame of the pickup truck?

21          A.   Correct.

22          Q.   All right.  One officer has his left

23  arm, and one officer has his right arm?

24          A.   If we go further, yes.  We can see

25  the officers have his arm.

1          Q.    Okay.  What arms do these officers

2   usually carry?

3          A.    What do you mean?

4          Q.    What weapons do officers carry with

5   them?

6          A.    We carry pepper spray.

7          Q.    Okay.

8          A.    Carry a taser, we carry a baton, and

9   then we carry a firearm.

10         Q.    All right.  All these officers

11  equipped with those weapons?

12         A.    Yes.

13         Q.    All right.

14              MR. VALOIS:  Katie, let's run it

15  from, run it from 116 to 133, please.

16              (Video playing.)

17  BY MR. VALOIS:

18         Q.    Okay.  At this particular instant we

19  can see his -- his right hand is behind his back,

20  and we can't see his left hand, but the officer

21  there in glass -- in the left obviously has control

22  of his left arm at this point; right?

23         A.    Yes.  He has, the officer on the

24  right has his right arm.

25         Q.    All right.

```
 1              A.   And then the officer on the left has
 2    his left arm.
 3                   MR. VALOIS:  All right.  Katie, let's
 4    run it from 130 to 135.
 5                   (Video playing.)
 6    BY MR. VALOIS:
 7              Q.   Okay.  Did you hear him say, "Hey,
 8    get the cuffs"?
 9              A.   Yes.
10              Q.   All right.  Well, does he not have
11    cuffs?
12              A.   I don't know.  He should have
13    handcuffs.
14              Q.   Okay.  But he's asking for handcuffs
15    at that point; right?
16              A.   Yeah.  He said, "Get the cuffs."
17                   MR. VALOIS:  Okay.  Now, Katie, let's
18    run it from 133 to 130 -- do it to 140.
19                   (Video playing.)
20    BY MR. VALOIS:
21              Q.   Okay.  So at this point the officer's
22    just asked for handcuffs, and you're warning him
23    that the dog is going to bite him; right?
24              A.   I advise him if he kept fighting.
25              Q.   Okay.  Let's talk about fighting.
```

1          What do you mean by fighting in this

2  context?

3          A.    Not complying with the officer's

4  commands.

5          Q.    So in your mind, fighting means?

6          A.    Active, it's active resistance.

7  Physically resisting against the officers, trying

8  to place handcuffs on him.

9          Q.    Right.  Physically trying to prevent

10  the officer from handcuffing him?

11          A.    Yes, sir.

12          Q.    All right.  As opposed to when you

13  say "fighting," you don't mean trying to inflict

14  injury on anyone?

15          A.    Correct, not like fistfighting.

16          Q.    Right.  Just noncompliance?

17          A.    Yes, sir.  Active resistance.

18          Q.    Active resistance and noncompliance

19  to a verbal command at this point?

20          A.    Yes, sir.

21          Q.    All right.  And he was not armed in

22  this incident.  And let me -- I'm going to have

23  to ask you the same question.  Let me go back to

24  one of the things I should have asked you about in

25  preliminary time, because I forgot to mention this.

```
 1                    This deposition may be used in court,

 2      may or may not.  It could be.  All right.  And for

 3      that reason, each question kind of has to stand on

 4      its own.  So I'm going to be repeating myself a lot

 5      with questions because I have to kind of ask them

 6      in a full context, unlike a trial.

 7               A.   Yes, sir.

 8               Q.   Do you understand that?

 9               A.   Yes, sir.

10               Q.   I'm not trying deliberately to be

11      irritating, and I don't want to be here any longer

12      than we have to be, but I have to make a complete

13      record.

14               A.   Yes, sir.

15               Q.   Okay.  All right.  So he's not armed

16      here; right?

17               A.   Correct.

18               Q.   He hadn't hit anyone?

19               A.   No, sir.

20               Q.   All right.  He's just not complying,

21      and yet you're threatening to use the dog; right?

22               A.   I'm giving him a K-9 warning.  I'm

23      not threatening him.

24               Q.   You said, "The dog will bite you."

25               A.   I said, "If you keep fighting."
```

1        Q.    And by fighting you mean
2    noncompliance?
3             A.    Yes, sir.  Active resistance.
4             Q.    Right.  So essentially your threat is
5    for him to comply with the officers or else the dog
6    will bite him?
7             A.    Yes, sir.  We want compliance.
8             Q.    Right.  But I understand what you
9    want, but my question is the nature of your
10   communication is to make it clear that if he
11   doesn't comply with verbal commands, you're going
12   to have the dog bite him?
13            A.    Yes, sir.
14            Q.    Okay.  All right.  He hadn't
15   threatened anyone at this point, had he?
16            A.    No, sir.
17            Q.    And it's not like he can go anywhere;
18   right?
19            A.    Correct.
20            Q.    How many officers are present at this
21   time?  It's you and those two.  Are there any other
22   officers there at this point?
23            A.    There are.  I don't know where
24   exactly they're at.
25            Q.    How many officers right around the

1  area total?  Do you remember?

2          A.    There was four officers.

3          Q.    All --

4          A.    I believe there's two additional

5  officers that are not hands-on at this point.

6          Q.    And these are all trained officers

7  and armed?

8          A.    Yes, sir.

9          Q.    And they've all been trained in

10 basically, essentially, combat training as part of

11 their academy training; correct?

12         A.    What are you referring to, like

13 combat?

14         Q.    I mean, that's the standard police --

15         A.    We don't receive combat training.

16         Q.    You get, you learned how to

17 physically handle yourself in --

18         A.    We learn basic hand-to-hand

19 techniques, control techniques, but we don't --

20         Q.    Haven't you particularly been, didn't

21 you particularly receive combat training?

22         A.    I received training outside of law

23 enforcement.

24         Q.    Isn't it in your police record, or am

25 I wrong, that you received combat training as part

1  of your police service record?  Am I wrong about

2  that?

3          A.    I don't understand what you're saying

4  as far as combat training.  When I think combat

5  training, I think of military training,

6  hand-to-hand combat, overseas fighting.

7          Q.    I don't want to speculate.  I'm not

8  going to ask you.  If I have to speculate about the

9  question it's not fair for me to ask you to answer

10  my speculation, so I'll strike my own question at

11  this point.

12          A.    Okay.

13          Q.    We'll come back to that later.

14          MR. VALOIS:  All right.  Katie, let's

15  do from 140 to 144.

16          (Video playing.)

17  BY MR. VALOIS:

18          Q.    Now, that was the only warning given;

19  right?

20          A.    I gave two.

21          Q.    Well, they're given in quick

22  succession; right?

23          A.    Yes, sir.  I gave two K-9 warnings.

24          Q.    Well, here.  Let's do it from 138 to

25  144.

```
 1                    (Video playing.)
 2   BY MR. VALOIS:
 3         Q.   All right.  Are both of both of those
 4   warnings there?
 5         A.   Yes.  No, they were together.
 6         Q.   Right there together; right?  Is
 7   there any acknowledgment?  You can concede he
 8   didn't acknowledge that, he didn't respond to you?
 9         A.   He did not respond to me.
10         Q.   And there's a lot of yelling and
11   screaming going on at the time?
12         A.   Yes, sir.
13              MR. VALOIS:  All right.  Katie, let's
14   run it up to from 138 to 146, to 147.
15              MS. THOMAS:  To 147?
16              MR. VALOIS:  Well, I'll tell you
17   what.  Let's just go ahead and speed it up.  Let's
18   go from 138 to 153.
19                    (Video playing.)
20              MR. VALOIS:  Pause.
21   BY MR. VALOIS:
22         Q.   Okay.  We're at -- we're at 13:14:18,
23   and that officer has just provided handcuffs to the
24   other officer; is that right?
25         A.   Yes.
```

1           Q.   All right.  So that's the first time

2   cuffs were introduced into this scene; is that

3   correct?

4           A.   Yes sir.

5               MR. VALOIS:  All right.  Go ahead and

6   play it up to 153.

7               MS. THOMAS:  Just a second.

8               MR. VALOIS:  Let's start at 145 so we

9   catch up.

10              (Video playing.)

11  BY MR. VALOIS:

12          Q.   All right.  So you can see there at

13  13:14, what was 18 seconds, Calvin complained about

14  his pain to his shoulder; right?

15          A.   Yes.

16          Q.   And as they're trying to handcuff

17  him; right?  And he's repeated about shoulder pain

18  in both incidents, both this incident and the

19  incident that you were involved in later in

20  December; is that correct?  Do you remember him

21  complaining about shoulder pain?

22          A.   The other incident on, you're saying

23  Old Forest Road?

24          Q.   Yes.

25          A.   Yes sir.

```
 1                    MR. VALOIS:  Okay.  All right.
 2   Katie, run it up to, run it back from 148 to 1,
 3   let's do 159.
 4                    (Video playing.)
 5                    MR. VALOIS:  Pause.
 6   BY MR. VALOIS:
 7        Q.    You just heard him say thank you, for
 8   relieving the pressure on his shoulder; right?
 9        A.    Yes.
10        Q.    Okay.  And we're at 13:14:23, and you
11   can see the officer is placing handcuffs on his
12   left arm; is that right?
13        A.    Yes.
14                    MR. VALOIS:  All right.  Go ahead,
15   Katie.
16                    (Video playing.)
17                    MR. VALOIS:  Pause.
18   BY MR. VALOIS:
19        Q.    Okay.  So now he has his left arm
20   cuffed, his right arm's behind his back.  You have
21   three officers present now in front of you.
22                    So it was you and at least three
23   other officers; right?
24        A.    Yes.
25        Q.    And they're attempting to get the
```

1  cuffs.  His left arm is cuffed, and they're

2  attempting to cuff his right arm; is that right?

3          A.   Yes.

4          MR. VALOIS:  Okay.  All right.

5  Continue up until 220.

6              (Video playing.)

7          MR. VALOIS:  All right.  Actually,

8  run it back from, run it back, Katie, from 204,

9  let's run it to 222.

10             (Video playing.)

11         MR. VALOIS:  All right.  Pause it

12  right there.

13 BY MR. VALOIS:

14         Q.   That's you saying, "Get away from the

15 car," to the officers; right?  You're directing the

16 officers to get away from the car?

17         A.   Could we play it back?

18         Q.   Yeah.

19         MR. VALOIS:  Go from 215, let's go to

20 224.

21             (Video playing.)

22 BY MR. VALOIS:

23         Q.   That's you --

24         A.   So that was Officer Person.  You

25 could see him.  He said, "Get away from the car."

1    Q.    That's not you saying, "Get away from
2  the car"?
3    A.    I don't believe so.  We could back up
4  and play it again, but it sounds like Officer
5  Person's voice.
6    Q.    That's you dragging the police,
7  moving the police officers out of the way though;
8  right?
9    A.    I moved Officer McLeod out of the
10 way, yes sir.
11   Q.    All right.  Well, if he's
12 got -- okay.  Let me ask you this:  So the
13 handcuffs went on at 13:14:23, I mean, were asked
14 for at 13:14:23.  He's cuffed at 13:14:30, his left
15 arm.  The officers have control of his right arm.
16 They're trying to cuff him.  The officer, he has
17 his arm, and you can see he's holding onto his
18 right arm.
19          Why would you shove the officer who's
20 got control of his right arm out of the way?
21   A.    Because they can't get him into
22 custody.  They've been struggling --
23   Q.    For --
24   A.    And actively fighting with Mr. Wesley
25 for a while now, and they can't get him into

Page 55

```
 1   custody.  Three officers cannot get one individual

 2   into custody.

 3              Q.   All right.  Well, let's talk about "a

 4   while."  Okay.  The officer asked for handcuffs at

 5   13:14:16, and then you're asking them to shove out

 6   of the way at 13:14:44.

 7                   That's 28 seconds; correct?

 8              A.   If you say so.  You've probably

 9   subtracted.

10              Q.   Well, let's look.  You tell me.  You

11   watch it and tell me.

12                   MR. VALOIS:  Let's take it back to,

13   take it back to 149, Katie, and then let's pause it

14   at 220.

15                   (Video playing.)

16                   MR. VALOIS:  There are the cuffs

17   being introduced.  Pause.

18   BY MR. VALOIS:

19              Q.   The cuffs are on at basically

20   13:14:25; right?

21                   MR. GUYNN:  You mean cuff, right?

22                   MR. VALOIS:  The cuff is on his left

23   hand.

24                   MR. GUYNN:  Yeah, but you're saying

25   "cuffs."
```

```
 1                   MR. VALOIS:  Well, the hand -- well,
 2   the handcuffs are on his left hand --
 3                   MR. GUYNN:  Okay.
 4                   MR. VALOIS:  -- one hand at 13:14:25.
 5   All right.  Go ahead.
 6                   (Video playing.)
 7                   MR. VALOIS:  All right.  Pause.
 8   BY MR. VALOIS:
 9         Q.   He's struggling; right?  No question
10   about it; right?
11         A.   Yes, sir.
12         Q.   But he isn't hurting anybody?  He's
13   just avoiding being handcuffed; right?
14         A.   Yes.  He's fighting with them.
15         Q.   Again, when you say "fighting," to be
16   clear, you're using that to mean his noncompliance?
17         A.   Correct.  He is not compliant with
18   any of the officers.
19         Q.   Right.  But he isn't hurting anybody?
20         A.   He has not injured anybody yet.
21         Q.   He hasn't threatened to harm anybody?
22         A.   No, sir.
23         Q.   And he hasn't armed himself in the
24   interim?
25         A.   No.
```

```
 1                    MR. VALOIS:  Okay.  Go ahead.
 2   Continue, Katie.
 3                    (Video playing.)
 4                    MR. VALOIS:  Pause.
 5   BY MR. VALOIS:
 6         Q.   You heard, "Just get away from the
 7   car."
 8              That's not you saying that?
 9         A.   I can't say whether it's myself.  It
10   sounds like Officer Person's voice.
11         Q.   All right.  You see in the reflection
12   that's you with the dog next to you; right?
13         A.   Yes.
14                    MR. VALOIS:  Okay.  Go ahead.
15                    (Video playing.)
16                    MR. VALOIS:  Pause.
17   BY MR. VALOIS:
18         Q.   All right.  You're saying "packen,
19   packen, hier packen."
20              What do those words mean?
21         A.   Packen is German for take hold.  It
22   means to grasp or to take hold.
23         Q.   When you say "take hold," you mean by
24   with the teeth?
25         A.   Correct.  They don't have hands.
```

```
 1                 Q.   Right.  So that means to bite?
 2                 A.   Yes.
 3                 Q.   It's a command to the dog to bite.
 4                      And then what does hier mean?
 5                 A.   That's German for come.
 6                 Q.   All right.  Why are you saying hier
 7    in the context of bite?
 8                 A.   Because I wanted the K-9 to come to
 9    where I was.  Like if you rewind --
10                 Q.   Yeah, to where --
11                 A.   -- to where the dog is behind me.
12    Hier, I want him to come to where I am, and then
13    packen, grasp or take hold of.
14                 Q.   So you're directing him to bite
15    Calvin?
16                 A.   Yes.
17                 Q.   Okay.  All right.  So by this point,
18    we're at 13:14:51, you're ordering the bite?
19                 MR. VALOIS:  Go back to 13:14:42 and
20    be ready to pause.
21                      (Video playing.)
22                 MR. VALOIS:  All right.  Pause.
23    BY MR. VALOIS:
24                 Q.   All right.  So at 1348, or 13:14:48,
25    you're pulling the other officers out of the way.
```

```
 1                    You've obviously made the decision to

 2  sic the dog on Calvin at that point; right?

 3           A.    Not sic the dog, to have my K-9 bite

 4  and apprehend Mr. Wesley, yes, sir.

 5           Q.    What's the difference between that

 6  and sic?

 7           A.    We don't train, we don't train, do

 8  any K-9 training, with siccing the dog on somebody.

 9           Q.    Well, okay.  When you say deploy the

10  dog with the intention to bite?

11           A.    Yes.

12           Q.    All right.  And so you already made

13  that decision?

14           A.    When I --

15           Q.    And just --

16           A.    -- made room, yes.

17           Q.    You've already made the -- so at

18  13:14:48, you've already made the decision to

19  deploy the dog.

20                    None of the officers had asked you to

21  deploy the dog?

22           A.    Correct.  That's not their decision

23  to make.

24           Q.    Okay.  None of them had expressed any

25  need for backup?  When you say, "it's not their
```

1  decision to make," is there a policy against

2  officers asking for a dog?

3         A.   No, but it's not the officers -- it's

4  not another officer's determination to deploy.

5  It's like another officer asking you to deploy your

6  taser or use your pepper spray.

7         Q.   Right.

8         A.   Like they can't make that

9  determination.  Only I can make the determination

10  whether or not the K-9 is utilized, because they

11  have no training in the K-9.

12              Does that make sense?

13         Q.   Yeah.  Well, I mean, yeah, sure, they

14  can't pull the trigger, but they can ask you to

15  come with the gun; right?

16         A.   We're all armed with firearms.

17         Q.   Right.  And the same reason, they

18  can't -- they can ask you to assist with the dog,

19  they just can't tell the dog what to do is what

20  you're saying; right?

21         A.   Ultimately I make the determination

22  what the dog does.

23         Q.   Right.  But they can -- to be clear,

24  there's nothing that prohibits an officer from

25  asking for assistance from a dog?

1          A.    Correct.

2          Q.    Okay.  All right.  Although all those

3  officers are equipped with weapons, none of them

4  had deployed any weapons?

5          A.    Correct.

6          Q.    And you've already said those weapons

7  are tasers, batons, and pepper spray, along with a

8  firearm; right?

9          A.    Correct.

10         Q.    Now, when a dog bites, it's almost

11 guaranteed to inflict a serious injury; is that

12 correct?

13         A.    No.  What's the determination of a

14 serious injury?  When a dog bites we train our dogs

15 to bite and hold.

16         Q.    Right.  And they pierce the flesh?

17         A.    Not all the time, no.

18         Q.    What percentage of the time?

19         A.    I don't know what the actual

20 percentage is.

21         Q.    Aren't you required to know that as

22 part of your duty as a handler?

23         A.    How many times it pierces the flesh

24 versus not, I don't know what the percentage is of

25 like a generalization of what's the dog's pierce.

1          Q.    Do you know what the dog Knox's bite

2    ratio is?

3          A.    What do you mean?

4          Q.    You don't know what bite ratio means?

5          A.    So we've had over 1,000 deployments,

6    and is that what you're asking, like how many

7    deployments have we had?

8          Q.    No.  I'm asking right now, let me

9    back up.

10          You've never heard the term "bite

11    ratio" in the context of K-9 training?

12          A.    No.  Are you saying like

13    apprehensions versus a nonbite apprehension?

14          Q.    I'm not asking you to speculate.  I'm

15    just asking if you know what the term means.  If

16    you don't know what the term means, there's no

17    point in me asking you questions about it.

18          A.    Correct.  I don't know what the --

19          Q.    So you never heard that term?

20          A.    No, sir.

21          Q.    Okay.  So when was the last time that

22    Knox had been -- had bitten somebody before Calvin?

23          A.    I'm not sure what the exact date is.

24          Q.    Well, let me ask you this:  When was

25    the last time Knox bit somebody before you came

1  here today?

2            A.    Earlier this year, I think it was

3  January, February, March of 2023.

4            Q.    Did that person go to the hospital?

5            A.    Yes.  They were seen by medics, but

6  they did not -- I don't believe they received

7  anything at the hospital.  I don't know whether or

8  not --

9            Q.    They were taken to the hospital?

10            A.    I don't know if he was transported or

11  not.

12            Q.    Okay.  The one before that, the one

13  that Knox bit before that, did he go to the

14  hospital?

15            A.    I'm not sure.

16            Q.    Okay.  Well, let me ask you this:

17  When was the last subject you remember that Knox

18  bit that didn't go to the hospital?

19            A.    I can't say like under oath, but I

20  don't believe this last bite, he went to the

21  hospital.

22            Q.    Well, if you can't say under oath, I

23  don't want you speculating.

24            MR. GUYNN:  You are talking about

25  going to the hospital as a result of a dog bite?

1                    MR. VALOIS:  Yes.  Okay.  That's a

2    good point.

3    BY MR. VALOIS:

4         Q.    I'm talking about going to the

5    hospital as a result of the injury suffered after

6    being bitten by a police dog?

7         A.    I can't say.  I'm sorry.

8         Q.    Well, it happened in both of these

9    cases with Wesley; right?

10        A.    Yes.  He went to the hospital both

11   times.

12        Q.    And it happens frequently?

13        A.    I can't say whether or not -- I can't

14   say like how many times somebody's gone to the

15   hospital versus hasn't gone to the hospital.

16        Q.    Well, you know that a dog is likely

17   to inflict serious injury when it bites into your

18   flesh?

19        A.    A dog can inflict serious injury.

20   There's a lot of determining factors involved.

21        Q.    There always are anytime you're

22   injured; right?  But I mean, the dog can rip up

23   nerves, arteries, you agree to that?

24        A.    It can.

25        Q.    Okay.  And there's always that risk,

1  anytime you deploy the dog, that there's a risk of

2  serious injury?

3          A.    There is a risk, yes.

4          Q.    All right.  Now, why did you elect to

5  use the dog instead of like, for example, a taser?

6          A.    At this distance I would not say a

7  taser would be very effective.  The greater the

8  distance --

9          Q.    Well, what model taser do you carry?

10         A.    I think it's a P26.

11         Q.    Okay.  A P26, which is manufactured

12  by Axon Corporation?

13         A.    Yes.

14         Q.    It's a dual cartridge taser.

15                Do you know what -- do you know how

16  long the leads you guys order?

17         A.    I believe they're 18 feet, it's 15 to

18  18 feet.

19         Q.    Okay.  And you're well within that

20  range; right?

21         A.    Yes.

22         Q.    And you're aware, you've been trained

23  in the operation of that taser?

24         A.    Yes.

25         Q.    You're aware that a taser can be used

1  for either incapacitation, neuromuscular

2  incapacitation --

3          A.   Yes.

4          Q.   -- right?  By pulling the trigger and

5  deploying the probes with nitrogen into darts that

6  are embedded in his skin?

7          A.   I don't what they're -- I don't have

8  extensive training.  I don't know whether they'd

9  have nitrogen or --

10         Q.   You had to take a taser hit, didn't

11 you?

12         A.   Yes.

13         Q.   It incapacitated you, didn't it?

14         A.   Yes.

15         Q.   Okay.  And so -- or you're also aware

16 that a taser can be used, by removing the

17 cartridge, for pain compliance?

18         A.   Yes.

19         Q.   And that both of those methods are

20 very unlikely to cause serious bodily injury?

21              MR. GUYNN:  I'm going to object to

22 that.

23              MR. VALOIS:  Are you -- I'll rephrase

24 the question.

