IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| CALVIN WESLEY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Civil Action: 6:24cv00032 |
| THE CITY OF LYNCHBURG and LPD OFFICER SETH REED, | ) ) ) ) |
| Defendants. | ) ) |

## DEFENDANT CITY OF LYNCHBURG'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, City of Lynchburg, Virginia (the "City"), by counsel, respectfully submits this memorandum in support of its motion for summary judgment.

### INTRODUCTION

Plaintiff Calvin Wesley ("Plaintiff" or "Wesley") claims pursuant to 42 U.S.C. § 1983 that Lynchburg Police Department ("LPD") Sergeant Seth Reed ("Sgt. Reed") used excessive force in violation of his Fourth and Fourteenth Amendment rights on two separate occasions in 2021 by deploying his police canine, or K-9, against Wesley during the course of his arrests. In connection therewith, Wesley also claims the City is liable under a theory of municipal liability for having an unconstitutional custom or practice of excessive use of force, particularly by the LPD's use of police canines, as well as for failing to train its police officers in the constitutional limits of handling and deploying police canines in the pursuit and apprehension of subjects. The undisputed evidence, however, shows that the City—contrary to Wesley's claims—has an official policy and custom of discouraging, training against, investigating, and disciplining use of excessive force. Accordingly, the City is entitled to summary judgment.

1

## STATEMENT OF UNDISPUTED FACTS

### Use of Force Policies at the Lynchburg Police Department

The LPD maintains Use of Force, Use of Canine Teams policies. (*See* PD21-0602 Use of Force; PD16-0706 and PD21-0706 Use of Canine Teams; and PD21-1601 Internal Investigations.)[1] Pursuant to those policies, all complaints of excessive force are investigated by a LPD supervisor with a rank of sergeant or higher who was not involved in the use of force incident. In addition, all uses of force that fall under the enumerated criteria in Section III(K)(2)(a)-(k) of the Use of Force Policy are investigated. These categories include, *inter alia*, all uses of force involving weapons and all uses of force in situations resulting in visible injury or complaint of injury to a suspect or arrestee, or visible injury or complaint of injury to an involved officer. (PD21-0602, Use of Force.)

The City designates oversight of the LPD to the Chief of Police, who is the final policymaker for the City with respect to LPD policies. (Byrne Depo. 6:7-14.)[2] Multiple factors are considered when deciding whether to change LPD policies with regard to use of force, such as recent events, recent case law, or recent apprehensions within the LPD or elsewhere in the state. (*Id.* 7:3-15.) The use of force policy was changed in 2021, 2022, 2023 and 2025. (*Id.* 7:16-24.) Specifically with respect to use of force involving K-9s, the use of force policy was changed via operational memorandum in September 2022, which was incorporated into the change in the policy in 2023. (*Id.* 9:20-10:1.) That change occurred due to an apprehension that had occurred prior where the officer was found to have acted within policy, however, the LPD determined that the policy could provide greater clarity. (*Id.* 10:2-10.) That particular apprehension involved a

---

[1] The 2021 Use of Force, Use of Canine Teams and Internal Investigations policies are attached hereto as Exhibit 1.
[2] The transcript of Sergeant Collin Byrne's sworn 30(b)(6) deposition testimony on behalf of the City is attached hereto as Exhibit 2.

traffic stop in which a passenger had provided false identification, was warned not to run, and then fled on foot; K-9 Knox was deployed by Sgt. Reed to apprehend the subject. (*Id.* 10:11-11:10.)

Prior to this change in 2022, the LPD use of force policy allowed for a K-9 to be used as a means of physical restraint or control, apprehending or subduing a person resisting arrest by fleeing or physical actions, defense of a person. (Byrne Depo. 16:10-17:1.) The policy held that K-9s were not to be used as a threat to make a person comply with an officer's verbal order in a nonarrest situation or when no physical threat of violence appears imminent, to elicit information from a person as retaliation for verbal or physical abuse. (*Id.* 17:2-7.) The change implemented by the September 2022 operational memorandum was to which situations a K-9 could be deployed to apprehend a subject. (*Id.* 21:17-22.) The change allowed for a K-9 to be deployed against someone who has committed a violent felony, has committed a crime involving the display or use of a firearm, is actively resisting arrest through physical force, or is actively committing a burglary. (*Id.* 22:17-23:2.)