25              MR. GUYNN:  I guess, and I can help

Page 67

```
 1   you.  The Armstrong case pretty much says you can't
 2   do what you're asking him to do, but go ahead.
 3               MR. VALOIS:  Well, it says -- the
 4   Armstrong case says that you can -- well, the
 5   Armstrong case --
 6   BY MR. VALOIS:
 7         Q.   Are you aware of the Armstrong case?
 8         A.   Yes.
 9         Q.   Are you aware it says that tasers,
10   because it's likely to cause serious pain, that it
11   has to be handled in situations tantamount to a
12   firearm?
13         A.   I don't know the exact verbiage of
14   the -- I know --
15         Q.   You took Armstrong training; right?
16         A.   Yes.  I know he was tased multiple
17   times by multiple different officers, and it was
18   not effective.
19         Q.   Right.  And are you aware that as
20   part of that holding, that the Fourth Circuit ruled
21   that a taser is a dangerous instrumentality that
22   can be -- because it can inflict serious pain, the
23   same rules that apply to handling firearms have to
24   apply to tasers in the context of considerations of
25   use of force by a police officer?
```

```
 1                    MR. GUYNN:  I'll object to the legal
 2    argument, but go ahead.
 3                    MR. VALOIS:  I'm asking him if he's
 4    been trained to that.
 5                    MR. GUYNN:  Yeah.
 6                    THE WITNESS:  That firearms and
 7    tasers are -- you're saying they're the same on the
 8    lethal force?
 9    BY MR. VALOIS:
10         Q.    No, I'm not saying that.  I'm saying
11    that the same considerations that an officer must
12    consider when considering a use of a firearm have
13    to be considered when using a taser?
14         A.    Anytime we use any sort of force, we
15    have to go down through Graham versus Connor, the
16    three-prong test.
17         Q.    And the police have developed a
18    wheel?
19         A.    Yes.
20         Q.    Right?  And you're familiar with
21    that?
22         A.    Yes.
23         Q.    And a dog sits at the high end of
24    that wheel?
25         A.    No.
```

```
 1              Q.    No?
 2              A.    Our dog sits at active resistance,
 3   the same level as a taser.
 4              Q.    All right.  But in this case, you
 5   admit a taser is not likely to puncture to cause
 6   bleeding?
 7              A.    Typically, they do bleed when they're
 8   tased.  There's puncture wounds in the skin when
 9   they're tased.
10              Q.    A taser is likely to cause less
11   significant injury and bleeding than a dog bite,
12   would you agree to that?
13              A.    It'd be less punctures because
14   there's two prongs versus a K-9.
15              Q.    Right.
16              A.    If that's what you're -- is that what
17   you're asking?
18              Q.    I'm asking if you would agree that a
19   taser is less likely to seriously injure a subject
20   than a dog, in your experience?
21              A.    My personal experience, I can't
22   really -- I don't know what you're -- I'm not sure
23   what you're --
24              Q.    All right.  I'll ask it again.
25                    Based upon your experience as a
```

Evans & Company

1  police officer, do you agree that a taser is less

2  likely to cause serious injury to a subject than a

3  dog?

4            A.    There's just too many -- there's too

5  many factors involved with that.  If someone is

6  tased, and they're on asphalt and they fall and

7  they break all their teeth out, then no.  There's,

8  there's just too many -- personally, that's just my

9  opinion.

10            I think there's too many variables

11  that could be, that need to be applied to say that

12  K-9s will always cause more damage than a taser,

13  because I don't think you can say that looking at

14  the spectrum of things.  I think there's too many

15  different variables.

16            Q.    What about pepper spray?

17            A.    Well, you could argue that someone

18  could suffocate on pepper spray and choke and feel

19  like they're dying.

20            Q.    So pepper spray is, in your mind --

21            A.    But on our use of -- I'm sorry.  Go

22  ahead.

23            Q.    Well, in your mind, is pepper spray

24  as likely to cause serious injury as a dog?

25            A.    It should cause less.

1          Q.    All right.  Why didn't you elect to
2    use pepper spray?
3          A.    I don't know.  I don't know why I
4    didn't use pepper spray.  I've never used pepper
5    spray.
6          Q.    You've never used it?
7          A.    No.
8          Q.    Did you -- did you run through this
9    continuum?  Did you run through this wheel of force
10   before you elected to deploy the police dog in this
11   case?
12         A.    Yes.  In my mind, we had reached the
13   point of active resistance to have the K-9
14   deployed.
15         Q.    And so that means you had already
16   decided not to deploy less injurious methods like
17   pepper spray?
18         A.    I didn't think about pepper spray.
19         Q.    Okay.
20         A.    If that's what you're asking.
21         Q.    So you didn't consider the wheel,
22   then, because pepper spray is on the wheel?
23         A.    Yes.
24         Q.    So you didn't fully consider that?
25         A.    I did consider the wheel.

1          Q.   But you didn't consider pepper spray?

2          A.   No.

3          Q.   How can you -- if you didn't consider

4    pepper spray, and if pepper spray is on the wheel,

5    the continuum, the wheel of use of force, how did

6    you consider it?  How can you say you considered

7    the wheel if pepper spray is on the wheel and you

8    didn't consider pepper spray, in other words?  How

9    can you say that?

10         A.   Okay.  So I can't say that.  I'm

11   not --

12         Q.   Okay.  Now, why are these dogs

13   trained in German?  Why do you have to speak German

14   to the dog?

15         A.   That's their primary language.  Our

16   dogs are imported.

17         Q.   Oh, they are?  All right.  Well, I've

18   got a whole section on the dog, and I'm going to

19   come back to him, so we'll get back to that.

20              So to be clear, the dog did what you

21   commanded when it bit Calvin?

22         A.   Yes.

23              MR. VALOIS:  All right.  Katie, can

24   we go from 0225 to 0232?

25              (Video playing.)

```
 1                        MR. VALOIS:  Pause.
 2     BY MR. VALOIS:
 3            Q.    All right.  So Calvin's on the
 4     ground, the dog is biting into his buttocks; right?
 5            A.    Yes, sir.
 6            Q.    It is 13:14:57, you see at the top,
 7     and you just had him on the ground and said, "Good
 8     boy"; right?
 9            A.    Yes, sir.
10                        MR. VALOIS:  All right.  Go ahead and
11     play it some more.
12                        (Video playing.)
13                        MR. VALOIS:  Pause right there.
14     BY MR. VALOIS:
15            Q.    Now, Calvin, at this point, he's
16     facedown.  He's got a fence sitting next to him.
17     He's facedown in the sidewalk.  His pants are down.
18                        There's a police dog biting into his
19     buttocks at your command; right?
20            A.    Yes, sir.
21            Q.    And yet you're ordering the dog to
22     continue to bite?  You just said, "Packen."
23            A.    Correct.  I repeated my command.
24            Q.    Why are you ordering the dog to bite
25     a subject who's lying facedown on the sidewalk,
```

1  penned against a fence, surrounded by armed

2  officers, with his pants pulled down?  Why are you

3  ordering the dog to bite him?

4          A.   At this point, we still do not have

5  him in custody.

6          Q.   He's not going anywhere facedown on

7  the sidewalk; right?

8          A.   We still don't have him in custody.

9          Q.   Okay.  But you see he's not going

10 anywhere; right?

11         A.   Yes.  He's down on the sidewalk.

12         Q.   All right.  He's not armed at this

13 point?

14         A.   Correct.

15         Q.   His pants are down?

16         A.   Yes, sir.

17         Q.   There's a dog gnawing into his

18 buttocks?

19         A.   Correct.

20         Q.   Right?  He's surrounded by uniformed

21 officers with -- at least three or four, right?

22         A.   Yes.

23         Q.   All armed?

24         A.   Correct.

25         Q.   All right.  What do you mean he's not

1  in custody?

2          A.    We do not have him in handcuffs yet.

3          Q.    So your contention is is that you can

4  have the dog bite a subject like that until he's

5  handcuffed?

6          A.    Yes.

7                MR. VALOIS:  All right.  Katie, let's

8  play it up to 238.

9                MS. THOMAS:  Continue from here?

10               MR. VALOIS:  Run it back a couple,

11  let's do it, run it back about 3 seconds for

12  continuity, and we'll take it to 240.

13                   (Video playing.)

14               MR. VALOIS:  All right.  Pause right

15  there.

16  BY MR. VALOIS:

17          Q.    Okay.  Can we agree that you

18  commanded that dog four times to aus?

19          A.    Correct.

20          Q.    All right.  The first command, can we

21  agree, was at 13:15:03?  Do we need to run it back,

22  or you want me to run it back?

23               MR. VALOIS:  Run it back to 1301, or,

24  yeah, 1301.  There you go.  That's good enough.

25  Listen for the first aus, and then pause it, Katie.

```
 1                    (Video playing.)
 2   BY MR. VALOIS:
 3           Q.   All right.  So that's at 13, I had
 4   03, it just switched to 04, but you just said
 5   "aus"; right?
 6           A.   Correct.
 7                MR. VALOIS:  All right.  Go to the
 8   next aus.
 9                    (Video playing.)
10   BY MR. VALOIS:
11           Q.   There you go.  13:15:06; right?
12           A.   Yes.
13           Q.   Why have there two before then?
14                    MR. VALOIS:  Let's go back to
15   1301, Katie, and run it to 1305.
16   BY MR. VALOIS:
17           Q.   And let's count the auses.
18                Can you count them as you hear them
19   for us?
20           A.   Yes, sir.
21           Q.   Okay.
22                    (Video playing.)
23                MR. VALOIS:  Stop.
24   BY MR. VALOIS:
25           Q.   Okay.  So in that range there, of
```

1    that few seconds, you commanded him four times aus;

2    right?

3              A.    Total, yes, sir.

4              Q.    Right.  What does aus mean?

5              A.    Release or to let go of.

6              Q.    All right.  The dog ignored you three

7    times; right?

8              A.    It released on the third to fourth

9    aus, yes, sir.

10             Q.    Right.  But it ignored you at least

11   twice; right?  You were commanding it, and it

12   wasn't doing what you were saying; right?

13             A.    Correct.  So I repeated the command.

14             Q.    And you said "nein."  What does nein

15   mean?

16             A.    No.

17             Q.    All right.  Why are you saying nein?

18             A.    Because there's a sequence to dog

19   training, the way that dogs understand.  You give a

20   command, either correction or verbal praise, and

21   then you repeat the command, and then you go

22   through that sequence.  So it's command,

23   correction, command.

24                   So the dog understands you tell him

25   to do something, he doesn't do it, you give him a

```
 1   negative, which is nein.  I told him no, and I
 2   repeated the command to release.
 3              Q.   All right.  Then you said, I believe
 4   you said, "aus, aus, nein, aus, buoy, aus"?
 5              A.   Pfui.
 6              Q.   Pfui, what is pfui?
 7              A.   So we have -- it's a harsher no.  So
 8   we have two different no's for K-9.  We have nein,
 9   which is no, and then pfui, which is a harsher no.
10              Q.   All right.  So why are you correcting
11   the dog?  Why are you saying nein and pfui?
12              A.   Because I want him to understand I'm
13   giving him an instruction to release.
14              Q.   And he's not doing it?
15              A.   Correct.
16              Q.   He's disobeying you?
17              A.   Yes.
18              Q.   All right.  Well, isn't there an
19   inherent danger in having a dog that bites people
20   and doesn't release on command?
21              A.   He did release on command.
22              Q.   Not on the first command.
23                   That's why you corrected him; right?
24              A.   Yes, sir.
25              Q.   Isn't it -- I mean, shouldn't he
```

1   release the first time you say release?

2           A.    He should, yes.

3           Q.    Isn't there a danger in having a dog

4   on the streets that bites people that doesn't do

5   that?

6           A.    Are you asking if the dog's a danger?

7           Q.    I'm asking if any dog, if you have a

8   police dog that's supposed to be trained to release

9   when you command it to release, and it ignores you,

10  if that's not an inherently dangerous dog?

11          A.    No, sir, he's not an inherently

12  dangerous dog.  He listens to what I command, and

13  what I commanded him to do.

14          Q.    We just ran through where he didn't

15  listen to you for several times; it took multiple

16  times to do it?

17          A.    Yes, sir.

18          Q.    He's supposed to do it the first time

19  you say it?

20          A.    Correct.

21          Q.    I mean, this could be life or death,

22  you understand that; right?

23          A.    Yes, sir.

24          Q.    He could have a hold of somebody's

25  artery, somebody's nerve?

1          A.    Correct.

2          Q.    So why would you have a dog that

3    doesn't follow your first command to release is my

4    question?

5          A.    So there's a sequence in a dog's

6    mind, too.  So if the dog has different drives, if

7    the dog goes into a different drive, the way the

8    dog's mind works, it just doesn't go from zero to

9    100.  There's a sequence, if that makes sense.

10          Q.    Well, I understand the dog's got some

11    sort of, call it behavioral issue, call it

12    instinct, whatever.  My question isn't is there a

13    dog psychology involved or is there a dog

14    behavioral issue involved.

15               My question is isn't it dangerous to

16    have a dog that doesn't release on your first

17    command?  Isn't that an inherently dangerous

18    condition?

19          A.    I believe that this dog is very

20    responsive to commands.

21          Q.    That's the answer to a different

22    question.  I'm not talking about whether you

23    believe the dog is responsive.  I'm asking you as a

24    K-9 officer.  Right.

25               Isn't it inherently dangerous to have

```
 1  a dog that does not release on its first command to

 2  release?

 3              MR. GUYNN:  You're asking his

 4  opinion?

 5              MR. VALOIS:  I'm asking based upon

 6  his experience as a K-9 officer.

 7              MR. GUYNN:  Which would be his

 8  opinion.

 9  BY MR. VALOIS:

10       Q.   Okay.  If you can offer one, sure.

11       A.   Is it dangerous to have a dog that

12  does not listen; yes.

13       Q.   Okay.  I'm not talking about

14  listening in general.  All right.  My question is

15  not a general question.  My question is a very

16  specific question.

17       A.   Okay.

18       Q.   Okay.  As a police officer, as a

19  trained K-9 handler, all right, isn't it dangerous

20  to deploy a police dog that does not release

21  subjects on the first command from its handler to

22  release?

23              MR. GUYNN:  And I'm objecting because

24  it's an opinion, but go ahead if you've got an

25  opinion.
```

```
 1                    THE WITNESS:  You want, and we train,
 2   our dogs to release on the first command, yes.
 3   BY MR. VALOIS:
 4            Q.   No, no.  I'm not asking what you
 5   train the dogs to do.  Okay.  I mean, we can -- I
 6   can keep asking the same question.  You're
 7   answering different questions.  You understand
 8   that; right?
 9                    My question to you is, as a certified
10   dog handler, K-9 police K-9 handler; right?
11            A.   Uh-huh.
12            Q.   Do you agree that it's a danger to
13   deploy a dog that does not release subjects on the
14   first command to release?
15                    MR. GUYNN:  The same objection.
16                    MR. VALOIS:  That's fine.
17   BY MR. VALOIS:
18            Q.   I mean, if you don't agree, you can
19   say.  If you agree, you say.  If you don't have an
20   opinion, you can say either way.  But that's the
21   question.
22            A.   Yeah.  We train -- we want our dogs
23   to be as perfect as possible.  We train for our
24   dogs to release on the first aus.
25            Q.   I understand what you train.  Okay.
```

1            A.    Did Knox release on the first

2    command; no.  He did not release when I told him to

3    release on the first command.

4            Q.    Isn't it dangerous to have a dog that

5    doesn't do that?

6                  MR. GUYNN:  The same objection.

7                  THE WITNESS:  Can it be dangerous;

8    yes.

9    BY MR. VALOIS:

10           Q.    Is it dangerous?

11           A.    I don't believe at this point that

12    this was dangerous.

13           Q.    I'm not asking about this situation.

14    I'm asking about the next one he bites, or whoever

15    he bites.

16                 To have a dog on the street that

17    doesn't do that, isn't that a dangerous dog?

18           A.    K-9 Knox is very responsible to my

19    commands to release.

20           Q.    All right.

21           A.    If he could not certify, and he was a

22    danger, we would not be certified as a K-9 team in

23    the aspect of patrol.

24           Q.    All right.  We'll come back, we'll

25    move on for now, and we'll come back to the

Page 84

```
 1  certification later.
 2                  MR. VALOIS:  Oh, we need a break.
 3  All right.  You guys could use a break?
 4                  THE WITNESS:  Whenever.
 5                  MR. GUYNN:  Go ahead.
 6                  MR. VALOIS:  How about, can we take
 7  about a 15-minute break?
 8                  THE VIDEOGRAPHER:  Our time is
 9  11:16 a.m.  We're off the record.
10                  (Recess.)
11                  THE VIDEOGRAPHER:  All right.  Our
12  time is 11:31 a.m.  We're back on the record.
13                  MR. VALOIS:  All right, Katie, can
14  you --
15  BY MR. VALOIS:
16          Q.   Well, before we move on, Officer
17  Reed, okay, so now the dog is sitting down, sitting
18  there, and it's off of Calvin, it's released from
19  Calvin; correct?
20          A.   Yes.
21                  MR. VALOIS:  And we're at 13:15:08.
22  Can you roll it, please, Katie.
23                  (Video playing.)
24                  MR. VALOIS:  Pause.
25  BY MR. VALOIS:
```

```
1              Q.    What was that command you just gave?
2              A.    Bleiben.
3              Q.    What does bleiben mean?
4              A.    Bleiben means stay.
5                    MR. VALOIS:  Okay.  All right.  Go
6   ahead, Katie.
7                    (Video playing.)
8                    MR. VALOIS:  Pause that right now.
9   BY MR. VALOIS:
10             Q.    All right.  So she just asked you
11  what he was being arrested for?
12             A.    Correct.
13             Q.    And you said, "We don't have to
14  explain that to you"?
15             A.    Correct.
16             Q.    Is there any policy against
17  explaining it to her?
18             A.    We don't, we just don't explain other
19  people's business to -- I don't know what her
20  relationship is to him.  So before checking with
21  whoever we're dealing with, "Hey, can we share your
22  information with X, Y, and Z," we don't typically
23  just tell.
24             Q.    All right.  Well, Calvin had been
25  asking what he was being arrested for repeatedly
```

1    during this; right?

2              A.    Yes.

3              Q.    Did anybody ever tell him?

4              A.    I did not tell him.

5              Q.    Why not?  Why didn't you tell him?

6              A.    I don't know why I specifically

7    didn't say for violation, or X, Y, and Z, assault

8    and battery.

9              Q.    Is there any reason why you wouldn't

10   tell him?

11             A.    I don't know why I did not tell him.

12   I can't testify for the other officers.

13             Q.    Well, I mean -- I mean, you can -- do

14   you realize being arrested is a stressful

15   situation?

16             A.    Yes.

17             Q.    Right.  And arrested, getting hands

18   put on you, that can cause stress to an individual?

19             A.    Yes.

20             Q.    And natural for them to have

21   questions about why?

22             A.    Correct.

23             Q.    Wouldn't it deescalate to answer the

24   question?

25             A.    It could.

```
1              Q.   Why not do that?
2              A.   Like I said, I don't know why I
3   didn't tell him why, or you have an assault and
4   battery warrant.
5              Q.   All right.  How about exhibit -- now,
6   Madam Court Reporter, my exhibits, paper exhibits,
7   are numbered this time, so you don't have to number
8   them.  But they are going to be presented out of
9   order, because I rearranged the order at the last
10  minute.
11             What I've done is you have them on a
12  thumb drive.  All my exhibits are on that thumb
13  drive.  Did I already give you one?  Okay.  Will
14  you give her that thumb drive?  I will offer the
15  paper exhibits to you, the audio, video exhibits,
16  and PDFs of the paper exhibits are on there too.
17  Okay.  All right.
18  BY MR. VALOIS:
19             Q.   I'm going to give you this -- present
20  you with this document, which is marked Plaintiff's
21  Exhibit 10, and ask if you can identify that
22  document?
23             A.   What am I supposed to say to it?
24  I've never --
25             Q.   Well, can you just say what it is?
```

1          A.    It says, "Confidential dispatch

2    information.  CC Number 2021003502."

3          Q.    All right.  Do you recognize that

4    document as being a CAD sheet?

5          A.    Yes.

6          Q.    Can you describe what a CAD sheet is?

7          A.    So in our dispatch system off of

8    Candlers Mountain Road, someone dials 911.  It goes

9    to a calltaker.  The calltaker will type notes into

10   this CAD, and then we have a dispatcher.  The

11   dispatcher takes this information, creates a case,

12   and then we'll actually dispatch officers to a call

13   for service.

14          So the calltaker is usually on the

15   phone with Individual A, whoever dialed 911, and

16   that calltaker is typing notes into the CAD.  And

17   then you got the dispatcher who we communicate

18   with.  They'll typically type notes into CAD that

19   we relate to them.

20          Q.    Okay.  And can you read through that

21   document briefly?  Just I'm really more interested

22   in there's photographs at the end of the document.

23          A.    Do you want me to start from the

24   bottom?  So the CAD notes are typically upside

25   down.

1          Q.   Well, I don't want you to read all

2    those CAD notes.  You don't need to.  Can you flip

3    to the next page?  And that's just a dispatch

4    record of the units that responded to the scene and

5    the times they responded, the times they changed

6    location, the times they cleared the scene; right?

7          A.   Yeah.

8          Q.   Okay.  Flip to the next page.  These

9    are just warrants.  You can skip over the warrants.

10              These are warrants that you obtained;

11   right?

12         A.   Officer Bryant obtained that one.

13   Officer Foster obtained that one.  I obtained this

14   one.

15         Q.   Okay.

16         A.   I obtained this one.

17         Q.   All right.  Now, could you look at

18   these photographs?

19         A.   Yes, sir.

20         Q.   And just look at those photographs,

21   there's a series of them.  Just examine them,

22   please, and flip through them.

23              My question at the end is going to be

24   do they appear to be photographs of the injuries

25   consistent with the injuries you observed on Calvin

1  Wesley on March 11th, 2021, as the result of the

2  dog bites?

3          A.   Yes.

4          Q.   All right.  Can you hand me that

5  document, please?

6          A.   Yes, sir.

7               MR. VALOIS:  I offer Plaintiff's

8  Exhibit 10 as a deposition exhibit.

9               (Plaintiff's Exhibit 10 marked.)

10 BY MR. VALOIS:

11         Q.   Okay.  Now I need to show you another

12 exhibit.  This would be Exhibit 6.

13              Can you identify that document?

14         A.   This is our IBR.

15         Q.   Could you tell, explain what IBR

16 means?

17         A.   It's an Incident Based Report.  It's

18 where our police reports are typed.

19         Q.   Okay.  And is there a computer system

20 that you use to prepare these?

21         A.   Yes.  It's MFR, Mobile Field Review,

22 or Report, or something to that nature.

23         Q.   Okay.  And did you prepare a report?

24         A.   Yes.

25         Q.   All right.  And in your report, does

Page 91

```
 1  it fully describe the incident that occurred on

 2  March 11th --

 3          A.   Yes.

 4          Q.   -- 2021?  You'll note -- read through

 5  that report and see if you agree with me that it

 6  doesn't mention that the dog disobeyed your

 7  commands to release several times?

 8          A.   Correct.

 9          Q.   Why is that information omitted from

10  the report?

11          A.   Because I believe when I told the K-9

12  to release, he did release.

13          Q.   But why is the fact that you had to

14  issue the command multiple times, that he disobeyed

15  you two times, and that you had to issue two

16  corrections before he released, why is that

17  information not in the report?

18          A.   Because I didn't put it in the

19  report.

20          Q.   I know you didn't put it in, but why

21  did you not include that information in the report?

22          A.   I don't know.

23          Q.   Don't you think that's important

24  information?

25          A.   How many times I said release?
```

1          Q.   How many times -- don't you think
2   leadership needs to know if there's a dog that's
3   not releasing on the first command?
4          A.   Leadership reviews all of our uses of
5   force.
6          Q.   Well, I understand.  That's the
7   answer to a different question.
8               But my question is don't you think
9   that leadership needs to be apprised of the fact
10  that one of their K-9 units is not releasing on
11  command?
12         A.   I believe that the K-9 did release on
13  command.
14         Q.   Okay.  Don't you believe that it's
15  important for the leadership, and the command in
16  the Lynchburg Police Department, to know that one
17  of its K-9 units ignores several commands to
18  release a subject before it actually releases a
19  subject?
20         A.   If we had issues with that K-9, we
21  would bring that up to our supervision, and they
22  would present that to command.
23         Q.   Did you present any of those issues
24  to command?
25         A.   No.