The September 2022 change in the use of force policy was made internally following discussions among the K-9 supervisor, the captains, deputy chiefs, and chief via messaging applications within the LPD. (*Id.* 23:11-24:10.) Ultimately, the Chief of Police, who was then Chief Zuidema, made the determination to make the change. (*Id.* 25:2-7.)

LPD's Use of K-9 Teams Policy states that the Chief of Police and his designee will make all decisions regarding the removal of a police K-9 from service as well as final disposition of the police K-9. (Godsie Depo. 57:15-58:8.) In other words, the Chief of Police has the ultimate authority over whether a police K-9 that is certified under NAPWDA remains in service. (*Id.* 59:13-25.)

3

**Use of Force Training at the Lynchburg Police Department**

The Virginia Department of Criminal Justice Services ("DCJS") sets compulsory minimum training requirements to become certified as a law enforcement officer in Virginia. 6VAC20-20-21, 6VAC20-20-30. These requirements include basic training at a certified criminal justice training academy, involving a minimum of 480 hours of approved training in eight categories. *Id.* One of these categories is "[d]efensive tactics and use of force." 6VAC20-20-21(B)(1)(f). DCJS also mandates that officers complete a minimum of 100 hours of approved field training, and a certification exam prior to certification. 6VAC20-20-21(B)(2), (C).

Sergeant Nathan Godsie oversees the training of K-9 units. (Godsie Depo. 7:17-23.)[3] His duties include selection of training locations, training dates, and topics of trainings, as well as coordination of the aforementioned with the master trainer. (*Id.* 8:2-9.) The master trainer for K-9 units is Mr. Harold Bennett, a Senior Master Trainer with the North American Police Work Dog Association (NAPWDA) who is contracted with the City to conduct K-9 training. (*Id.* 8:12-16.) K-9 units are certified annually through the NAPWDA. (*Id.* 8:25-9:10.) LPD policy requires that in order for a police canine to be in service, it must be certified either by NAPWDA or Virginia Police Work Dog Association (VPWDA). (*Id.* 9:13-17.) K-9s are certified in obedience, tracking, article search, area search, building search, and narcotics detection, among other skills. (*Id.* 10:14-18.)

K-9s are trained to release on command. (Godsie Depo. 17:2-4.) If a K-9 does not release on command, it will not pass an NAPWDA certification. (*Id.* 23:13-15.) K-9 handlers are also certified through the NAPWDA. (*Id.* 24:22-25.) The training for officers to become a K-9 handler is approved and selected by the Chief of Police, and it is typically a six-week course. (*Id.*

---

[3] The transcript of Sgt. Godsie's sworn 30(b)(6) deposition testimony on behalf of the City is attached hereto as <u>Exhibit 3</u>.

25:1-6.) Once the course is completed, the officers are paired with a dog, and this dog team has to certify as a unit. (*Id.* 26:16-27:4.)

Police canine (or K-9) Knox is certified and in service. (*Id.* 12:8-12.) Sgt. Reed is Knox's handler. (*Id.* 12:13-15.) K-9 Knox and Sgt. Reed were last certified prior to the first incident involving Wesley on March 17, 2020, approximately one year prior to the incident. (*Id.* 27:23-28:8.) The last time Sgt. Reed and K-9 Knox trained as a team prior to the March 11, 2021 incident was February 17, 2021. (*Id.* 37:24-38:6.)

The rules of certification of the NAPWDA pertaining to obedience and specifically, the aggression control test, state that "Failure of the dog to release and/or respond to the obedience commands in a timely manner is grounds for failure." (Godsie Depo. 44:6-45:7.) K-9 Knox passed the aggression control test in order to be certified. (*Id.* 45:14-46:3.)