Page 93

```
 1                   Q.   Why not?

 2                   A.   Because I believe that my K-9

 3   released.

 4                   Q.   But it released -- there's no

 5   question it released, you saw it release?

 6                   A.   Yes.

 7                   Q.   But my question is what about the

 8   fact that it ignored your commands, your previous

 9   command?

10                   A.   I did not bring that up.

11                   Q.   Why not?

12                   A.   I didn't feel like it was necessary

13   to bring that up.

14                   Q.   Can I have that document, please?

15                   A.   Yes, sir.

16                   MR. VALOIS:  I offer Plaintiff's

17   Exhibit 6, as identified by the witness, as a

18   deposition exhibit.

19                   (Plaintiff's Exhibit 6 marked.)

20   BY MR. VALOIS:

21                   Q.   Now I'm going to present you with

22   what is marked at the top as Plaintiff's Exhibit 7.

23                   Can you identify that document

24   please?

25                   A.   This is an LPD use of force report.
```

1          Q.   And that use of force report was
2    related to the use of force on March 11th, 2021; is
3    that correct?
4          A.   Yes.
5          Q.   And the use of force was the
6    deployment of your K-9 Knox against Wesley Calvin?
7          A.   Yes.
8          Q.   All right.  And that report was
9    investigated by a supervisor, a lieutenant?
10         A.   Yes.
11         Q.   Who was that person?
12         A.   It said -- I've never seen one of
13   these.  So it says IAPro assigned investigator
14   Lieutenant Lucas Bryan.
15         Q.   And who reported there on the report?
16         A.   It says entered by Lieutenant Brian
17   Smith.
18         Q.   All right.  And is Brian Smith the
19   one who wrote that narrative?
20         A.   Which narrative?  This is my first
21   time ever seeing one of these, so I'm not really
22   familiar with the Blue Team, so we don't have
23   access to Blue Team.
24         Q.   Okay.
25         A.   So I don't -- I've never seen one of

```
 1   the Blue Team documents before.

 2              Q.    Okay.

 3              A.    So I don't know who or how it's

 4   written out.

 5              Q.    All right.  Well, then I'm not going

 6   to belabor you with reading the whole thing here,

 7   but we'll deal with it later.

 8                    But let me just ask you this,

 9   Lieutenant Smith is a supervisor?

10              A.    Yes.

11              Q.    He's the one that responded to the

12   scene?

13              A.    Yes.

14              Q.    And that's per policy, anytime

15   there's a serious use of force, a supervisor

16   reports to the scene?

17              A.    Yes.

18              Q.    And conducts an immediate

19   investigation?

20              A.    Correct.

21              Q.    Interviews the subject?

22              A.    Yes, sir.

23              Q.    Interviews witnesses?

24              A.    Correct.

25              Q.    Interviews the officers?
```

```
 1              A.   Yes.

 2              Q.   That was done in this case --

 3              A.   Yes.

 4              Q.   -- by Lieutenant Brian Smith?

 5              A.   Yes, sir.

 6              Q.   All right.  He prepared that report?

 7              A.   It says entered by, yes, sir.

 8              Q.   Yeah, entered by.  Now, without

 9    making you read it, you can read it if you want,

10    and if you want to, or you can take my word for it.

11    It's up to you.  Okay.

12                   But that report makes no mention of

13    the multiple acts of disobedience by K-9 Cox?

14                   MR. GUYNN:  I'll object to the form

15    of the question.

16    BY MR. VALOIS:

17              Q.   All right.  Well, then, will you

18    please read the document?

19              A.   You want me to read it out loud?

20              Q.   Yeah.  No, just read it to yourself.

21              A.   Okay.

22              Q.   Just let me know when you're

23    finished?

24              A.   Yes, sir.

25                   MR. GUYNN:  My objection was only
```

```
 1  that you used --
 2              MR. VALOIS:  I'm sorry, pause.  Pause
 3  just one second.  I'm sorry.  Can we go off the
 4  record for just one minute?
 5              THE VIDEOGRAPHER:  Sure.  The time is
 6  11:43 a.m.  We're off the record.
 7              (Off-the-record discussion.)
 8              THE VIDEOGRAPHER:  All right.  Our
 9  time is 11:44 a.m.  We're back on the record.
10  BY MR. VALOIS:
11       Q.   All right.  Can you look through that
12  document and see if you find any reference to the
13  fact that the dog ignored your command to release
14  Wesley Calvin at least twice?
15       A.   Yes, sir.  I'll read it over.
16              MR. GUYNN:  I'm going to object to
17  the term "ignored," because I think it's reading
18  the dog's mind.  I don't know whether you --
19              MR. VALOIS:  Okay.  I can rephrase.
20  I'll rephrase again.
21              MR. GUYNN:  It's a dog ckck.
22  BY MR. VALOIS:
23       Q.   Can you look through that document
24  and see if you agree that it makes no reference to
25  the fact that you gave the command for the dog to
```

1  release at least twice and that the dog did not

2  release on both of those first two occasions, when

3  you commanded the dog to release, on March 11th,

4  2021?

5           A.   You want me to read everybody's or

6  just mine?

7           Q.   Just read yours.

8           A.   Okay.

9           Q.   And we'll limit to your statement.

10          A.   Okay.  There's not anything, any

11 mention of that in my --

12          Q.   Okay.  Taking my word for it, which

13 is a dangerous thing to do with lawyers involved.

14 Okay.

15          But for the sake of argument here,

16 taking my word for it that you're not going to find

17 any reference to that in that document, did you

18 know why that would be omitted from that?  And if

19 you don't know, I'm not asking you to speculate, if

20 you --

21          A.   I don't, I don't know.

22          Q.   Okay.  That's fine.  Can I have that

23 document?  Oh, let me ask you this.  Can you flip

24 back to the findings.  At the very end you'll see

25 there are a bunch of statements and then there'll

1  be a finding.

2                  Do you see those?

3          A.    Yes, sir.

4          Q.    Can you read through those findings,

5  and can you verify that in those findings there's

6  no mention made that at the time he was bitten by

7  the dog that Calvin Wesley posed any imminent

8  threat of harm to anyone?

9          A.    So what was your question to this?

10         Q.    Having read that, sir, can you verify

11 that the use of force findings make no finding that

12 Wesley Calvin posed a threat to anyone on March

13 11th, 2011?

14         A.    So he says that he actively resisted

15 arrest in here.

16         Q.    But does he -- there's no mention of

17 any threat of harm?

18         A.    Correct.  He did not say that.

19         Q.    All right.  Thank you.

20              MR. VALOIS:  I offer Plaintiff's

21 Exhibit 7 as a deposition exhibit.

22              (Plaintiff's Exhibit 7 marked.)

23              MR. GUYNN:  I'm going to object to

24 it.  I mean, I understand it for identification,

25 but since he had never seen it before, I don't know

Page 100

```
 1  that we can authenticate or he can --
 2                  MR. VALOIS:  Well, for the record,
 3  you provided it to me in discovery.
 4                  MR. GUYNN:  That doesn't mean he did.
 5                  MR. VALOIS:  No.
 6                  MR. GUYNN:  Right.
 7                  MR. VALOIS:  Right.
 8                  MR. GUYNN:  So he's never seen it
 9  before.  That's, I'm just -- it should still be
10  attached to the deposition, because he read it and
11  commented on it.
12                  MR. VALOIS:  Well, right.
13                  MR. GUYNN:  But whether or not it's
14  admissible at this point --
15                  MR. VALOIS:  Oh, okay, yeah.  You're
16  just saying that because he had a lack of
17  foundation essentially.
18                  MR. GUYNN:  Yes.
19                  MR. VALOIS:  All right.  Okay.
20  That's fine.  I'll handle that with an RFA if it
21  comes down to it.  Thanks.  All right.  I see.
22  BY MR. VALOIS:
23          Q.  Let's get on.  Now we're into
24  December.  All right.
25                  So did you have any interaction with
```

1  Calvin Wesley between March 11th of 2021 and

2  December 20th of 2021?

3          A.    I do not believe so.

4          Q.    All right.  He was charged, you

5  charged him with assault on a law enforcement

6  officer?

7          A.    Yes, sir.

8          Q.    That charge was dropped by the

9  prosecutors?

10          A.    By the Commonwealth, yes, sir.

11          Q.    What was the assault that you

12  alleged -- let's go back to March and let's finish

13  that up.

14              What was the act of assault that you

15  alleged occurred?

16          A.    So when the K-9 was deployed -- I'll

17  try to like slow this down in my mind.  I know

18  that -- I don't know which arm, I believe it was

19  his right arm, when the K-9 was deployed, I had my

20  hand up, and then I was elbowed in the top of the

21  arm as well as --

22              MR. VALOIS:  Can we go off the record

23  for just one second?

24              THE VIDEOGRAPHER:  Yes, sir.  The

25  time is 11:52 a.m.  We're off the record.

```
 1                    (Off-the-record discussion.)
 2                    THE VIDEOGRAPHER:  All right.  Our
 3   time is 11:54 a.m.  We're back on the record.
 4                    MR. VALOIS:  All right.  I tell you
 5   what, Mr. Guynn, when do you want to do lunch?
 6                    MR. GUYNN:  I was thinking about
 7   12:30.
 8                    MR. VALOIS:  Because this video is a
 9   little bit longer, and it may take a little longer.
10   I'll do the preliminary stuff first.  It might take
11   me about 15 minutes.  You want to do a break then?
12                    MR. GUYNN:  We can do that.
13   BY MR. VALOIS:
14        Q.   So we're getting back, you had said
15   that the act was after the dog was deployed, he had
16   elbowed you?
17        A.   Yes, sir.
18        Q.   Was he looking at you when he elbowed
19   you, or did his elbow come --
20        A.   His elbow came down.
21        Q.   From behind?
22        A.   Yeah.  It came down like more towards
23   like the side.
24        Q.   Was he facing away from you or facing
25   toward you?
```

```
1              A.    Away.

2              Q.    Okay.  So he couldn't even see you?

3              A.    Correct.

4              Q.    And this was after the dog was

5    latched onto him?

6              A.    Yes.

7              Q.    Is that the only instance of conduct

8    that you perceive to be assaultive conduct?

9              A.    Yes.  Getting elbowed, yes, sir.

10             Q.    All right.  And that's what you

11   reported in your IBR?

12             A.    Yes, sir.

13             Q.    All right.  Moving on.  We're going

14   into December of 2021, and you were dispatched to

15   apartments at 2550 Anthony Place, Number 18?

16             A.    Yes, sir.

17             Q.    Anthony Place, is that an apartment

18   complex?

19             A.    It's kind of like duplexes or

20   townhouses.

21             Q.    Okay.  And it's near Old Forest Road?

22             A.    Yes, sir.

23             Q.    And how did you arrive there?

24             A.    Like in my car?

25             Q.    How did you come to -- what brought
```

1  you there?

2          A.    We were dispatched to -- I believe

3  the initial call was a disorderly call.

4          Q.    Disorderly call at that particular

5  apartment number?

6          A.    Yes, sir.

7          Q.    All right.  And in this one, did you

8  self-dispatch or did you dispatch on your own?

9          A.    I'm not sure.

10         Q.    It was a domestic disturbance call,

11  and when you got there, were you aware of any

12  outstanding warrants for Calvin Wesley at that

13  time?

14         A.    Yes, sir.

15         Q.    All right.  Had that come over

16  dispatch?

17         A.    Yes.

18         Q.    Did you look that up in that Pistol

19  thing?

20         A.    I'm not sure if I did or not.

21         Q.    Or were there notes given?

22         A.    There was notes in CAD.

23         Q.    All right.  Isn't it true that those

24  notes were not for Calvin Wesley, but for Kelvin

25  Wesley?

```
 1             A.    The dispatch notes, CAD notes was
 2   Calvin, with a C.
 3             Q.    The ones you saw?  Was there -- do
 4   you recall having a discussion about whether or not
 5   it was Calvin or Kelvin?
 6             A.    Not prior to the dispatch to the
 7   call.
 8             Q.    No, afterwards.  After the dog had --
 9             A.    Another -- yes.  So after the
10   apprehension on Anthony Place, another officer came
11   up and said it was Kelvin, with a K.
12             Q.    To which you said, "Well, that's not
13   good."
14             A.    Correct.
15             Q.    Right?  And then you whispered, "He
16   has scars on his butt from the last time"?
17             A.    Correct.
18             Q.    Right?  What was that all about?
19   What was the whispering for?
20             A.    Just to blatantly not say it in front
21   of everybody.
22             Q.    Okay.  But the notes definitely said
23   Calvin?  The notes didn't say Kelvin?
24             A.    Correct.
25             Q.    And how do you know that?  You read
```

1  them yourself?

2          A.    Yes.

3          Q.    Okay.  And the warrant was for a

4  misdemeanor?

5          A.    Yes, sir.

6          Q.    All right.  And you said it was, you

7  called it a nonpermitted warrant.

8                Can you describe what you mean by a

9  nonpermitted warrant?

10          A.    So we have to bring them to the

11  magistrate's office before -- we have to bring them

12  to jail before a magistrate.

13          Q.    Can you distinguish, for the record,

14  please, between a permitted warrant and a

15  nonpermitted?

16          A.    So a permitted warrant, we will set

17  an advisement date, and then they can go to court.

18  It's like releasing somebody on a summons.

19          Q.    Right.

20          A.    They sign saying I promise to appear

21  in court on this advisement date.  They go to

22  court, and then the judge will ask if they want an

23  attorney present with them or not.

24          Q.    And the misdemeanor warrant form

25  actually has a provision on the back for permitted,

1  where you can release on a summons instead of

2  having to make an actual arrest, if it's a

3  permitted warrant; right?

4          A.   I haven't read the back of the

5  summons.

6          Q.   The back of a misdemeanor warrant?

7  You haven't read the back of a misdemeanor

8  warrant?

9          A.   I haven't read all the boxes on the

10 back, no.

11         Q.   When you have a permitted warrant in

12 hand, do you execute it differently than if it's

13 nonpermitted?

14         A.   Yes.

15         Q.   Okay.  And that happens by the way

16 you fill out the back; right?

17         A.   Yes, sir.

18         Q.   Okay.  And that's not the case in

19 this case?  In this case, there's no question that

20 this was a nonpermitted warrant?

21         A.   Correct.

22         Q.   Meaning that the duty of the officer,

23 you were there, you had to arrest?

24         A.   Yes.

25         Q.   Any officer, upon notice, by state

```
 1   code, that there's an outstanding warrant, upon
 2   receiving a call by a radio or by computer dispatch
 3   that there's an outstanding warrant, a warrant
 4   against an individual, who encounters that
 5   individual, has a duty to arrest?
 6            A.   Yes.
 7            Q.   All right.  So what happened when you
 8   got to Anthony Place?
 9            A.   The first time?
10            Q.   Oh, I didn't know there were two
11   times.
12            A.   So we were initially dispatched
13   there, and he was gone when we arrived.
14            Q.   Okay.
15            A.   So you talking about the first time
16   when he was gone, or when we actually --
17            Q.   I'm unaware that there were two times
18   that you went there.
19            A.   So --
20            Q.   Just why don't you start with the
21   first time and tell me about what happened?
22            A.   Okay.  So that was the domestic
23   disturbance that we were dispatched to.  His wife
24   called Lyncomm, said that he was making threats
25   towards her.  This was put into the CAD notes, and
```

1   then that's where we were advised that he had a

2   warrant.

3              We had another officer call the

4   complaint desk, or he had dispatch call the

5   complaint desk, verify the warrant.  That was

6   verified.  We could not locate him.  So myself and

7   another officer canvassed the area looking for

8   Mr. Wesley, because he left.  According to the

9   caller, he had left the area on foot.

10             Q.   Right.  And then what'd you do?

11             A.   Then I ended up seeing him.  I

12   checked the apartment complex across from Old

13   Forest Road.  I observed him walking down Anthony

14   Place from Old Forest Road.  I got on the radio,

15   notified the other officer that I observed the

16   suspect, who Ms. Wesley had given us a pretty good

17   suspect description of Mr. Wesley, what he was

18   wearing.  I observed him walking down.  We called

19   it out over the radio, and then made approach on

20   foot.

21             Q.   To where?

22             A.   I believe it was Apartment 26 or

23   36.

24             Q.   Okay.

25             A.   So we were like -- so it's like 18,

```
1   and then he was walking down and standing on the

2   front porch of an apartment building that we

3   observed, and then we approached on foot.

4           Q.   Okay.  So you approached another

5   apartment, and you had received -- you encountered

6   an individual standing outside that apartment;

7   right?

8           A.   Yes.

9           Q.   And that individual said that Calvin

10  Wesley was a friend of his, and he had gone into

11  that apartment?

12          A.   Yes.

13          Q.   And from there you ascertained he

14  jumped out of a window?

15          A.   Yes.

16          Q.   And that window would have been in

17  the back of that apartment?

18          A.   Yes, sir.

19          Q.   And that's trending downhill at that

20  point?

21          A.   Yes, sir.

22          Q.   Is this an apartment where the front

23  of the apartment is at ground level, but the back

24  of the apartment is above ground level?

25          A.   Yes, sir.
```

1        Q.    And so at that point, did you elect
2   to pursue him down that hill?
3        A.    Yes.
4        Q.    All right.  And you had your K-9 with
5   you?
6        A.    Yes.
7        Q.    Why'd you have your K-9 with you at
8   this point?
9        A.    Officer safety.
10       Q.    Were you armed at this point with
11  your standard weapons too?
12       A.    Yes.
13       Q.    All right.  And you had another
14  officer there with you?
15       A.    Yes, sir.
16       Q.    Who was that other officer?
17       A.    Officer Bryant.
18       Q.    There's two Bryants; right?
19       A.    He's Collin, or Chase, Bryant.
20       Q.    Okay.  So you had Officer Bryant with
21  you, and you began a pursuit through the woods with
22  a flashlight.
23             I guess is that your pistol?
24       A.    Yes, sir.
25       Q.    Equipped with a flashlight?

```
1              A.    Yes, sir.
2              Q.    You're using the flashlight on your
3    pistol, and you have the dog with you, and you're
4    pursuing the subject who was headed through those
5    woods?
6              A.    Yes, sir.
7              Q.    And those woods headed towards a road
8    called Westbrook?
9              A.    Yes.
10             Q.    Is that right?  All right.  And
11   that's where you encountered Calvin Wesley; is that
12   right?
13             A.    Yes, sir.
14             Q.    At that time it was dark?
15             A.    Correct.
16             Q.    And you elected to release your dog
17   from physical control at that point; right?
18             A.    Yes.
19             Q.    All right.  How far away was Calvin
20   when you did that?
21             A.    Roughly -- I don't know, 25, 35, 40
22   yards.  I can't say exactly.  I never -- I didn't
23   pace it off or measure it.
24             Q.    Okay.  But approximately 40 yards, in
25   that area?
```

```
 1              A.    Yeah, 25 to 40 yards.
 2              Q.    And in the dark how did you know it
 3   was Calvin?
 4              A.    Like out of the whole thing?
 5              Q.    How did you know it was Calvin?
 6              A.    So I observed him initially walking
 7   down the road, and then I watched him --
 8              Q.    You observed him in the apartment
 9   complex?
10              A.    Yes, sir.
11              Q.    And his wife had given a description;
12   right?
13              A.    Yes.
14              Q.    And were you able to positively
15   identify -- you got a positive identification that
16   he went into the apartment?
17              A.    Yes, I watched him go into the
18   apartment.
19              Q.    Right.  And but how were you
20   able -- when you released a dog that's, what, a
21   quarter mile away?  How far away is that?
22              A.    25 to 40 yards.
23              Q.    No, from the apartment?  How far did
24   you go through the woods before you got to the
25   scene where you released the dog?
```

```
 1                A.   I don't know, maybe 300 yards,
 2   roughly.  Three football --
 3                Q.   A quarter mile is 440; right?
 4                A.   I don't know what it is in yards.
 5   So it was from --
 6                Q.   300 yards?
 7                A.   Yeah.  I'm not sure exactly the exact
 8   distance.  It was a little ways running through the
 9   woods from the apartment.
10                Q.   And you saw a figure running?
11                A.   Yes.
12                Q.   But you can't identify -- if it's
13   dark, you can't tell -- you can't see that figure
14   in the dark; right?
15                A.   I could see Mr. Wesley.  I closed the
16   distance significantly from when we started to
17   where I actually deployed the dog.  I could see he
18   was wearing the same clothing that he was wearing
19   when I observed him first on Anthony Place.
20                Q.   Okay.  And then when you released the
21   dog, Calvin was trying to -- he'd flagged down a
22   car?
23                A.   Correct.
24                Q.   And the car had stopped, and he was
25   trying to get in the back of the car?
```

1           A.    Yes.

2           Q.    And that's when you elected to

3  release the dog?

4           A.    Yes, sir.

5           Q.    Why did you choose to release the dog

6  at that point?

7           A.    Because I couldn't physically get to

8  him in order to take him into custody.

9           Q.    So in order to take --

10          A.    In order to take him into custody,

11 yes, sir.

12          Q.    So is it fair to say that you elected

13 to use the dog to take him into custody in lieu of

14 letting him escape?

15          A.    Yes.

16          Q.    And at that time, the information you

17 had, had you received information yet that there

18 was a protective order?

19          A.    Yes.  I ran that through NCIC on my

20 computer.

21          Q.    So at that time you were aware that

22 he could have been in violation of a protective

23 order?

24          A.    Yes, sir.

25          Q.    Which is a misdemeanor?

```
 1                A.    Correct.

 2                Q.    And that he had an outstanding

 3   misdemeanor warrant?

 4                A.    Yes.

 5                Q.    Right.  You weren't aware that there

 6   was any felony warrant outstanding?

 7                A.    No.

 8                Q.    You had no information that he had

 9   been armed?

10                A.    No.

11                Q.    He hadn't harmed anyone, to your

12   knowledge?

13                A.    Not to my knowledge, no.

14                Q.    And when he was getting into the car,

15   he wasn't threatening anybody?

16                A.    No.

17                Q.    And yet, and so the only reason to

18   release the dog at that point would be that you

19   didn't want him to get away?

20                A.    In order to take him into custody,

21   yes, sir.

22                Q.    That's the only reason for that

23   particular release; right?

24                A.    Yes, that's right.

25                Q.    All right.  We're going to get into
```

1  the video, but where are we, are we at 12:15 yet?

2                    MR. GUYNN:  12:10.

3                    MR. VALOIS:  You want to do your

4  break now?  I'm going to get into the video now, I

5  think.

6                    MR. GUYNN:  That's fine.

7                    MR. VALOIS:  Whichever you want.

8                    MR. GUYNN:  Well, how long is the

9  video going to be?

10                    MR. VALOIS:  It could be a little

11  bit.  I mean, it's going to be frame by frame like

12  we did the other one.

13                    MR. GUYNN:  Right.

14                    MR. VALOIS:  That took about 45

15  minutes.

16                    MR. GUYNN:  I'd say we go ahead and

17  eat lunch now, then.

18                    MR. VALOIS:  All right.  Let's break

19  for lunch.

20                    THE VIDEOGRAPHER:  The time is

21  12:07 p.m.  We're off the record.

22                    (Lunch recess.)

23                    THE VIDEOGRAPHER:  Our time is

24  12:59 p.m.  We are back on the record.

25                    MR. VALOIS:  Okay.  Katie, the video

1  will be V-2, Exhibit V-2.  And can you just run

2  through from the beginning?  There's 30 seconds,

3  again, the sound is going to start at 30 seconds

4  into this.  I don't want it to surprise anyone.

5           (Video playing.)

6  BY MR. VALOIS:

7           Q.   While that's doing that, do you know

8  why that 30-second delay is there?

9           A.   I don't.  I think it's just something

10 with Axon.

11          Q.   That's fine.  This is you responding

12 to the apartments?

13          A.   Yes.

14          Q.   All right.  And that's Knox in the

15 back?

16          A.   Yes.

17          Q.   And you've retrieved him; right?

18          A.   Yes.

19          Q.   Is this the first time you've been

20 there?

21          A.   This will be the second time.  This

22 is when I actually observed him.

23               MR. VALOIS:  All right.  So let's

24 pause that real quick.