### Investigating Uses of Force at the LPD

Every incident involving a use of force by a K-9 is reviewed by "Blue Team," a system the LPD uses to review all use of force incidents and complaints, including uses of force involving a K-9. (Godsie Depo. 12:20-13:17.) Blue Team is essentially the software that is used during a use of force investigation. (Byrne Depo. 53:24-54:22.) Once a use of force investigation has been completed in the Blue Team software and approved, it is then moved into IAPro, which is essentially a database for all the uses of force. (*Id.* 55:5-17.)

In order for a use of force investigation to be approved, the investigating supervisor reviews the facts by interviewing the individuals involved and any available witnesses, reviewing any available body camera, dash camera, or other camera footage, and reviewing all incident reports, which are generated by the officers involved. (Byrne Depo. 55:24-64:18.) The supervisor then makes a report and generates findings and recommendations as to whether he or

5

she believes the officer(s) violated the LPD's use of force policy. (*Id.*) The supervisor's findings and recommendations are reviewed by each supervisor in the involved officer's chain of command. (*Id.*) At each level, the LPD supervisor reviews the findings and recommendations of the supervisor below and makes his or her own recommendation. (*Id.*) This process continues up the chain of command, all the way up to the Chief of Police. (*Id.*) The Lynchburg Chief of Police is the final authority on use of force investigations, and he (or his designee if he is unavailable) makes the final decision on the findings and punishment, if necessary. (*Id.*)

LPD policy allows for the Master Trainer to be consulted regarding a police K-9's service and removal from service. (Godsie Depo. 65:6-16.)

## The Use of Force Investigations in this Case

The LPD performed thorough use of force investigations in this case. (*See generally* UOF Inv. Report 3/11/21; UOF Inv. Report 12/20/21.) On the afternoon of March 11, 2021, shortly after Wesley was detained, LPD Lieutenant Brian Smith ("Lt. Smith") arrived on scene and began a use of force investigation. (Smith Body Cam 1 00:40.)[4] The investigation was initiated pursuant to standard procedure, as outlined in the Use of Force Policy (PD21-0602). Lt. Smith talked to Sgt. Reed, took photographs of Wesley's injuries, interviewed Wesley, interviewed Bernice Perkins, and then talked briefly to some of the other officers involved. (*Id.* 00:54.) Shortly thereafter he interviewed involved officers, including Sgt. Reed. (*See generally* Smith Body Cam 2.)[5] He reviewed body camera footage. (UOF Inv. Report 3/11/21 at 2.) He then turned over the investigation to LPD Lieutenant Lucas Bryan ("Lt. Bryan") in the LPD Professional Standards Unit. (*Id.* at 1.) Lt. Bryan reviewed the incident reports, interviewed and

---

[4] The body camera footage of Lt. Smith from shortly after the March 11, 2021 incident is attached hereto as <u>Exhibit 4</u>.

[5] The body camera footage of Lt. Smith from his interview with Officer Reed following the March 11, 2021 incident is attached hereto as <u>Exhibit 5</u>.

6

obtained statements from all responding officers to the March 11, 2021 call, and reviewed body camera footage. (*Id.* at 6–7.) He then prepared an administrative report and forwarded it up the chain of command. (*Id.* at 7–10.) Sgt. Reed's and the other officers' actions were found to be within policy according to the Use of Force Policy guidelines. (*Id.* at 10.)

On the night of December 20, 2021, shortly after Wesley was detained, LPD Officer Vernon Parrish ("Officer Parrish") arrived on scene and began a use of force investigation. (Parrish Body Cam 1 00:45.)[6] The investigation was initiated pursuant to standard procedure, as outlined in the Use of Force Policy (PD21-0602). Officer Parrish talked to some of the officers involved in the incident, took body camera footage of Wesley, and interviewed Officer Rowland. (*Id.*) Early the following morning, he interviewed Sgt. Reed. (*See generally* Parrish Body Cam 2.)[7] He then turned over the investigation to LPD Captain Lisa Singleton ("Capt. Singleton") in the LPD Professional Standards Unit. (UOF Inv. Report 12/20/21 at 1.) Capt. Singleton reviewed the incident reports, interviewed and obtained statements from all responding officers to the December 20, 2021 call, and reviewed body camera footage. (*Id.* at 1–2.) She then prepared an administrative report and forwarded it up the chain of command. (*Id.* at 5–9.) The defendant officers' actions were found to be within policy according to the Use of Force Policy guidelines. (*Id.* at 7.)