25 BY MR. VALOIS:

1          Q.    There's another time that you were
2    there earlier?
3          A.    Initially dispatched.  That's when
4    she said he wasn't there, he had left.  So that
5    call was cleared.  Myself and Officer Bryant stayed
6    in the area and looked for him, and then I observed
7    him walking down the road.  And so this would be
8    the incident.
9              So I don't know if I'm not sure if
10   Chase tagged.  So you can tag, so you have event
11   numbers and you got criminal, or you got IBR
12   numbers.  I don't know if they were linked, but
13   there's the disorderly call, or the initial call,
14   and then this is when we get out.  I don't know
15   what the CAD notes look like.  I don't know if
16   they're tied in to the previous call.
17              Does that make sense, what I'm trying
18   to say?
19         Q.    It will when I see it in a
20   transcript, I'm sure.  But right now, no.
21              But let me ask you this:  Would there
22   be body cam of the earlier incident?
23         A.    I don't know.
24         Q.    Were you wearing a body cam?
25         A.    Yes.  I was wearing a body camera all

1  night.

2          Q.   Was it deployed?

3          A.   It should have been if I was there.

4          Q.   Would it have been saved as a matter

5  of course?

6          A.   I don't know.  Because body camera

7  deletes after.

8          Q.   All right.  Well, Katie, hold up on

9  this one.  I hate to do this to you, but let's move

10 back to that first incident.

11              How long before this was that

12 time-wise?

13         A.   I had not left the area, so it was

14 right before this.

15         Q.   So minutes?

16         A.   I'd say within 20 minutes.

17         Q.   Okay.  We're not talking 3 hours?

18         A.   No.  I don't know exactly.  I can't

19 say like it was --

20         Q.   So you responded and met with

21 Calvin's wife?

22         A.   Yes.

23         Q.   And we're calling her a wife?

24         A.   I don't know if it's ex-wife or what

25 their relationship is.

```
 1              Q.   Right.  But long-term relationship
 2  with this lady?
 3              A.   Yes.
 4              Q.   Her name is Shanda?
 5              A.   Shayna.
 6              Q.   Shayna, right.
 7              And so is that who you spoke with at
 8  the first incident?
 9              A.   Yes.  It was myself and Officer
10  Bryant.
11              Q.   And was it her apartment where you
12  spoke with her?
13              A.   Yes.  It would have been, Apartment
14  18 is what we were initially dispatched to.
15              Q.   And did she make a statement to you?
16              A.   Yes.
17              Q.   And what did she tell you exactly?
18              A.   So that's in my IBR, or the CAD
19  notes, or in the IBR, exactly what she said to the
20  dispatcher, that he had threatened her and
21  threatened to choke her.
22              Q.   Threatened to choke her?
23              A.   And then leave drugs in the
24  apartment, and then he left on foot.
25              Q.   He threatened to choke her and leave
```

```
 1  drugs in the apartment?
 2            A.   Yes.  That's in the -- that's what
 3  the calltaker put into the CAD notes.
 4            Q.   Okay.  And that's --
 5            A.   She personally did not tell me
 6  that.
 7            Q.   Okay.  That's what you had when you
 8  got there?
 9            A.   Yes.
10            Q.   What did she tell you when you got
11  there?
12            A.   I don't remember exactly what she
13  said.
14            Q.   Okay.  But she gave you a description
15  of Calvin, you said; right?
16            A.   Yes.  She had given that to the
17  calltaker.
18            Q.   Okay.  How long did you speak with
19  her at the apartment?
20            A.   I don't remember exactly.
21            Q.   Are we talking -- can you estimate?
22  Are we talking an hour?
23            A.   No.  It was just --
24            Q.   A few minutes?
25            A.   It was relatively short, yes sir.
```

1          Q.    So then you stayed on scene?

2          A.    In the area, yes.

3          Q.    Looking for Calvin?

4          A.    Yes.

5          Q.    All right.  And then eventually you

6    saw Calvin going towards that other apartment?

7          A.    Yes.

8          Q.    All right.  And that's where we're

9    starting now?

10         A.    Yes sir.

11         Q.    How far away from you -- from Calvin

12   were you when you saw him go to the other

13   apartment?

14         A.    So this is, so to the right side of

15   the screen is Old Forest Road.  There's this house,

16   and then it's Anthony Place.  100 yards maybe.

17         Q.    Okay.  So from 100 yards away you see

18   somebody matching -- you can't identify him at 100

19   yards as being Calvin, obviously; right?

20         A.    No, but he's wearing the clothing

21   that --

22         Q.    Okay.  You suspect he's Calvin, and

23   then when you get to the door, we're going to see

24   when you get to the door here that that neighbor

25   identifies him as Calvin; right?

```
 1                    A.    Yes.
 2                    MR. VALOIS:  Okay.  All right.  Go
 3    ahead and start it back up.
 4                    (Video playing.)
 5                    MR. VALOIS:  Pause.
 6    BY MR. VALOIS:
 7             Q.    So we just heard you say it's going
 8    to be a reference to the last call, and you don't
 9    want to put it over Channel 1?
10             A.    Yes.
11             Q.    And why would you not want to put it
12    over Channel 1?
13             A.    We have a lot of suspects in
14    Lynchburg, or individuals in Lynchburg, they all
15    listen to our radio traffic.
16             Q.    So you have an unencrypted -- Channel
17    1 is unencrypted?
18             A.    Yes.
19             Q.    Do you know why they don't encrypt
20    it?
21             A.    I don't know.
22             Q.    It seems like it'd be a quarter well
23    spent.  But, hey, that's a different -- we'll leave
24    that for a different day.  All right.  So that's
25    the purpose there.  That makes sense.
```

Page 125

```
 1                  MR. VALOIS:  Go ahead and start it
 2    back up, Katie.
 3                      (Video playing.)
 4                  MR. VALOIS:  All right.  Scooch up
 5    about a minute, Katie.  You see those buttons on
 6    the -- to the right of the pause button, they
 7    actually move in 5-second increments.  So push it
 8    through a few times, and let's get to the part
 9    where we get to the apartment building.
10                  MS. THOMAS:  It's taking it back to
11    the beginning every time.
12                  MR. VALOIS:  Figures.  All right.
13    Yeah.  Take it to the right.  Let's try about 3
14    minutes, see where we are.  Yeah.  A little bit
15    more.  There we go.  Back about -- there you go.
16                      (Video playing.)
17                  MR. VALOIS:  All right.  Pause that
18    right there.
19    BY MR. VALOIS:
20          Q.   Now, is he the one, did he positively
21    identify Calvin?  He said it was his neighbor, but
22    did you hear him positively identify Calvin?
23          A.   No.
24                  MR. VALOIS:  All right.  Go ahead.
25    Well, let me pause it again just a second.
```

```
 1   BY MR. VALOIS:

 2          Q.   Did you actually observe the person

 3   you believed to be Calvin from 100 yards away go

 4   into that apartment?

 5          A.   Yes.

 6          Q.   Okay.

 7               MR. VALOIS:  All right.

 8               (Video playing.)

 9               MR. VALOIS:  Pause right there.  All

10   right.

11   BY MR. VALOIS:

12          Q.   You're pointing your flashlight

13   towards the back of that apartment into a -- it

14   looks like a wooded area, and that's a pretty steep

15   hill headed down; is that correct?

16          A.   Yes.

17          Q.   And it enters into woods that are

18   headed towards Westbrook Drive; right?  Westbrook

19   Road or whatever?

20          A.   Yeah, whatever the back road is.

21               MR. VALOIS:  Okay.  All right.  Go

22   ahead, Katie.

23               (Video playing.)

24               MR. VALOIS:  Pause.

25   BY MR. VALOIS:
```

```
 1              Q.   So you've asked for backup?
 2              A.   Yes.
 3                   MR. VALOIS:  All right.  Now, Katie,
 4   scooch it up.  Not much happens until he leaves to
 5   run, so let's pop it up forward a little bit.  A
 6   little bit more.  Keep going.  All right.  Stop.
 7   Okay.
 8   BY MR. VALOIS:
 9              Q.   So we're at 21:58:52, and you're
10   beginning to run away from that apartment; right?
11              A.   Yes.
12              Q.   Where are you headed?
13              A.   Around to the back side.
14              Q.   Why?  For what purpose?
15              A.   In order to pursue Mr. Wesley.
16              Q.   Okay.  And that's the person that you
17   had seen go into the apartment in Apartment 26?
18              A.   Yes.
19              Q.   And you had concluded that he had
20   jumped out the back window?
21              A.   Yes.
22              Q.   All right.  And so is there anybody
23   there with you?  Do you have an officer there with
24   you at this time?
25              A.   Officer Bryant was behind me.
```

```
 1                    MR. VALOIS:  Okay.  All right.  Go
 2   ahead, Katie.
 3                    (Video playing.)
 4                    MR. VALOIS:  Pause.
 5   BY MR. VALOIS:
 6        Q.   Now, you just saw another officer, or
 7   an officer, join you on your right side there?
 8        A.   Yes.
 9        Q.   Do you know who that officer was?
10        A.   Officer Rowland.
11        Q.   All right.  Rowland.  So now there
12   are two officers.
13                    You're in the lead, or is there
14   anybody in front of you, or are you leading?
15        A.   I'm leading.  Officer Bryant stayed
16   back at the apartment.
17        Q.   Okay.
18        A.   I advised him to keep eyes on the
19   subject.
20        Q.   Okay.
21        A.   And then Officer Rowland initially
22   starts to join me.
23        Q.   All right.  So you and Knox are in
24   front?
25        A.   Yes.
```

```
 1                    Q.    Officer Rowland's behind you?

 2                    A.    Yes.

 3                          MR. VALOIS:  All right.  Go ahead,

 4    Katie.

 5                          (Video playing.)

 6                          MR. VALOIS:  Pause.

 7    BY MR. VALOIS:

 8                    Q.    All right.  That's your firearm with

 9    its flashlight attached?

10                    A.    Yes.

11                    Q.    And the reason you've drawn the

12    firearm is solely for the flashlight at this point;

13    right?  You're not --

14                    A.    Yes.  I'm now searching.

15                    Q.    You're not looking to shoot anybody?

16                    A.    No, but I'm now searching woods,

17    looking for an individual.

18                    Q.    Okay.  But the only reason, to be

19    clear, for the deployment of the flashlight is

20    illumination?

21                    A.    For the firearm?

22                    Q.    I mean, the deployment of the firearm

23    is for the illumination that comes with it?

24                    A.    Correct.  Illumination and protection

25    of yourself.  We're trained to never enter the
```

```
 1  woods.
 2              MR. VALOIS:  Okay.  All right.
 3  Go ahead, Katie.
 4              (Video playing.)
 5              MR. VALOIS:  Pause, Katie.
 6  BY MR. VALOIS:
 7         Q.   What command did you just give him
 8  there?
 9         A.   To heel, fuss.
10         Q.   And by heel, does that mean to stay
11  by your side?
12         A.   Yes.
13         Q.   Is the dog leading you at that point?
14         A.   We're both running, so the dog's in
15  front of me.  He's not leading me.  We're not
16  tracking or anything.  We're just running at that
17  point.
18         Q.   What was he doing that you felt at
19  the time you needed to tell him to heel?
20         A.   He was in front of me.
21         Q.   Okay.  So you just wanted to back --
22         A.   I just wanted him close, closer to
23  me.
24         Q.   Got you.  All right.
25              (Video playing.)
```

```
 1                    MR. VALOIS:  Pause again, Katie.
 2   BY MR. VALOIS:
 3           Q.   We can see that it's a pretty steep
 4   incline here, because you can see the level bricks
 5   of a retaining wall to the left there?
 6           A.   Yes.
 7           Q.   Right.  So although it looks flat, if
 8   you look straight ahead, this is, in actuality,
 9   this is a pretty steep decline; right?
10           A.   Yes.
11                    MR. VALOIS:  All right.  Go ahead,
12   Katie.
13                    (Video playing.)
14                    MR. VALOIS:  Quick pause.  Pause
15   right now.
16   BY MR. VALOIS:
17           Q.   Okay.  Warning is issued at 21:59:40,
18   41, about then; right?
19           A.   Yes.
20           Q.   "Do not run.  I have a warrant for
21   your arrest," and you've reached the bottom of that
22   hill.
23                    You're still in that wooded area;
24   right?
25           A.   I haven't reached the bottom yet.
```

1  The brook bed is the bottom of the hill.

2          Q.    Okay.  So we're still in this steep

3  decline part; correct?

4          A.    Yes.

5          Q.    And have you seen Calvin?

6          A.    You can see him on camera.

7          Q.    Do you see him right now?

8          A.    Yes.  Right there.

9          Q.    That's him?

10         A.    Yes.

11         Q.    Okay.

12         A.    I believe that's him.  You can see

13  movement.  Like, if you rewind it and then play it

14  again, you should be able to see movement when I

15  first make that initial --

16             MR. VALOIS:  All right.  Katie, let's

17  try this.  Let's go back to 345.  All right.  Go up

18  at the top, where it says video.  Go down to where

19  it says -- no.  There's a playback.  How about

20  tools?  It might be in tools.  Playback.  Speed.

21  All right.  Let's do this.  Let's do slower.

22             MS. THOMAS:  Which one?

23             THE WITNESS:  I don't want interrupt

24  you.  If you -- if it's paused, you can click the

25  next book, and then it goes slower.  Does that make

```
 1   sense?
 2                  MS. THOMAS:  If it's paused, do what?
 3                  THE WITNESS:  Then you can click the
 4   next arrow.
 5   BY MR. VALOIS:
 6          Q.   That does frame by frame; right?
 7          A.   Yeah.
 8                  MR. VALOIS:  All right.  Well, I'll
 9   tell you what, let's go ahead and click frame by
10   frame.  Be ready to click a lot, all right, because
11   it's 30 frames per second.  So go ahead and start
12   clicking through.  Let's do frame by frame.
13                  MS. THOMAS:  The button likes to take
14   it back to the beginning.
15                  MR. VALOIS:  Yeah, let's don't do
16   that.
17                  MS. THOMAS:  Where were we?
18                  MR. MCFADGEN:  345.
19                  (Video playing.)
20                  MR. VALOIS:  All right.
21                  MS. THOMAS:  Oh, for Pete's sake.
22                  MR. VALOIS:  All right.  That's okay.
23   Let's just let it go.
24                  (Video playing.)
25                  MR. VALOIS:  All right.  Let's pause
```

1  that right now.

2  BY MR. VALOIS:

3        Q.    So you've given multiple warnings to

4  him that you're going to release the dog, and the

5  dog will bite him unless he gets on the ground;

6  right?

7        A.    Correct.

8        Q.    Can you tell what he's saying?

9  Because is it -- I can't tell from the audio, but

10 do you know what he's saying?

11       A.    I don't.  I just know he was yelling

12 back at me.

13       Q.    I can't -- okay.

14             MR. VALOIS:  Go ahead.

15             (Video playing.)

16             MR. VALOIS:  Pause.

17 BY MR. VALOIS:

18       Q.    All right.  A car's coming, and

19 Calvin's out of the -- Calvin's just above that.

20 That's him next -- between the tree and the spot on

21 the ground; right?

22       A.    Yes.

23       Q.    That's him?  All right.  And there's

24 a car coming to the left; right?

25       A.    Yes.

```
 1              Q.   And what we're going to see here,
 2    we're going to see Calvin run out and try and flag
 3    that car down; right?
 4              A.   Yeah.  He runs towards the car.
 5              Q.   He's going to run out in the road and
 6    wave his hands to stop that car; is that right?
 7              A.   I don't know.  I don't remember if he
 8    waved his hands.  I know he was running towards
 9    that vehicle.
10              Q.   All right.  Let's watch it and see if
11    you agree?
12                   (Video playing.)
13                   MR. VALOIS:  Okay.  Stop.
14    BY MR. VALOIS:
15              Q.   Did you see him waving his hands
16    there to stop the car?
17              A.   I saw him -- what appeared with his
18    hands up.
19              Q.   All right.  The car stops, at any
20    rate; right?
21              A.   Yes.
22              Q.   All right.  And you've already issued
23    packen, packen?
24              A.   Yes.
25              Q.   All right.  And that's bite?
```

Evans & Company

```
 1              A.    Correct.

 2              Q.    Right?

 3              A.    Or apprehend.  It's not bite.  To

 4   take hold of is the correct terminology.

 5              Q.    Okay.  But it has the effect of the

 6   dog placing his jaws with teeth somewhere on

 7   Calvin's flesh?

 8              A.    Yes.

 9                    MR. VALOIS:  Okay.  Go ahead and

10   play.

11                    (Video playing.)

12                    MR. VALOIS:  Right there.  Okay.

13   BY MR. VALOIS:

14              Q.    So right now we're at 22:00:23, and

15   the dog is chomping onto Calvin's forearm; right?

16              A.    The dog bit Calvin's forearm, yes.

17              Q.    Right.  And it's continuing to bite;

18   right?

19              A.    Yes.

20                    MR. VALOIS:  All right.  Go ahead.

21                    (Video playing.)

22                    MR. VALOIS:  Katie, back it up to

23   0458 and let it play to about 0506, please.

24   BY MR. VALOIS:

25              Q.    Wait, before we do that, you don't
```

```
 1   know who's driving this car?
 2            A.    I don't.
 3            Q.    Okay.  They obviously didn't want to
 4   stick around; right?
 5            A.    Yeah, they drove off.
 6            Q.    They took off as soon as the dog
 7   showed up; right?
 8                  MR. VALOIS:  All right.  Hit play.
 9                  (Video playing.)
10                  MR. VALOIS:  Katie, run it back again
11   to make it 445, please.  I mean, 455.  I want to
12   make sure we're not missing anything.  Go ahead.
13                  (Video playing.)
14                  MR. VALOIS:  Pause.
15   BY MR. VALOIS:
16            Q.    You just tell him do not hit the dog?
17            A.    Yeah.  Do not hurt the dog, because I
18   observed him punch the dog multiple times at this
19   point.
20            Q.    All right.
21            A.    I watched him punch the dog a couple
22   of times in the head.  So I said, "Don't hurt the
23   dog."
24            Q.    All right.  But that time the dog's
25   head is like biting into his arm; right?
```

1          A.    The dog is on his forearm, yes.

2          Q.    On it, it's biting, its teeth are

3    sinking into his flesh; right?

4          A.    He's biting his forearm.

5          Q.    Well, that's got to be excruciatingly

6    painful, wouldn't you suspect?

7          A.    Yes.

8          Q.    Do you honestly expect someone in

9    that condition not to reflexively punch at

10   something?

11         A.    I would hope so.

12         Q.    Hope what?

13         A.    That they wouldn't punch a police

14   K-9.

15         Q.    I mean, if a dog were to jump up and

16   bite you on the arm and refuse to let go, would you

17   punch it?

18         A.    If I was trying to get the K-9 off of

19   me, yes.

20         Q.    Okay.  And similarly, if he's trying

21   to get the K-9 off of him, wouldn't it be

22   reasonable to expect him to punch the dog?

23         A.    Well, I asked him not to hurt the

24   dog, yes.

25         Q.    Well, do you expect someone who is

```
 1   suffering excruciating pain while being bitten by a

 2   dog to act reasonably?

 3           A.   I don't know.

 4           Q.   Would you expect that?  Have you been

 5   trained to expect that?

 6           A.   To ask for compliance from people?

 7           Q.   To expect people who are being bitten

 8   by a dog to act reasonably?  Have you been trained

 9   to expect that?

10           A.   Not specifically, no.

11           Q.   Have you been trained to expect that

12   they're not going to act reasonably while a dog is

13   biting on them?

14           A.   I'm not sure what you're asking.

15   Like are you asking like if we train specifically

16   for people to not hit our animals?

17           Q.   No.  I'm asking you to -- whether

18   have you been trained in human behavior as a result

19   of being bitten by a dog?  Have you received that?

20   Is that a part of your training?

21           A.   No.

22                MR. VALOIS:  In any event -- all

23   right.  Let's take it to -- oh, take it to

24   22:00:15, and let it run until 19.

25                MS. THOMAS:  You said 15?
```

1                    MR. VALOIS:  15.  Yeah, that's fine.

2  You can let it run until 19 from there.  That's

3  good enough.

4                    (Video playing.)

5                    MR. VALOIS:  Stop.

6  BY MR. VALOIS:

7        Q.    You issue a command there, nein and

8  phui?

9        A.    Yes.

10       Q.    Those are corrections to the dog?

11       A.    Yes.

12       Q.    Phui being an even stronger

13  correction than nein?

14       A.    Yes.

15       Q.    What are you trying to correct the

16  dog, what are you trying --

17       A.    The dog, the K-9 nipped me.  K-9 Knox

18  nipped me.

19       Q.    What does Knox nipped you mean?

20       A.    Like he bit my leg, so I said no.

21       Q.    Does a dog routinely bite people

22  without being commanded?

23       A.    Not my dog, no.  It's, I would say it

24  is common in training for a K-9 to test his handler

25  and nip at the handler during apprehension work,

1   yes.  If you talk to K-9s -- the K-9, it's common

2   for a K-9 to nip at its handler.

3           Q.    When you say "nip," did it actually

4   bite you?

5           A.    He just like nipped at me.

6           Q.    Did it draw blood or anything?

7           A.    No.

8                 MR. VALOIS:  All right.  45, where

9   are we?  Are we at 456.  Okay.  Take it up

10  to -- we've already been through this whole page.

11  BY MR. VALOIS:

12          Q.    Now, let's go back to -- before we go

13  further.

14                So you see him getting in the car,

15  you order packen, packen, which is bite, bite,

16  right, or -- or what do you call it?  You don't use

17  the word bite, you use what?

18          A.    To take hold of.

19          Q.    Take hold of.  Take hold of, take

20  hold of in German; right?  But -- and you release

21  the dog from its leash, and I believe you already

22  testified the sole purpose of doing so is to try

23  and take custody of Calvin?

24          A.    Yes.

25          Q.    At this point, he's unarmed?

```
 1              A.    I don't know that at this point.
 2              Q.    Well, you don't know that he's armed?
 3              A.    I can't see a weapon.  I didn't see a
 4    weapon.
 5              Q.    And you had not received any
 6    information that he had a weapon?
 7              A.    Correct.
 8              Q.    You've never known him to carry a
 9    weapon?
10              A.    Correct.
11              Q.    All right.  You had no reason to
12    believe he had a weapon?
13              A.    At this point I could not see a
14    weapon.
15              Q.    But you had no reason to believe that
16    he did have a weapon?
17              A.    He did not say I have a gun, or I
18    have a knife.  We didn't receive any information,
19    but you never assume the suspects we're dealing
20    with are unarmed.
21              Q.    Do you always assume that they are
22    armed?
23              A.    Potentially, yes.
24              Q.    You do?
25              A.    Because I've had a firearm pulled on
```

1  me in my past with a suspect that is never -- was

2  never armed with me, and then he pulled a firearm.

3          Q.   Oh, sure.  I mean, your job is

4  dangerous, there's no doubt about it.

5               But is that the official policy of

6  Lynchburg Police Department, is to treat every

7  suspect as though they're armed?

8          A.   I'm not going to quote the policy.

9  I'm not sure.

10          Q.   Is that your policy?

11          A.   I treat --

12          Q.   Do you treat every suspect?

13          A.   I treat suspects as if they are armed

14  until I observe they are no longer -- they're not

15  armed.

16          Q.   Is that a practice that's common with

17  other officers?

18          A.   Yes.

19          Q.   Are you trained in that practice?

20          A.   Yes.

21          Q.   Trained by LPD in that practice?

22          A.   Yes.

23          Q.   So why not just let him go at this

24  point and catch him later?  If all he's being -- if

25  all you're chasing him for is misdemeanors, why not

```
 1   just let him go and catch him later?
 2              A.   I'm not -- I can't say what my
 3   thought process was, why I wouldn't let him go.  We
 4   routinely don't let suspects just run away and get
 5   away and then be like, we'll catch him later.
 6              Q.   Even misdemeanor subjects?
 7              A.   Yes.
 8              Q.   Is it your -- is it the policy to use
 9   force on misdemeanor subjects rather than let them
10   go?
11              A.   In this case, yes.
12              Q.   Well, I'm not asking about this case.
13              In general, does LPD have a policy
14   where that's permissible?
15              A.   To what?
16              Q.   To use force against fleeing
17   misdemeanor subjects?
18              A.   Yes, we can.
19              Q.   Even force that could inflict a
20   serious injury?
21              A.   Yes.
22              Q.   That's their policy?
23              A.   Yes.  We can utilize force.
24              Q.   All right.  That inflicts serious
25   injury?  This force inflicted a serious injury;
```

1  right?