## PROCEDURAL POSTURE

Wesley brings this action pursuant to 42 U.S.C. § 1983. (Complaint, ECF No. 1.) He claims, under a theory of municipal liability, that the City violated his Fourth and Fourteenth Amendment rights by (i) maintaining an alleged custom or practice of allowing its officers to use

---

[6] The body camera footage of Officer Parrish from shortly after the December 20, 2021 incident is attached hereto as Exhibit 6.

[7] The body camera footage of Officer Parrish from his interview with Officer Reed shortly following the December 20, 2021 incident is attached hereto as Exhibit 7.

excessive force, particularly by its use of police canines (Counts IV and V), (ii) failing to train its officers on proper use of police canines (Counts VI and VII), (iii) failing to discipline its officers for using excessive force (Counts VIII and IX), and (iv) ratifying its officers' use of excessive force (Counts X and XI).

Wesley seeks judgment against the City in the amount of ten million dollars ($10,000,000.00), as well as costs and expenses (including attorney's fees) and injunctive relief.

In its Order entered June 13, 2025, this Court granted the City's motion to dismiss with respect to Counts VIII, IX, X and XI for failure to discipline and ratification.

ARGUMENTS

I. **Standard of Review**

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Establishing the parameters for consideration of a motion for summary judgment, the Supreme Court has stated that:

> The judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find a preponderance of the evidence that the plaintiff is entitled to a verdict.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). To withstand a motion for summary judgment, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l., Inc.*, 916 F.2d 924, 930 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249-50).

**II.     The City is entitled to summary judgment on Plaintiff's *Monell* claims.**

Wesley asserted municipal liability claims against the City of unconstitutional custom or practice and failure to train. At the outset, these claims fail because Wesley cannot support the underlying constitutional claims against Sgt. Reed. *See Turner v. Thomas*, 313 F. Supp. 3d 704, 716 (W.D. Va. 2018) ("For a municipality to be liable under [42 U.S.C. §] 1983, a plaintiff must demonstrate an underlying constitutional violation.") (citing *Waybright v. Frederick Cty. MD*, 528 F.3d 199, 203 (4th Cir. 2008)). Furthermore, no reasonable juror could find the City had a policy or custom of allowing excessive force that caused a deprivation of Wesley's Fourth or Fourteenth Amendment rights, or that the City failed to train its officers in the constitutional use of force.

A local government entity cannot be held liable under § 1983 for injuries inflicted solely by its employees or agents. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Local governments are only liable for their own illegal acts. Accordingly, to impose liability on a governmental entity, a plaintiff must establish the existence of an official policy or custom that caused the constitutional deprivations. *Id.* The entity may be held liable only when its policy or custom is "the moving force of the constitutional violation." *Id.*

**A.     No reasonable juror could find that the City has a policy, custom or practice of allowing unconstitutional use of force.**

In Counts IV and V, Wesley asserts *Monell* claims based on a theory of unconstitutional custom or practice. In other words, Wesley attempts to show that the City "fail[ed] to put a stop to or correct a widespread pattern of unconstitutional [excessive force by police officers]." *Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 402 (4th Cir. 2014) (citing *Spell*, 824 F.2d at 1389). Prevailing under this theory "is no easy task." *Id.* Wesley must point to a

9

"persistent and widespread practice of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference." *Id.* (internal citations omitted). "A court may infer that a custom exists 'from continued inaction in the face of a known history of *widespread* constitutional deprivations on the part of city employees' but not 'merely from municipal inaction in the face of *isolated* constitutional deprivations by municipal employees.'" *Booker v. City of Lynchburg*, 2021 U.S. Dist. LEXIS 26538, at *9 (W.D. Va. Feb. 11, 2021) (quoting *Milligan v. Newport News*, 743 F.2d 227, 229-30 (4th Cir. 1984)). Further, the custom "must be of such a character that municipal employees could reasonably infer from it tacit approval of the conduct in issue." *Id.* (citing *Milligan*, 743 F.2d at 230).