2          A.   We can utilize force to apprehend a

3  suspect.

4          Q.   I'm asking force?  I'm asking, what

5  I'm asking for specifically, can you use force that

6  inflicts serious injury upon a fleeing misdemeanor

7  subject?

8          A.   Yes.

9          Q.   All right.  And that's your policy?

10         A.   Yes.

11         Q.   And you're trained in that?

12         A.   Yes.

13         Q.   How long has the LPD maintained this

14 policy?

15         A.   I'm not sure.

16         Q.   Do other officers follow the same

17 policy?

18         A.   Yes.

19         Q.   Have you seen other officers do the

20 same thing?

21         A.   Yes.

22         Q.   Frequently, routinely?

23         A.   Yes.

24         Q.   Routinely?

25         A.   I see officers utilize force taking a

```
 1  suspect into custody for misdemeanor warrants.
 2            Q.    When you released the dog, you knew
 3  the dog would bite him?
 4            A.    Yes.
 5            Q.    So you released him with the intent
 6  for the dog to bite him?
 7            A.    Yes.
 8            Q.    And you actually charged him with a
 9  felony for hitting the dog?
10            A.    Yes.
11            Q.    But that charge was dropped?
12            A.    The Commonwealth dropped that charge,
13  yes.
14            MR. VALOIS:  Okay.  Let's -- Katie,
15  let's run it up -- where are we?  We're at 2218.
16  Let's go to 20 - 20:00:27, make it 28.  That's
17  fine.  That's good enough.  From there to -- make
18  it, make it 30.  Let it run up to 20:00:30.
19                 (Video playing.)
20  BY MR. VALOIS:
21            Q.    Okay.  So you're telling him to get
22  on the ground; right?
23            A.    Yes.
24            Q.    And he's got the dog still attached
25  to his forearm?
```

```
 1              A.    Yes.
 2              Q.    And he's saying, "Get the dog off
 3  me"?
 4              A.    Yes.
 5              Q.    He's not running now.  He's standing
 6  still?
 7              A.    Correct.
 8              Q.    Why not just go grab him and pull the
 9  dog off him?
10              A.    I was by myself at that point.
11              Q.    Okay.  So you wanted to wait for
12  backup?
13              A.    Yes.
14              Q.    Okay.  And so why not draw a weapon
15  on him and take the dog off him?
16              A.    I do have my weapon.
17              Q.    Well, if you have your weapon, then
18  why do you keep letting the dog bite on him?
19              A.    Because there's -- so you're
20  saying --
21              MR. GUYNN:  As opposed to shooting
22  him?
23              MR. VALOIS:  Well, I mean --
24              MR. GUYNN:  I'm sorry.
25  BY MR. VALOIS:
```

1          Q.    Well, I'm serious, if you have other
2    weapons -- you have a taser; right?
3          A.    You never transition from lethal to
4    less lethal by yourself.  We were trained that way
5    in the academy.
6          Q.    What do you mean, lethal?
7          A.    So we never -- you never holster your
8    firearm and transition to a less lethal tool in a
9    situation like this completely by yourself.
10          Q.    Well, you're not -- are you using
11    this -- right now in this situation, are you using
12    lethal force?
13          A.    No.
14          Q.    Or are you pointing a flashlight at
15    him?
16          A.    I have him a firearm.
17          Q.    Right.  Are you using it as force or
18    for illumination?
19          A.    I'm using it with both.
20          Q.    Okay.  So you're using lethal force
21    now?
22          A.    I'm not using lethal force now.
23          Q.    You're threatening lethal force with
24    a firearm?
25          A.    I'm not making any threats with a

1  firearm.  I'm using the firearm to maintain

2  protection for myself until I get assistance from

3  my backup officer that's shortly behind me.

4          Q.    Okay.  But I understand you to say

5  that the use of force continuum, you don't go from

6  lethal to less lethal, but you're not using lethal

7  at this point?

8          A.    Correct.

9          Q.    So that wouldn't apply, using your

10  reasoning; right?

11          A.    What?

12          Q.    You're not using lethal force, then

13  you don't have to worry about not using lethal

14  force, because you're not using it?

15          A.    I don't know what you're asking.

16          Q.    Okay.

17          A.    Are you asking why I have my firearm

18  out?

19          Q.    Yes.

20          A.    So I have my firearm out for personal

21  protection at this point.

22          Q.    Okay.

23          A.    I've seen him running through the

24  woods, ignoring commands, which he had multiple of.

25  I made the determination to deploy the dog, watched

1  him, observed him punch the dog.  At this point, I

2  still don't know weapon-wise.  I still have my

3  firearm.  Once when I have backup arrive, I holster

4  my firearm, and then I go hands-on with the K-9.

5           Q.   Okay.  Let's -- but to be clear, you

6  have all those weapons still with you.

7           Right now at this instant, you have a

8  taser, you have pepper spray, you have a baton?

9           A.   Yes.

10           Q.   And your gun is out and pointed.

11           Are you pointing it at Calvin?  I

12  mean, the light is on him.  Does that mean the gun

13  is pointed at him too?

14           A.   If the light's illuminating, yes.

15           Q.   Okay.  All right.  And you're

16  ordering him packen again, you're continuing to

17  order the dog to bite Calvin?

18           A.   Correct.  I'm telling the dog that

19  he's doing what I'm asking him to do.

20           Q.   Which is to bite Calvin Wesley on the

21  forearm?

22           A.   Yes.

23           MR. VALOIS:  Okay.  All right.

24  Katie, let's move it up to -- I'm going to get to

25  about 20, let it run from where you were to about

```
 1   2044, and be ready to pause, please.
 2                   (Video playing.)
 3                   MR. VALOIS:  Pause.
 4   BY MR. VALOIS:
 5           Q.   Okay.  He's on the ground now, right?
 6           A.   Yes.
 7           Q.   22:00:44.  All right.  Now he's on
 8   the ground.  He's complied with your command.
 9                   Are you going to release the dog now?
10           A.   That's what I'm walking, to grab a
11   hold of the K-9.
12           Q.   You're going to walk towards him to
13   release him; right?
14           A.   Yes, to get the K-9 to release.
15                   MR. VALOIS:  All right.  Go ahead.
16   Hit play, Katie.
17                   (Video playing.)
18                   MR. VALOIS:  Pause.
19   BY MR. VALOIS:
20           Q.   All right.  Now, you can see that you
21   ordered him to -- the dog to bite while he was
22   still on the ground before this; right?
23           A.   Huh?
24                   MR. VALOIS:  Well, let's roll it
25   back.  Roll it back and let it play to this point.
```

1   We're at 20:00:54.  Roll it back to 20:00, say, 30.

2   Just let it play all the way out to that point,

3   Katie.  That's good enough.

4                 (Video playing.)

5                 MR. VALOIS:  Get ready to pause it.

6   All right.  Go ahead.  Is that it?  Pause.

7   BY MR. VALOIS:

8          Q.   Okay.  So he's saying get the dog off

9   me, and you're engaging in this conversation with

10  him about he's not going to bite you in the face?

11         A.   Yeah.  He said, "He's going to bite

12  me in the face."

13                I said, "He's not going to bite you

14  in the face."

15         Q.   All right.  Why are you confident

16  that the dog won't bite him in the face?

17         A.   So we don't train our dogs to bite

18  human beings in the face.

19         Q.   All right.

20         A.   Very rarely will a dog release and

21  then reengage.

22         Q.   Okay.  And you just said, at this

23  point, at 20:00:53, you've just said your first

24  command, aus; right?

25         A.   Yes.

Page 153

```
 1              Q.   All right.  And the dog ignores this
 2    command?
 3              A.   If we could play it.
 4                   MR. VALOIS:  Go ahead, play it.
 5                   (Video playing.)
 6                   MR. VALOIS:  Again, pause.
 7    BY MR. VALOIS:
 8              Q.   Now we have another aus.  At 20:00:56
 9    we had an aus, and at 20:00:57 we have a buoy.
10              How do you say that?
11              A.   Pfui.
12              Q.   Pfui, does it start with a P-F?
13              A.   It's an F.
14              Q.   In German?
15              A.   I believe so.
16              Q.   I think that'd be like a finick.  I
17    think that would be a P-F word, but I'm not sure.
18              But it's a German word; right?
19              A.   Yes.
20              Q.   All right.  And it's the even harsher
21    command, you said nein and pfui?
22              A.   Yes.
23              Q.   And that's because the dog's not
24    obeying your command to release, your aus; right?
25              A.   Correct.
```

Page 154

```
 1            Q.   Okay.  So, and the whole time the dog
 2  is still biting into Calvin's forearm?
 3            A.   Yes.  As of right now.
 4                 MR. VALOIS:  All right.  Let's run it
 5  up to 22:00 -- 22:01:00, Katie.
 6                 (Video playing.)
 7                 MR. VALOIS:  All right.  So that's
 8  the fourth -- pause.
 9  BY MR. VALOIS:
10            Q.   So at 22:01:00, we get the fourth
11  command aus; right?
12            A.   Yes, sir.
13            Q.   And the dog is still ignoring your
14  command?
15            A.   The dog at this point is hung up in
16  Calvin's shirt.  If you rewind the video, you see
17  that, you see Calvin's arm, and then you see his
18  shirt pulled away from his arm.  They're in
19  different directions.
20                 MR. VALOIS:  Rewind the video.  All
21  right.
22                 (Video playing.)
23                 THE WITNESS:  So you see his hand,
24  and then you see the shirt being pulled.  So the
25  K-9 is not in contact with his skin at this point.
```

1  BY MR. VALOIS:

2          Q.    Okay.  But he's still ignoring your

3  command to release the shirt?

4          A.    The canines, the dog's canines are

5  hooked into the suspect's shirt.

6          Q.    Okay.  So it took, again, it took it

7  four auses to get the dog to release?

8          A.    Yes.

9          Q.    All right.  So the first three ones

10  he ignored?

11          MR. GUYNN:  Objection.

12  BY MR. VALOIS:

13          Q.    The first three ones he disobeyed?

14          A.    Correct.

15          Q.    The dog disobeyed your command for

16  the first three; is that correct?

17          A.    Yes.

18          And then -- and then so he released.

19          MR. VALOIS:  Let's go back and mark

20  the time of the release.

21          (Video playing.)

22  BY MR. VALOIS:

23          Q.    Is he released now?

24          A.    That's when we completely break

25  contact with Mr. Wesley's shirt.

```
 1                    MR. VALOIS:  Okay.  Run it back
 2   to -- again.  Let's find out the time when the dog
 3   gets off his arm, Katie.  Let's note that for the
 4   record.  Back a little bit further.  Go ahead and
 5   run that.
 6   BY MR. VALOIS:
 7             Q.   Will you ask her to pause when you
 8   see the dog get off his arm, please?
 9             A.   Yes, sir.
10                  (Video playing.)
11                  THE WITNESS:  So right in here, he is
12   no longer in contact.  This is my personal
13   observation.  He's no longer in contact with
14   Mr. Wesley's --
15   BY MR. VALOIS:
16             Q.   Go ahead and -- so let's note that
17   time as 22:01:01.
18                  You see that?
19             A.   Yes, sir.
20                  MR. VALOIS:  All right.  Let's go
21   ahead and play it.
22                  (Video playing.)
23   BY MR. VALOIS:
24             Q.   All right.  Okay.  All right.  Now,
25   you've just issued several corrections to the dog.
```

```
1              You've given him at least two neins
2  and the pfui?
3         A.   Yes, sir.
4         Q.   What do you do, how do you reinforce
5  that?  Do you -- I mean, is it possible to send a
6  police dog mixed messages?  I mean, after you issue
7  corrections and say, for example, you were to give
8  them a reward or a pat on the head, wouldn't that
9  be sending the dog mixed messages?
10        A.   What do you mean?
11        Q.   Well, it's a dog.  I don't know, you
12 tell me?  I'm asking you a question.
13        A.   So the sequence of a command is a
14 command, correction, command.  If that -- there's
15 no change, then it's command, correction, command.
16 And then whether you can get a physical command or
17 a physical correction, that's a sequence of a
18 command.  So if the dog complies, it's command,
19 praise.
20        Q.   Right.  Anytime the dog -- right,
21 because dogs respond to praise too; right?
22        A.   Yes.
23        Q.   Right.  That's what
24 I'm -- essentially that's what I'm asking you is,
25 is when do you praise a dog?  Do you, if a dog's
```

```
 1   been disobedient, do you praise it then or --

 2           A.    No.

 3           Q.    -- you correct it; right?

 4           A.    Yes.

 5           Q.    And then, but if it then obeys your

 6   command, then you praise it; right?

 7           A.    If it obeys, yes.

 8                 MR. VALOIS:  Okay.  Can you

 9   fast -- put it up to near the end, the very end of

10   the video?  Let it go.  Let it go right here, and

11   just run it to the end.

12                 (Video playing.)

13   BY MR. VALOIS:

14           Q.    Okay.  That's you actually turning

15   off your body cam; right?

16           A.    Yes.

17           Q.    Okay.  Why did you turn off your body

18   cam?

19           A.    I don't know.

20           Q.    Isn't it your policy that before you

21   turn off a body cam, you have to announce why

22   you're turning it off?

23           A.    Yes.  We say, "End body cam

24   recording."

25           Q.    All right.  And you didn't do that
```

1  there?

2          A.   No.

3          Q.   Why didn't you follow the policy and

4  say that then?

5          A.   I don't know why I didn't.

6          Q.   And that's what you had been

7  counseled about before, was improper body cam

8  use?

9          A.   My body camera being in sleep mode.

10          MR. VALOIS:  All right.  I offer

11  Exhibit V-1, which is on the thumb drive, as a

12  deposition exhibit.

13              (Exhibit V-1 marked.)

14          MR. VALOIS:  Can we cue up V-3?  Just

15  play the beginning of this one, Katie.  The sound

16  will start at the 30-second interval.

17              (Video playing.)

18  BY MR. VALOIS:

19          Q.   All right.  You're engaged in some

20  sort of conversation with a group of officers

21  there, right?

22          A.   Yes.

23          Q.   What were you talking about?  Do you

24  remember?

25          A.   No.

```
 1                    (Video playing.)
 2                    MR. VALOIS:  Pause that right there.
 3   BY MR. VALOIS:
 4         Q.    So what's going on there?
 5         A.    So Officer Waterman shows up, and he
 6   observes the subject.  And then he said that's
 7   Calvin with a C, or Kalvin with a K.
 8         Q.    He said the notes had Calvin with a
 9   K?
10         A.    That's what he said.
11         Q.    All right.  But he's wrong?
12         A.    Yes.  I've looked at the CAD notes.
13   It's Calvin with a C.
14         Q.    Okay.  I'm just trying to get to the
15   bottom of it.  Obviously, one of you is wrong, but
16   you respond, "That's not good"; right?
17         A.    Correct.
18                    MR. VALOIS:  All right.  But in any
19   event, go ahead and play it, Katie.
20                    (Video playing.)
21   BY MR. VALOIS:
22         Q.    And this is where you're whispering
23   about he has scars on his ass from the last time
24   you interacted with him; right?
25         A.    Yes, sir, that's correct.  I advise
```

1   that he had scars on his ass.

2           Q.   And why are you whispering that to

3   these guys?

4           A.   I don't feel like that's information

5   that I need to broadcast among everybody.

6           Q.   Well, there's not every -- I mean,

7   only the people there can hear it?

8           A.   There's four or five officers there.

9           Q.   Okay.  Why would you not want to

10  broadcast that?

11          A.   I don't know.

12          Q.   I'm going to offer -- show you an

13  exhibit, which I've marked as Exhibit 8.

14               Can you identify that exhibit,

15  please?

16          A.   Yes.

17          Q.   Can you tell us what it is?

18          A.   It's an IBR.

19          Q.   Again, that IBR is Incident Based

20  Report system?

21          A.   Yes.

22          Q.   It's a document that police -- it's

23  commonly known as a police report?

24          A.   Yes, sir.

25          Q.   And officers prepare that after

1  incidents?

2          A.   Yes, sir.

3          Q.   And did you prepare one?

4          A.   I prepared a supplement to this IBR.

5          Q.   Okay.  And can you look at your

6  supplement?  Do you need to read it again?  You

7  want me to give you a minute?

8          A.   I should be fine with it.  I just

9  want to make sure I --

10         Q.   Have you reviewed this before our

11  deposition?

12         A.   Yes.

13         Q.   Okay.  A supplement, it doesn't

14  mention the fact that your dog disobeyed you again

15  three separate times before it released Calvin?

16         A.   Correct.

17         Q.   Why is that omitted from this report?

18  Why is that information omitted?

19         A.   I don't know.  I don't know why I

20  didn't feel the need to type that in here.

21         Q.   And it also doesn't mention the fact

22  that you attempted to correct the dog twice with

23  nein and once with pfui while biting on Calvin

24  after you commanded him to release?

25         A.   I did not put that in here.

1          Q.    Why didn't you put that information

2    in there?

3          A.    I don't know, I don't.

4          Q.    Well, again, I mean, isn't that

5    information important for command to have to assess

6    the reliability of a K-9 unit?

7          A.    The command will review all of our

8    body camera footage.

9          Q.    They routinely review body camera

10   footage?

11         A.    Yes.  For Blue Team, they review all

12   body camera footage and then all supplements or

13   reports submitted up.  So whoever the initial

14   supervisor is, they review.

15         Q.    And you believe that that relieves

16   you from your duty to include that information in

17   the report?

18         A.    No, I don't think so.

19         Q.    Is there any particular reason why

20   you didn't include that information in the report?

21         A.    No.

22         Q.    Can I have that back?

23         A.    Yes, sir.

24               MR. VALOIS:  I offer Plaintiff's

25   Exhibit 8 as a deposition exhibit.

```
 1                    (Plaintiff's Exhibit 8 marked.)
 2   BY MR. VALOIS:
 3           Q.    I'm going to give you what I've
 4   marked as Exhibit 9.  I'm not going to ask you to
 5   identify this exhibit because you can't.
 6                This is a use of force exhibit
 7   similar to the one I offered you before, and you've
 8   never seen those before?
 9           A.    Correct.
10           Q.    So I'm not going to ask you to
11   identify it or to authenticate it.  However, I
12   would ask you to review your contribution to this
13   report, to read your statement in this report, and
14   thumb through it until you find that.  And then let
15   me know when you're ready to talk about that.
16           A.    Is this the only narrative?
17           Q.    Yes.
18           A.    Is this my narrative?
19           Q.    I don't know.
20           A.    Is this a supervisor's typing?
21           Q.    I believe it is.  I believe the
22   supervisor in this case was Parrish.
23           A.    Okay.  So this is what Vernon typed?
24           Q.    I believe, yes.  I can't authenticate
25   it either.
```

1                A.    Okay.  Do you want me to read what

2    Vernon typed?

3                Q.    Yeah.  Well, yeah, read that, but I'm

4    going to ask you, I want you to read it, and then I

5    want you to ask this question.  Maybe I'll give you

6    the question first so you can look out for it.

7                A.    Okay.

8                Q.    But is there any mention in this that

9    Knox disobeyed your command to release three times

10   before releasing Calvin during this incident?

11               A.    No.

12               Q.    Okay.  It's been a while, so let me

13   make sure you're answering no to the same question

14   I asked.  I'm also getting tired myself.

15               So the question was there's -- in

16   that use -- there's no mention of the fact that the

17   dog disobeyed your command three times to release

18   Calvin in this incident, in that report?

19               A.    Correct.

20               Q.    All right.  Can you look at the

21   findings and read the findings, and can you tell us

22   whether there's any mention that Calvin Wesley

23   posed an imminent threat of harm at the time force

24   was applied to him on December 20th, 2021?

25               A.    Would it say findings?

1          Q.    There should be findings at the very

2    end.  I think they're very summary.  Well, I said

3    the very end.  The end is a chain of command issue.

4    There should be, at the very end of the narrative,

5    Parrish should have made some findings.  Let me

6    see.  Maybe I can point them to you.

7                It's on the front page here.  So at

8    the very -- the last paragraph there, it doesn't

9    say findings, but it says, it begins with, "This

10   use of force was justified."

11               You see that?

12         A.    Yes, sir.

13         Q.    Can you read that?  Why don't you

14   just read the whole paragraph for the record?

15         A.    Okay.  "This use of force was

16   justified within LPD policy due to the following:

17   Officer Reed was familiar with Calvin Wesley's

18   violent history due to his previous encounters with

19   Calvin, as well as Calvin's history with LPD.

20               "One of those occasions resulted in

21   Officer Reed being assaulted by Calvin.  Other LPD

22   officers had been victims of assault by Calvin

23   Wesley while attempting to arrest him.  Calvin had

24   an outstanding warrant for violating a protective

25   order and was in the process of violating the same

1  protective order on that date of this incident.

2              "Calvin fled on foot through the

3  woods, disregarding at least five commands.  Each

4  command clearly stated he was wanted and that the

5  dog would bite him if he refused to stop.  He did

6  not comply with any of these.

7              "Calvin attempted to flee in a

8  vehicle after disregarding commands, and this was

9  the moment Officer Reed deployed K-9 Knox to

10 apprehend him.  Medical treatment was rendered once

11 he was in custody and a supervisor immediately

12 notified."

13         Q.   Okay.  Do you agree that there's no

14 mention that at the time you deployed Knox against

15 Calvin Wesley on December 20th, 2021, that Calvin

16 posed any imminent risk of harm to anyone?

17         A.   That is not written in there, yes,

18 sir.

19         Q.   All right.  Thank you.

20              MR. VALOIS:  I offer this as

21 Plaintiff's Exhibit 9 for the purpose of the

22 deposition.

23              (Plaintiff's Exhibit 9 marked.)

24              MR. VALOIS:  All right.  And you

25 didn't make it, but I'll assign the same objection

1 as your previous objection to the other use of

2 force.

3                MR. GUYNN:  Oh, yeah.  Well, you had

4 said beforehand that you were not offering it to be

5 authenticated or whatever, so I figured that was

6 fine.

7 BY MR. VALOIS:

8                Q.   Okay.  Now, I'm going to give you

9 another exhibit, you can thank me later, which is

10 marked as Exhibit 2.

11                That's Exhibit 2; right?

12                A.   Yes, sir.

13                Q.   Okay.  Can you see that?  Can you

14 tell us what that is?

15                A.   It's a written directive use of K-9

16 teams.

17                Q.   All right.  How many K-9 teams are

18 there in Lynchburg?

19                A.   There's currently four.

20                Q.   All right.  And do you provide

21 continuous coverage?  In other words, do you guys

22 work it out on a four-man rotating shift to provide

23 24 --

24                A.   We have one platoon that doesn't have

25 a dog.

1      Q.   All right.  So do you like alternate

2  shifts to keep a dog on duty at all times, or do

3  you have all dogs working at the same time?

4      A.   Typically they -- we stagger the

5  dogs, but we have an on-call schedule as well.  So

6  we try to -- there's always typically a dog on

7  call.  So if there's not one working, one can be

8  called out.  And if we don't have any working, or

9  in the capacity, then we will contact a county to

10  have a dog available.

11      Q.   Okay.  Now, this policy is the policy

12  that was in force both times when you were -- when

13  you -- both times when you deployed Knox against

14  Wesley Calvin in 2021; is that correct?

15      A.   I believe so.  I don't -- I wasn't

16  employed in 2016 for the effective date.

17          Okay.  But there was not a

18  superseding policy?  In other words, you were

19  working under this 2016 policy at the time; right?

20          MR. VALOIS:  And for the record,

21  these documents were provided to me by the City of

22  Lynchburg in discovery and represented to be the

23  policies and procedures that were in place.

24          THE WITNESS:  Okay.  Then, yes,

25  that's -- if that's what their -- if they issued

1  these to you, then that's what we were falling

2  under.

3  BY MR. VALOIS:

4          Q.    All right.  Are you trained to -- are

5  you given training on that policy?