To demonstrate the requisite causation, Wesley must show the unconstitutional custom proximately caused his alleged Fourth Amendment deprivations. *Jackson v. Brickey*, 771 F. Supp. 2d 593, 604 (W.D. Va. 2011). That is, Wesley must show there existed a pattern of widespread constitutional violations that were "specific and similar enough" to the conduct at issue that the City's indifference to them could be seen as a "deliberate choice." *Booker*, 2021 U.S. Dist. LEXIS at *9-10 (citing *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).

Wesley has not adduced evidence to demonstrate a history of widespread, similar uses of excessive force by the City's police officers, nor has he shown deliberate indifference by the City. Rather, the evidence demonstrates that, in circumstances like this case, where a suspect receives visible injury, the LPD investigates *every* use of force, and virtually all other uses of force, even without a complaint. Each use of force investigation is performed by a LPD supervisor (rank of sergeant or higher) who was uninvolved in the use of force incident. The supervisor's findings are reviewed by each supervisor in the involved officer's chain of

10

command, up to Chief Zuidema, who is the final authority and makes the final decision on findings and, if necessary, punishment.

The City designates oversight of the police department to the Chief of Police. Chief Zuidema is the final policymaker for the City with respect to LPD policies and use of force investigations. This is not a novel concept. *See Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (finding the Chief of Police of Newport News, Virginia was the final policymaker because he was "responsible for the choice and implementation of police department practices and procedures").

Furthermore, LPD's Use of K-9 Teams Policy states that the Chief of Police and his designee will make all decisions regarding the removal of a police K-9 from service as well as final disposition of the police K-9. In other words, the Chief of Police has the ultimate authority over whether a police K-9 that is certified under NAPWDA remains in service. LPD policy allows for the NAPWDA Master Trainer to be consulted regarding a police K-9's service and removal from service.

In his complaint, Wesley appears to argue that City officials—independent from the Chief or other law enforcement—had a constitutional duty to investigate uses of force by LPD officers. But the constitutional mandate is that the City not consciously disregard widespread uses of excessive force by its police officers. The City accomplishes that mandate through the multi-level LPD investigative process. There is no evidence to demonstrate that the process is inadequate, or that widespread excessive force is permitted to go unchecked. And there is no case establishing a constitutional duty for a municipality to have non-law enforcement officials conduct independent excessive force investigations.

In short, given the lack of widespread, similar excessive force incidents, as well as the LPD's thorough internal processes, no reasonable juror could find the City has a custom or practice of permitting excessive force by LPD officers, whether involving K-9s or otherwise.

### B. No reasonable juror could find that the City has a policy of constitutionally deficient training with respect to use of force.

Wesley also claims the City has unconstitutional training deficiencies with respect to preventing excessive force. To establish municipal liability on the basis of failure-to-train, Wesley must establish the City has a policy of inadequate training with respect to particular tasks, for which "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers can reasonably be said to have been deliberately indifferent to the need, and that the inadequate training actually caused a claimed injury." *Revene v. Charles County Comm'rs*, 882 F.2d 870, 874-75 (4th Cir. 1989) (internal quotations and citations omitted). Wesley must prove "specific deficiencies in training." *Id.* at 875; *Allen v. City of Fredericksburg*, 2011 U.S. Dist. LEXIS 17405, at *23-24 (E.D. Va. Feb. 20, 2011); *Johnson v. Balt. Police Dep't*, 2020 U.S. Dist. LEXIS 61052, at *56 (D. Md. Apr. 7, 2020). Generally, a pattern of similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference for purposes of a failure to train claim. *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