6          A.    Yes.

7          Q.    Do you conduct yourself in accord

8  with this policy?

9          A.    Yes.

10          Q.    Can you go to page 2 of the policy?

11  Let me see that for one second.  Okay.  And can you

12  read Number 6, the paragraph marked Number 6 there,

13  in its entirety, please?

14          A.    Okay.  "Use of police K-9s for any of

15  the following purposes will be in accordance with

16  guidelines set forth in directive PD 0602 use of

17  force, physical restraint and control, apprehend or

18  subdue a person resisting arrest, defense of any

19  person.  All handlers will conduct themselves in a

20  professional manner in any activity involving the

21  handler or control of their K-9s."

22          Q.    Okay.  So is it fair to say -- I'll

23  take this back if it's -- is it fair to say that

24  this policy puts K-9s under the general use of

25  force policy?

1          A.    Yes.

2          Q.    All right.  Is that your

3    understanding at both times?  In March 11th of 2021

4    was that your understanding?

5          A.    Yes.

6          Q.    And March, and in December 20th of

7    2021, was that your understanding?

8          A.    Yes.

9          Q.    All right.  And this policy

10   specifically states that your use will be in

11   accordance with those guidelines, the use of force

12   guidelines?

13         A.    Yes.

14               MR. VALOIS:  I'll offer this exhibit

15   as Plaintiff's Exhibit Number 2 for the purpose of

16   deposition.

17               (Plaintiff's Exhibit 2 marked.)

18   BY MR. VALOIS:

19         Q.    Have you been trained in the use of

20   force?

21         A.    Yes.

22         Q.    All right.  Do you understand your

23   department's policies?

24         A.    Yes.

25         Q.    Do you adhere to your department's

```
 1   policies?
 2            A.   Yes.
 3            Q.   All right.  I'm going to present you
 4   with a document that I've marked Plaintiff's
 5   Exhibit 1.
 6                 Do you recognize that document?
 7            A.   Yes, sir.
 8            Q.   All right.  What is that document?
 9            A.   It's our PD use of force policy.
10            Q.   All right.  And was that the policy
11   that was in force when you deployed Knox against
12   Calvin Wesley on March 11th, 2021, and on December
13   20th of 2021?
14            A.   If this is what the department
15   provided you, yes.
16            Q.   Okay.  And for the record, that is
17   what the department provided me.  All right.  Can I
18   ask you to look at the policy number?  Go to page 1
19   of 20, right, at the top.  Policy 1.3.1, 1.3.12.
20                 Do you see that?
21            A.   Yes.
22            Q.   Okay.  Can you read that, please?
23            A.   "It shall be the policy of the
24   Lynchburg Police Department to value and preserve
25   human life.  Officers shall use only the force
```

1  objectively reasonable to effectively maintain

2  order and control of an incident while protecting

3  the safety of the officers and others.

4             "Officers will use force only when

5  all other viable options have been attempted, or no

6  reasonably effective alternative appears to exist.

7  If force must be used, officers shall use only the

8  level of force that a reasonable, prudent officer

9  would use under the same similar circumstance."

10             Q.   Okay.  Now, can you turn to page 12,

11  please?

12             A.   I'm here.

13             Q.   All right.  Very good.  Do you see

14  Policy Number 1.5.2.3?  Did I get the page wrong?

15  Maybe I did.

16             A.   So it's 1.341 --

17             Q.   5.2.3?

18             A.   I'm not sure what page that is.

19             Q.   I'll find it.  I could have it.  Oh,

20  here it is.  You're on -- yeah, I have it.

21  5. -- yeah, I have the -- oh, that's my own

22  numbers.  I'm sorry.

23             MR. VALOIS:  For the record, this is

24  Policy Number 1.3.4/41.1.4A.

25  BY MR. VALOIS:

1          Q.    Do you see where it says use of

2    police K-9s?

3          A.    Yes, sir.

4          Q.    Can you read that whole policy,

5    subpolicy, in its entirety?

6          A.    Yes.  "The use of police K-9s will be

7    in accordance with the guidelines set forth in

8    directive PD 06 -- correction, 0706 department K-9

9    teams.  Police K-9s may be used as a means of

10   physical restraint and control, apprehending or

11   subduing a person resisting arrest by fleeing or

12   physical actions or defense of any person."

13         Q.    All right.  And do you see the -- can

14   you keep reading?

15         A.    Yes, sir.  "Police K-9s used by the

16   LPD will be trained to utilize force in

17   apprehending and retaining control of persons until

18   the K-9 handler deems it safe to recall or remove

19   the police K-9.  Officers will be mindful that any

20   use of police K-9 in which a K-9 is not under the

21   handler's physical or voice control may be

22   potentially be considered the use of deadly force.

23              "In cases where the use of a police

24   K-9 does not prove effective, officers should

25   utilize other uses of force options as necessary

1  for restraint and control.  Police K-9 will not be

2  used for the following:  As a threat to make a

3  person comply with the officer's verbal order in a

4  nonarrest situation, or when no physical threat of

5  violence appears imminent, to elicit information

6  from a person, as retaliation of verbal or physical

7  abuse."

8          Q.   Okay.  So have you ever deviated from

9  this policy?

10         A.   No.

11         Q.   The policy states that you will not

12 be used to make a person comply, a dog shall not be

13 used as a threat to make a person comply with an

14 officer's verbal order.

15              And yet you testified, at least with

16 regard to the December -- the December 20th

17 incident, that your reason for deploying the dog

18 was to get him to comply?

19         A.   To take him into custody, yes, sir.

20         Q.   Okay.  You can also not use -- you

21 cannot use it when no physical threat or violence

22 appears imminent.

23              Both of these situations, you've

24 already admitted there was no physical threat or

25 violence that appeared imminent; right?

1        A.    He was not physically assaulting at

2    this point, but he was actively resisting.

3        Q.    He was -- when you say "he was

4    actively resisting," he was resisting being taken

5    into custody?

6        A.    Yes.

7            MR. VALOIS:  I'll offer this,

8    Plaintiff's Exhibit 1, as a deposition exhibit.

9            (Plaintiff's Exhibit 1 marked.)

10            MR. GUYNN:  I don't know if I need to

11    say on the record, I think it's -- we've done this

12    before, but the relevance of policies we object to.

13            MR. VALOIS:  That's fine.

14            MR. GUYNN:  Yeah, I mean, we always

15    have that argument.

16            MR. VALOIS:  Right.  I would respond,

17    though, that there are Monell claims where policies

18    are directly at issue; and, thus, with regard to

19    the Monell claims, these policies are indeed

20    relevant.  In fact, they're a necessary element of

21    that Monell claim, is to analyze the policies and

22    customs of the police force.

23            MR. GUYNN:  From the City's

24    standpoint, but not from his.

25            MR. VALOIS:  Well --

1              MR. GUYNN:  Right?  Because the

2    Monell claim is against the City.

3              MR. VALOIS:  Well, I'm here in the

4    whole suit.  He's a witness in the whole suit at

5    this point.  This isn't just his.  We're not -- I'm

6    not -- you may be bifurcating them.  I'm not.

7    Okay.  They're all one kit and caboodle as far as

8    I'm concerned.

9              All right.  Am I out?  I'm out.  No,

10   I got a few more written exhibits.  Damn it.  Okay.

11   BY MR. VALOIS:

12        Q.   Body worn cameras.  Let's go over

13   those.  Just tell me if I'm wrong.  We'll try and

14   speed through these.

15              They're made by Axon?

16        A.   Yes, sir.

17        Q.   Right?  The ones you are issued are

18   manufactured by Axon?

19        A.   Yes, sir.

20        Q.   They download automatically when you

21   charge them?

22        A.   Yes.

23        Q.   Right?  They upload to a website

24   called Evidence.com?

25        A.   Yes.

1              Q.    They're saved there indefinitely on
2    the server based on the policy maintained by your
3    department?
4              A.    Yes.
5              Q.    You can flag them and tag them to
6    save them?
7              A.    Yes.
8              Q.    So can your supervisors?
9              A.    Correct.
10             Q.    Right?  And let's talk about the
11   policies with regard to stopping and recording.
12   We've already gone over this.  I have to ask you,
13   I'm going to ask you again.
14                  Isn't it the policy of the LPD that
15   before you pause or stop recording, that you
16   announce why, the reason for doing so?
17             A.    Yes, sir.
18             Q.    Okay.  And you've already conceded
19   you didn't do that?
20             A.    Correct.
21             Q.    And you don't know why?
22             A.    No, sir.
23             Q.    Okay.  All right.  Now, let's talk
24   about investigations in these cases of the use of
25   force.

```
 1                     Can we agree that the use of force by
 2  a police officer is a very serious matter?
 3           A.    Yes.
 4           Q.    Okay.  Can we agree that the use of
 5  force is a source of contention amongst some parts
 6  of the -- some populations in the city, and it is a
 7  source of distrust?
 8                  MR. GUYNN:  I'm going to object.
 9                  MR. VALOIS:  That's fine.
10  BY MR. VALOIS:
11           Q.    You can still answer.
12           A.    With what?
13           Q.    As an officer, can you agree that use
14  of force by police officers is a bone of contention
15  between the police and certain aspects of the
16  community?
17                  MR. GUYNN:  The same objection.
18                  THE WITNESS:  So you're saying are
19  there people in the community that mistrust the
20  police?
21  BY MR. VALOIS:
22           Q.    Yes.
23           A.    Yes.
24           Q.    And a lot of that centers around
25  perceived use of force by police officers?
```

1          A.    Yes.

2                MR. GUYNN:  Objection.

3  BY MR. VALOIS:

4          Q.    Okay.  I understand.  You can answer.

5  You said yes?

6                MR. GUYNN:  Yeah, he did.

7                THE WITNESS:  Yes.

8  BY MR. VALOIS:

9          Q.    All right.  And so is there anything

10 funny about the use of force by police officers?

11         A.    No.

12         Q.    Is it anything that any officer

13 should ever joke about?

14         A.    No.

15         Q.    Have you ever joked about use of

16 force?

17         A.    I don't know.  I can't say whether or

18 not I have or not.

19         Q.    Have you --

20         A.    We don't take lightly to use of

21 force, no.

22         Q.    Have you ever seen officers, fellow

23 officers, joking about the use of force?

24         A.    No.

25         Q.    If you did, what would you do about

1  it?

2         A.   I would talk to them and tell their

3  supervisor.

4         Q.   All right.  Have you ever seen --

5         A.   Just -- I'm sorry.  Go ahead.

6         Q.   Have you ever -- okay.

7              But you've never seen it?

8         A.   No.

9         Q.   Have you ever seen your supervisors

10  joking about use of force?

11         A.   No.

12         Q.   All right.  You haven't seen any

13  memes or email jokes about using force?

14         A.   No.

15         Q.   You've already conceded that your

16  dog, in fact, did cause serious injuries to Wesley?

17         A.   Yes.

18         Q.   All right.

19              MR. GUYNN:  I'll accept your

20  characterization of serious.

21  BY MR. VALOIS:

22         Q.   Well, would you agree that it caused

23  serious injuries to Wesley?

24         A.   Yes.

25         Q.   And you saw the photos; right?

Page 182

```
 1              A.    Yes, I've seen the photos.
 2              Q.    Now, you were assisted in both of
 3    these incidents by an officer, John Person; right?
 4              A.    Yes.
 5              Q.    Do you know him well?  Do you work
 6    with him frequently?
 7              A.    I work with him some.  He was, so
 8    it's like north side, south side, and he's on -- we
 9    worked together.  He's on another shift now.
10              Q.    Okay.  Have you ever known him to
11    joke about use of force?
12              A.    No.
13              Q.    Would it surprise you if he did?
14              A.    If he jokes around about using force,
15    it would surprise me, yes.
16              Q.    I'm going to show you an exhibit I've
17    marked as Exhibit 3.
18                    Can you describe that picture in that
19    document, please?
20              A.    It's a screenshot from body worn
21    camera videorecording made by Officer John Person
22    of the background image of smartphone he used to
23    take photographs of Calvin Wesley's police K-9 bite
24    injuries on December 20th, 2021.  Source Deposition
25    Exhibit V-4.
```

1          Q.   Can you look at the image on that

2   phone right there?  You recognize that to be a

3   smartphone and it's labeled December 20th, right,

4   and the time is 10:10.

5               You see that?

6          A.   I can't see what date it is.  I know

7   it's 10:10.

8          Q.   Okay.  Well, we'll get to that in a

9   second.

10              But do you see that image there?

11         A.   Yes.

12         Q.   Can you describe that image?

13         A.   It's somebody in a vehicle.

14         Q.   Is it a police officer, an officer

15  next to a vehicle?

16         A.   That's what appears it to be.

17         Q.   Grabbing a subject by the throat?

18         A.   I don't know where he's grabbing him

19  by.

20         Q.   Pulling him out of a car?

21         A.   That's what it appears.

22         Q.   And you see there's some text at the

23  top of that little circle there.

24              Do you see what it says?

25         A.   I can't read it.  It says Mimms.

```
1              Q.    Pennsylvania v Mimms, do you
2    recognize that?
3              A.    Yes.
4              Q.    Are you familiar with Pennsylvania v.
5    Mimms?
6              A.    Yes.
7              Q.    What is Pennsylvania v. Mimms?
8              A.    You can ask the driver of the vehicle
9    to get out of the vehicle for officer safety
10   reasons.
11             Q.    Right.  It's the Supreme Court case
12   that authorizes officers, in appropriate
13   circumstances, based upon a reasonable and
14   articulable suspicion, to ask passengers to remove
15   for officer safety; is that correct?
16             A.    Yes, sir.
17             Q.    All right.  And in that capacity you
18   can ask a -- does Pennsylvania v. Mimms authorize
19   you to grab a driver by his neck and haul him out
20   of a car?
21             A.    No.
22             Q.    All right.  You would take that to be
23   some sort of humor, then, some humorous reference
24   to a use of force then; right?
25             A.    In that picture?
```

```
 1                Q.    Yes.

 2                A.    Yes.

 3                Q.    In fact, that's the only possible

 4   context to take of it, right, only reasonable

 5   possible context?

 6                A.    Yes.

 7                Q.    Okay.  All right.  I want to offer

 8   this as Exhibit 3.

 9                     (Plaintiff's Exhibit 3 marked.).

10                MR. VALOIS:  Can we play, can you cue

11   up the video, please?  I think it's going to be

12   V-3.  V-4, I'm sorry, V-4.

13                     (Video playing.)

14                MR. VALOIS:  Pause right there.

15   BY MR. VALOIS:

16                Q.    Did you recognize that to be Officer

17   Person?

18                MR. VALOIS:  We want to go back, look

19   at the reflection in the -- start at the very

20   beginning, Katie.

21                     And I will offer, for the record,

22   this is a clip taken from Officer Person's body cam

23   that was provided to me in discovery from the night

24   of 12/20/21.

25                     (Video playing.)
```

```
 1   BY MR. VALOIS:
 2          Q.   Did you see that reflection in the
 3   glass?
 4              MR. VALOIS:  Go back to the
 5   reflection in the glass and see if you can pause it
 6   there, Katie.
 7              (Video playing.)
 8   BY MR. VALOIS:
 9          Q.   Right there?
10          A.   Yes.
11              MR. VALOIS:  Okay.  Go ahead and hit
12   play.
13              (Video playing.)
14   BY MR. VALOIS:
15          Q.   You see him grab a phone right there?
16          A.   Yes.
17          Q.   Did you see that?  Do you recognize
18   that as being this picture that I just showed you?
19          A.   Yes.
20              MR. VALOIS:  All right.  Very good.
21   I offer that as Defense Exhibit V-4, a video of
22   Officer John Person's body camera, a clip from it
23   from 12/20/21.
24              MR. GUYNN:  No, no, defense exhibit?
25              MR. VALOIS:  Plaintiff's exhibit,
```

```
 1   sorry.
 2                   MR. GUYNN:  I still object.
 3                   MR. VALOIS:  Okay.  I figure, so
 4   objectionable, so objectionable.
 5                   (Plaintiff's Exhibit V-4 marked.)
 6   BY MR. VALOIS:
 7         Q.   So what do you think?  I mean, do you
 8   think that's an appropriate thing for an officer to
 9   be using on his cell phone that he's using for
10   police business?
11         A.   No.
12         Q.   Now that you know about it, are you
13   going to do anything about it?
14         A.   I will address that.
15         Q.   How are you going to address it?
16                   MR. GUYNN:  I would object.  That has
17   nothing to do with the case.
18   BY MR. VALOIS:
19         Q.   You can answer.
20                   MR. GUYNN:  No.  You can't ask him
21   what he's going to do in the future.  That doesn't
22   have anything to do with it, Paul.
23                   MR. VALOIS:  Well, okay.  I'll let it
24   go.  I don't see the harm in answering; but,
25   anyway, that's fine.
```

```
 1                    MR. GUYNN:  Well, that's the point of
 2   relevance.  I mean, I don't see the harm ckck--
 3                    MR. VALOIS:  Well, relevance you can
 4   answer on.  I mean, if you want to stop, I'm not
 5   going to go down and call a judge over it.  I'll
 6   let it go before I do that.  But, I mean, there is
 7   not a protective order in place and it's not
 8   privileged; so.  All right.  But, whatever, I'll
 9   let it slide.
10   BY MR. VALOIS:
11            Q.   Now, Lieutenant Smith is Lieutenant
12   Brian Smith?
13            A.   Correct.
14            Q.   And he's the one that investigated
15   your use of force on March 11th of 2021; right?
16            A.   Yes.
17            Q.   Have you ever known him to be
18   anything but professional?
19            A.   No.
20            Q.   Have you ever known him to laugh at a
21   use of force or to make fun of a use of force?
22            A.   No.
23            Q.   Would it surprise you if he did?
24            A.   Yes.
25                    MR. VALOIS:  All right.  Let's cue up
```

```
 1  V-5, and just pause it before it starts up.  Okay.
 2  For the record, this is the dash cam, or this is
 3  the dash cam from Lieutenant Smith that was
 4  provided to us in discovery from the incident on
 5  March 11th, 2023, where he is arriving at the scene
 6  of the arrest where Calvin Wesley was injured by
 7  Knox, the police dog, to conduct a use of force
 8  investigation.
 9              MR. MCFADGEN:  '21.
10              MR. VALOIS:  Pardon me, '21.  I'm
11  sorry, 2021, March 11th, 2021.  We're going to need
12  some volume here, because this is very quiet.  I
13  want you to listen to it carefully.  Go ahead.
14              (Video playing.)
15  BY MR. VALOIS:
16         Q.   All right.  Could you hear that?
17  Could you hear what he said?
18         A.   No.
19         Q.   He said, "It bit this old dude, poor
20  guy," and then he started laughing, but I can play
21  it louder if you want to hear it louder.
22              MR. VALOIS:  Let's take it -- is that
23  as loud as it gets?  Start it from the very
24  beginning, please.
25              (Video playing.)
```

```
 1  BY MR. VALOIS:
 2           Q.    Do you hear him say that?
 3           A.    Yes, I can hear him say that.
 4           Q.    Yeah.  You heard him say, "It bit
 5  this old dude.  Poor guy."
 6                 Does that surprise you, that
 7  Lieutenant Smith would make a comment like that on
 8  the way to investigate use of force?
 9           A.    Yeah.
10           Q.    You think it's professional to make a
11  comment like that when you're investigating use of
12  force?
13           A.    No.
14           Q.    And this is the man who actually
15  issued the report that found that your use of force
16  was justified; right?
17           A.    He investigated it.
18           Q.    He wrote the report, he made the
19  report that found that you were -- that the use of
20  force was justified by policy; right?
21           A.    Yes, sir.
22                 MR. VALOIS:  Offer that as
23  exhibit -- what I did say it was?  Katie, can you
24  pull up the list?  Did I say 7?  5, V-5.
25                 (Plaintiff's Exhibit V-5 marked.)
```

```
 1                    MR. GUYNN:  Object on relevance
 2    grounds again.
 3                    MR. VALOIS:  Okay.  And to respond to
 4    the objection, since the nature of the objection
 5    was stated, it is relevant to show a policy or
 6    custom or practice that shows that is relevant to
 7    the Monell claim in this case.
 8    BY MR. VALOIS:
 9            Q.   All right.  I mean, do you think
10    there's anything funny about your dog biting
11    Calvin?
12            A.   No.
13            Q.   All right.  Have you ever heard
14    anybody making a racial joke?
15            A.   Like ever in my life?
16            Q.   No, among your officers?
17            A.   No.
18            Q.   You think it'd be appropriate to do
19    that on the job?
20            A.   No.
21            Q.   Or to mock somebody because of his
22    race?
23            A.   No.
24            Q.   Would you be surprised if I told you
25    Officer Person did that?
```

```
 1              A.   I would be surprised, yes.

 2                   MR. VALOIS:  All right.  Cue up V-7.

 3    I'm sorry, cue up V-6.

 4                   (Video playing.)

 5                   MR. VALOIS:  Pause right there.  Oh,

 6    man.  You got to hit escape, I think, to get back

 7    out of that.  Poor Katie.  That thing's giving her

 8    a fit.  All right.

 9    BY MR. VALOIS:

10              Q.   So he just -- you heard Calvin.  This

11    is the December 20, 2021, incident.  The time is

12    22:07:27 on the camera.

13                   You just heard Calvin Wesley call

14    some other officer Waterman; right?

15              A.   Uh-huh.

16              Q.   But apparently it was not Waterman,

17    it was somebody else.

18                   Did you see that?

19              A.   I wasn't there during any of this

20    conversation.

21              Q.   All right.  That's fine.

22                   MR. VALOIS:  Go ahead and back it up

23    a little bit.  Play it from scratch.

24                   (Video playing.)

25                   MR. VALOIS:  Pause right there.
```

```
 1   BY MR. VALOIS:
 2           Q.    That's John Person with the light
 3   right there?
 4           A.    Correct.
 5           Q.    The one that's smiling; right?
 6   That's Calvin Wesley saying that his fingers are
 7   hurt, that he can't straighten his fingers out, and
 8   that he's in pain, and he's actually bent over
 9   there; right?  And that's John Person smiling while
10   he's shining a light; right?
11           A.    Yes, that is Officer Person.
12           Q.    And he is smiling, and he's shining a
13   light; right?
14           A.    Yes.  He's smiling and shining a
15   light.
16                 MR. VALOIS:  Okay.  Hit play, Katie.
17                 (Video playing.)
18                 MR. VALOIS:  Oh, we'll need some
19   volume there, Katie.  Back it towards the end.  So
20   basically go back and start from the beginning.
21   Let's give us a bunch of volume, I'm afraid, and
22   just let it run.  It's only -- the whole clip is
23   only what?
24                 MR. MCFADGEN:  14 seconds.
25                 MR. VALOIS:  It's not very long.
```

```
1                        (Video playing.)
2    BY MR. VALOIS:
3            Q.    Listen to what he says here.
4                  Did you hear him say, "All white cops
5    look the same, I guess"?  Did you hear those words
6    come out?
7            A.    Yes.  I heard those words come out of
8    his mouth.
9            Q.    Okay.  Is that appropriate?  When
10   you're dealing with an African-American subject in
11   a crowd of white cops, you think that's an
12   appropriate comment to make?
13           A.    I don't.
14           Q.    Are you surprised he made that kind
15   of a comment?
16           A.    Yes.
17                 MR. VALOIS:  I offer that as
18   Plaintiff's Exhibit V-6.
19                 (Plaintiff's Exhibit V-6 marked.)
20   BY MR. VALOIS:
21           Q.    All right.  Does LPD, did they
22   maintain any policy, or practice, or custom of
23   delaying medical treatment for subjects in favor of
24   treating police officers for minor injuries?
25           A.    No.  I don't believe there's any
```

Page 195

```
1   policy like that.
2           Q.    Would it surprise you to find that
3   that's happening in practice amongst LPD officers?
4           A.    Yes, it would.
5               MR. VALOIS:  Okay.  Cue up -- can you
6   cue up V-7, please?
7               (Video playing.)
8               MR. VALOIS:  Did you -- pause that.
9   BY MR. VALOIS:
10          Q.    Did you hear him say, "We have a K-9
11  bite, but we have an officer who's hurt.  Can you
12  go look at him first?"
13              Which officer was hurt at the scene?
14          A.    Officer Rowland.
15          Q.    He had a pulled muscle; right?
16          A.    Yeah.  He blew a hamstring when he
17  was running through the woods.
18          Q.    Did he blow a hamstring, or was it
19  just pulled?
20          A.    He was out of work for months.
21          Q.    Was he?
22          A.    From his hamstring.  Yes, sir.
23              MR. VALOIS:  Okay.  Go ahead.
24              (Video playing.)
25              MR. VALOIS:  Pause right there.
```

1  Pause right there.

2  BY MR. VALOIS:

3          Q.    So he tells -- he tells the EMTs

4  there's not a whole lot you're going to be able to

5  do for me; right?