As discussed, Wesley cannot demonstrate a pattern of constitutional violations by untrained LPD officers. The LPD takes considerable measures to ensure its officers are adequately trained on the use of force. This starts with completing the compulsory minimum training requirements set by DCJS, which includes "defensive tactics and use of force" as one of eight mandatory categories trained on during the 480-hour minimum training at a certified criminal justice academy. DCJS further requires 100 hours of field training, a certification exam,

12

and 40 hours of approved, in-service training every two years. LPD officers must maintain their training to be certified and work as law enforcement on the street.

With respect to training specific to use of police canines, K-9 units are certified annually through the NAPWDA by Senior Master Trainer, Mr. Harold Bennett. LPD policy requires that in order for a police canine to be in service, it must be certified either by NAPWDA or Virginia Police Work Dog Association (VPWDA). K-9s are certified in obedience, tracking, article search, area search, building search, and narcotics detection, among other skills. K-9s are trained to release on command. If a K-9 does not release on command, it will not pass an NAPWDA certification.

K-9 handlers are also certified through the NAPWDA. The training for officers to become a K-9 handler is approved and selected by the Chief of Police, and it is typically a six-week course. Once the course is completed, the officers are paired with a dog, and this dog team has to certify as a unit.

K-9 Knox is certified and in service. Sgt. Reed is Knox's handler. K-9 Knox and Sgt. Reed were last certified prior to the first incident involving Wesley on March 17, 2020, approximately one year prior to the incident. The last time Sgt. Reed and K-9 Knox trained as a team prior to the March 11, 2021 incident was February 17, 2021.

The rules of certification of the NAPWDA pertaining to obedience and specifically, the aggression control test, state that "Failure of the dog to release and/or respond to the obedience commands in a timely manner is grounds for failure." K-9 Knox had to pass the aggression control test in order to be certified.

Given the extensive training required of LPD officers generally, and specifically with respect to use of K-9s in the field, no reasonable juror could find that the City has a policy of

13

constitutionally deficient training on use of force involving K-9s or otherwise. Accordingly, this Court should grant summary judgment in favor of the City on the failure-to-train claims.

## CONCLUSION

For the foregoing reasons, Defendant City of Lynchburg, Virginia respectfully requests that the Court grant its motion for summary judgment and dismiss the Plaintiff's claims against it with prejudice.

                CITY OF LYNCHBURG, VIRGINIA

                By /s/ John R. Fitzgerald
                Jim H. Guynn, Jr., Esq. (VSB # 22299)
                John R. Fitzgerald, Esq. (VSB # 98921)
                GUYNN WADDELL, P.C.
                415 S. College Avenue
                Salem, Virginia 24153
                Phone: 540-387-2320
                Fax:    540-389-2350
                Email: jimg@guynnwaddell.com
                          johnf@guynnwaddell.com
                *Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of February, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

| | |
|---|---|
| M. Paul Valois | Steven D. McFadgen, Sr. |
| James River Legal Associates | McFadgen Law, PLC |
| 7601 Timberlake Road | 3831 Old Forest Road, Suite 6 |
| Lynchburg, VA 24502 | Lynchburg, VA 24501 |
| Phone: (434) 845-4529 | Phone: (434) 385-4579 |
| Fax: (434) 845-8536 | FAX: (888) 873-1048 |
| Email: mvalois@vbclegal.com | Email: muchmorelaw@gmail.com |
| *Counsel for Plaintiff* | *Counsel for Plaintiff* |

/s/ John R. Fitzgerald
Jim H. Guynn, Jr. (VSB #22299)
John R. Fitzgerald (VSB #98921)
GUYNN WADDELL, P.C.
415 S. College Avenue
Salem, Virginia 24153
Phone: 540-387-2320
Fax:    540-389-2350
Email: jimg@guynnwaddell.com
            johnf@guynnwaddell.com
*Counsel for Defendants*

15