6          A.    Correct.

7              MR. VALOIS:  All right.  Go ahead.

8              (Video playing.)

9              MR. VALOIS:  Pause.

10  BY MR. VALOIS:

11          Q.    He says, "It's just a hamstring.  I

12  slipped.  You're not going to be able to do

13  anything about it here.  He's got a bite."

14              Hear him say that?

15          A.    Yes.

16              MR. VALOIS:  All right.  Go ahead and

17  play it.

18              (Video playing.)

19              MR. VALOIS:  Pause.

20  BY MR. VALOIS:

21          Q.    All right.  So he says he can still

22  drive, it's just a hamstring; right?  He's going to

23  drive himself.  And he refused an ambulance, right?

24          A.    Yes.

25              MR. VALOIS:  All right.  All right,

1  Katie.

2                    (Video playing.)

3                    MR. VALOIS:  All right.  That very

4  end there, Katie.  Get up to the end.  You're going

5  to need a lot of volume.

6                    (Video playing.)

7                    MR. VALOIS:  Can you make that

8  louder?  Yeah.  And just play about the last 10

9  seconds of that, maybe the last 15 seconds.

10                    (Video playing.)

11                    MR. VALOIS:  No, you're going to need

12  more than that.  Just go ahead and let it run.

13                    (Video playing.)

14                    MR. VALOIS:  Can we increase the

15  volume even more now?

16                    (Video playing.)

17                    MR. VALOIS:  Pause that.

18  BY MR. VALOIS:

19            Q.   Did you hear Officer Person say,

20  "It's just the principle of them getting to check

21  you first"?

22            A.   Yes, I could hear that.

23            Q.   All right.  Is there such a principle

24  in practice among the LPD?

25            A.   No.

```
 1              Q.   Do you know why he would say that?

 2              A.   I don't.

 3              Q.   Are you surprised to hear him say

 4    that?

 5              A.   Yes.

 6              MR. VALOIS:  Okay.  I have a few more

 7    questions, getting into the dog.  Anybody need a

 8    break?  I don't know how long we've been going?

 9    You all good?  Okay.  All right.

10              I offer video clip Exhibit V-7 as an

11    exhibit to the deposition.

12              (Plaintiff's Exhibit V-7 marked.)

13    BY MR. VALOIS:

14              Q.   K-9 Knox, where was he born?

15              A.   In Poland.

16              Q.   And trained in Germany?

17              A.   No, we train them here.  They -- so

18    they speak German to him.

19              Q.   Here?

20              A.   They get shipped from overseas.  So

21    John, he has a kennel up in Pennsylvania called

22    Shallow Creek, so he travels all over the country

23    and imports dogs to his kennel.

24              Q.   Okay.  How old was Knox when

25    Knox -- so Knox came from Poland to Shadow Creek?
```

1          A.    Shallow Creek, yes, sir.

2          Q.    Where?

3          A.    Shallow Creek.

4          Q.    Shallow Creek, and how old was Knox

5  when he came to Shallow Creek?  Do you know?

6          A.    He was born in 2016.  We picked him

7  up in 2017, or I should say the department picked

8  him up.

9          Q.    And what breed is he?

10          A.    He's a Malinois Shepherd mix.

11          Q.    Okay.  Why do they select that breed?

12          A.    So going back to the genetic makeup

13  of a dog, you put drives -- you can't put drives

14  that are genetically not in a dog.  So the

15  Europeans have put a lot of different breeds into

16  one dog so that it can have multiple different

17  drives.

18                And then health issues.  They want a

19  straight-back dog, because the traditional German

20  Shepherd ran into hip issues with the slanted back,

21  so they wanted to create a straight-back dog.

22          Q.    Okay.  So they kind of like

23  genetically engineered this dog, I mean?

24          A.    Malinois are five different breeds

25  into one.

```
 1              Q.    Yeah, okay.  So it's basically
 2    engineered to be a police dog?
 3              A.    Yes, police and military use that.
 4              Q.    Okay.  But why do they -- still they
 5    teach it German in Pennsylvania?
 6              A.    They speak either German or Dutch.
 7              Q.    Why don't they --
 8              A.    Certain dogs they speak one language
 9    to, and I don't know why they speak different
10    languages to the different dogs.
11              Q.    Okay.  That's fine.
12              A.    We have handlers here, they speak
13    Dutch to their dogs, because their dogs are
14    imported and initially taught Dutch.  And then I
15    speak German to my dog.
16              Q.    Okay.  So, now, when the dog came
17    here, you were not the first LPD handler; right?
18              A.    Correct.
19              Q.    Who was the dog's first LPD handler?
20              A.    Nick Barb.
21              Q.    And how long did he handle Knox?
22              A.    He worked Knox from 2017 until I took
23    over.  I was given, - or I got the dog in July of
24    2019.
25              Q.    July of 2019, so that would have
```

1  been almost two years?

2           A.   He certified the dog in, I'm not 100

3  percent sure, I think it was July or August.  It

4  was late summer 2017.  I got the dog approximately

5  two years later.

6           Q.   And when you say "certified," that's

7  by the Virginia Police Work Dog Association?

8           A.   We certify through North American

9  Police Work Dog.

10          Q.   Okay.

11          A.   It's just they got another step.

12          Q.   That's fine.  And he was certified?

13          A.   Yes.

14          Q.   And he was certified in all those

15  areas which you've already spoken?

16          A.   Yes, sir.

17          Q.   Okay.  And when was that

18  certification?

19          A.   We certify every year.  So he would

20  have certified in the basics after the basic

21  school, which would have been 2017, and then every

22  year after that.

23          Q.   How long before March 11th of 2021

24  had he been certified by the National Police Work

25  Dog Association?

```
 1              A.    So he would have certified, like,
 2   again, I'm not sure what month it was in 2017, but
 3   then it would have been all of 2018, all of 2019,
 4   and then three months into 2020.  And then if you
 5   put -- so that'd be '18, '19, three months in 2020,
 6   and then from July to, July or August, we can say
 7   five months.  So it'd be two years and eight months
 8   he would have been certified.
 9              Q.    Okay.  And he had his annual
10   certifications, recertification?
11              A.    Yes.
12              Q.    When was the most recent
13   recertification before March 11th of 2021?
14              A.    It would have been -- so we certified
15   in October of 2019.  COVID, we did not recertify in
16   2020, so it would have been, our first initial
17   certification would have been 2019.  Because then
18   we certify our dogs in October, so I hadn't gotten
19   to the 2021 before March.
20              Q.    So he had not been recertified?
21              A.    Not in '20.
22              Q.    Not in 2020 because of COVID?
23              A.    Yes, sir.
24              Q.    All right.  Is there a danger in
25   having a police dog that doesn't recertify?
```

```
 1                A.    No.
 2                Q.    Then why do you do it?  Why do you --
 3                A.    To maintain a certain standard.  So
 4    we train, we bring a master trainer in every month.
 5    We run two maintenance days with our master
 6    trainer, and then we run a single day with just
 7    LPD.  So we train three days a month, two with our
 8    master trainer, with other agencies, and then one
 9    with just by ourself.
10                Q.    So Knox has three days of training a
11    month?
12                A.    Typically, yes.
13                Q.    But the certification that he gets is
14    just a test; right?
15                A.    Yes.
16                Q.    When he goes for a certification,
17    it's just a test.  I assume they put out dope,
18    drugs of some sort --
19                A.    Yes.
20                Q.    -- and they have him find it; right?
21                A.    Yes.
22                Q.    They hide it, and they see how good
23    he is at detecting it; right?
24                A.    Yes.
25                Q.    And does he get scored on that?
```

1              A.    Yes.  He's a very good narcotics dog.

2              Q.    He has to get -- he has to maintain

3    the minimum score in order to get certified, is

4    that how it works?

5              A.    It's either pass or fail.

6              Q.    If a dog is decertified, does it mean

7    you can't use it?

8              A.    Until --

9              Q.    Until he recertifies?

10             A.    Until he recertifies, yes.

11             Q.    Okay.  In the meantime, you also have

12   periodic training, which you said is three times a

13   month.

14                   Is that without fail?

15             A.    Yes, sir.  It's sometimes, it's

16   typically three days, sometimes it's four, but we

17   at least train 16 hours a month.

18             Q.    And when you train him, who's present

19   for that training?

20             A.    Either our master trainer, Harold

21   Bennett, or Sergeant Godsie will sometimes be at

22   training.  Typically our master trainer for all of

23   our maintenance days.  Harold Bennett is our master

24   trainer, so he comes in from Chesapeake and runs

25   our training days.

```
 1                Q.    And do they train with a shock
 2   collar?
 3                A.    We train with an E-collar, yes.
 4                Q.    Okay.
 5                A.    And then a prong collar as well.
 6                Q.    And that's a shock, and E-collar is a
 7   collar that gives an electronic shock?
 8                A.    Yes.  There's a page button and then
 9   there's an electronic shock button.
10                Q.    Right.  For correction?
11                A.    Yes.
12                Q.    And do you use an E-collar for aus?
13                A.    We can, yes.  Typically on a -- so
14   when we utilize the E-collar, a lot of times we're
15   taught you never give a command, you have no means
16   of correction.  So if the dog is off-leash, we can
17   use an E-collar.  If the dog is on-leash, we're
18   instructed to use the prong collar.
19                Q.    And you understand that amongst the
20   K-9 police community, there's kind of two schools
21   of thought with aus?  There's a verbal aus and a
22   nonverbal aus.  Have you heard of that?
23                A.    As far as like a liftoff?
24                Q.    Yeah, as far as getting the dog to
25   release --
```

```
 1              A.   Yes.
 2              Q.   -- command to release.
 3                   And Knox is trained to do a verbal
 4    aus?
 5              A.   He's trained in both.  We can certify
 6    in either one.
 7              Q.   Well, he's trained in a nonverbal
 8    aus?  What is his trigger for a nonverbal aus?
 9              A.   Nonverbal aus is a liftoff.  But
10    you're right, our certification, we do conduct a
11    verbal call-off.
12              Q.   Right.  So that's his primary means.
13    His primary means of release is, I call it aus.
14                   His primary release of aus is the
15    verbal aus in the LPD?
16              A.   Yes.
17              Q.   Is that LPD-wide, or is that just
18    you?
19              A.   Typically most of us, LPD.
20              Q.   Okay.  And did all of his equipment
21    meet the policy guidelines?
22              A.   Yes.
23              Q.   He has a short leash, a medium leash,
24    and a long leash; right?
25              A.   Yes.
```

```
 1              Q.   And all that's, you carry all that in
 2    the truck with you wherever you go?
 3              A.   Yes, sir.
 4              Q.   And you don't know what bite ratio
 5    means?
 6              A.   I don't.
 7              Q.   How many subjects has he bitten since
 8    you've had him?
 9              A.   16.
10              Q.   All right.  How many apprehensions
11    has he done?
12              A.   Is that what you mean, apprehensions?
13              Q.   I mean, how many total apprehensions?
14              A.   16 total apprehensions.
15              Q.   Well, that's with biting; right?
16              A.   Yes.
17              Q.   How many times has he engaged in
18    apprehensions without biting the subject?
19              A.   I'd say hundreds.
20              Q.   Well, do you know or you just --
21              A.   I don't have that actual.  I would
22    have to go back through all my training logs.  I
23    know we have hundreds of nonbite apprehensions.
24              Q.   All right.  Has he ever bitten anyone
25    without being commanded to bite?
```

1          A.     Yes.

2          Q.     Any civilians?

3          A.     Yes.

4          Q.     When did that occur?

5          A.     I believe it was 2022.

6          Q.     Where did that occur?

7          A.     On Westover Boulevard.

8          Q.     What happened there?

9          A.     We were attempting to arrest a

10   robbery suspect for strong-arm robbery.  He was up

11   in a bedroom.  We started going up the steps, and

12   once when we got into the steps, we conducted -- I

13   conducted, a K-9 warning.  Because his mom had told

14   him -- told us he was in that room.  He ended up

15   stepping out of the room.

16               The group of officers that we were

17   with, we went up to the hallway.  I backed up.

18   They went hands-on.  They initially started

19   fighting with the subject.  There's a two-story

20   railing right there.  They ended up taking the

21   subject to the ground.  They dumped -- they brought

22   the suspect to the ground right on top of Knox and

23   I.  Knox lunged out and bit the guy in the chest.

24          Q.     Is that the only time he's bit a

25   civilian without being commanded?

```
 1              A.    Yes.

 2              Q.    And he nips at you?

 3              A.    Yes.

 4              Q.    How frequently does he do that?

 5              A.    In training.  We try to correct it.

 6  We try to alpha roll the dog.

 7              Q.    Alpha roll means assume a position of

 8  dominance over the dog?

 9              A.    Yes.  That's what the dogs

10  understand.

11              Q.    An alpha roll means literally roll

12  the dog; right?

13              A.    Yes.

14              Q.    It means take -- it means assume a

15  superior position, physical position, on the dog

16  and roll it into the ground --

17              A.    Yes.

18              Q.    -- to let it know who's boss?

19              A.    Yes.

20              Q.    Right?  And that's necessary with

21  this breed, to assert dominance?

22              A.    Correct.  They have rank drive.

23  That's the actual terminology of it.

24              Q.    Now, I'm going to ask you about two

25  specific uses of force by Knox.  I'm going to
```

1  present you with a document that I've received in

2  discovery from the City of Lynchburg, and I've

3  marked it as Plaintiff's Exhibit 4.

4              Can you look at that?  You may

5  not -- again, this is one you may not be able to

6  authenticate; right?  But it involves an incident

7  in which you and Knox were involved.

8         A.   Yes.

9         Q.   And just look at that and let me know

10 if you -- when you get to the point where you

11 remember the incident involved?

12        A.   I remember the incident.

13        Q.   All right.  What happened in that

14 incident?

15        A.   I responded to a subject.  Again,

16 this is all off my memory.  Is all the report in

17 here and everything?  Responded to a subject

18 breaking into cars over off of West Princeton

19 Circle.  We ended up arriving on scene there, right

20 near Randolph College.

21             He ended up -- I believe he was

22 running through like a courtyard from the direction

23 that officers were.  I ran around the other.  We

24 ended up meeting each other.  He had a bag with

25 him.  I don't remember exactly what was in the bag.

1    I downed -- I told the dog to lay down and stay.

2                    I ended up going hands-on and told

3    him place his hands behind the back, and then he

4    ended up jerking away from me.  He squared up on

5    me, and then I went hands-on again and deployed the

6    dog.

7                    Q.   Well, before that, he dropped the

8    bag; right?  Didn't he drop the bag of --

9                    A.   If you've watched the video, I don't

10   know what all the succession was.

11                   Q.   All right.  But in any event, this

12   was an unarmed subject?

13                   A.   Yes.

14                   Q.   And he was accused of tampering with

15   a vehicle, which is a misdemeanor?

16                   A.   Yes.

17                   Q.   Right?  And you encountered him near

18   University of Lynchburg, by the chapel; right?

19                   A.   By Randolph.

20                   Q.   Randolph?

21                   A.   Is it -- it's over off of Rivermont.

22                   Q.   Right.  I'm sorry, wrong college.

23                   Randolph University, over by the

24   chapel; right?

25                   A.   Yes, sir.

1          Q.    And then he slipped out of

2    your -- you were engaged with him, and he ran off,

3    and then you let the dog chase him.

4                Is that what happened?

5          A.    No.   I went hands-on with him again,

6    started struggling with him again.   And then when I

7    was physically hands-on with the subject and the

8    dog, I gave the dog the apprehension command, and

9    the dog bit him.

10         Q.    Was he fighting you?

11         A.    Yes.

12         Q.    Was he using force against you?

13         A.    Yes.

14         Q.    Hitting you and stuff?

15         A.    He wasn't assaulting me.

16         Q.    What was he doing?

17         A.    He had pulled away and then squared

18   up on me.  So that's --

19         Q.    Squared up, describe squared?

20         A.    That's a fighting stance, so I

21   initially went hands-on.  I downed the dog, told

22   him to stay.  I grabbed a hold of him, told him

23   place his hands behind his back, and then he jerked

24   away from me and then squared up on me.

25         Q.    Was he squared up on you when you

1  deployed the dog against him?

2          A.    I was physically hands-on with him,

3  trying to take him into custody, when I deployed

4  the dog.

5          Q.    Were there other officers at the

6  scene?

7          A.    Not with me, no.  I was by myself.

8  There was other officers there.

9          Q.    Did you have -- were you armed with

10 your taser and your pepper spray then?

11         A.    Yes.

12         Q.    And you elected to use the dog

13 instead of the taser or the pepper spray?

14         A.    Yes.

15         Q.    Why is that?

16         A.    Because I was physically in contact

17 with the subject at that point.

18              MR. VALOIS:  I'll offer this as

19 exhibit, Plaintiff's Exhibit 4.

20              (Plaintiff's Exhibit 4 marked.)

21 BY MR. VALOIS:

22         Q.    I'm going to offer you a document

23 that I've marked as Plaintiff's Exhibit 5.  If you

24 could look through that.  I'm not going to ask you

25 to authenticate that document, but I'm going to ask

1  you to look at it until you see if you can remember

2  the incident in question.

3        A.    Yes, sir.

4        Q.    Do you remember the incident?

5        A.    I do.

6        Q.    What happened there?

7        A.    I was called to conduct a narcotics

8  scan.  Again, as far as this is all my

9  recollection.  An officer conducted a traffic stop.

10  I was called to conduct a narcotics scan.  We were

11  trying to identify the three occupants in the

12  vehicle.  The gentleman in the backseat, he

13  appeared to be under the influence of some sort of

14  serious narcotic.  I was trying to identify him.

15  He gave -- provided me the information.

16              I walked back to my car.  We were

17  trying to get a proper ID on him.  We couldn't get

18  him identified.  He ended up running from the

19  scene.  He ran down Rivermont and then took a left

20  down -- I don't remember the road right there.  He

21  ran down that road.  I ran down Rivermont.

22              I used my door popper, I pushed the

23  door popper.  I called for K-9 Knox.  I told

24  Officer Person to stop.  He was -- the subject was

25  pretty much right to a fence.  I deployed my dog.

1  As the subject was going up onto the fence, K-9

2  Knox bit the suspect on the lower leg.

3          Q.   You call him a suspect, but he was a

4  passenger in a car, and the basis for the stop of

5  the car was some traffic violation; right?

6          A.   I don't know what the violation was.

7          Q.   But you didn't see him committing a

8  crime?

9          A.   I didn't.

10          Q.   So, I mean, what did you suspect him

11  of?

12          A.   Being wanted or lying.  He was lying

13  about who he was.  We couldn't properly identify

14  him.

15          Q.   That's a misdemeanor; right?

16          A.   Lying to law enforcement, yes.

17          Q.   Yeah.  So aside from that, I mean,

18  assuming he's lying, but you weren't aware of any

19  felonies or anything?

20          A.   No.

21          Q.   And so why'd you put the dog on him?

22  Why'd you --

23          A.   That's a determination I made to

24  apprehend him, because he was running --

25          Q.   I know you made the determination.

```
 1                A.    -- because he was running to resist
 2   arrest.
 3                Q.    So, again, you believe that you're
 4   entitled to release a dog to bite a fleeing
 5   misdemeanor subject?
 6                A.    At that time, yes.
 7                Q.    You still believe that; right?
 8                A.    The policy has changed since then.
 9                Q.    When did the policy change?
10                A.    August of '22.
11                Q.    Is that a written policy --
12                A.    Or '23, December '23.  The Chief sent
13   out a memorandum first, and then the policy was
14   updated.
15                MR. VALOIS:  Can we go off the record
16   for a second?
17                THE VIDEOGRAPHER:  The time is 2:40.
18   We're off the record.
19                     (Off-the-record discussion.)
20                THE VIDEOGRAPHER:  The time is 2:40
21   and 23 seconds.  We're on the record.
22   BY MR. VALOIS:
23                Q.    So the policy, the policy has
24   changed, and you've receive written guidance on
25   this?
```

```
 1                    A.    Yes.

 2                    Q.    And what does the new guidance say?

 3                    A.    It says the suspect has to be

 4   committing a violent felony, act of burglary, crime

 5   involving a firearm, or physical force used against

 6   an officer.

 7                    Q.    Before you can put the dog on it?

 8                    A.    Yes.  And then it follows the same

 9   guidelines, physical restraint and control,

10   apprehending, dealing with a suspect resisting

11   arrest by fight or flight, and then, yeah.

12                    Q.    But you can't use -- in other words,

13   if you had it to do over again --

14                    A.    They changed --

15                    Q.    -- under this new policy, you

16   wouldn't have deployed the dog in either

17   circumstance?

18                    A.    Correct.

19                    Q.    Did they tell you why this new policy

20   came around?

21                    A.    That's what the Chief of Police put

22   out.

23                    Q.    But he didn't say why?

24                    A.    He just wanted to make the K-9 policy

25   stricter, because it hadn't been updated in a long
```

1  time.

2        Q.   All right.  But --

3        A.   I haven't physically had a

4  conversation with him, no.  I can't say under oath.

5        Q.   That's fine.  I'm not asking you.

6  I'm just asking if you know why, but if you don't

7  know, you don't know.

8        A.   No.

9        Q.   All right.  Now, what steps did you

10  take -- you saw that your dog disobeyed your

11  command to release multiple times in both

12  instances; right?

13        A.   Yes, sir.

14        Q.   What steps did you take to correct

15  that action?

16        A.   I brought the body camera up to our

17  master trainer from the --

18        Q.   No, I mean with the dog training?

19        A.   Training, we've trained.

20        Q.   What specific training did you engage

21  in?

22        A.   Harsher corrections.

23        Q.   All right.  And are these, is all

24  this training, I have like a 500 PDF of his whole

25  service record.

Page 219

```
 1              A.    Yes, sir.
 2              Q.    In really poor handwriting.  He must
 3    come from a family of doctors.
 4                    But is it going to be in there
 5    somewhere?
 6              A.    Yes sir.  Where we have worked on his
 7    aus.
 8              Q.    If I send you an RPD, a request for a
 9    production of document, to look through that record
10    and send me the records that reflect that training
11    on that specific area of correcting his
12    disobedience on aus, would you be able to do that?
13              A.    Yes, sir.
14              Q.    Okay.  Now, at the March 11th
15    incident, you actually took out the assault charge
16    on Calvin, the assault on a law enforcement officer
17    charge?
18              A.    Yes sir.
19              Q.    Right?  But none of the officers,
20    none of the other officers did.
21                    To your knowledge, were any of the
22    other officers assaulted?
23              A.    I don't believe so.
24              Q.    Okay.
25              A.    So the initial -- I don't, I can't
```

Page 220

```
 1  speak for them.

 2            Q.   Okay.

 3            A.   My observation was that they were,

 4  that when he had thrashed into the door and pushed

 5  back, that Officer Hall was struck.  That's what

 6  I -- that was my perception.  Officer Bryant, I'm

 7  not sure.

 8            Q.   So you perceived that two officers

 9  were assaulted?

10            A.   Yes.

11            Q.   And then what would make you change

12  your mind about that?

13            A.   What would make me change my mind?

14            Q.   Yeah.  Did you change -- have you

15  changed your mind about that?

16            A.   About what?

17            Q.   About believing that two --

18            A.   Well, they said they weren't.

19            Q.   They told you they weren't?

20            A.   They weren't assaulted.

21            Q.   So you didn't change your mind about

22  that until after they told you?

23            A.   What do you mean?

24            Q.   After you --

25            A.   Like, my perception initially was
```

```
 1   that they were --
 2              Q.   Right.  You were there, you saw it,
 3   and it was your perception; right?
 4              A.   Yes.
 5              Q.   And then later on they came to you,
 6   had a conversation?
 7              A.   Yes.  They said they weren't
 8   assaulted, because we were trying to figure out
 9   what we --
10              Q.   This was after the incident was over;
11   right?
12              A.   Yes.
13              Q.   All right.  And then you decided that
14   you weren't -- at that point that it was only you,
15   and you didn't know about them?
16              A.   Correct.
17              MR. VALOIS:  All right.  Can you cue
18   up V-8?  Katie, I'm going to ask you to be pretty
19   quick on the pause button with this one.  This is
20   going to be a very short clip.  All right.
21                   (Video playing.)
22              MR. VALOIS:  Pause it.  Start over.
23   We need more volume.  All right.  Go ahead and try
24   that, and then get ready to pause when I give you a
25   pause.
```

```
 1                    (Video playing.)
 2                    MR. VALOIS:  Pause.
 3   BY MR. VALOIS:
 4          Q.   Okay.  So at 13:16:05 you're
 5   reporting to Lyncomm that he's assaulted a couple
 6   of officers; right?
 7          A.   Yes, sir.
 8                    MR. VALOIS:  Okay.  Continue, Katie.
 9                    (Video playing.)
10                    MR. VALOIS:  Pause.  All right.  Go
11   ahead and -- go ahead and get ready to pause when
12   it comes back on.
13                    (Video playing.)
14                    MR. VALOIS:  Pause.  All right.  Go
15   ahead.
16                    (Video playing.)
17                    MR. VALOIS:  Pause.
18   BY MR. VALOIS:
19          Q.   You're having a conversation, that's
20   Officer Bauserman; right?
21          A.   Yes, sir.
22          Q.   He's a senior patrol officer with
23   Lynchburg, been there forever; right?
24          A.   Yes.
25          Q.   All right.  And he's talking to you.
```

1  Look at the time.  1318.  This is 1 minute

2  and -- less than 2 minutes later, you're telling

3  Officer Bauserman that he assaulted you and you

4  don't know about the others?

5       A.   Correct.  I said he definitely

6  assaulted me.

7       Q.   And I don't know about the others.

8  Now, you told Lyncomm that other officers were

9  assaulted, but now you're telling him it was you

10 and maybe -- and you're not sure about the other

11 ones.

12       What made you change your mind in

13 that less than 2-minute period?

14       A.   That I knew for sure that he had

15 assaulted me.

16       Q.   Right.

17       A.   It was my perception that the others

18 were assaulted.

19       Q.   Right.

20       A.   But I didn't want to say to him -- I

21 don't know.  I can't say what my mind or my mindset

22 was three years ago, like what -- I can't say

23 exactly what I was thinking.

24       Q.   Okay.  But do you remember why you

25 would -- in less than 2 minutes, you would go from

Page 224

```
 1  saying multiple officers are assaulted to telling

 2  Bauserman, "I was assaulted.  I don't know about

 3  the other officers."

 4          A.   I don't.

 5              MR. VALOIS:  Okay.  All right.  I'll

 6  offer that as Exhibit V-8.

 7              (Plaintiff's Exhibit V-8 marked.)

 8  BY MR. VALOIS:

 9          Q.   Now, do you remember an incident

10  involving a subject named Shanta Brown?

11          A.   I haven't read over the lawsuit that

12  was just issued to me yet.

13          Q.   Pardon me?

14          A.   What's that?

15          Q.   I'm sorry, do you remember the

16  criminal case that you were involved in with Shanta

17  Brown?

18          A.   If you could give me a little bit

19  more information.

20          Q.   Well, do you remember taking out a

21  criminal charge against Shanta Brown?

22          A.   Can you give me a little more

23  information about the individual, like what the

24  case was?

25          Q.   Kemper Street Apartments.  It was,
```

1  you responded to an incident at Kemper Street Lofts

2  involving a young man who wouldn't get out of a

3  car?

4              MR. GUYNN:  (Indiscernible.)

5              THE WITNESS:  I left it in my car.

6  BY MR. VALOIS:

7        Q.   We had a jury trial in May about it.

8  You testified.  It involved you and another

9  officer?

10       A.   Yes, I recall.

11       Q.   All right.  Now, in that incident,

12 you ended up being involved, taking a young man out

13 of a car and then eventually taking out charges

14 against his mother and his sister; right?

15       A.   I took out charges, I believe, on

16 just the one subject.

17       Q.   Just on Shanta Brown?

18       A.   Yes.

19       Q.   All right.  And a felony assault on a

20 law enforcement officer charge; right?

21       A.   Yes.

22       Q.   And in that, in that case it turned

23 out to be a pretty significant police -- it started

24 as a traffic stop?

25       A.   Correct.

1           Q.    Tags out.  And who was the other

2    officer involved?  Do you remember his name?

3           A.    Officer Miller.

4           Q.    Zach?

5           A.    Yes.

6           Q.    Zach Miller.  He's former Officer

7    Zach Miller now.

8                 He's currently an Amherst deputy?

9           A.    A Bedford County deputy.

10          Q.    He moved to Bedford now?

11          A.    I think he's in Bedford.  He might be

12   in Amherst.  I'm not sure.  I know he left here and

13   went to Bedford County, but that's been a couple

14   years.

15          Q.    But at the time, this would have been

16   in 2020, Zach Miller, he initiated a traffic stop

17   on Kemper Street, at the Kemper Street Lofts, and

18   asked you to respond to run the drug dog around an

19   SUV that was parked there.  And there was a young

20   man inside named Tarrant.  What's Tarrant's last

21   name?  I forget Tarrant's last name, young man in

22   there named Tarrant.

23                Remember that?

24          A.    Yes.

25          Q.    In any event, the young man reported

1  to you that he was scared of police and that he was

2  afraid of you, and he didn't want you to touch him.

3              A.   Okay.

4              Q.   And you came and you ordered him to

5  get out of the car?

6              A.   Correct.

7              Q.   He wouldn't get out of the car?

8              A.   Correct.

9              Q.   And then you ended up, you and Zach

10  Miller ended up pulling him out of the car?

11              A.   Correct.

12              Q.   Right?  And then taking him to the

13  SUV, to Zach Miller's SUV, it was a squad car;

14  right?

15              A.   Yes.

16              Q.   Trying to conduct a search on him

17  there?

18              A.   Correct.

19              Q.   And then threw him on the ground;

20  right?

21              A.   No.  He was --

22              Q.   Assisted to the ground; right?

23              A.   He would not let us search him.

24              Q.   Right.  And then he ended up on the

25  ground, his mother came running up squawking?

```
 1              A.    Correct.

 2              Q.    Right?  And a bunch of people were

 3     charged.  My client was Shanta Brown.

 4              A.    Yes.

 5              Q.    Right?  Now, do you recall in that

 6     incident making statements to your supervisor at

 7     the scene that turned out to be demonstrably false?

 8              A.    You brought this up in court.

 9              Q.    I did.  Do you recall doing it,

10     though?

11              A.    Yes.

12              Q.    Okay.  And do you know why you did

13     that?

14              A.    I don't.

15              Q.    All right.  But you acknowledge that

16     you did do it; right?

17              A.    Yes.

18              MR. VALOIS:  All right.  Go ahead and

19     play V-8.

20              MS. THOMAS:  V-8?

21              MR. VALOIS:  Yeah.

22              MS. THOMAS:  Or V-9?

23              MR. VALOIS:  I mean V-9.

24              (Video playing.)

25     BY MR. VALOIS:
```

Evans & Company

1         Q.    Do you recognize this as being at the

2    scene of Kemper Lofts in 2020, April 29?

3         A.    Yes.

4         Q.    Okay.  And I'll represent this as

5    just a clip from a much longer video.

6                   (Video playing.)

7                   MR. VALOIS:  Pause.

8    BY MR. VALOIS:

9         Q.    Is that you arriving on the scene?

10        A.    Yes.

11                  MR. VALOIS:  Okay.  Go ahead and

12   play.

13                  (Video playing.)

14                  MR. VALOIS:  All right.  Pause.

15   BY MR. VALOIS:

16        Q.    So there's my mom, there's Shanta

17   Brown over here squawking; right?  That's, the kid

18   in the car right there is Tarrant Slaughter; right?

19   Does that ring a bell?

20        A.    I don't think his last name is

21   Slaughter.

22        Q.    Tarrant?  I forget his --

23        A.    His first name is Tarrant.

24        Q.    I forget his last name too, but

25   that's Shanta Brown there; right?

1          A.    Yes.  It's either her, or there was
2    two females standing up there.
3          Q.    You're trying to get Tarrant out, and
4    his mom's saying -- his mom's a correctional
5    officer, and she's squawking at you saying he
6    doesn't have to get out of the car; right?
7          A.    Yes.
8              MR. VALOIS:  All right.  Go ahead and
9    play.
10             (Video playing.)
11             MR. VALOIS:  Pause that.  Pause right
12   now.
13   BY MR. VALOIS:
14        Q.    Okay.  So you can hear him there
15   telling you, telling you that he's scared of you
16   and please don't touch me, sir?
17        A.    Correct.
18        Q.    He's been disobedient, but has he
19   been anything other than disrespectful in his
20   communication?
21             MR. GUYNN:  I'm going to object.  I
22   think you have the wrong case.  You just served
23   this case.
24             MR. VALOIS:  No, no, no.  This is for
25   impeachment in this case.  It's being offered for

```
 1   impeachment and for the way that -- and for what --
 2               MR. GUYNN:  Well, the civil rule is
 3   it has to have some connection to the case to be
 4   impeachment, Paul.
 5               MR. VALOIS:  It does have connection
 6   to the case, for his propensity to lie to his
 7   supervisors about what happens at the scene.  So I
 8   understand your objection, but that's what's coming
 9   up next is going to be him lying about what
10   happened, to his supervisors.  It's a pattern, a
11   pattern of practice, and it's perfectly at issue --
12               MR. GUYNN:  And it's shown by one
13   video?
14               MR. VALOIS:  No.  We have several.  I
15   have more.
16               MR. GUYNN:  Okay.
17               MR. VALOIS:  Okay.  All right.  Go
18   ahead.
19               (Video playing.)
20               MR. VALOIS:  Pause it.
21   BY MR. VALOIS:
22        Q.   So he's been nothing but -- I mean,
23   he's been disobedient, he's not getting out of the
24   car.  But he's being polite with you.  He's
25   addressing you as sir.  He's asking you please;
```

1 right?  Please don't touch me?

2          A.    Correct.  But we've now given him

3 multiple opportunities to get out of the car.

4          Q.    Right.  He's not doing what you told

5 him to?

6          A.    Correct.

7          Q.    Right?  He's being a knucklehead, and

8 he's being a little screamy brat, but he's not

9 saying any impolite words to you; right?

10          A.    Once, when we place hands on him,

11 then he grabs the steering wheel in the seat and

12 now starts pulling back into the vehicle.

13          Q.    Yeah, yeah.  He's not wanting to get

14 out of the car; right?

15          A.    Correct.  He does not want to get out

16 of the car.

17          Q.    Right.  Absolutely.  Okay.  But my

18 question are regarding his communications.

19                You're saying that you recognize

20 everything he said to you has been polite, right?

21          A.    He's not being --

22          Q.    He hasn't used any foul language?

23          A.    No.

24          Q.    All right.  Then why would you report

25 to your supervisor, like you did, that this young

1  man said, "I ain't getting out of the fucking car,"

2  right, and "Don't fucking touch me."  When the

3  supervisor came to investigate this incident

4  after -- this turned into a melee; right?  This

5  turned into a whole every unit available response

6  for a traffic stop for a tag out; right?

7          A.   Correct.

8          Q.   Okay.  The supervisor came out to

9  investigate it; right?  Right?

10         A.   Yes.

11         Q.   Why would you report to him that this

12 young man said those words when he didn't say them?

13         A.   Like I told you before, I'm not sure.

14         Q.   Well, you understand that that's

15 casting him in a negative light; right?  Falsely?

16         A.   Correct.  He said he was not getting

17 out of the car.

18         Q.   Right.  But you're, by using those

19 words, you're falsely casting him in a more

20 negative light than existed?

21         A.   And he said, "Don't touch me."

22         Q.   He said, "Please don't touch me."

23         A.   I don't remember exactly what he

24 said, but he did say, "I'm not getting out of the

25 car" and, "Don't touch me."

```
 1              Q.   All right.  Do you recall telling
 2   that same supervisor that you witnessed Ms. Brown
 3   and her daughter assault both you and the other
 4   officer?
 5              A.   If that's what you have written down
 6   there, then yes.
 7              Q.   Well, I can play it.
 8              A.   Okay.
 9                   You want to play it?  All right.
10                   MR. VALOIS:  Keep playing that,
11   Katie.  Play that one to the end.
12                   (Video playing.)
13   BY MR. VALOIS:
14              Q.   All right.  You just said you saw,
15   you said you saw somebody assault Rob Miller right
16   there; right?
17                   (Video playing.)
18                   MR. VALOIS:  Pause.
19   BY MR. VALOIS:
20              Q.   You heard you just that; right?
21              A.   Correct.
22              Q.   But at trial, you conceded you never
23   saw anybody assault Rob Miller?
24              A.   Correct.  I did not see the physical
25   assault.  I saw the altercation.
```

```
1              Q.   Why would you tell a supervisor at
2   the scene that you assaulted -- that you saw an
3   assault, when you didn't see the assault?
4              A.   Like I said before, I'm not sure.
5              Q.   Well, don't you think it's important
6   to give accurate information to a supervisor?
7              A.   Yes.
8              Q.   I mean, he's getting inaccurate
9   information here.  He can't do his job
10  without inaccurate -- with inaccurate information,
11  can he?  Not properly; right?
12             A.   Correct.
13             Q.   That's his whole function there;
14  right?
15             A.   Yes.
16             MR. VALOIS:  The other one's
17  duplicative.  We don't -- he's already admitted the
18  other one.  We don't need that one, the last one.
19  We don't need the other Shanta Brown video at this
20  point.
21             And could we play, could you play a
22  CD over that?  Can you play audio over that into
23  the TV?  I bet you could on VLC.
24             MS. THOMAS:  It doesn't have CD
25  capability.
```

```
 1                   MR. VALOIS:  No, no, that's on the
 2   file.  There's an audio file on the --
 3   BY MR. VALOIS:
 4           Q.   You recall testifying at Shanta
 5   Brown's trial; right?
 6           A.   Yes.
 7                   MS. THOMAS:  Which one is the audio?
 8                   MR. VALOIS:  It's marked A-U-D.
 9                   MS. THOMAS:  This one?
10                   MR. VALOIS:  Yeah.
11                   (Audio playing.)
12                   MS. THOMAS:  Do you want me to play?
13                   MR. VALOIS:  Yeah, go ahead.  How
14   long is this one?
15                   MS. THOMAS:  15 minutes.
16                   MR. VALOIS:  Okay.  Pause that for a
17   second.
18   BY MR. VALOIS:
19           Q.   You recognize this to be the recorded
20   testimony from our trial?
21           A.   Yes.
22           Q.   All right.  And will you concede at
23   that trial that you admitted that you had made all
24   these false statements to the supervisor?
25           A.   That I didn't physically see it.  I
```

1  saw, like I said, I saw the commotion.  But the

2  actual physical assault with Rob Miller, I remember

3  seeing his body go flying through the air.  Like it

4  was pretty chaotic.

5          Q.   Right.  Not like you reported,

6  that -- they were inconsistent.  The statements

7  that -- your testimony was inconsistent with what

8  you reported to the supervisor?  You had conceded

9  that at trial; right?

10         A.   Yes.

11         Q.   I mean, I could play it.  Do you want

12  to -- I could play it, and we can listen to it.

13              Do you remember it?

14         A.   I remember this case.

15         Q.   All right.  And are you willing to

16  concede that that's what happened, that what I'm

17  saying is true, or do you want to hear it for

18  yourself?

19         A.   If it's on here, we can play it.

20              MR. VALOIS:  Let's play it.

21              (Audio playing.)

22              THE WITNESS:  -- in here, or are you

23  saying the whole video?

24              MR. VALOIS:  It's the way it's come

25  from the -- it's going to be coming up pretty soon.

1    I can skip it forward.

2                    MS. THOMAS:  Skip forward?

3                    MR. VALOIS:  This is where he

4    gives -- okay.  So pause it for a second.

5    BY MR. VALOIS:

6         Q.    Let me see if you remember it this

7    way.  All right.  You gave testimony, there were

8    objections with the prosecutor, and then we came

9    back.  And then after the objections were heard by

10   the judge, we came back.

11                    And you made a bunch of statements;

12   right, that were in accord --

13        A.    I remember going out and then coming

14   back in.

15        Q.    But the statements you made the

16   second time were in accord with all this

17   preliminary stuff; right?

18        A.    I believe so.

19        Q.    You want to skip the preliminary

20   stuff and get to what you said?

21        A.    I just don't -- yeah, whatever we can

22   do.

23        Q.    I mean, it's up to you.  You're the

24   one testifying.  If you want to hear it, we'll play

25   it.  If you remember it -- if you remember it,

1   fine.  But if you don't, I'll play the whole thing

2   for you.

3           A.   I don't care.  We can play the whole

4   thing.

5               MR. VALOIS:  Go ahead, play it.

6               (Audio playing.)

7               MR. VALOIS:  All right.  Pause it

8   right here for a second, Katie.

9   BY MR. VALOIS:

10          Q.   All right.  So you've given your

11  testimony, and do you recognize this as being the

12  portion where we're playing back the statements you

13  made to your supervisor?

14          A.   Yes.

15          Q.   Okay.  Are you willing to concede

16  that you made all the statements that I said you

17  made to the supervisor --

18          A.   Yes.

19          Q.   -- at this point?

20          A.   Yes.

21          Q.   Okay.  And that you admitted as much

22  to the jury?

23          A.   Yes.

24          Q.   All right.  And, again, you don't

25  know why you made all those inconsistent

Page 240

1  statements?

2          A.   No.

3               MR. VALOIS:  All right.  I offer

4  Exhibit AUD-1, defense exhibit, I offer exhibit --

5               MR. GUYNN:  (Indiscernible).

6               MR. VALOIS:  -- plaintiff's exhibit.

7  I'm sorry?

8               MR. GUYNN:  I'm objecting on

9  relevance grounds.

10              MR. VALOIS:  Okay.  I'm sorry?

11              MR. GUYNN:  You said defense again.

12              MR. VALOIS:  Oh, I'm getting tired.

13  Usually I'm in the defense shoes.  I'm not usually

14  in the plaintiff's.  Plaintiff's Exhibit AUD-1.

15  And in response to the objection I would just say

16  it's relevant to show a practice, a relevant

17  practice.

18              (Plaintiff's Exhibit AUD-1 marked.)

19              MR. VALOIS:  I would also offer

20  Plaintiff's Exhibit 5.  I don't believe that's been

21  offered.

22              (Plaintiff's Exhibit 5 marked.).

23              MR. VALOIS:  And then the last

24  thing --

25              MR. GUYNN:  I think when you put both

1  of those in, you agreed that he probably hadn't

2  seen them before?

3              MR. VALOIS:  Right, right.

4              MR. GUYNN:  So the same deal as far

5  as foundation and all that.

6              MR. VALOIS:  Yeah, absolutely, yeah,

7  absolutely.

8  BY MR. VALOIS:

9        Q.    And I got another one here, same way.

10  This is, this will be the end of it for me.

11  Mr. McFadgen may have some questions for you, but

12  this will be my last one.

13        A.    All right.

14        Q.    I know you're sad to hear it.

15              But can you look at that?  I'm not

16  going to ask you to authenticate that either,

17  because I don't think you'll be in a position to;

18  right?

19              MR. GUYNN:  Is that 1?

20              MR. VALOIS:  This is Exhibit 11.

21              MR. GUYNN:  Oh, 11.

22              MR. VALOIS:  For the record, I've

23  asked the -- I'm sorry.  I've asked the witness to

24  examine the document marked Plaintiff's Exhibit 11.

25              THE WITNESS:  What do you want me to

1  look -- I'm sorry.  My brain is --

2  BY MR. VALOIS:

3          Q.    Well, the first thing is, so this is

4  another use of force investigation; right?  Can you

5  just -- do you recognize it to be that?  Oh, I'm

6  sorry.  Is that a CAD, that's the CAD?

7          A.    This is CAD.

8          Q.    Oh, that's a CAD report.  This is the

9  CAD report from December 20th of 2021?

10         A.    Anthony Place.

11         Q.    Anthony Place; right?

12         A.    Yes, sir.

13         Q.    Okay.  Same thing, those are the

14  warrants.  You see the warrants in there?  You see

15  the CAD report?  You've already described what a

16  CAD report is?

17         A.    Yes, sir.

18         Q.    It's basically a dispatch record;

19  right?

20         A.    Yes.

21         Q.    And it records the communications

22  from the officers to dispatch?

23         A.    Yes.

24         Q.    And it records the particular

25  officers movements during the dispatch; right?

```
 1              A.   Yes.
 2              Q.   Okay.  Inside of that you're going to
 3   find some pictures.
 4                   Can you just examine those pictures,
 5   and let me know after you have examined them
 6   whether they're consistent with the injuries that
 7   you observed on Calvin Wesley's person on December
 8   20th of 2021 after the dog bite?
 9              A.   Yes, sir.
10              Q.   When you say yes, they are consistent
11   with what you observed?
12              A.   Yes.
13              Q.   Those injuries on those photos are
14   consistent with what you observed at the scene?
15              A.   Yes.
16                   MR. VALOIS:  All right.  Very good.
17   I don't have any questions.  Mr. McFadgen may have
18   some questions.
19                   MR. MCFADGEN:  No questions.
20                   MR. VALOIS:  I offer this as
21   Plaintiff's Exhibit 11.
22                   (Plaintiff's Exhibit 11 marked.)
23                   THE VIDEOGRAPHER:  Sir?
24                   MR. GUYNN:  Yeah, no questions.
25   We'll read and sign.
```

1          THE VIDEOGRAPHER:  Yes, sir.  This

2    concludes the videorecorded deposition of Seth

3    Reed.  The time is 3:12 p.m.  We're off the record.

4              (Reading and signature reserved.)

5              (Deposition concluded at 3:12 p.m.)

6                    * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1         COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
 2              I, KIMBERLY A. HENDERSON, a
 3   Registered Professional Reporter and  Electronic
 4   Notary Public in and for the Commonwealth of
 5   Virginia at Large, Notary Registration Number
 6   359658, whose commission expires November 30, 2025,
 7   do certify that the aforementioned appeared before
 8   me, was sworn by me, and was thereupon examined by
 9   counsel; and that the foregoing is a true, correct,
10   and full transcript of the testimony adduced to the
11   best of my ability.
12              I further certify that I am neither
13   related to nor associated with any counsel or party
14   to this proceeding, nor otherwise interested in the
15   event thereof.
16              Given under my hand and Notarial seal
17   at Forest, Virginia, this 6th day of December,
18   2023.
19
20
21
22   _____
23        Kimberly A. Henderson, Notary Public
24        Commonwealth of Virginia at Large
25
```

**Evans & Company**

```
 1              CHANGES REQUESTED TO THE DEPOSITION OF:

 2                            SETH REED

 3                 TAKEN ON:  November 6, 2023

 4

 5   Page/Line:      From:           To:           Reason:

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16

17

18              _____

19                           SETH REED

20

21   COMMONWEALTH OF VIRGINIA to wit:
     Subscribed to and sworn before me
22   this _____ day of _____
     My commission expires
23

24

25   Notary Public                  (AFFIX NOTARY SEAL)
```