IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

*****************************************************

CALVIN WESLEY,

     Plaintiff

v.                       Case No.: 6:22-cv-00031

CITY OF LYNCHBURG, et al.,

     Defendants.

*****************************************************

VIDEORECORDED 30(b)(6) DEPOSITION

OF SERGEANT COLLIN BYRNE

September 22, 2025

11:32 a.m. - 3:01 p.m.

Lynchburg, Virginia

REPORTED BY: Kimberly A. Henderson, RPR

1          Videorecorded 30(b)(6) deposition of SERGEANT

2    COLLIN BYRNE, taken and transcribed on behalf of

3    the Plaintiff, pursuant to notice and/or agreement

4    to take depositions; by and before Kimberly A.

5    Henderson, a Registered Professional Reporter and

6    Notary Public in and for the Commonwealth of

7    Virginia at Large; commencing at 11:32 a.m.,

8    September 22, 2025, at the Offices of the City

9    Attorney, 900 Church Street, Lynchburg, Virginia.

10   APPEARANCES OF COUNSEL:

11

12        JAMES RIVER LEGAL ASSOCIATES
          7601 Timberlake Road
13        Lynchburg, Virginia  24502
          434.845.4529
14        mv@vbclegal.com
     BY:  M. PAUL VALOIS, ESQUIRE
15             Counsel for the Plaintiff

16        GUYNN WADDELL, P.C.
          415 S. College Avenue
17        Salem, Virginia  24153
          540.387.2320
18        johnf@guynnwaddell.com
     BY:  JOHN R. FITZGERALD, ESQUIRE
19             Counsel for the Defendants

20        Also Present:  Melissa Stephens, Videographer

21

22

23

24

25

1                    I N D E X

2   WITNESS                                          PAGE

3   SERGEANT COLLIN BYRNE

4       Examination by Mr. Valois                    5

5       Examination by Mr. Fitzgerald               102

6       Examination by Mr. Valois                   102

7

8                    E X H I B I T S

9   (None marked.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  (11:32 a.m., September 22, 2025)

 2

 3               THE VIDEOGRAPHER:  Good morning.  My

 4  name is Melissa Stephens, I'm the videographer.

 5  The court reporter is Kim Henderson.  Today's date

 6  is September 22nd, 2025, and the time is 11:32 a.m.

 7  This is the videorecorded deposition of Sergeant

 8  Collin Byrne, taken in the matter of Calvin Wesley

 9  versus The City of Lynchburg, et al., Case Number

10  6:22-cv-00031.  This is for the United States

11  District Court for the Western District of

12  Virginia, Lynchburg Division.

13               This deposition is being held at the

14  law offices of the city attorney in Lynchburg at

15  900 Church Street in Lynchburg, Virginia 24504.

16  Counsel, please introduce yourselves for the

17  record, after which the court reporter will swear

18  in the witness

19               MR. VALOIS:  Paul Valois, counsel for

20  Mr. Wesley.

21               MR. FITZGERALD:  John Fitzgerald,

22  counsel for the defendants.

23

24

25
```

```
 1                    SERGEANT COLLIN BYRNE
 2               was sworn and testified as follows:
 3                   E X A M I N A T I O N
 4   BY MR. VALOIS:
 5           Q.   Sergeant Byrne, thank you for coming
 6   today.  This is a continuation of a deposition, a
 7   prior deposition.  It's a Rule 30(b)(6) deposition.
 8   Right.  And again, my purpose is, is not to obtain
 9   so much information, but to obtain binding answers,
10   answers that will bind the Lynchburg Police
11   Department.  Right.
12               To that end, I ask that just if you
13   don't know, just say you don't know.  I don't want
14   any opinions or speculation.  It's a little
15   different than a situation where I'm trying to
16   probe to find answers.  I'm just really just trying
17   to get committed answers for the record.
18               Do you understand that?
19           A.   Yes.
20           Q.   All right.  Very good.  Thank you
21   very much.  You're here today to talk upon
22   particular subjects.  Right.
23               And I guess it's the subjects in my
24   notice of deposition that were -- except for
25   paragraphs 11, 12, and 13; is that correct?
```

1          A.    Correct.

2          Q.    Okay.  We've already done this once

3    before.  I don't want to rehash it all and be here

4    all day, but just to run through them, the first

5    section is the command structure of the Lynchburg

6    Police Department.

7                    Really, I just want a commitment that

8    who the final policymaker is within the Lynchburg

9    Police Department?

10         A.    Well, the chief of police ultimately

11   has to sign off on any policy.

12         Q.    And so he is the final, he's the

13   final policymaker; is that correct?

14         A.    Correct.

15         Q.    Okay.  All right.  So -- all right.

16   Again, so the -- essentially, my second, the second

17   category involves basically the policies or

18   directives that authorize, limit, or regulate the

19   use of force by police K9s deployed since January

20   1st, 2012.

21                    And then from the tenor of the

22   subcategories, you can see that I'm looking at the

23   changes that have occurred in these policies.

24   Right.  And the evolution of these policies, how

25   it's evolved so that a use of force by a K9 under

1 | one policy might be permitted when it wouldn't be

2 | permitted under another policy.  All right.

3 |         Do you have any -- essentially,

4 | what's driven these changes in these policies, in

5 | the policies regarding the use of force?

6 |         A.    Changes would depend upon recent

7 | events, recent cases, any recent apprehensions

8 | within the police department or apprehensions

9 | other -- anywhere else in the state.  There's a

10 | number of factors that would affect that.

11 |         As far as, like I said, current

12 | events, as far as issues somewhere else, issues

13 | here with a K9 apprehension, any changes to case

14 | law.  All those factors are -- you know, would come

15 | into play when looking at changing policies.

16 |         Q.   How many changes have there been

17 | since January 1st, 2012?

18 |         A.   I would have to review how many there

19 | were, because they change quite often.  All right.

20 | So we've got '21, '22.  I don't know off the top of

21 | my head how many prior to '21, but you would have

22 | the policy in '21, '22, the operational memorandum

23 | in '22, then a change in '23, and then a change in

24 | '25.

25 |         Q.   All right.  Let's go one by one.

```
 1                    The first change in policy, what
 2   directed that change in policy?
 3           A.   So '21 and '22, there were changes in
 4   the policy use of force, but not in the K9 use of
 5   force section.
 6           Q.   What directed the use of force, what
 7   were the changes in the use of force policy?
 8           A.   I don't know, because I was looking
 9   at the K9 specific section.
10           Q.   Okay.  Were there any changes to the
11   use of force by K9s?
12           A.   In '21 and '22, there was not.
13           Q.   Well, let me ask you this:  Does the
14   use of force policy, the general use of force
15   policy, address the use of force policy by K9s?
16           A.   The use of force of K9s is a section
17   of the use of force policy.
18           Q.   Okay.  So then looking back at
19   Category 2, when I said, when I asked you to
20   testify about policy directives that authorize,
21   limit, or regulate the use of force by police K9s,
22   that would be under the standard use of force
23   policy, not under the K9 policy; is that correct?
24                    MR. FITZGERALD:  Object to form.
25   BY MR. VALOIS:
```

1          Q.    I'm just asking, is that right?

2          A.    Say that again.

3          Q.    All right.  With regard to Category

4    2, right, I've asked you to testify here today

5    about the policies or directives that authorize,

6    limit, or regulate the use of force by police K9s,

7    right, deployed by the Lynchburg Police Department.

8                The use of force by K9s is covered by

9    the standard use of force policy; is that right?

10         A.    Yes.

11         Q.    It speaks to that.

12               Are you prepared to testify about

13   that today?

14         A.    About the use of force involving K9s,

15   yes.

16         Q.    Based upon the use of -- standard use

17   of force policy?

18         A.    Specific to use of force involving

19   K9s.

20         Q.    Okay.  So has that changed?  Has the

21   policy changed, since 2012, with regard to the

22   permissible use of force by K9s?

23         A.    Well, the change that occurred would

24   have occurred through the operational memorandum in

25   September '22, which then went into the change in

1  2023.

2        Q.   Okay.  The operational memorandum,

3  what brought about that?  What went into that

4  decision to create the operational memorandum in

5  2022?

6        A.   That was based on an apprehension

7  that had occurred prior, where the officer

8  was -- acted within the policy, but they felt that

9  the policy didn't provide enough clarity, and they

10 were trying to tighten up the policy.

11       Q.   What was the circumstances?  What was

12 the officer doing within policy that needed to be

13 tightened up?

14       A.   There was a traffic stop conducted on

15 Rivermont Avenue in which a passenger was providing

16 a false name, false identification.  The officers

17 could see that the individual was nervous, was

18 providing a false name, and they thought he was

19 getting ready to run.

20            At that point, they told him, listen,

21 Officer Reed here is a K9 officer, and he has his

22 K9, so do not run.  Shortly after that, the

23 individual did run, and the K9 was used to

24 apprehend that individual.

25       Q.   And the K9 -- the individual had not

Page 11

```
 1   been suspected of committing a crime at that point,

 2   correct?

 3            A.   That -- yes.  They did not know,

 4   because they did not who he was.

 5            Q.   And the dog that was turned loose was

 6   Knox; is that right?

 7            A.   Yes.

 8            Q.   And it was Officer Reed that turned

 9   the dog loose at that time; is that correct?

10            A.   Yes.

11            Q.   At that time, there was this

12   memorandum that was put into place.  Right.

13                 Was Officer Reed disciplined for his

14   use of that dog at that point?

15            A.   No, he was not.

16            Q.   So was his use of the dog on a

17   suspect who was -- or on a person who wasn't even

18   suspected to be in a crime, was his deployment of

19   the dog at that point deemed to be consistent with

20   policy?

21                 MR. FITZGERALD:  Object to form.  You

22   can answer.

23                 THE WITNESS:  It was -- it can -- it

24   was within policy that was in that place.

25
```

```
1   BY MR. VALOIS:
2           Q.   So to be clear, the policy that
3   was -- now, the incident in question here was March
4   11th of 2021.
5                That would have been before that
6   memorandum, correct?  Before --
7           A.   Are you referring to Mr. Wesley now?
8           Q.   Yes, yes.  The incident in question
9   here with Mr. Wesley was in March of 2021 and in
10  December of 2021, two incidents, right?
11          A.   Yes.
12          Q.   Both of those incidents preceded this
13  memorandum?
14          A.   Correct.
15          Q.   Right.  And the changes were the
16  result of Officer Reed's deployment of Knox against
17  a person who was not suspected of a crime?
18               MR. FITZGERALD:  Object to form.
19  BY MR. VALOIS:
20          Q.   Well, is that correct?
21          A.   It was a result of looking at that
22  apprehension and looking at it essentially was
23  within policy, and it did not look like the policy,
24  as I said, was clear enough regarding that
25  situation.  So they wanted to change it to clarify
```

1  some issues.

2          Q.   So the policy was unclear to the

3  point where an officer, where Seth Reed, prior to

4  this clarification of policy, Seth Reed, as an

5  officer of the Lynchburg Police Department, could,

6  following his policy, conclude that what he did was

7  okay, that it was legal, and that it was

8  authorized?

9              MR. FITZGERALD:  Object to form.

10             THE WITNESS:  Repeat that again.

11 BY MR. VALOIS:

12         Q.   All right.  So let me try and fix it

13 in my own mind here.  But to be -- the

14 incident -- let me lay a little background, and

15 tell me if I'm wrong, because I want to make sure I

16 get the facts right.

17             But it's my understanding that

18 officer Seth Reed, using Knox, right, deployed Knox

19 against a young man who was a passenger in a car on

20 Rivermont Avenue, who ran away from the car, but

21 who had not been suspected of committing any crime?

22             MR. FITZGERALD:  Object to form.

23 BY MR. VALOIS:

24         Q.   Well, that's my understanding.

25             Is that, is my understanding, correct

1  there?

2          A.   There was suspicion that there was

3  something going on, because they knew at that point

4  he was providing false identification as far as who

5  he was.  So he was providing false ID, which is a

6  crime.

7          Q.   Providing false ID of a -- to

8  a -- was he charged with that?

9          A.   He was charged, I believe, with

10 obstruction.  And then there were several warrants

11 that were served on him because he was wanted,

12 which is why he was giving the false name.

13         Q.   Right.  But at that time, he

14 was -- he had given a false identity to a law

15 enforcement.

16              That's a misdemeanor, right?

17         A.   Yes.

18         Q.   All right.  So at that time, he had

19 been -- was there any indication that this young

20 man was armed?

21         A.   There were no indicators that they

22 knew of at that point, no.

23         Q.   Right.  But no evidence of it.

24              So essentially, at this point, he is

25 a passenger in a car who is giving false

1  information, which is a misdemeanor, no evidence of

2  weapons, and he ran from the car; is that correct?

3          A.    He ran after he was warned by them

4  that Officer Reed was a K9 officer, warned him not

5  to run because the K9 would be used.

6          Q.    They threatened and said, if you run,

7  we're going to --

8          A.    Well, that's not a threat.  That's a

9  statement.

10         Q.    Well, I guess it depends on your

11 point of view the distinction between --

12         A.    Well, it's just a fact of matter.  If

13 you run, this will happen.

14         Q.    Right.  If you move, I will shoot

15 you.  That can just be a statement.  Right.

16               But it could also be -- you concede

17 that could very well be construed as a threat,

18 depending on your perspective, wouldn't you?

19         A.    I would consider it a statement.

20         Q.    Okay.

21         A.    Here's the consequence if you do

22 this.

23         Q.    Right.  And so -- but the policy

24 changed, or did the memorandum, what was that,

25 operational memorandum, did that change the policy?

1          A.    Yes.

2          Q.    Or did it clarify policy?

3          A.    Well, it was changed to clarify as

4     far as what you could use a dog apprehension on

5     what type of situation.

6          Q.    But up until that time, it was

7     permissible to use a dog on a fleeing subject, an

8     unarmed fleeing subject, who was suspected of

9     committing just a misdemeanor; is that right?

10          A.    So here we go.  All right.  So 2021,

11     police K9 may be used as a means of physical

12     restraint or control apprehending or subduing a

13     person resisting arrest by fleeing or physical

14     actions.

15              Defense of a person.  Police K9s used

16     by the LPD will be trained to utilize force in

17     apprehending and retaining control of persons until

18     the K9 handler deems it safe to recall or remove

19     the police K9.  Officers will be mindful that any

20     use of police K9s in which the K9 is not under the

21     handler's physical or voice control may potentially

22     be considered a use of deadly force.

23              In cases where the use of police K9s

24     does not prove effective, officers should utilize

25     other force options as necessary for restraint or

1   control.

2              Police K9s will not be used for the

3   following:  As a threat to make a person comply

4   with an officer's verbal order in a nonarrest

5   situation or when no physical threat or violence

6   appears imminent, to elicit information from a

7   person as retaliation for verbal or physical abuse.

8              Q.   Right.

9              A.   So that's '21.

10             Q.   All right.  And this incident that

11  brought about this change of policy, was there any

12  violence or threat posed by this person?

13             A.   No.

14             Q.   All right.  So that -- and

15  nevertheless Seth Reed was found not to have

16  violated that policy when he put the dog on the

17  fleeing kid?

18             MR. FITZGERALD:  Object to form.

19             THE WITNESS:  No, because he was

20  fleeing.

21  BY MR. VALOIS:

22             Q.   Right.

23             A.   That's what I just read.

24             Q.   But I believe you also just read that

25  in addition to fleeing, you can't deploy a dog -- a

```
 1  dog is to be considered -- an unleashed dog is to

 2  be considered potentially deadly force, I believe

 3  you just read that, did you not?

 4          A.    Officers will be mindful that any use

 5  of police K9s in which the K9 is not under the

 6  handler's physical or voice control may potentially

 7  be considered a use of force.

 8          Q.    Okay.

 9          A.    A deadly use of force.

10          Q.    And in this particular occasion, he

11  turned -- the subject ran from Rivermont Avenue and

12  ran down towards Bedford Avenue.

13                The dog chased after him, right?

14          A.    Yes.

15          Q.    All right.  And bit, actually bit and

16  injured that subject to the point that subject

17  required hospitalization; is that correct?

18          A.    He was taken to the hospital.

19          Q.    Right.  And furthermore, in that

20  policy, towards the end, it also says that in

21  addition to everything else, you shall not deploy a

22  dog.  That policy speaks -- the first part of that

23  policy says that when you are authorized to use a

24  dog.

25                And then the second, the end of that
```

1  policy, tells you when an officer may not use a

2  dog.  There are circumstances that prohibit the

3  officer from using a dog?

4          A.  As a threat to make a

5  personal -- person comply with an officer's verbal

6  order in a nonarrest situation --

7          Q.  Okay.

8          A.  -- or when physical threat or

9  violence appears imminent.

10          Q.  All right.  So in order to deploy a

11  dog, there has to be -- there has to be some

12  imminent risk of harm, right?  If there's no risk

13  of harm, you can't --

14          A.  No.  It says to comply in a verbal or

15  in a nonarrest situation.

16          Q.  Right.  And this was a nonarrest

17  situation?

18          A.  He was detained at that point.

19          Q.  That's not -- you understand the

20  difference between a detention and an arrest?

21          MR. FITZGERALD:  Object to form.

22  BY MR. VALOIS:

23          Q.  Do you?  Do you understand the

24  difference between them?

25          A.  Yes, I do.

1            Q.    Okay.  Can you describe --

2            A.    They had probable cause to arrest him

3    for giving false identification.

4            Q.    All right.  Had he been arrested?

5            A.    They had probable cause to make an

6    arrest.

7            Q.    Okay.  So then is it your contention

8    that because they had probable cause to arrest him

9    for a misdemeanor, and he chose to flee, while

10   unarmed, that under the policy that was in place at

11   the time, the policy allowed Seth Reed to deploy

12   potentially deadly force by use of a K9 dog against

13   that fleeing subject?

14            MR. FITZGERALD:  Object to form.

15            THE WITNESS:  No.

16   BY MR. VALOIS:

17            Q.    Well --

18            A.    It's not if -- it's if he's not under

19   voice control, it says that, not just if he's off

20   the leash.

21            Q.    Where did the dog bite this person?

22   Wasn't it, in fact, many blocks away down at

23   the -- on Bedford Avenue?

24            A.    It was a block away.

25            Q.    Right.  And does the report indicate

```
 1  that Officer Reed was present near the dog and that
 2  the dog was under his command?
 3          A.   I could not tell you exactly where he
 4  was, but he was within a block.
 5          Q.   Did Seth -- did Officer Reed order
 6  the dog to bite the subject?
 7          A.   Yes.
 8          Q.   Okay.  And so was it -- it was deemed
 9  to be consistent with LPD policy that Seth Reed was
10  authorized to order his dog to bite an unarmed
11  suspect who fled, when that suspect was suspected
12  of only committing a misdemeanor?
13          A.   Yes.
14          Q.   Okay.  And that's what changed?
15          MR. FITZGERALD:  Object to form.
16  BY MR. VALOIS:
17          Q.   That's what changed with the
18  memorandum, the change in policy in September?  I
19  forget the exact title of the letter.
20          A.   So in September, the change indicated
21  what situations the dog could be deployed to
22  apprehend a subject.
23          Q.   Okay.  And that was in September of
24  2022.
25               When was the incident in question
```

1  with this dog on the -- I didn't ask you that, but

2  what was the date of the incident involving the

3  dog?

4          A.   It was May of '21.

5          Q.   Are you sure it was May?

6          A.   May 30th of '21.

7          Q.   May 30th of '21.  All right.  We'll

8  come back to that.

9               So then, with regard to the change in

10 September, the letter that went in September, what

11 did that accomplish?

12         A.   What did it accomplish?

13         Q.   You were just speaking as to what it

14 directed?

15         A.   It changed what a K9 could be used

16 for as far as an apprehension, what situations.

17         Q.   And how -- what did -- and what were

18 the changes, the specific changes?

19         A.   A violent felony, burglary in

20 progress, someone who is physically resisting

21 arrest, someone who is committing a crime involving

22 the display or use of a firearm.  So those four.

23              Have committed a violent felony, has

24 committed a crime involving the display, use of

25 firearm, is actively resisting arrest through

1  physical force, or is actively committing a

2  burglary.

3          Q.   So until this letter came out, until

4  this came out, what's the date of that?

5          A.   September 26th, 2022.

6          Q.   Until from -- so from May 30th until

7  9/26/22, what Seth Reed did would have comported

8  with LPD policy?

9          A.   Yes.

10          Q.   Right.  And this policy was changed.

11              Now, what was the process that was

12  involved in changing this policy?  Was there a

13  commission or a study?

14          A.   There was discussion among

15  stakeholders as far as K9 supervisor and captains

16  and deputy chiefs and chief.

17          Q.   Who are, who were those stakeholders?

18  Who were the people involved in that?

19          A.   I don't know, because that was in

20  September, and the system that we use only keeps

21  data for the current policy as far as who was

22  involved in it.

23          Q.   How did that process work?  Were

24  there formal meetings?

25          A.   There were discussions and comments

1    through messaging apps within the police

2    department.

3            Q.   Were there any in-person meetings or

4    board meetings?

5            A.   I don't know.

6            Q.   Was there -- was it done in

7    consultation with counsel?  Was advice -- was it

8    based upon legal advice, or was this an internal

9    decision that was made within?

10           A.   This was an internal decision.

11           Q.   Okay.  So there were -- the city's

12   attorney's office wasn't involved?

13           A.   I can't absolutely say they weren't.

14   I don't have any information that they were.

15           Q.   Okay.  Do you know why it took all

16   the way from May 30th until September, we're

17   talking June, July, August, almost four months, to

18   effect this change?

19               MR. FITZGERALD:  Object to form.

20               THE WITNESS:  I don't know the exact

21   timeline.

22   BY MR. VALOIS:

23           Q.   All right.  Is that still the current

24   policy now?

25           A.   It's been updated, but that's -- this

1  is specifically still in there.

2          Q.    All right.  And ultimately the chief

3  of police, who was then Chief Zuidema, was the one

4  who made this determination; is that right?

5          A.    Correct.  Chief Zuidema put this out

6  and decided that this would be the policy going

7  forward.

8          Q.    And he -- there's nobody above him

9  that could override this?  He's the final

10  policymaker; is that right?

11          A.    Yes.

12          Q.    Okay.

13          A.    Within the police department.

14          Q.    Right.  Is there anybody over top of

15  the police department that could override that

16  policy?

17              MR. FITZGERALD:  Object to form.

18  BY MR. VALOIS:

19          Q.    Is there anybody in the City of

20  Lynchburg who could override this policy, who could

21  tell the officers what to do, except for the chief?

22          A.    I don't know that I could answer that

23  question, because you're talking about the inner

24  workings of the city in law.  The chief of police

25  works for the city manager.

```
 1              Q.   So when we go back to paragraph 1,
 2    where I asked you about the command structure and
 3    asked you to look into who the final policymaker
 4    was, you don't know if there is somebody else in
 5    the City of Lynchburg who could override the policy
 6    of the chief?
 7              A.   Well, the chief works for the city
 8    manager.
 9              Q.   Do the -- with regard to the policies
10    of the Lynchburg Police Department, can you say
11    whether or not the city manager could effectively
12    rip up that letter and make his own policy?
13                        MR. FITZGERALD:  Object to form.
14    You can answer.
15                        THE WITNESS:  That's not something
16    that I can answer.
17                        MR. VALOIS:  Can we take -- can we go
18    off the record for just a minute?
19                        MR. FITZGERALD:  Sure.
20                        THE VIDEOGRAPHER:  Our time is 12:03.
21    We're off the record.
22                        (Recess.)
23                        THE VIDEOGRAPHER:  Our time is 12:13.
24    We're back on record.
25                        MR. VALOIS:  Thank you.
```

```
 1   BY MR. VALOIS:
 2           Q.    Sergeant Byrne, just to clarify, to
 3   be sure, can you please name the person who is the
 4   final policymaker in the Lynchburg Police
 5   Department?
 6           A.    The chief of police has to sign off
 7   on all the policies.
 8           Q.    And that is the final policymaker?
 9           A.    Yes.
10           Q.    Okay.  All right.  Moving on.
11                 Now, how many times has this dog Knox
12   been deployed against fleeing subjects?
13           A.    I believe it is nine times.
14           Q.    Nine times.  How many of those
15   involved armed suspects?  Do you know?
16           A.    You're going to have to give me a
17   minute, because I counted all of them.
18           Q.    Take your time.
19           A.    All right.  One.  Five.
20           Q.    So five, so that means four times
21   they were unarmed, right?
22           A.    Yes.
23           Q.    Of the four that were unarmed, how
24   many were suspected of misdemeanors only?
25           A.    Three.
```

Page 28

```
1              Q.   And in those three cases, the

2    one, obviously one of them, is the May 30th

3    incident.

4              When was the one prior, the closest

5    one prior to that?

6              A.   Prior to that was Mr. Wesley in

7    March.

8              Q.   Was there one prior to that?

9              A.   No.

10             Q.   Wasn't there an incident right around

11   March 11th, maybe the next day, March 12th?

12             A.   Yes.

13             Q.   And didn't that incident involve a

14   misdemeanor, a subject who was suspected of

15   breaking into cars?

16             A.   A suspect who was suspected breaking

17   into cars and resisted, attempted to flee, and then

18   physically resisted arrest.

19             Q.   That's a misdemeanor too, right?  So

20   is he one of the three?  When you said that three

21   times there had been misdemeanors, did you include

22   him, or is he another one?

23             MR. FITZGERALD:  I'll object to the

24   form of the question.  You can answer it.

25             THE WITNESS:  There was a cleanup
```

```
 1  that I missed.  Let me go back and make sure.  One,

 2  two, three.  Did I say three?

 3  BY MR. VALOIS:

 4          Q.   Yes.

 5          A.   It's four.

 6          Q.   So this would be another one, right?

 7          A.   Yes.

 8          Q.   Okay.  So in this one, and the

 9  particular, the event that occurred on March 12th,

10  that occurred over at Lynchburg College; is that

11  right?  Or not --

12          A.   Randolph.

13          Q.   -- Randolph, Randolph, I meant

14  Randolph.

15          A.   Yeah, Randolph.

16          Q.   Randolph College, over off Rivermont;

17  is that right?

18          A.   Yes.

19          Q.   And I believe the incident in

20  question was Seth, Officer Reed, responded with

21  Knox to a report of a young man who was accused of

22  breaking into, or suspected of, breaking into cars;

23  is that right?

24          A.   Yes.

25          Q.   And when he got there, he observed
```

```
 1   the young man basically near the observatory over

 2   on Randolph College; is that right?

 3             A.   Let me pull that right now.

 4             Q.   Somewhere off of Princeton, I think.

 5             A.   Yeah, it was off of Princeton.

 6             Q.   Right.  And that subject was not

 7   armed; is that right?

 8             A.   Correct.

 9             Q.   And he was suspected of misdemeanors,

10   and he fled; is that right?

11             A.   Yes.  He fled, and Officer Reed had

12   grabbed him, and then he attempted to get away from

13   him.

14             Q.   And at that point, Officer Reed

15   released Knox when the subject ran away, right?

16             A.   I believe he used Knox when --

17             Q.   When you say believe, can you

18   clarify --

19             A.   Give me one minute.

20             Q.   Sure.

21             A.   So the individual physically pulled

22   away from Officer Reed.  As he continued to attempt

23   to pull away from Officer Reed, Officer Reed gave

24   his K9 to assist in the apprehension.

25             Q.   Right.  And so the -- and the
```

```
 1  apprehension would be -- actually, at this point,
 2  Officer Reed hadn't even observed anything himself.
 3              He was just, he just suspected the
 4  young man to have been breaking into cars, but he
 5  hadn't personally observed that himself at this
 6  point, right?
 7              MR. FITZGERALD:  Object to form.
 8  BY MR. VALOIS:
 9         Q.   Well, you can answer the question, I
10  guess.  I mean, is there anything in the record
11  that indicates that Officer Reed had personally
12  observed any criminal activity?
13         A.   He didn't use the dog until he was
14  physically trying to get away from him.
15         Q.   I know.  But the -- he's -- he has
16  detained this young man, right?
17         A.   Yes.
18         Q.   Okay.  Had he personally observed
19  any -- before he -- prior to detaining him, had he
20  personally observed any criminal activity?
21         A.   He did not.
22         Q.   Okay.  So had he received a report
23  that this young man had been observed?
24         A.   Yes.
25         Q.   Okay.  So at this point, he's trying
```

1  to detain the young man suspected of committing a

2  misdemeanor, correct?

3          A.   Yes.

4          Q.   The young man tried to pull away from

5  him, correct?

6          A.   Yes.

7          Q.   And at that point, Reed deployed the

8  dog to bite the young man, correct?

9          A.   Yes.  As he struggled to maintain

10 control, he deployed the dog.

11         Q.   Yeah.  He did -- in order to bite,

12 the dog to bite him, right?  He ordered the dog to

13 bite him; is that correct?

14         A.   Ordered him to, yes, to apprehend

15 him, to control him.

16         Q.   Right.  Well, then, actually, the

17 word, the German word to do that is packen; is that

18 correct?

19         A.   I don't know.

20         Q.   You don't know?  Okay.  You don't

21 know whether he ordered the dog packen or not at

22 that incident?

23         A.   No.  I don't know the specific word

24 he used.

25         Q.   In any event, the young man was

```
 1  injured to the point of requiring hospitalization;
 2  is that right?
 3          A.   He went to the hospital and had some
 4  cuts and a laceration.
 5          Q.   Right.  So he had to be taken to the
 6  hospital for treatment, correct?
 7          A.   Yes.
 8          Q.   All right.  And all that, and that
 9  was investigated?
10          A.   Yes.
11          Q.   And Officer Reed was found to have
12  comported with LPD policy at that time?
13          A.   Yes.
14          Q.   All right.  That -- but that
15  particular apprehension would not be permitted
16  under current policy?
17              MR. FITZGERALD:  Object to form.
18              THE WITNESS:  No, it would.
19  BY MR. VALOIS:
20          Q.   Why would it?
21          A.   Because he was physically trying to
22  get away.
23          Q.   You're allowed to -- so is it the
24  current policy of the LPD that if you're detaining
25  someone for a misdemeanor and they
```

1    are -- physically try to get away?

2         A.    If they are actively resisting.

3         Q.    On a misdemeanor?

4         A.    As I just said, if they were actively

5    resisting arrest through physical force.

6         Q.    While being charged with a

7    misdemeanor?

8         A.    Yes.

9         Q.    Without any weapons?

10        A.    Yes.

11        Q.    That's the current policy?

12        A.    Yes.

13        Q.    And they don't have to pose a danger

14   to the officer?

15        A.    They're actively resisting by force.

16        Q.    There's no requirement -- they could

17   be -- they can be -- the dog can still -- to be

18   clear, the current policy of the Lynchburg Police

19   Department is that a police dog can be deployed

20   against a subject, an unarmed subject, who is

21   resisting being arrested on a misdemeanor without

22   posing harm to the officer?

23        A.    Resisting by force.

24        Q.    Resisting by force, meaning -- what

25   is -- describe resisting by force?

1              A.    Using any force to -- whether it's

2    physically escape by overpowering the officer,

3    whether it's using strikes on the officer.

4              Q.    Did either --

5              A.    Any physical force to escape.

6              Q.    Did either of those steps, did he use

7    physical strikes on the officer, or did he try to

8    overpower him?

9              A.    He used physical force to overpower

10   to get away from the officer.

11             Q.    To overpower him?  So pulling away is

12   using physical force?

13             A.    Yes.  You're physically --

14             Q.    That's the official policy of the

15   Lynchburg Police Department?

16             A.    The official policy is in the policy.

17   It's in black and white.

18             Q.    Right, right.  But is it the official

19   policy, the understanding now, from command, that

20   by pulling away, that when a subject who tries to

21   pull away from an officer is using force to resist,

22   that's the official policy?

23             A.    If they use physical force to escape,

24   yes.

25             Q.    How could you -- how -- but they

```
 1   don't have to apply force to the person of the
 2   officer?  If I just --
 3            A.   Well, they're using force to get away
 4   from control of the officer.
 5            Q.   Let's make it clear.  Let's say an
 6   officer is grabbing my arm.
 7            A.   Yes.
 8            Q.   And I go like that and pull away from
 9   them, I'm using force?
10            A.   You're using force to escape.
11            Q.   And that comports with current LPD
12   policy?
13            A.   Yes.
14            Q.   Even in misdemeanor cases?
15               MR. FITZGERALD:  Object to form.
16   BY MR. VALOIS:
17            Q.   Even when, even in cases involving
18   misdemeanors?
19            A.   If an individual is using force,
20   there's no stipulation what the crime is.  If
21   they're using force to attempt to resist.
22            Q.   Okay.  Well, if an individual is
23   trying to pull away from an officer without trying
24   to strike that officer, and that's using force,
25   right?
```

Page 37

```
 1              A.    They're using force to resist arrest.
 2              Q.    Okay.  So if an individual, if an
 3    individual, to be clear, with regard to current
 4    policy of the Lynchburg Police Department, if a
 5    misdemeanor subject, right, someone suspected of a
 6    misdemeanor, is trying to pull away from an officer
 7    to run away, while unarmed, right, that is a use of
 8    force that permits the deployment of a K9, and
 9    that's current policy?
10              MR. FITZGERALD:  Object to form.
11              THE WITNESS:  I don't know what else
12    you want me to say.
13    BY MR. VALOIS:
14              Q.    I just want an answer to the
15    question.
16              A.    I answered the question.
17              Q.    All right.  Well, let me -- I
18    don't -- I want to make sure that I'm clear.  I
19    want to lay out -- let me lay out --
20              A.    As I said, they're actively resisting
21    arrest through the use of physical force.
22              Q.    Well, let me -- that's what I'm
23    trying to pin down is what is -- how can one pull
24    away without using -- is it possible for one to try
25    and escape without using force?  Is that possible?
```

1    Is it possible that a misdemeanor subject could try

2    and pull away from an officer without using force?

3            A.    If the officer has control of a part

4    of their body and they're trying to escape that,

5    they're using some sort of force to resist arrest.

6            Q.    Okay.  So I think we're good.  Let me

7    clarify that so I understand.

8            So the position is at any time an LPD

9    officer has anyone detained and that person tries

10   to get away, that officer is authorized to deploy a

11   dog on that person?

12           MR. FITZGERALD:  Object to form.

13   BY MR. VALOIS:

14           Q.    Is that correct?  Anytime I

15   have -- anytime an officer is physically detaining

16   someone --

17           A.    Physically arresting.

18           Q.    Okay.  Physically arresting

19   someone?

20           A.    It's an arrest.

21           Q.    Okay.  Say physically arresting --

22           A.    Actively resisting arrest.

23           Q.    All right.  But at this point, let me

24   back up to this kid that was over there at Randolph

25   College.  He wasn't under arrest.

```
 1                    You understand that the law does not
 2   permit an officer to arrest on a misdemeanor unless
 3   the officer personally observes the misdemeanor,
 4   right?
 5                    MR. FITZGERALD:  Object to form.
 6   BY MR. VALOIS:
 7          Q.   You do understand that, right?
 8                    MR. FITZGERALD:  Object to form.
 9   BY MR. VALOIS:
10          Q.   Unless he has a warrant.
11                    I mean, do you agree with that?
12                    MR. FITZGERALD:  Object to form.
13                    THE WITNESS:  Agree with what?
14   BY MR. VALOIS:
15          Q.   That a police officer in Virginia is
16   prohibited by statute from effecting an arrest for
17   a misdemeanor breaking into cars unless he
18   personally observes it or unless he has a warrant?
19                    MR. FITZGERALD:  Object to form.
20   BY MR. VALOIS:
21          Q.   You agree to that, you can't make
22   that arrest?
23          A.   You can detain them.
24          Q.   Right.
25          A.   Yeah.
```

1           Q.   And do you understand the difference

2    between detaining and arrest?

3           A.   Yes.

4           Q.   All right.  So at this incident in

5    question, back on March 12th of 2021, Seth Reed had

6    not arrested anyone.

7                It was a detention, correct?

8           A.   Yes.

9           Q.   All right.  And so was it the policy,

10   to be clear, that while being detained, if you try

11   and break -- while someone has -- well, let's

12   assume, according to the report, it appears that

13   Officer Reed had this subject under his physical

14   control at some point, right?

15          A.   Yes.

16          Q.   And at that point, the subject broke

17   away and ran, right?

18          A.   No.  From what I read, he had his

19   arm.  He was trying -- as he was attempting to get

20   away, he had ran.  At that point, he was in control

21   of Officer Reed attempting to get away.

22          Q.   Okay.  Well, okay.

23          A.   That's why he deployed the dog.

24          Q.   He's attempting, he's attempting to

25   pull away, I believe you've said in the report; is

```
 1  that right?
 2           A.   Yes.
 3           Q.   All right.  He's attempting to pull
 4  away, and at that point, while he's being detained,
 5  Officer Reed deployed Knox to bite this man, right?
 6           A.   Yes.
 7           Q.   Right.  And that comported with LPD
 8  policy at the time?
 9           A.   Yeah, at the time, yes.
10           Q.   And it still does, right?  Because
11  he's pulling away, right?
12           A.   As far as if it comports now, I would
13  have to sit down and review the body camera, body
14  camera footage to look at that.
15           Q.   Well --
16           A.   Because back then it absolutely did,
17  but now I don't -- you know, I'd have to look at
18  it.
19           Q.   Well, let me ask you this:  In
20  answering for the city, all right, if a subject is
21  being detained, all right, and decides to pull
22  away, try to pull away without striking the officer
23  or trying to overpower the officer, just tries to
24  pull away from the officer, under current policy,
25  is an officer authorized to deploy a dog to bite
```

Page 42

1   that person?

2              MR. FITZGERALD:  Object to form.

3              THE WITNESS:  If they're actively

4   resisting arrest or using physical force.

5   BY MR. VALOIS:

6        Q.   Right.  We keep going in circles with

7   regard to this physical force.  I want to make it

8   clear.

9              The policy of the Lynchburg Police

10  Department is that anytime someone who is being

11  held by an officer tries to pull away from the

12  officer, Lynchburg policy deems that to be a use of

13  force against the officer?

14       A.   Use of physical force --

15       Q.   Right.

16       A.   -- against an officer.

17       Q.   Right.  That is deemed to be use of

18  physical force --

19       A.   I didn't say that did.  I said that

20  the policy is actively resisting arrest or use of

21  physical force against an officer.

22       Q.   Right.  And what I'm asking with

23  regard to that policy is if it is the policy, okay,

24  whether or not it is the policy that anytime a

25  subject is being held by an officer, if that

```
 1  subject tries to pull away from the officer and run
 2  away, is that deemed to be using force against the
 3  officer?
 4                 MR. FITZGERALD:  Object to form.
 5                 THE WITNESS:  If they're using
 6  physical force to arrest, yes.
 7  BY MR. VALOIS:
 8          Q.   If the officer is using physical
 9  force?
10          A.   No.  If the individual is using
11  physical force to resist arrest.
12          Q.   Okay.  Okay.  Well, we weren't
13  talking about arrest.  We were talking about
14  detention.
15          A.   Detention.
16          Q.   All right.  Same thing?
17          A.   They're resisting.
18          Q.   All right.  When you say -- if
19  they're using -- again, you said, your answer to
20  my -- you're not answering my question.  My answer
21  is what constitutes force?  Okay.
22                 Is it the position of the Lynchburg
23  Police Department that merely pulling away from an
24  officer's grasp is a use of force against the
25  officer?
```

```
 1              A.   It could be physical force, yes.
 2              Q.   Well, when -- let's talk about the
 3   circumstances which could render that physical
 4   force and which couldn't.
 5                   Give me some circumstances in which
 6   it could not be considered to be use of force?
 7                   MR. FITZGERALD:  Object to form.
 8                   THE WITNESS:  I mean, there's all
 9   kinds of hypotheticals we can talk about all
10   afternoon.
11   BY MR. VALOIS:
12              Q.   Name one.  I'll take the first one
13   that comes to the top, the first one that
14   would -- we're talking about can you give me an
15   example of when a detained subject who tries to
16   pull away from an officer does not use force as
17   contemplated by Lynchburg Police Department policy?
18              A.   I would have to look at video of a
19   particular incident.  If it's a situation where
20   there is very little force, then it may be
21   debatable.  But if it's obvious physical force,
22   where they're -- whether they're pushing the
23   officer, whether they're grabbing the officer's arm
24   to resist.
25              Q.   I'm not talking about pushing the
```

1  officer.  I'm not talking about that.  I'm talking

2  about pulling away from an officer.  I'm not

3  talking about --

4          A.   Depending upon how much force is used

5  to pull away.

6          Q.   How do you use force to pull away?  I

7  mean --

8          A.   There are situations where maybe an

9  officer does not have a very strong grip on the

10  suspect, and there's very little, if any, force

11  used to pull away.

12          Q.   But it is the -- but pulling away,

13  the mere act of pulling away without applying a

14  force to the body of the officer himself, without

15  direct application of force to the body --

16          A.   The force has to be against an

17  officer.

18          Q.   Well, if, again, if an officer has my

19  hand, and I pull away from him, I'm going the

20  opposite -- the force is going the opposite

21  direction.  My whole intent is to go away from the

22  officer.

23          How am I applying force to the

24  officer if I'm going away from the officer?

25          MR. FITZGERALD:  Object to form.

```
 1                  THE WITNESS:  The policy is when it's
 2   against.  If they're physically pulling on the
 3   officer's arm, that's force against the officer.
 4   BY MR. VALOIS:
 5          Q.   That is, if they're pulling on his
 6   arm, if they have grasp of his arm?
 7          A.   If he's pulling on the officer's arm,
 8   there's force on the officer's arm.
 9          Q.   Right.  But if he's -- when you say
10   pulling, does -- do you imply that he has to be
11   grabbing the officer's arm and pulling his arm, or
12   can the officer have his arm and he could just be
13   trying to get away?  You understand the
14   difference?
15          A.   Pulling on the officer's arm is
16   force.
17          Q.   All right.  Right.  But what is
18   pulling on the officer's arm?
19          A.   The suspect.
20          Q.   Let me give you two circumstances.
21          A.   The suspect.
22          Q.   I'm going to give you two different
23   situations.  In one situation, I grab your arm and
24   start pulling it.
25                  I am pulling on your arm, right?
```

1           A.    Yes.

2           Q.    In the other situation, you grab me,

3    right, and I'm pulling away.

4                 Are both of those identical with

5    regard to Lynchburg's use of force policy and its

6    policy of deploying K9s and considering whether or

7    not a subject is, quote, using force against an

8    officer, end quote?  Are those identical

9    situations?

10               MR. FITZGERALD:  Object to form.

11               THE WITNESS:  They're not identical,

12   but they're very similar.  But --

13   BY MR. VALOIS:

14          Q.    But do they have the same effect?

15               MR. FITZGERALD:  Object to the

16   interruption of the witness.

17   BY MR. VALOIS:

18          Q.    Sorry, I wasn't trying to interrupt,

19   but please go ahead.

20          A.    Physical force is obviously a general

21   term.  So if physical force, whether it's towards

22   the officer, away from the officer, it's still

23   force.

24          Q.    Right.  And the policy doesn't

25   distinguish between those two?

Page 48

1              A.    No.

2              Q.    Okay.  So if the officer is grabbing

3    a young man, and the young man is trying to slip

4    his hand out of the officer's grasp and get away,

5    that's a use of force?

6              A.    If he's using physical force, not

7    just slip.

8              Q.    Pull?

9              A.    Okay.  Yes.

10             Q.    Not slip.  I'm not --

11             A.    Yes.

12             Q.    But if he's trying to -- if he's

13   trying to pull away from an officer's grasp, that

14   is, in the -- under official policy of the

15   Lynchburg Police Department, that is deemed to be a

16   use of force against the officer?

17             A.    Yes.  But it's also considered along

18   with other factors.  It's not a sterile

19   environment.

20             Q.    What other factors?  Are they in the

21   policy?

22             A.    Yes.  It's right there.

23             Q.    Do you have cites in the policy?

24             A.    It's right there.

25             Q.    Okay.  What other factors are

1  considered?

2          A.   Well, it's Graham versus Connor.

3  Severity of the crime, whether the suspect poses

4  immediate threat to the safety of the officers or

5  others, and whether the suspect is actively

6  resisting arrest or attempting to evade arrest by

7  flight.

8          Q.   Well, do the Graham versus Connor

9  factors play into the deployment of dogs?

10         A.   Yes.

11         Q.   All right.  And so in the case -- in

12 this case, you have someone who is suspected of

13 committing a minor crime, a misdemeanor.  Right.

14 Unarmed.  Right.  Not trying to assault anyone,

15 just trying to pull away.  Right.

16              How does that -- how did Officer

17 Reed's conduct on that date comport with the Graham

18 factors?

19              MR. FITZGERALD:  Object to form.

20              THE WITNESS:  Well, the Graham

21 factors are current.  They weren't in play then.

22 BY MR. VALOIS:

23         Q.   That policy did not incorporate the

24 Graham factors?

25         A.   For the K9 it did not.

1            Q.   So.   Okay.   Just to be clear, March

2    11th of 2021, and in December of 2021, when Calvin

3    Wesley was bitten by the police dog, the use of

4    force policies of the City of Lynchburg did not

5    incorporate the Graham factors in the deployment of

6    the dog?

7                 MR. FITZGERALD:  Object to form.

8                 THE WITNESS:  Can you repeat that?

9    BY MR. VALOIS:

10           Q.   Okay.   To be clear, in 2021, in March

11   11th of 2021, and later in December of -- 20th of

12   2021, when Calvin Wesley was bitten by the police

13   dog Knox, the deployment of Knox by Seth Reed was

14   not governed by the Graham factors?

15                MR. FITZGERALD:  Object to form.

16                THE WITNESS:  I didn't say they

17   weren't governed, but it wasn't in the policy.

18   BY MR. VALOIS:

19           Q.   The policy did not incorporate, the

20   official written policy of the Lynchburg Police

21   Department did not incorporate the Graham factors

22   then?

23           A.   At that time, the Graham factors were

24   not in the policy for use of a K9.

25           Q.   All right.   They are now?

1            A.   Yes.

2            Q.   All right.  Looking at those now, the

3    deployment that Seth Reed conducted on March 12th,

4    the use of force against this young man suspected

5    of breaking into cars, would that comport with

6    policy now?

7            A.   I would have to look at the body

8    camera footage on that one.  It's just, really

9    that's something that's difficult to answer

10   without --

11           Q.   Well, you can analyze --

12           A.    -- looking at the video footage to

13   see exactly what was going on.

14           Q.   Well, I'm not talking about the use.

15   I'm talking about the Graham factors, you know, I

16   mean, the seriousness of the crime.  You don't --

17           A.   Well, you're asking me about a case

18   that I wasn't -- I didn't go through all the

19   details like I did on your client.

20           Q.   Okay.  So the policy changed in

21   September.

22                Has it been altered since September?

23           A.   There were some -- well, this was put

24   into the actual policy in '23.

25           Q.   What do you mean put into the actual

```
 1  policy?  I don't understand.
 2              A.   This is an operational memorandum.
 3              Q.   Does that memorandum --
 4              A.   Not an actual directive.  This served
 5  as the policy temporarily until the policy was
 6  completely written and updated.
 7              Q.   Okay.  I understand.  Let me just
 8  make sure I understand this, and this is important
 9  to be clear.
10              When you're saying the policy was
11  updated, the memorandum is actually policy, it's
12  just like an interim policy?
13              A.   Correct.
14              Q.   Until it gets -- and then it
15  officially gets into a complete revision of the
16  existing policies?
17              A.   Correct.
18              Q.   However, to the officers, to the
19  officers on the street, this, this document here,
20  this, this memorandum has -- is the same effect as
21  the actual policy?
22              A.   Correct.
23              MR. VALOIS:  All right.  Tell you
24  what, we're getting into a break time.  You guys
25  want to take a break for some lunch?
```

```
 1                    THE WITNESS:  That's fine.
 2                    MR. VALOIS:  Yeah, I mean, I'm
 3   probably going to be a little bit.  So what do you
 4   want to do?  What time is it?
 5                    THE VIDEOGRAPHER:  Let's get off the
 6   record first.  Our time is 12:47 p.m.  We're off
 7   the record.
 8                    (Lunch recess.)
 9                    THE VIDEOGRAPHER:  Our time is
10   1:43 p.m.  We're back on the record.
11   BY MR. VALOIS:
12        Q.   All right.  I hope you had a good
13   lunch.  We're back on the record here now.
14                    Sergeant Byrne, we had last talked,
15   we had gone over the number of incidents with
16   police K9s, and we were talking about, in
17   particular, the deployments by the K9 Knox, and we
18   were talking about policies.  I think we've covered
19   most of that.
20                    Let's go on to paragraph Number 4 of
21   my notice of deposition, Procedures Used to
22   Investigate Use of Force by Officers of the
23   Lynchburg Police Department.  All right.
24                    In order to speed things up, I've
25   received some prior testimony earlier today
```

```
 1   that the -- from Sergeant Godsie that this, use of

 2   force incidents are investigated by something he

 3   referred to as a Blue Team?

 4            A.   Blue team is the software that we use

 5   to document the use of force.

 6            Q.   Okay.

 7            A.   So some people refer to a Blue Team

 8   regarding the use of force investigation.  It's

 9   just the software that is used.  So when you

10   investigate a use of force, you document all that

11   within that software, where you've got an area for

12   the narrative, where you write up the details of

13   the use of force statements.

14                 And then there's areas where you can

15   attach different documents to it, attach a URL for

16   the Axon footage, and essentially it becomes a

17   warehouse of everything related to that use of

18   force.

19            Q.   Okay.  So Blue Team being software,

20   essentially, is it custom designed for use of force

21   investigations?  Is that its primary function?

22            A.   That's essentially it.  Well, it's

23   used for uses of force and then any complaints as

24   far as demeanor, complaint, allegation of

25   misconduct.
```

```
 1              Q.   Okay.  But it's -- but it exists
 2    outside of the IBR, the Incident Based Reporting,
 3    system?
 4              A.   Correct.
 5              Q.   Are there any other software packages
 6    besides Blue Team that are used in the
 7    investigation of uses of force by the officers of
 8    the Lynchburg Police Department?
 9              A.   So IAPro, which is software that's
10    made by the same company, and it's paired and
11    integrated with Blue Team.  Professional standards
12    uses IAPro, and then the captain's deputy chief
13    have access to IAPro.
14                   So once a use of force investigation
15    has been completed in the Blue Team software and
16    approved, it then is moved into IAPro, which
17    essentially is a database of all the uses of force.
18              Q.   All right.  You said the Blue Team,
19    the investigation occurs on this Blue Team software
20    platform; is that right?
21              A.   Yes.
22              Q.   All right.  And you said when that's
23    been approved.
24                   How is that approval rendered?
25              A.   So use of force, it's submitted by
```

1  the supervisor conducting it, and it goes to their

2  next supervisor and then to their supervisor and

3  then the deputy chief and the chief.  So ultimately

4  a use of force is either approved or not approved

5  by the chief.

6           Q.   Well, does that happen in Blue Team?

7           A.   Yes.

8           Q.   So what is IA -- if that happens in

9  Blue Team, and so does the chief and all the people

10 leading up to that, do they reach a conclusion over

11 whether the use of force was within policy under

12 Blue Team?

13          A.   Yes.

14          Q.   Then what does the IAPro do?

15          A.   Once the investigation has been

16 approved and concluded, then either I, or someone

17 else in the professional standards unit, will then

18 close it out and move it into IAPro, where it's

19 archived within IAPro.

20          Q.   Is that its only function is

21 archiving?

22          A.   No.  IAPro can also be used for

23 different investigations that we will do in

24 professional standards.  Not everyone in the police

25 department has access to IAPro.  It's primarily

1   professional standards and deputy chief and chief.

2          Q.   So access to IAPro is more restricted

3   within the department than it is to Blue Team?

4          A.   Yes.  It's the same company that

5   they're -- so they're kind of integrated related

6   software, but it's the same company.

7          Q.   All right.  When a use of force, as

8   defined by the policy, when an officer uses force,

9   how does the investigation begin?  What is the

10  first step?

11         A.   First step would be whether there's

12  any witnesses to the use of force.

13         Q.   Well, let's see if there's -- the

14  actual, the first step in the investigation, I

15  mean, what's procedurally the first step?  For

16  example, an officer on the street has to use a

17  baton on a subject hypothetically.  Right.

18              He's got to write an IBR on his own,

19  right?

20         A.   Right.

21         Q.   But then also something puts him into

22  Blue Team?

23         A.   Yeah, a supervisor.

24         Q.   How does his supervisor know what

25  happened with the baton?

1              A.   They respond to the scene, and if

2    there's any witnesses on the scene, they interview

3    the witnesses.  They interview the individual that

4    was involved as far as the individual force was

5    used on.  They get a statement from them.

6              Q.   How does the supervisor become aware

7    of the use of force?

8              A.   The officer has to --

9              Q.   Self-report?

10             A.   -- Self-report, or obviously some

11   uses of force are very obvious on the radio,

12   depending if it's --

13             Q.   Sure.

14             A.   Yeah.

15             Q.   I'm sure if you hear gunshots on the

16   radio, the supervisor is showing up, right?

17             A.   Right.

18             Q.   Right.  Okay.  But in general, and in

19   the general case, it's the duties upon the officer,

20   there's a duty imposed upon them by policy, as a

21   matter of fact, to self-report any use of force as

22   contemplated by the policy, right?

23             A.   Yes.

24             Q.   Okay.  And at that point a supervisor

25   comes to the scene?

```
 1              A.    Yes.
 2              Q.    And the supervisor's duty to identify
 3   witnesses?
 4              A.    Yes.
 5              Q.    Okay.  And to take statements?
 6              A.    Yes.
 7              Q.    And to at least begin the
 8   investigation at that point, right?
 9              A.    Correct.
10              Q.    All right.  And then is the
11   supervisor in charge of conducting the
12   investigation at that point, or is it handed off to
13   someone else?
14              A.    Yeah, the supervisor conducts it.
15              Q.    Okay.
16              A.    They get all the statements and
17   collect any video footage that might be available
18   that's not Axon body camera footage, whether it was
19   in front of a store that had video surveillance or
20   anything like that.
21              Q.    Sure.
22              A.    And then they review all the body
23   camera footage.  They take a statement from the
24   officers involved, and then they write it all up, a
25   synopsis, and attach all the documents associated
```

```
1   with it and attach a URL for the body camera

2   footage.

3             Q.   Does the investigating supervisor,

4   does he make any assessment as to whether or not

5   the use of force fell within policy?

6             A.   He does, but that's not the finalized

7   decision.  They make a finding, and then the

8   supervisor above them has to either agree or

9   disagree on whether it was within policy.

10            Q.   And ultimately it's up to the chief

11  to determine whether or not any particular use of

12  force was justified; is that right?

13            A.   Yes.  He's the final reviewer on uses

14  of force.

15            Q.   Is there any time when anyone from

16  outside the department contributes to that

17  decision-making process?

18            A.   I'm not aware of, as far as

19  internally, an investigation for use of force, I'm

20  not aware of any.

21            Q.   Is there --

22            A.   Now, they may get an expert opinion

23  on a shooting such as contracting out to Force

24  Science or something like that.

25            Q.   But I mean, is there any input from
```

1  the courts or from city council or a committee?

2           A.   Not on an internal investigation, no.

3           Q.   And then is there any means, if a use

4  of force has been found, determined to have been

5  within policy, is there any means for overriding

6  the chief's decision?

7           A.   Someone, I mean, as far as the person

8  who the force is used on?

9           Q.   Or anyone, a concerned citizen,

10  anyone.  Is there any means of challenging the

11  chief's determination or persuading some tribunal

12  or authority or --

13           A.   Not internally.

14           Q.   Or externally, is there any external

15  agency that has the power to overturn that

16  decision?

17           A.   I mean, obviously the FBI has

18  authority.  If there is a particular incident that

19  warrants it.

20           Q.   The FBI can overturn like --

21           A.   Not the internal investigation.

22           Q.   Well, that's what --

23           A.   But the FBI does civil rights

24  investigations.

25           Q.   Right.  But with regard -- not

1  regarding any other complaints or anything, I'm

2  only talking about the findings of the police

3  department.

4              Lynchburg doesn't have a -- as

5  some -- you're aware some police departments have

6  citizens review boards, right, and have panels that

7  review uses of force by --

8         A.    There's a few of them.

9         Q.    Right.  But Lynchburg doesn't have

10 that?

11        A.    No.

12        Q.    Okay.

13        A.    Well, actually, I take it back.  We

14 don't have a panel that reviews them per se, but

15 the Citizen Police, CPAC, Citizen Police group -- I

16 forget the --

17        Q.    Action Committee?

18        A.    Yes.  They, when the uses of force

19 are finalized, it's presented to them.

20        Q.    And what's their power?

21        A.    They don't have direct power

22 internally.

23        Q.    What's their function?

24        A.    Transparency.  They, obviously if

25 they see an issue, then they can bring it up.

```
 1              Q.   If they see an issue and bring it up,
 2   what effect does it have on the outcome of the
 3   investigation?
 4              A.   Well, I'm not involved with CPAC, so
 5   I can't really say.
 6              Q.   But does CPAC have the power to
 7   overturn the chief's decision?
 8              A.   I don't believe so.
 9              Q.   Is there any way you could find out
10   if that -- if you're -- if that -- find out whether
11   or not they have that authority?
12              A.   Yeah, I can make a call.
13              MR. VALOIS:  All right.  Would you
14   mind?  Can we take a little break and make a call
15   real quick?
16              THE VIDEOGRAPHER:  Our time is
17   1:56 p.m.  We're off the record.
18              (Recess.)
19              THE VIDEOGRAPHER:  Our time is
20   2:01 p.m.  We're back on the record.
21              MR. VALOIS:  Thank you.
22   BY MR. VALOIS:
23              Q.   Sergeant Byrne, during the break,
24   were you able to find out how this CPAC thing
25   works?
```

```
 1              A.   Yes.  So apparently they've stopped
 2   presenting the use of forces to CPAC.  So CPAC does
 3   not review the uses of force anymore.
 4              Q.   Okay.  And do you know when they
 5   stopped doing that?
 6              A.   I'm not sure.  It's been a little
 7   while, apparently.
 8              Q.   All right.  So ultimately, there's no
 9   way to challenge the -- there's no way -- there's
10   no way to challenge the internal findings of the
11   Lynchburg Police Department?
12              MR. FITZGERALD:  Object to form.
13   BY MR. VALOIS:
14              Q.   No way to, is there any way that a
15   citizen, or anyone on the outside, can challenge
16   the internal findings of the Lynchburg Police
17   Department to reverse those findings?
18              A.   Not that I'm aware of.
19              Q.   Skipping, I think we've addressed 5
20   and 6 pretty substantially.  Okay.  The complaints,
21   let's talk about the complaints made against
22   Lynchburg Police Department for the incident
23   involving Calvin Wesley on March 11th.  All right.
24              Who investigated that?  It's
25   paragraph Number 7.
```

```
 1              A.   That was Lieutenant Smith.
 2              Q.   And ultimately he concluded that the
 3   use of force against Mr. Wesley was within policy,
 4   right?
 5              A.   Correct.
 6              Q.   And the basis for that finding was
 7   what?
 8              A.   The significant resistance.  The
 9   significant force used by Calvin Wesley attempting
10   to escape.
11              Q.   Okay.  The force used, what
12   particular force was used in that incident?
13              A.   I think it was evident that there was
14   a significant wrestling match to get him into
15   custody.
16              Q.   Did you ever witness -- you watched
17   the video, right?
18              A.   Yes.
19              Q.   Did you ever witness Calvin Wesley
20   put his hands or his fingers on any officer in that
21   video?
22              A.   As I said, I saw a significant
23   wrestling match, attempting to get him into
24   custody, that was prolonged.
25              Q.   Yeah.  I understand you said you saw
```

```
 1   a wrestling match.  What I'm asking you is a
 2   different question, though.
 3                 What I'm asking you is in the video,
 4   did you observe Calvin Wesley put any of his hands
 5   or fingers onto the person of any police officer?
 6             A.   Not that I could see.
 7             Q.   Okay.  Did you observe Calvin Wesley
 8   strike any police officer?
 9             A.   No.
10             Q.   Did you observe any weapons on the
11   person of Calvin Wesley?
12             A.   No.
13             Q.   Were any weapons recovered from the
14   person of Calvin Wesley?
15             A.   I do not believe so.
16             Q.   Okay.  Well, do you know -- you don't
17   know that to be the case for sure?
18             A.   Yeah.  I did not read anything where
19   it indicated he had any.
20             Q.   He was being arrested on a
21   misdemeanor warrant; is that correct?
22             A.   Yes.  Assault and battery.
23             Q.   That charge was ultimately dismissed,
24   was it not?
25             A.   I don't know.
```

```
1              Q.   Did you review the statements made by

2   Officer Reed in the course of the investigation

3   that was being conducted by Lieutenant Smith?

4              A.   Did I review --

5              Q.   The statements that Officer Reed made

6   in the course -- I'm asking if you had, if you

7   reviewed them at the time?

8              A.   I reviewed them, yes.

9              Q.   Did you review the body cam video

10  taken of the incident?

11             A.   I reviewed either one or two of the

12  body cameras.

13             Q.   Okay.  But the conclusion of the

14  investigation was that Officer Reed acted within

15  Lynchburg policy?

16             A.   Yes.

17             Q.   Because of the use of force by Calvin

18  Wesley?

19             A.   All right.  Give me one second.  I

20  had that separated before lunch.

21             Q.   Sure.  Take your time.

22             A.   Okay.  So what's the question again?

23             Q.   Well, the question was had you

24  reviewed the statements made by Officer Reed and

25  had you -- in the course of the investigation and
```

```
 1  the body cam videos?  I believe you said you had
 2  seen some of the videos?
 3            A.   Yes.
 4            Q.   All right.  And so ultimately, the
 5  conclusion was made that Seth Reed, Officer Reed,
 6  acted within policy in deploying the dog Knox
 7  against Calvin Wesley; is that correct?
 8            A.   Correct.
 9            Q.   And the basis for that being that
10  Calvin Wesley used force?
11            A.   Yes.
12            Q.   And the particular force that he used
13  was what?
14            A.   Physical force trying to break free.
15            Q.   Trying to get loose?
16            A.   Yes.
17            Q.   All right.  When the dog was
18  deployed, how far from the vehicle was Calvin
19  Wesley when the dog was deployed?
20            A.   Very close to the car.
21            Q.   So after Calvin Wesley stepped out of
22  the car, how far had he moved?  How far had he
23  moved from that position when the dog bit him?
24            A.   Not very far, 2 feet, maybe 3 feet.
25            Q.   Perhaps even less?  Maybe even
```

1  standing right next to him?

2          A.   Possibly.  There was some movement,

3  but there wasn't --

4          Q.   Well, in fact, when the dog bit

5  him --

6          A.   It was all within the opening of the

7  door.

8          Q.   The door has opened; and, in fact,

9  the officers had Mr. Wesley pressed up against that

10 door when the dog bit him; is that correct?

11         A.   I believe so, yes.

12         Q.   Okay.  And so he had the open door in

13 front of him, so that prevented him from moving

14 forward at that time, correct?

15         A.   Correct.

16         Q.   And he had one officer on his left

17 arm and one officer on his right arm and another

18 officer with a dog standing behind him, correct?

19         A.   Yes.

20         Q.   So he wasn't trying to move

21 backwards, right?

22         A.   I don't know what his intent was.

23         Q.   Well, you said he was trying to break

24 loose and get away.

25              That was his use of force, right?

```
 1              A.   Yes.
 2              Q.   Where was he trying to go?
 3              A.   I'm not in Mr. Wesley's mind.  I
 4   don't know where he was trying to go.
 5              Q.   Well, which direction was the force
 6   applied?  When he applied the force to --
 7              A.   I think the video was quite evident
 8   that he was physically resisting.
 9              Q.   Well, I'm not asking -- I'm asking
10   about the particular force in the attempt to -- you
11   said that he used force, right?  How, what
12   particular force did you observe him use?
13              A.   I think the video is quite evident.
14              Q.   Well, then, please describe it for
15   this video that we're taking right now.  Please
16   describe for the people watching this video?
17              A.   He resisted the officer's attempts to
18   place him in handcuffs.
19              Q.   How so?  How did he resist the
20   officers attempts?
21              A.   By not allowing them to put him in
22   cuffs.  He was pulling his arms away.
23              Q.   There we go.
24              A.   He was trying to --
25              Q.   That's what he was doing; he was
```

```
 1  pulling his arms away from them, right?
 2          A.   That's one of the things he was
 3  doing, yes.
 4          Q.   Okay.  What's some other things he
 5  was doing, if there were more than one?
 6          A.   He was trying to prevent them from
 7  putting him in cuffs, and he was trying to get back
 8  in the car, I believe, to flee, but I don't know if
 9  that's what he was trying to do.  It appeared that
10  that's what he was trying to do.
11          Q.   It appeared to you that he was trying
12  to get back in the car to flee from --
13          A.   I don't know.  That's speculation.
14  So I don't know exactly what he was trying to do.
15          Q.   Well --
16          A.   But it looked like he was trying to
17  get back in the car.
18          Q.   He was pulled from the passenger seat
19  of a vehicle; is that correct?
20          A.   He got out of the passenger seat of a
21  car.
22          Q.   That's where he was sitting when the
23  police arrived there, right?
24          A.   Yes.
25          Q.   And there was a driver in the car, a
```

1  lady was in the driver's seat, the owner of the

2  car --

3          A.   Yes.

4          Q.   -- was in the driver's seat, right?

5          A.   Yes.

6          Q.   Is it your contention that he was

7  trying to get in the van to have her drive him, the

8  lady?

9          A.   I don't know, because that's

10 speculation.  So I have no idea what he was trying

11 to do.

12         Q.   Oh, I'm trying to avoid speculation

13 now.

14              So your contention, to back up, your

15 contention that he tried to get back in the car is

16 just speculation?

17              MR. FITZGERALD:  Object to form.

18              THE WITNESS:  He was attempting to

19 resist arrest physically.

20 BY MR. VALOIS:

21         Q.   Right.  And that's what I'm trying to

22 get you to describe, for the people watching this

23 video right now, is the means by which he was

24 trying to do that.  Right.  I'm asking the specific

25 things that you observed him do.  And so far, we

Page 73

1   have he's trying to pull away from the officers.

2   Just like that young man who got bit by the dog the

3   day after this was trying to pull away from the

4   officer.  He's doing the same thing.

5               Did he apply any other force, towards

6   any officer, that you observed on the video?

7               A.   He was physically resisting arrest by

8   preventing them from putting him in cuffs.

9               Q.   How?  What did he do?

10              A.   And the officers were also concerned

11  that if he did break free, that they would be

12  assaulted.

13              Q.   Had he threatened to assault any of

14  them?

15              A.   He has a history of it.

16              Q.   His history.  All right.

17              So the history goes into the

18  decision-making as to whether to deploy the dog?

19  His past history is something to be considered when

20  trying to decide whether or not to deploy a dog?

21              MR. FITZGERALD:  Objection.  Paul,

22  I'm just wondering, are we getting to complaints

23  made against Lynchburg police officers on the

24  scene?

25              MR. VALOIS:  Well, I'm actually

**CHOICE COURT REPORTING**
Kim@choicecourtreporting.com

Page 74

```
 1  backing up as to the investigation of this
 2  incident, but each and every investigation to the
 3  use of force by police canines against an unarmed
 4  suspect.  Paragraph Number 3.  That's fair game.
 5             He's an unarmed suspect.  It's an
 6  investigation of the use of force, and that's
 7  exactly what I'm asking him about now.  We've kind
 8  of segued backwards a little bit, but it's still
 9  fair game for the purposes of this deposition.
10             THE WITNESS:  He's using physical
11  force to resist arrest.
12  BY MR. VALOIS:
13        Q.    Exactly.  You keep saying the same
14  thing.
15        A.    Yeah.
16        Q.    And I'm asking you to describe to me
17  the particular acts --
18        A.    I already --
19        Q.    -- that you --
20        A.    I already --
21        Q.    Pardon me?
22        A.    I already addressed that.
23        Q.    Well, not to my satisfaction, and
24  we're going to keep asking the question until I can
25  get satisfied that we have an answer here.  Okay.
```

1  So far, I've heard you said he's trying to pull

2  away.  Okay.  That's one thing.  That's one use

3  of -- what you consider to be a use of force, is

4  he's trying to pull away from the officers.

5              Then you said that, I believe, that

6  you thought he might be trying to get back into the

7  truck, but that was speculation.  All right.  Other

8  than that, I haven't heard any other particular

9  things that he did that were use of force.  We have

10 now since gone back into the officers were

11 concerned that if he got away, he would assault

12 them because he has a history.

13             And I'm asking you, is that something

14 that the officers consider when deciding whether to

15 use force?  Does that factor into their decision as

16 to whether or not to deploy a dog?

17       A.   It goes into the decision-making

18 process of what to do in that split second that

19 they have to react.

20       Q.   Okay.  But in this case, there was no

21 split second?

22       A.   Yes, there was.

23       Q.   No.  Well, I mean --

24       A.   Yes.  When they're -- when he is

25 resisting arrest, and they are physically engaged

```
 1   with him, that creates a situation where their

 2   options are limited.

 3             Q.   Okay.  In this case, we had two

 4   officers attempting to put handcuffs on Mr. Wesley,

 5   right?

 6             A.   Yes.

 7             Q.   One had one arm, one had the other

 8   arm.  Mr. Wesley is struggling to avoid being

 9   handcuffed.

10             No question about that, right?

11             A.   Yes.

12             Q.   Did either of those officers ask for

13   assistance?  On the video did you hear any officer

14   ask for assistance?

15             A.   From who?

16             Q.   From anyone?  Did you hear either of

17   the --

18             A.   I don't think they could put their

19   hands on the radio to ask for assistance.

20             Q.   I'm talking about on the video.

21   There's several -- these officers, these two

22   officers, are surrounded by three other police

23   officers on a warrant squad, correct?

24             A.   Yes, correct.

25             Q.   All right.  While they're there at
```

1  the scene, their words are being recorded on the

2  body cam video, which you said you observed,

3  correct?

4           A.    Okay.  He resisted physically.

5           Q.    Well, I'm --

6           A.    It's very clear on the video that he

7  was resisting arrest.

8           Q.    Okay.  That's fine.  That's the

9  answer to a different question.

10          MR. FITZGERALD:  Paul, why don't we

11  take a quick break?

12          MR. VALOIS:  To do what?

13          MR. FITZGERALD:  Just so we can have

14  a breather and refresh.

15          MR. VALOIS:  I don't need to have a

16  breather.  I'm fine.  I just want to get an answer

17  to my questions.  I mean, we can stay here until

18  9:00 or 10:00, but I'm going to get these questions

19  answered, or there's going to be no answer, and I

20  mean, I want answers to these questions.

21          THE WITNESS:  I gave you an answer.

22          MR. VALOIS:  Not -- not to the -- I'm

23  going to get answers to my questions.  All right.

24  That's the whole purpose of this deposition.  If

25  the answer is he doesn't know, he doesn't know.  If

```
1   you have to speculate, then I want that on the

2   video.  All right.

3                I want answers to these questions.

4   These are tough questions, but that's why we have

5   depositions, is to ask tough questions.  I don't

6   want to take a break.  I want to keep going.

7   BY MR. VALOIS:

8        Q.   So anyhow, look, you watched the body

9   cam video of this incident?

10       A.   Yes.

11       Q.   There were five officers present,

12  correct?

13       A.   I could not see them all in the

14  camera footage.  I saw the two.

15       Q.   Officer Person was standing on the

16  other side of the door, correct?  Do you remember

17  that?  And there was another officer positioned on

18  the other side of the open door.  Do you remember

19  that being on the video?

20       A.   Yes.

21       Q.   All right.  You had Officer Reed

22  standing behind, correct?

23       A.   Yes.

24       Q.   All right.  So, at least in frame

25  there at the time, you can see four people, right?
```

1  Plus a police dog, right?

2         A.   Yes.

3         Q.   All right.  Then you have Mr. Wesley

4  standing there in the corner of the door.  You've

5  already testified that he used force by trying to

6  pull away.  Right.  And you said that the officers

7  had to make a split-second decision, correct?  Is

8  that right?

9         A.   If they make a decision, it had to be

10 a split-second decision.

11        Q.   All right.  Well, they stood there

12 wrestling with him for about what, 30 seconds

13 approximately, something like that?

14        A.   Yes.

15        Q.   And at any time, you've heard the

16 audio, did you ever hear either of those two

17 officers request assistance of another officer?

18        A.   No.  They just told him to stop

19 fighting.

20        Q.   Right.  And when they said fighting,

21 they -- did they -- again, just to be clear, the

22 word fighting implies striking back and forth.

23 None of that was happening.

24             You didn't observe anybody struck on

25 either side, did you?

```
 1                    MR. FITZGERALD:  Object to form.

 2                    THE WITNESS:  No.

 3   BY MR. VALOIS:

 4           Q.   Pardon?

 5           A.   They had his, they were on his arms.

 6   They just couldn't control his arms.

 7           Q.   Right.  All right.  So at the time,

 8   when Officer Reed deployed the dog to bite

 9   Mr. Wesley, he had not been asked to do that,

10   correct?

11           A.   He had not been asked to do what?

12           Q.   Deploy the dog to bite Mr. Wesley?

13           A.   Did the other officer ask him?

14           Q.   Seth, Officer Seth Reed, on March

15   11th, 2021, when Officer Seth Reed directed the

16   dog, police dog Knox, to bite Calvin Wesley.

17   Right.

18                    He had not been requested to do so by

19   any human being on the face of the earth; is that

20   correct?

21           A.   No.  He wasn't requested to do that,

22   no.

23           Q.   He made that decision on his own,

24   correct?

25           A.   Yes.
```

```
 1            Q.   Thank you.
 2                 At that time, Calvin Wesley was
 3  facing away from Seth Reed, correct?
 4            A.   Yes.
 5            Q.   And at that time, Seth Reed directed
 6  the police dog Knox, instructing him packen.
 7                 Do you recall that, seeing that in
 8  the video?
 9            A.   Well, first he told Mr. Wesley that
10  if he didn't stop, the dog would be deployed.
11            Q.   Yes, yes.  He did threaten to use the
12  dog, that is correct.
13            A.   He made a statement.  He didn't
14  threaten.
15            Q.   He made a statement saying --
16            A.   That if he continued, the dog would
17  be used.
18            Q.   He made an invitation to use the dog.
19  Is there a better word to describe?  You said a
20  statement.  To put that into verb, to put that into
21  a verb form, is there a way that we can do it that
22  sounds more suitable than a threat?
23            A.   Well, it's a fact.
24            Q.   Right.
25            A.   If you do this, this will happen.
```

```
 1                 Q.   Right.  It's a fact.  If you
 2   give -- if you don't give me the money, I will hit
 3   you on the head with a club.  That's a fact.
 4                      That's a statement, too, right?
 5                      MR. FITZGERALD:  Object to form.
 6   BY MR. VALOIS:
 7                 Q.   That's a statement.  Similar.  If you
 8   don't do what I want, I will hurt you.
 9                      That's not a threat, though, right?
10   That doesn't count as a threat?
11                      THE WITNESS:  Do I have to answer
12   that question?
13                      MR. FITZGERALD:  Object to form.  No.
14                      MR. VALOIS:  No?  Why?  You're
15   instructing him not to answer?
16                      MR. FITZGERALD:  I'm not instructing,
17   no, I'm not instructing.  I'm just --
18                      MR. VALOIS:  Well, you are
19   instructing.  You just did instruct.  You just said
20   no, he didn't have to answer, but --
21                      MR. FITZGERALD:  I'm not instructing
22   him not to answer.
23   BY MR. VALOIS:
24                 Q.   That doesn't -- that's not a threat
25   in your mind?
```

```
 1            A.   No, it's not.
 2            Q.   Okay.  Fair enough.  All right.
 3   Moving on to the December 20th incident.  I'm on
 4   paragraph, I think, 16 now.  Kind of, I'm kind of
 5   hopping around.  I'm not trying to confuse anybody.
 6   I'm just also not trying -- we covered a lot of
 7   this ground earlier, and I'm trying not to reinvent
 8   the wheel.
 9            MR. FITZGERALD:  Yeah.  The only
10   thing I would say is if we're identifying a
11   particular matter he's addressing, let's identify
12   that one and not jump back and forth and all
13   around.
14            MR. VALOIS:  Well, I agree in
15   practice, I agree in principle.  In practice, it's
16   not -- in practice examination can take you from
17   category to category.
18            MR. FITZGERALD:  I understand.
19            MR. VALOIS:  If I can recognize that
20   I switch categories, I'll try and do that.  Okay.
21   For my own sake as well as yours.  But moving on
22   there.  All right.
23   BY MR. VALOIS:
24            Q.   So did you review the video from the
25   March, or the December 20th, incident?
```

1              A.    Yes.

2              Q.    Okay.  In that incident, can you tell

3    the people who are viewing now what you saw?

4                   MR. FITZGERALD:  Object to form.

5    BY MR. VALOIS:

6              Q.    Please tell the people --

7              A.    Well, specifically, there's a lot of

8    things that occurred.  So specifically, what are

9    you asking?

10             Q.    I'm asking, when you observed the

11   video, what did you see and hear, when you observed

12   the video and heard the words spoken?  Can you just

13   please give us narrative, a brief narrative

14   summary, of what you saw?

15                  MR. FITZGERALD:  Object to form.

16   BY MR. VALOIS:

17             Q.    You can answer.

18             A.    What, everything that happened?

19             Q.    No.  Just describe the incident,

20   please, Sergeant.  Just please describe, I have

21   a -- we're recording this on video.  Right.

22             A.    I'm well aware.  The camera is right

23   in front of me.

24             Q.    Right.  And I want to -- I just want

25   you to describe, you reviewed the body cam video,

```
 1  you listened to it, and I just want you to describe
 2  what you remember seeing when you did that.  That's
 3  all.  It's --
 4           A.   At some point after they arrived,
 5  Mr. Wesley was running away.
 6           Q.   Okay.  And he was running,
 7  particularly, through a kind of a wooded area?
 8           A.   Yes.
 9           Q.   Off of Old Forest Road somewhere?
10           A.   Yes.
11           Q.   Is that right?  All right.  And he
12  was pursued at that point by Seth Reed, correct?
13           A.   Yes.
14           Q.   All right.  Seth Reed had responded
15  to that scene.
16                They were attempting to serve a
17  warrant on him then; is that right?
18           A.   Well, they had received a call from
19  his estranged wife, and there was a warrant for him
20  for violating a protective order.  In addition,
21  they were going to be charging him with violating a
22  protective order again, since he was violating the
23  protective order then.
24           Q.   Let me just stop you right there for
25  a matter of clarity.
```

```
 1                    Isn't it -- isn't it true, and I
 2  thought the same thing at first, but isn't it true,
 3  actually, just to be clear for the record, that he
 4  had an outstanding warrant for assault and battery
 5  against this woman, but she also had a protective
 6  order against him?
 7                    So the warrant was for an assault
 8  battery, but while they were there, they concluded
 9  that he was under a protective order also; is that
10  right?
11              A.   Yeah.  He was under a protective
12  order.
13              Q.   Yeah, yeah.  Okay.
14              A.   From June of '21.
15              Q.   Right.  So at that point, Seth Reed,
16  he had the right to make an arrest for a
17  misdemeanor?
18              A.   Yes.
19              Q.   Right.  And that's without question,
20  right?  And Mr. Wesley ran from the scene.  That's
21  without question too.  You can see that on the
22  video, right?
23              A.   Correct.
24              Q.   He's running through the woods.  He's
25  trying to get away, and at some point, the dog,
```

1    the -- Seth Reed threatened to release the dog if

2    he didn't stop, right?

3              A.    Seth Reed gave five commands warning

4    him of the dog.

5              Q.    What would happen.  He said, "I will

6    release the dog to bite you," I believe he said?

7              A.    Yes.

8              Q.    I will release the dog to bite you,

9    which is, in your mind, that's not a threat,

10   though, right?  Right?

11             A.    Correct.

12             MR. FITZGERALD:  Object to form.

13   BY MR. VALOIS:

14             Q.    And then he did exactly that.  When

15   Calvin didn't stop and tried to run towards a car,

16   Officer Reed let the dog loose to go bite him,

17   right?

18             A.    Yes.

19             Q.    And then ordered him to keep biting

20   him, even after he was on the ground, right?

21             MR. FITZGERALD:  Objection.  Form.

22   BY MR. VALOIS:

23             Q.    You saw that on the video, I assume,

24   right?

25             A.    I don't know that I can say he

1  ordered him to keep biting him.

2          Q.   You didn't see him order and say,

3  "packen, packen"?  Did you see him -- what is the

4  command for release?  Do you know?

5          A.   I believe it's aus.

6          Q.   Aus, right.

7               Did you hear Seth Reed issue the

8  command aus at any time before Mr. Calvin was on

9  the ground?

10          A.   Before he was on the ground?

11          Q.   Yeah?

12          A.   I don't believe so.

13          Q.   And how long did he remain on the

14  ground before he was ordered to -- that he gave the

15  dog the command to release?

16          A.   I didn't write down the exact time he

17  was on the ground.

18          Q.   Mr. -- was Mr. Wesley, was he armed?

19          A.   No.

20          Q.   Okay.  So he was a misdemeanor

21  fleeing subject.  Right.

22               Would that comport with current

23  policy to release a dog now?

24          A.   That one I cannot say absolutely one

25  way or another, based on the circumstances.

1         Q.    Why?

2         A.    Where he was wanted and then was

3    violating a protective order again, and then he was

4    attempting to get into somebody's car.  That was

5    completely unrelated.

6         Q.    Had you -- had there been any reports

7    that he had been armed?

8         A.    No.

9         Q.    Had there been any reports that he

10   had committed violence at the scene?

11        A.    There were just reports of

12   threatening violence.

13        Q.    What particular threats?

14        A.    There were threats of violence

15   against the estranged wife is what officers were

16   told.

17        Q.    By whom?  Who made those reports?

18        A.    His estranged wife.

19        Q.    She did?

20        A.    That's the documentation that I have.

21        Q.    That's in the use -- that's in

22   whatever document you're looking at now?  Is that

23   one of the use of force reports that was

24   previously --

25        A.    Shanna Wesley called 911 because her

1  estranged husband, Calvin Wesley, was in her

2  apartment threatening her.

3          Q.   Threatening her, and that's

4  what -- that's what they -- she -- that's what is

5  in the use of report?

6          A.   Yes.

7          Q.   Use of force report there?

8          A.   Yes.

9          Q.   And so but did she report any acts of

10 violence?

11         A.   On that day, no.

12         Q.   All right.  And so what would you

13 have -- why is it that you say that you would need

14 more information before you could determine whether

15 that particular use of force on December 20th,

16 2021, would comport with current policy?

17         A.   There's a couple issues there.  So

18 that one would not be clear one way or another,

19 because he obviously was going to continue to

20 violate the protective order.  And then him

21 attempting to get into a vehicle with an uninvolved

22 citizen was of concern.

23         Q.   Well, okay --

24         A.   So that one would be debatable.  So I

25 can't exactly say one way or another on that one.

1          Q.   But, I mean, wasn't he running away

2    from this woman at the time, her apartment?

3          A.   Yes.

4          Q.   How is that continuing to violate the

5    protective order?  It seems just the opposite.

6          A.   Because he had already violated it

7    prior to that.

8          Q.   How does running in a direction away

9    from somebody mean you're --

10         A.   He's running from the police.  He

11   wasn't running from her.  He was running from the

12   police.

13         Q.   But do you have any evidence that he

14   intended to return?

15         A.   Just his behavior.

16         Q.   Just his past history?

17         A.   Yes.

18         Q.   Okay.  Do you know why Officer Reed

19   instructed the dog Knox to keep biting Wesley, even

20   after he was down on the ground, in March?

21              MR. FITZGERALD:  Object to form.

22              THE WITNESS:  In March?

23   BY MR. VALOIS:

24         Q.   Yeah, back in March, after

25   they -- after -- while the dog was biting him, they

1   took Calvin Wesley, and they put him facedown on

2   the sidewalk next to a chain link fence.

3                  You remember seeing that?

4            A.    They moved to the sidewalk where they

5   told him to go to the ground, and they continued to

6   tell him three more times to give us your hand.

7   And then Officer Reed gives commands to come off of

8   the bite.

9            Q.    Right.  Why would Officer Reed

10  instruct a dog to continue biting someone who's

11  facedown on the sidewalk --

12               MR. FITZGERALD:  Object to form.

13  BY MR. VALOIS:

14           Q.    -- unarmed?

15               MR. FITZGERALD:  Object to form.

16  BY MR. VALOIS:

17           Q.    Well, how would it comport to -- how

18  would it comport with policy if any officer were to

19  direct a dog to bite an unarmed subject who's lying

20  facedown on the sidewalk?

21               MR. FITZGERALD:  Object to form.

22               THE WITNESS:  That would be a

23  question that's more appropriate for Sergeant

24  Godsie since he is the K9 sergeant, so to speak.

25  BY MR. VALOIS:

1          Q.   Well, it's my understanding you were

2   assigned to -- you were assigned to answer with

3   regard -- to testify with regard to Category 16?

4          A.   Well, you're talking about specifics

5   of the use of a K9 now.

6          Q.   Right.  Which is --

7          A.   And that's more in line with Sergeant

8   Godsie's expertise.

9          Q.   Well, the specifics, it could be, but

10  they've assigned you.  Are you saying --

11         A.   Okay.  Well, I can't, I can't answer

12  that question.

13         Q.   You can't answer that.  All right.

14              How about 17?  The weapons used, the

15  weapons issued, can you answer that?

16         A.   Well, they're issued a firearm,

17  they're issued a taser, they're issued a baton, and

18  they're issued pepper spray.

19         Q.   And all the officers have all of

20  that.  They're all --

21         A.   I can't, I cannot say absolutely

22  every single officer had it, but there is no reason

23  why any of them wouldn't.  I could not see where

24  any of them did not.  If any of them didn't have

25  one of those, they would be sent home to retrieve

```
 1    it if they didn't have it on them.

 2                    But there's no reason why they

 3    wouldn't have.  But I did not see anything in any

 4    of the videos that indicated any of those were

 5    missing from their duty belt.

 6            Q.   Well, so you can't commit that all of

 7    them had these weapons?

 8            A.   I can't say 100 percent, absolutely,

 9    but I did not see anything that indicated that they

10    didn't.

11            Q.   All right.  Let's move on to 18.

12                    Are you able to testify about the

13    Category 18?  Have you prepared to testify about

14    deescalation techniques?

15            A.   As far as?

16            Q.   As far as the techniques that are

17    available, the things that are described in the --

18            A.   Well, it's kind of difficult to

19    deescalate when he's already escalated, and they're

20    trying to get him into custody.

21            Q.   Well, you understand the whole point

22    of deescalation only applies when something has

23    already escalated?  That's why they call it

24    deescalation.

25            A.   Deescalation usually refers to
```

```
 1   something that's before they've got hands-on.
 2             Q.   Right.
 3             A.   Once their hands are on someone,
 4   attempting to arrest them, the options are limited
 5   at that point.
 6             Q.   Right.  That's what I'm asking.
 7                  What options are available?  What
 8   options are available to an officer?
 9             A.   Well, the problem in that situation,
10   if they go to pepper spray, that means they're
11   taking their hands off of his arms.
12             Q.   Right.  I'm not saying they should go
13   to anything.  I'm just asking about, what about the
14   first option, like ask one of the other officers,
15   can you give me a hand getting his arm?  Could they
16   do that?
17                  I mean, you had four officers at the
18   scene.  Could one of the officers say, hey, we
19   could use some help here.  Grab his arm.  Isn't
20   that an option?  You got Officer Person that's just
21   standing there with -- literally with his hands
22   like this in the video.  Couldn't he just come over
23   and help?
24             A.   Possibly, but that was a difficult
25   situation initially there, in between the door and
```

Page 96

1    the frame of the vehicle.

2              Q.    Right.  But couldn't he step around

3    the other side?  He's standing right there.  It's

4    like three steps and he's there.  Couldn't he say,

5    hey, let me give you a hand?  Or they could say,

6    hey, could you give us a hand?

7              A.    Well, the difficulty is they're on

8    him.  He comes around there in front of him.  So

9    that becomes a little bit difficult.

10             Q.    Who's in front of whom?

11             A.    The officers are in front of the

12   other officers if he comes around the door.

13             Q.    They couldn't just reach around and

14   grab an arm?  You've seen the video.  He's within

15   arm's grasp.  I mean, that's an -- I mean -- I

16   mean, isn't it fair to --

17             A.    It's possible.

18             Q.    Isn't it fair to say that that was

19   available, an option available to them?

20             A.    Potentially.

21             Q.    Actually, why not actually?  Why

22   couldn't they exercise that option then?

23             A.    They didn't do it in that situation.

24             Q.    I got you.

25                   What about, why would the officers

```
 1  refuse to tell Wesley why he's being arrested?
 2                  MR. FITZGERALD:  Object to form.
 3                  THE WITNESS:  They told him there was
 4  a warrant for his arrest.
 5  BY MR. VALOIS:
 6          Q.   Yeah.  He said, "For what?"  And they
 7  refused to tell him.  Why would you refuse to tell
 8  someone?  I mean, what's the purpose?  What benefit
 9  is it to the police to say you got a warrant --
10          A.   Because they're not going to get in a
11  debate before the person is in custody.
12          Q.   Well, the person is already debating
13  them.  That's what he keeps saying, "Why, why, why
14  why, why?"  Why not end the debate and say here's
15  what it is?
16                  MR. FITZGERALD:  Object to form.
17  BY MR. VALOIS:
18          Q.   I mean --
19          A.   They'll tell him once he's in
20  custody.
21          Q.   Well, why not, what I'm asking is
22  why -- I mean, what, what purpose?
23          A.   Because they want him in custody
24  before it escalates.
25          Q.   Right.  But how does it escalate to
```

1  tell, to provide that information?  What is

2  inherently escalatory about saying, oh, we got a

3  warrant for you, it's a misdemeanor warrant for

4  assault and battery?  How does that impede or

5  impair?

6          A.   They told him there's a warrant for

7  his arrest.

8          Q.   I know what they did.

9               What I'm asking you is if you know

10  the reason why they did what they did, or if

11  there's a policy of not doing it?

12         A.   Because it gives him extra time to

13  come up with a plan, decide what he's going to do,

14  where the first thing you want to do is take

15  someone into custody and handcuffs and control the

16  situation.

17         Q.   Okay.  After they arrested him, why

18  didn't they tell the landlady that was driving the

19  truck?

20         A.   Why would they tell her?

21         Q.   Why wouldn't they tell her, is my

22  question?  What legitimate interest does

23  it -- you're executing a warrant --

24         A.   They don't know who she is.

25         Q.   Right.

```
 1              A.    It's his business what the charge is.
 2              Q.    It's a public record.
 3              A.    Once he is processed, it's a public
 4  record.  But he wasn't processed at that point.
 5              Q.    So it's because you
 6  haven't -- there's a policy where you don't divulge
 7  what you're doing until it's processed?
 8                    MR. FITZGERALD:  Object to form.
 9  BY MR. VALOIS:
10              Q.    Is that the official policy of the
11  Lynchburg Police Department?
12              A.    At that point it's not public record.
13              Q.    But is that the policy?  Are
14  you -- is that --
15              A.    We don't, in practice, give out
16  information on other people to other people.
17              Q.    Is that a policy?  Is that an
18  official policy?  Is that the --
19              A.    It's a practice.
20              Q.    Where do -- are officers trained in
21  this practice?  Are they trained to not do that?
22  Is there like specific training?
23              A.    Are you serious?
24              Q.    Yes.  It's a practice.  How do
25  you -- how do --
```

```
1                A.    We do not give information about one

2    person about another person.

3                Q.    The person is --

4                A.    Why would we do that?

5                Q.    The person is there.

6                A.    It's not their business.  We're not

7    going to -- we're not going to give out someone's

8    personal information about whatever's going on to

9    someone else that is not them.  We're not going to

10   do that.

11               Q.    So it's to protect privacy?  Is that

12   the -- is that the policy?

13               A.    Yes.

14               Q.    And that's an official policy, is

15   you're there to protect the privacy of the

16   arrestee?

17               MR. FITZGERALD:  Object to form.

18   BY MR. VALOIS:

19               Q.    I mean, is that an official LPD

20   policy?

21               A.    It's our practice.

22               Q.    I know --

23               A.    It's our practice.

24               Q.    Okay.  It's a practice.  Okay.

25               But is that practice, are people
```

1  trained into that practice, or are they guided?

2  How does a new rookie officer know that that's the

3  practice?  Who instills into a new recruit that

4  that's the way to act?

5          A.   Their field training officer.

6          Q.   So and then they're instructed by

7  their field training officer?

8          A.   Yes.

9          MR. VALOIS:  Okay.  All right.  I

10  tell you what.  One more, let's go off for

11  about -- give me about 5, 10 minutes to think about

12  it a little bit.  I think I'm -- I don't think

13  there's anything else I need to get.

14          MR. FITZGERALD:  Okay.

15          THE VIDEOGRAPHER:  Okay.  All right.

16  Our time is 2:44 p.m.  We're off the record.

17          (Recess.)

18          THE VIDEOGRAPHER:  Our time is 2:55.

19  We're back on the record.

20          MR. VALOIS:  Sergeant Byrne, thank

21  you for your deposition.  I don't have any further

22  questions for you at this time, unless

23  Mr. Fitzgerald has any for you.

24

25

```
 1              E X A M I N A T I O N
 2  BY MR. FITZGERALD:
 3         Q.   Just one, Sergeant Byrne.  Earlier
 4  you testified regarding your interpretation of the
 5  officers during the December incident of Calvin
 6  Wesley's prior history of violating protective
 7  orders.
 8              Just to be clear, were you talking
 9  about that prior history as being a reason for why
10  Officer Reed chose to use force?
11         A.   No.  That was just something that,
12  being looked at in the evaluation of the use of
13  force regarding the current policy.
14              MR. FITZGERALD:  That's all.
15
16              E X A M I N A T I O N
17  BY MR. VALOIS:
18         Q.   Well, to follow up, then, what
19  significance would that have had?  If it wasn't a
20  justification for his use of force, then what
21  significance would it have on review?
22         A.   Well, all the totality of the
23  circumstances would be looked at on a use of force.
24         Q.   For what purpose?  I mean, if it's
25  not for whether his use of force was justified at
```

```
 1  the time or whether it was a consideration that

 2  went into his use of force, what significance would

 3  it have?

 4          A.   Let me go back to that one.  Well,

 5  when this was reviewed, the lieutenant conducting

 6  the use of force listed the following as

 7  justification.  One of them was the Officer Reed's

 8  familiarity with Calvin Wesley's violent history as

 9  well as his history with the Lynchburg Police

10  Department.

11          Q.   So that was a justification for the

12  use of force?

13          A.   Yes.

14          Q.   Okay.  So, I mean, I thought you just

15  testified -- correct me if I'm wrong, but when

16  Mr. Fitzgerald asked you, I thought you said that

17  that was not a factor in this?

18          A.   I don't know if Officer Reed had used

19  that, but the investigation looked at -- let me see

20  if Officer Reed stated that.  So that is in

21  Lieutenant Parrish's investigation.  But Lieutenant

22  Parrish did not list whether or not Officer Reed

23  articulated that as part of the reason.  So I don't

24  know.

25          MR. VALOIS:  All right.  That's it.
```

1   I don't have any other follow-up.

2                   THE VIDEOGRAPHER:  Okay.

3                   MR. FITZGERALD:  All done.

4                   MR. VALOIS:  All right.

5                   THE VIDEOGRAPHER:  Hang on.

6                   MR. VALOIS:  We don't know the answer

7   to this question or not, but --

8                   THE VIDEOGRAPHER:  Can I get us off

9   the record?

10                  MR. VALOIS:  Well --

11                  MR. FITZGERALD:  Wait, before you go

12  off the record.  Go ahead and say what you were

13  going to say.

14                  MR. VALOIS:  Oh.  Typically, when you

15  give a regular deposition, you're allowed to what's

16  called read and sign to check for errors and to

17  make corrections and to explain the errors in the

18  deposition.  We honestly, I honestly don't know if

19  you can do that in this type of deposition or not.

20  However, I'll leave it up to you whether you want

21  to request it or.

22                  MR. FITZGERALD:  I'd advise you to

23  read it and sign.

24                  THE WITNESS:  Okay.

25                  MR. VALOIS:  So I'm not going to

```
 1   fight over it because I don't know the answer
 2   myself.
 3                   MR. FITZGERALD:  I don't either to be
 4   sure.
 5                   THE VIDEOGRAPHER:  Okay.  This --
 6                   MR. VALOIS:  Well, you said you want
 7   to go off the record for what?
 8                   MR. FITZGERALD:  That was that, what
 9   you just brought up, read and sign.
10                   MR. VALOIS:  Okay.
11                   MR. FITZGERALD:  That was it.
12                   THE VIDEOGRAPHER:  This concludes
13   today's testimony provided by Sergeant Collin
14   Byrne.  The time is 3:01 p.m.  We're off the
15   record.
16                   (Reading and signature reserved.)
17                   (Deposition concluded at 3:01 p.m.)
18                          *****
19
20
21
22
23
24
25
```

```
 1              COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
 2                   I, KIMBERLY A. HENDERSON, a
 3    Registered Professional Reporter and  Electronic
 4    Notary Public in and for the Commonwealth of
 5    Virginia at Large, Notary Registration Number
 6    359658, whose commission expires November 30, 2025,
 7    do certify that the aforementioned appeared before
 8    me, was sworn by me, and was thereupon examined by
 9    counsel; and that the foregoing is a true, correct,
10    and full transcript of the testimony adduced to the
11    best of my ability.
12                   I further certify that I am neither
13    related to nor associated with any counsel or party
14    to this proceeding, nor otherwise interested in the
15    event thereof.
16                   Given under my hand and Notarial seal
17    at Forest, Virginia, this 14th day of October,
18    2025.
19
20
21
22    _____
23              Kimberly A. Henderson, Notary Public
24              Commonwealth of Virginia at Large
25
```

```
 1              CHANGES REQUESTED TO THE DEPOSITION OF:

 2                    SERGEANT COLLIN BYRNE

 3              TAKEN ON:  September 22, 2025

 4

 5   Page/Line:      From:           To:           Reason:

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16

17

18        _____

19              SERGEANT COLLIN BYRNE

20

21

22

23

24

25
```

```
1              CHANGES REQUESTED TO THE DEPOSITION OF:

2                   SERGEANT COLLIN BYRNE

3              TAKEN ON:  September 22, 2025

4

5    Page/Line:      From:          To:          Reason:

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16

17

18            _____

19                SERGEANT COLLIN BYRNE

20

21

22

23

24

25
```

| A | | | | |
|---|---|---|---|---|
| **ability** 106:11 | **agree** 39:11 39:13, 39:21 60:8, 83:14 83:15 | **apparently** 64:1 64:7 | 46:15, 46:18 46:23, 46:25 69:17, 69:17 76:7, 76:8 95:15, 95:19 96:14 | 42:22, 51:17 66:1, 66:3, 67:6 70:9, 70:9 72:24, 74:7 74:16, 74:24 75:13, 84:9 |
| **able** 63:24 94:12 | **agreement** 2:3 | **APPEARANC...** 2:10 | | |
| **absolutely** 24:13 41:16, 88:24 93:21, 94:8 | **ahead** 47:19 104:12 | **appeared** 71:9 71:11, 106:7 | **arm's** 96:15 | 84:10, 95:6 95:13, 97:21 |
| **abuse** 17:7 | **al** 1:6, 4:9 | **appears** 17:6 19:9, 40:12 | **armed** 14:20 27:15, 30:7 88:18, 89:7 | 98:9 |
| **access** 55:13 56:25, 57:2 | **allegation** 54:24 | **application** 45:15 | **arms** 70:22 71:1, 80:5, 80:6 95:11 | **assault** 49:14 66:22, 73:13 75:11, 86:4 86:7, 98:4 |
| **accomplish** 22:11, 22:12 | **allowed** 20:11 33:23, 104:15 | **applied** 70:6 70:6 | **arrest** 16:13 19:20, 20:2 20:6, 20:8 22:21, 22:25 28:18, 34:5 37:1, 37:21 38:5, 38:20 38:22, 38:25 39:2, 39:16 39:22, 40:2 42:4, 42:20 43:6, 43:11 43:13, 49:6 49:6, 72:19 73:7, 74:11 75:25, 77:7 86:16, 95:4 97:4, 98:7 | **assaulted** 73:12 |
| **accused** 29:21 | **allowing** 70:21 | **applies** 94:22 | | **assessment** 60:4 |
| **act** 45:13, 101:4 | **altered** 51:22 | **apply** 36:1, 73:5 | | **assigned** 93:2 93:2, 93:10 |
| **acted** 10:8 67:14, 68:6 | **analyze** 51:11 | **applying** 45:13 45:23 | | **assist** 30:24 |
| **Action** 62:17 | **and/or** 2:3 | **apprehend** 10:24, 21:22 32:14 | | **assistance** 76:13 76:14, 76:19 79:17 |
| **actions** 16:14 | **answer** 11:22 25:22, 26:14 26:16, 28:24 31:9, 37:14 43:19, 43:20 51:9, 74:25 77:9, 77:16 77:19, 77:21 77:25, 82:11 82:15, 82:20 82:22, 84:17 93:2, 93:11 93:13, 93:15 104:6, 105:1 | **apprehending** 16:12, 16:17 | | **associated** 59:25 106:13 |
| **actively** 22:25 23:1, 34:2, 34:4 34:15, 37:20 38:22, 42:3 42:20, 49:5 | | **apprehension** 7:13, 10:6 12:22, 16:4 22:16, 30:24 31:1, 33:15 | | **ASSOCIATES** 2:12 |
| **activity** 31:12 31:20 | | **apprehensions** 7:7, 7:8 | | **assume** 40:12 87:23 |
| **acts** 74:17, 90:9 | | **appropriate** 92:23 | | **attach** 54:15 54:15, 59:25 60:1 |
| **actual** 51:24 51:25, 52:4 52:21, 57:14 | | **approval** 55:24 | | **attempt** 30:22 36:21, 70:10 |
| **addition** 17:25 18:21, 85:20 | **answered** 37:16 77:19 | **approved** 55:16 55:23, 56:4 56:4, 56:16 | **arrested** 20:4 34:21, 40:6 66:20, 97:1 98:17 | **attempted** 28:17 30:12 |
| **address** 8:15 | **answering** 41:20, 43:20 | **approximately** 79:13 | | **attempting** 40:19, 40:21 40:24, 40:24 41:3, 49:6, 65:9 65:23, 72:18 76:4, 85:16 89:4, 90:21 95:4 |
| **addressed** 64:19 74:22 | **answers** 5:9 5:10, 5:16, 5:17 77:20, 77:23 78:3 | **apps** 24:1 | **arrestee** 100:16 | |
| **addressing** 83:11 | | **archived** 56:19 | **arresting** 38:17 38:18, 38:21 | |
| **adduced** 106:10 | **anybody** 25:14 25:19, 79:24 83:5 | **archiving** 56:21 | **arrived** 71:23 85:4 | |
| **advice** 24:7 24:8 | | **area** 54:11, 85:7 | | |
| **advise** 104:22 | **anymore** 64:3 | **areas** 54:14 | **articulated** 103:23 | |
| **affect** 7:10 | **anytime** 38:14 38:15, 42:10 42:24 | **arm** 36:6, 40:19 44:23, 46:3 46:6, 46:6, 46:7 46:8, 46:11 46:11, 46:12 | **asked** 8:19, 9:4 26:2, 26:3, 80:9 80:11, 103:16 | **attempts** 70:17 70:20 |
| **aforementioned** 106:7 | | | | **attorney** 2:9 4:14 |
| **afternoon** 44:10 | **apartment** 90:2 91:2 | | **asking** 9:1 | |
| **agency** 61:15 | | | | |

attorney's 24:12
audio 79:16
August 24:17
aus 88:5, 88:6
  88:8
authority 61:12
  61:18, 63:11
authorize 6:18
  8:20, 9:5
authorized 13:8
  18:23, 21:10
  38:10, 41:25
available 59:17
  94:17, 95:7
  95:8, 96:19
  96:19
Avenue 2:16
  10:15, 13:20
  18:11, 18:12
  20:23
avoid 72:12
  76:8
aware 58:6
  60:18, 60:20
  62:5, 64:18
  84:22
Axon 54:16
  59:18

**B**

back 8:18, 22:8
  26:1, 26:24
  29:1, 38:24
  40:5, 41:16
  53:10, 53:13
  62:13, 63:20
  71:7, 71:12
  71:17, 72:14
  72:15, 75:6
  75:10, 79:22
  83:12, 91:24
  101:19, 103:4
background
  13:14
backing 74:1

backwards
  69:21, 74:8
based 9:16, 10:6
  24:8, 55:2
  88:25
basically 6:17
  30:1
basis 65:6, 68:9
baton 57:17
  57:25, 93:17
battery 66:22
  86:4, 86:8, 98:4
Bedford 18:12
  20:23
behalf 2:2
behavior 91:15
believe 14:9
  17:24, 18:2
  27:13, 29:19
  30:16, 30:17
  40:25, 63:8
  66:15, 68:1
  69:11, 71:8
  75:5, 87:6, 88:5
  88:12
belt 94:5
benefit 97:8
best 106:11
better 81:19
bind 5:10
binding 5:9
bit 18:15, 18:15
  53:3, 68:23
  69:4, 69:10
  73:2, 74:8, 96:9
  101:12
bite 20:21, 21:6
  21:10, 32:8
  32:11, 32:12
  32:13, 41:5
  41:25, 80:8
  80:12, 80:16
  87:6, 87:8
  87:16, 92:8
  92:19
biting 87:19

88:1, 91:19
  91:25, 92:10
bitten 50:3
  50:12
black 35:17
block 20:24
  21:4
blocks 20:22
Blue 54:3, 54:4
  54:7, 54:19
  55:6, 55:11
  55:15, 55:18
  55:19, 56:6
  56:9, 56:12
  57:3, 57:22
board 24:4
boards 62:6
body 38:4
  41:13, 41:13
  45:14, 45:15
  51:7, 59:18
  59:22, 60:1
  67:9, 67:12
  68:1, 77:2, 78:8
  84:25
break 40:11
  52:24, 52:25
  63:14, 63:23
  68:14, 69:23
  73:11, 77:11
  78:6
breaking 28:15
  28:16, 29:22
  29:22, 31:4
  39:17, 51:5
breather 77:14
  77:16
brief 84:13
bring 62:25
  63:1
broke 40:16
brought 10:3
  17:11, 105:9
burglary 22:19
  23:2
business 99:1

100:6
Byrne 1:10, 2:2
  3:3, 4:8, 5:1, 5:5
  27:2, 53:14
  63:23, 101:20
  102:3, 105:14
  107:2, 107:19

**C**

call 63:12, 63:14
  85:18, 94:23
called 89:25
  104:16
Calvin 1:3, 4:8
  50:2, 50:12
  64:23, 65:9
  65:19, 66:4
  66:7, 66:11
  66:14, 67:17
  68:7, 68:10
  68:18, 68:21
  80:16, 81:2
  87:15, 88:8
  90:1, 92:1
  102:5, 103:8
cam 67:9, 68:1
  77:2, 78:9
  84:25
camera 41:13
  41:14, 51:8
  59:18, 59:23
  60:1, 78:14
  84:22
cameras 67:12
canines 74:3
captain's 55:12
captains 23:15
car 13:19, 13:20
  14:25, 15:2
  68:20, 68:22
  71:8, 71:12
  71:17, 71:21
  71:25, 72:2
  72:15, 87:15
  89:4

cars 28:15
  28:17, 29:22
  31:4, 39:17
  51:5
case 1:5, 4:9
  7:13, 49:11
  49:12, 51:17
  58:19, 66:17
  75:20, 76:3
cases 7:7, 16:23
  28:1, 36:14
  36:17
categories 83:20
category 6:17
  8:19, 9:3, 83:17
  83:17, 93:3
  94:13
cause 20:2, 20:5
  20:8
certify 106:7
  106:12
chain 92:2
challenge 64:9
  64:10, 64:15
challenging
  61:10
change 7:19
  7:23, 7:23, 8:1
  8:2, 9:23, 9:25
  12:25, 15:25
  17:11, 21:18
  21:20, 22:9
  24:18
changed 9:20
  9:21, 15:24
  16:3, 21:14
  21:17, 22:15
  23:10, 51:20
changes 6:23
  7:4, 7:6, 7:13
  7:16, 8:3, 8:7
  8:10, 12:15
  22:18, 22:18
  107:1
changing 7:15
  23:12

| | | | | |
|---|---|---|---|---|
| **charge** 59:11 66:23, 99:1 | **clarity** 10:9 85:25 | **committed** 5:17 22:23, 22:24 89:10 | 56:10, 67:13 68:5 | **contributes** 60:16 |
| **charged** 14:8 14:9, 34:6 | **cleanup** 28:25 **clear** 12:2 12:24, 34:18 | **committee** 61:1 62:17 | **conduct** 49:17 **conducted** 10:14, 51:3 | **control** 16:12 16:17, 16:21 17:1, 18:6 |
| **charging** 85:21 **chased** 18:13 | 36:5, 37:3 37:18, 40:10 | **committing** 11:1, 13:21 | 67:3 **conducting** 56:1 | 20:19, 32:10 32:15, 36:4 |
| **check** 104:16 **chief** 6:10, 23:16 | 42:8, 50:1 50:10, 52:9 | 16:9, 21:12 22:21, 23:1 | 59:11, 103:5 **conducts** 59:14 | 38:3, 40:14 40:20, 80:6 |
| 25:2, 25:3, 25:5 25:21, 25:24 | 77:6, 79:21 86:3, 90:18 | 32:1, 49:13 **Commonwealth** | **confuse** 83:5 **Connor** 49:2 | 98:15 **corner** 79:4 |
| 26:6, 26:7, 27:6 55:12, 56:3 | 102:8 **client** 51:19 | 2:6, 106:1 106:4, 106:24 | 49:8 **consequence** | **correct** 5:25, 6:1 6:13, 6:14, 8:23 |
| 56:3, 56:5, 56:9 57:1, 57:1 | **close** 56:18 68:20 | **company** 55:10 57:4, 57:6 | 15:21 **consider** 15:19 | 11:2, 11:9, 12:6 12:14, 12:20 |
| 60:10 **chief's** 61:6 | **closest** 28:4 **club** 82:3 | **complaint** 54:24 **complaints** | 75:3, 75:14 **consideration** | 13:25, 15:2 18:17, 25:5 |
| 61:11, 63:7 **chiefs** 23:16 | **collect** 59:17 **College** 2:16 | 54:23, 62:1 64:20, 64:21 | 103:1 **considered** | 30:8, 32:2, 32:5 32:8, 32:13 |
| **chose** 20:9 102:10 | 29:10, 29:16 30:2, 38:25 | 73:22 **complete** 52:15 | 16:22, 18:1 18:2, 18:7, 44:6 | 32:18, 33:6 38:14, 40:7 |
| **Church** 2:9 4:15 | **Collin** 1:10, 2:2 3:3, 4:8, 5:1 | **completed** 55:15 | 48:17, 49:1 73:19 | 52:13, 52:17 52:22, 55:4 |
| **circles** 42:6 **circumstances** | 105:13, 107:2 107:19 | **completely** 52:6 89:5 | **considering** 47:6 | 59:9, 65:5 66:21, 68:7 |
| 10:11, 19:2 44:3, 44:5 | **come** 7:14, 22:8 92:7, 95:22 | **comply** 17:3 19:5, 19:14 | **consistent** 11:19 21:9 | 68:8, 69:10 69:14, 69:15 |
| 46:20, 88:25 102:23 | 98:13 **comes** 44:13 | **comport** 49:17 51:5, 88:22 | **constitutes** 43:21 | 69:18, 71:19 76:23, 76:24 |
| **cites** 48:23 **citizen** 61:9 | 58:25, 96:8 96:12 | 90:16, 92:17 92:18 | **construed** 15:17 **consultation** | 77:3, 78:12 78:16, 78:22 |
| 62:15, 62:15 64:15, 90:22 | **coming** 5:5 **command** 6:5 | **comported** 23:7 33:12, 41:7 | 24:7 **contemplated** | 79:7, 80:10 80:20, 80:24 |
| **citizens** 62:6 **city** 1:6, 2:8, 4:9 | 21:2, 26:2 35:19, 88:4 | **comports** 36:11 41:12 | 44:17, 58:22 **contention** 20:7 | 81:3, 81:12 85:12, 86:23 |
| 4:14, 25:19 25:24, 25:25 | 88:8, 88:15 **commands** 87:3 | **concede** 15:16 **concern** 90:22 | 72:6, 72:14 72:15 | 87:11, 103:15 106:9 |
| 26:5, 26:7 26:11, 41:20 | 92:7 **commencing** | **concerned** 61:9 73:10, 75:11 | **continuation** 5:6 | **corrections** 104:17 |
| 50:4, 61:1 **city's** 24:11 | 2:7 **comments** 23:25 | **conclude** 13:6 **concluded** 56:16 | **continue** 90:19 92:10 | **council** 61:1 **counsel** 2:10 |
| **civil** 61:23 **clarification** | **commission** 23:13, 106:6 | 65:2, 86:8 105:17 | **continued** 30:22 81:16, 92:5 | 2:15, 2:19, 4:16 4:19, 4:22, 24:7 |
| 13:4 **clarify** 12:25 | **commit** 94:6 **commitment** | **concludes** 105:12 | **continuing** 91:4 **contracting** | 106:9, 106:13 **count** 82:10 |
| 16:2, 16:3, 27:2 30:18, 38:7 | 6:7 | **conclusion** | 60:23 | **counted** 27:17 |

**couple** 90:17
**course** 67:2
  67:6, 67:25
**court** 1:1, 4:5
  4:11, 4:17
**courts** 61:1
**covered** 9:8
  53:18, 83:6
**CPAC** 62:15
  63:4, 63:6
  63:24, 64:2
  64:2
**create** 10:4
**creates** 76:1
**crime** 11:1
  11:18, 12:17
  13:21, 14:6
  22:21, 22:24
  36:20, 49:3
  49:13, 51:16
**criminal** 31:12
  31:20
**cuffs** 70:22, 71:7
  73:8
**current** 7:11
  23:21, 24:23
  33:16, 33:24
  34:11, 34:18
  36:11, 37:3
  37:9, 41:24
  49:21, 88:22
  90:16, 102:13
**custody** 65:15
  65:24, 94:20
  97:11, 97:20
  97:23, 98:15
**custom** 54:20
**cuts** 33:4

**D**

**danger** 34:13
**data** 23:21
**database** 55:17
**date** 4:5, 22:2
  23:4, 49:17

**day** 6:4, 28:11
  73:3, 90:11
  106:17
**deadly** 16:22
  18:2, 18:9
  20:12
**debatable** 44:21
  90:24
**debate** 97:11
  97:14
**debating** 97:12
**December** 12:10
  50:2, 50:11
  83:3, 83:25
  90:15, 102:5
**decide** 73:20
  98:13
**decided** 25:6
**decides** 41:21
**deciding** 75:14
**decision** 10:4
  24:9, 24:10
  60:7, 61:6
  61:16, 63:7
  75:15, 79:7
  79:9, 79:10
  80:23
**decision-making**
  60:17, 73:18
  75:17
**deemed** 11:19
  21:8, 42:17
  43:2, 48:15
**deems** 16:18
  42:12
**deescalate** 94:19
**deescalation**
  94:14, 94:22
  94:24, 94:25
**defendants** 1:7
  2:19, 4:22
**Defense** 16:15
**defined** 57:8
**demeanor** 54:24
**department**
  5:11, 6:6, 6:9

7:8, 9:7, 13:5
  24:2, 25:13
  25:15, 26:10
  27:5, 34:19
  35:15, 37:4
  42:10, 43:23
  44:17, 48:15
  50:21, 53:23
  55:8, 56:25
  57:3, 60:16
  62:3, 64:11
  64:17, 64:22
  99:11, 103:10
**departments**
  62:5
**depend** 7:6
**depending**
  15:18, 45:4
  58:12
**depends** 15:10
**deploy** 17:25
  18:21, 19:10
  20:11, 38:10
  41:25, 73:18
  73:20, 75:16
  80:12
**deployed** 6:19
  9:7, 13:18
  21:21, 27:12
  32:7, 32:10
  34:19, 40:23
  41:5, 68:18
  68:19, 80:8
  81:10
**deploying** 47:6
  68:6
**deployment**
  11:18, 12:16
  37:8, 49:9, 50:5
  50:13, 51:3
**deployments**
  53:17
**deposition** 1:9
  2:1, 4:7, 4:13
  5:6, 5:7, 5:7
  5:24, 53:21

74:9, 77:24
  101:21, 104:15
  104:18, 104:19
  105:17, 107:1
**depositions** 2:4
  78:5
**deputy** 23:16
  55:12, 56:3
  57:1
**describe** 20:1
  34:25, 70:14
  70:16, 72:22
  74:16, 81:19
  84:19, 84:20
  84:25, 85:1
**described** 94:17
**designed** 54:20
**details** 51:19
  54:12
**detain** 32:1
  39:23
**detained** 19:18
  31:16, 38:9
  40:10, 41:4
  41:21, 44:15
**detaining** 31:19
  33:24, 38:15
  40:2
**detention** 19:20
  40:7, 43:14
  43:15
**determination**
  25:4, 61:11
**determine** 60:11
  90:14
**determined**
  61:4
**difference** 19:20
  19:24, 40:1
  46:14
**different** 5:15
  46:22, 54:15
  56:23, 66:2
  77:9
**difficult** 51:9
  94:18, 95:24

96:9
**difficulty** 96:7
**direct** 45:15
  62:21, 92:19
**directed** 8:2, 8:6
  22:14, 80:15
  81:5
**direction** 45:21
  70:5, 91:8
**directive** 52:4
**directives** 6:18
  8:20, 9:5
**disagree** 60:9
**disciplined**
  11:13
**discussion** 23:14
**discussions**
  23:25
**dismissed** 66:23
**display** 22:22
  22:24
**distinction**
  15:11
**distinguish**
  47:25
**District** 1:1, 1:1
  4:11, 4:11
**Division** 1:2
  4:12
**divulge** 99:6
**document** 52:19
  54:5, 54:10
  89:22
**documentation**
  89:20
**documents**
  54:15, 59:25
**dog** 11:5, 11:9
  11:14, 11:16
  11:19, 16:4
  16:7, 17:16
  17:25, 18:1
  18:1, 18:13
  18:22, 18:24
  19:2, 19:3
  19:11, 20:12

| | | | | |
|---|---|---|---|---|
| 20:21, 21:1 | 94:5 | 89:15, 89:18 | 69:4, 69:8 | 79:20, 79:22 |
| 21:2, 21:6 | | 90:1 | 81:23, 82:1 | **final** 6:8, 6:12 |
| 21:10, 21:21 | **E** | **et** 1:6, 4:9 | 82:3 | 6:13, 25:9, 26:3 |
| 22:1, 22:3 | | **evade** 49:6 | **factor** 75:15 | 27:4, 27:8 |
| 27:11, 31:13 | **earlier** 53:25 | **evaluation** | 103:17 | 60:13 |
| 32:8, 32:10 | 83:7, 102:3 | 102:12 | **factors** 7:10 | **finalized** 60:6 |
| 32:12, 32:12 | **earth** 80:19 | **event** 29:9 | 7:14, 48:18 | 62:19 |
| 32:21, 34:17 | **effect** 24:18 | 32:25, 106:15 | 48:20, 48:25 | **find** 5:16, 63:9 |
| 34:19, 38:11 | 47:14, 52:20 | **events** 7:7, 7:12 | 49:9, 49:18 | 63:10, 63:24 |
| 40:23, 41:25 | 63:2 | **evidence** 14:23 | 49:21, 49:24 | **finding** 60:7 |
| 50:3, 50:6 | **effecting** 39:16 | 15:1, 91:13 | 50:5, 50:14 | 65:6 |
| 50:13, 68:6 | **effective** 16:24 | **evident** 65:13 | 50:21, 50:23 | **findings** 62:2 |
| 68:17, 68:19 | **effectively** 26:11 | 70:7, 70:13 | 51:15 | 64:10, 64:16 |
| 68:23, 69:4 | **either** 35:4, 35:6 | **evolution** 6:24 | **facts** 13:16 | 64:17 |
| 69:10, 69:18 | 56:4, 56:16 | **evolved** 6:25 | **fair** 74:4, 74:9 | **fine** 53:1, 77:8 |
| 73:2, 73:18 | 60:8, 67:11 | **exact** 21:19 | 83:2, 96:16 | 77:16 |
| 73:20, 75:16 | 76:12, 76:16 | 24:20, 88:16 | 96:18 | **fingers** 65:20 |
| 79:1, 80:8 | 79:16, 79:25 | **exactly** 21:3 | **false** 10:16 | 66:5 |
| 80:12, 80:16 | 105:3 | 51:13, 71:14 | 10:16, 10:18 | **firearm** 22:22 |
| 80:16, 81:6 | **Electronic** | 74:7, 74:13 | 14:4, 14:5, 14:7 | 22:25, 93:16 |
| 81:10, 81:12 | 106:3 | 87:14, 90:25 | 14:12, 14:14 | **first** 6:4, 8:1 |
| 81:16, 81:18 | **elicit** 17:6 | **examination** 3:4 | 14:25, 20:3 | 18:22, 44:12 |
| 86:25, 87:1 | **enforcement** | 3:5, 3:6, 83:16 | **familiarity** | 44:13, 53:6 |
| 87:4, 87:6, 87:8 | 14:15 | **examined** 106:8 | 103:8 | 57:10, 57:11 |
| 87:16, 88:15 | **engaged** 75:25 | **example** 44:15 | **far** 7:11, 7:12 | 57:14, 57:15 |
| 88:23, 91:19 | **environment** | 57:16 | 14:4, 16:4 | 81:9, 86:2 |
| 91:25, 92:10 | 48:19 | **executing** 98:23 | 22:16, 23:15 | 95:14, 98:14 |
| 92:19 | **errors** 104:16 | **exercise** 96:22 | 23:21, 41:12 | **Fitzgerald** 2:18 |
| **dogs** 49:9 | 104:17 | **existing** 52:16 | 54:24, 58:4 | 3:5, 4:21, 4:21 |
| **doing** 10:12 | **escalate** 97:25 | **exists** 55:1 | 60:18, 61:7 | 8:24, 11:21 |
| 64:5, 70:25 | **escalated** 94:19 | **expert** 60:22 | 68:18, 68:22 | 12:18, 13:9 |
| 71:3, 71:5, 73:4 | 94:23 | **expertise** 93:8 | 68:22, 68:24 | 13:22, 17:18 |
| 98:11, 99:7 | **escalates** 97:24 | **expires** 106:6 | 72:25, 75:1 | 19:21, 20:14 |
| **door** 69:7, 69:8 | **escalatory** 98:2 | **explain** 104:17 | 94:15, 94:16 | 21:15, 24:19 |
| 69:10, 69:12 | **escape** 35:2 | **external** 61:14 | **FBI** 61:17 | 25:17, 26:13 |
| 78:16, 78:18 | 35:5, 35:23 | **externally** 61:14 | 61:20, 61:23 | 26:19, 28:23 |
| 79:4, 95:25 | 36:10, 37:25 | **extra** 98:12 | **feet** 68:24, 68:24 | 31:7, 33:17 |
| 96:12 | 38:4, 65:10 | | **fell** 60:5 | 36:15, 37:10 |
| **drive** 72:7 | **ESQUIRE** 2:14 | **F** | **felony** 22:19 | 38:12, 39:5 |
| **driven** 7:4 | 2:18 | | 22:23 | 39:8, 39:12 |
| **driver** 71:25 | **essentially** 6:16 | **face** 80:19 | **felt** 10:8 | 39:19, 42:2 |
| **driver's** 72:1 | 7:3, 12:22 | **facedown** 92:1 | **fence** 92:2 | 43:4, 44:7 |
| 72:4 | 14:24, 54:16 | 92:11, 92:20 | **field** 101:5 | 45:25, 47:10 |
| **driving** 98:18 | 54:20, 54:22 | **facing** 81:3 | 101:7 | 47:15, 49:19 |
| **duties** 58:19 | 55:17 | **fact** 15:12 | **fight** 105:1 | 50:7, 50:15 |
| **duty** 58:20, 59:2 | **estranged** 85:19 | 20:22, 58:21 | **fighting** 79:19 | 64:12, 72:17 |

73:21, 77:10
77:13, 80:1
82:5, 82:13
82:16, 82:21
83:9, 83:18
84:4, 84:15
87:12, 87:21
91:21, 92:12
92:15, 92:21
97:2, 97:16
99:8, 100:17
101:14, 101:23
102:2, 102:14
103:16, 104:3
104:11, 104:22
105:3, 105:8
105:11
**five** 27:19, 27:20
78:11, 87:3
**fix** 13:12
**fled** 21:11
30:10, 30:11
**flee** 20:9, 28:17
71:8, 71:12
**fleeing** 16:7
16:8, 16:13
17:17, 17:20
17:25, 20:13
27:12, 88:21
**flight** 49:7
**follow** 102:18
**follow-up** 104:1
**following** 13:6
17:3, 103:6
**follows** 5:2
**footage** 41:14
51:8, 51:12
54:16, 59:17
59:18, 59:23
60:2, 78:14
**force** 6:19, 6:25
7:5, 8:4, 8:5, 8:6
8:7, 8:11, 8:14
8:14, 8:15, 8:16
8:17, 8:21, 8:22
9:6, 9:8, 9:9

9:14, 9:17, 9:18
9:22, 16:16
16:22, 16:25
18:2, 18:7, 18:9
20:12, 23:1
34:5, 34:15
34:23, 34:24
34:25, 35:1
35:5, 35:9
35:12, 35:21
35:23, 36:1
36:3, 36:9
36:10, 36:19
36:21, 36:24
37:1, 37:8
37:21, 37:25
38:2, 38:5, 42:4
42:7, 42:13
42:14, 42:18
42:21, 43:2
43:6, 43:9
43:11, 43:21
43:24, 44:1
44:4, 44:6
44:16, 44:20
44:21, 45:4
45:6, 45:10
45:14, 45:15
45:16, 45:20
45:23, 46:3
46:8, 46:16
47:5, 47:7
47:20, 47:21
47:23, 48:5
48:6, 48:16
50:4, 51:4
53:22, 54:2
54:5, 54:8
54:10, 54:13
54:18, 54:20
54:23, 55:7
55:14, 55:17
55:25, 56:4
56:11, 57:7
57:8, 57:12
58:4, 58:7

58:11, 58:21
60:5, 60:12
60:14, 60:19
60:23, 61:4
61:8, 62:7
62:18, 64:3
65:3, 65:9
65:11, 65:12
67:17, 68:10
68:12, 68:14
69:25, 70:5
70:6, 70:10
70:11, 70:12
73:5, 74:3, 74:6
74:11, 75:3
75:9, 75:15
79:5, 89:23
90:7, 90:15
102:10, 102:13
102:20, 102:23
102:25, 103:2
103:6, 103:12
**forces** 64:2
**foregoing** 106:9
**Forest** 85:9
106:17
**forget** 21:19
62:16
**form** 8:24
11:21, 12:18
13:9, 13:22
17:18, 19:21
20:14, 21:15
24:19, 25:17
26:13, 28:24
31:7, 33:17
36:15, 37:10
38:12, 39:5
39:8, 39:12
39:19, 42:2
43:4, 44:7
45:25, 47:10
49:19, 50:7
50:15, 64:12
72:17, 80:1
81:21, 82:5

82:13, 84:4
84:15, 87:12
87:21, 91:21
92:12, 92:15
92:21, 97:2
97:16, 99:8
100:17
**formal** 23:24
**forth** 79:22
83:12
**forward** 25:7
69:14
**found** 17:15
33:11, 61:4
**four** 22:22
24:17, 27:20
27:23, 29:5
78:25, 95:17
**frame** 78:24
96:1
**free** 68:14
73:11
**front** 59:19
69:13, 84:23
96:8, 96:10
96:11
**full** 106:10
**function** 54:21
56:20, 62:23
**further** 101:21
106:12
**furthermore**
18:19

## G

**game** 74:4, 74:9
**general** 8:14
47:20, 58:18
58:19
**German** 32:17
**getting** 10:19
52:24, 73:22
95:15
**give** 27:16
30:19, 44:5

44:14, 46:20
46:22, 67:19
82:2, 82:2
84:13, 92:6
95:15, 96:5
96:6, 99:15
100:1, 100:7
101:11, 104:15
**given** 14:14
106:16
**gives** 92:7
98:12
**giving** 14:12
14:25, 20:3
**go** 7:25, 16:10
26:1, 26:17
29:1, 36:8
45:21, 47:19
51:18, 53:20
70:2, 70:4
70:23, 87:16
92:5, 95:10
95:12, 101:10
103:4, 104:11
104:12, 105:7
**Godsie** 54:1
92:24
**Godsie's** 93:8
**goes** 56:1, 73:17
75:17
**going** 14:3, 15:7
25:6, 27:16
42:6, 45:19
45:20, 45:24
46:22, 51:13
53:3, 74:24
77:18, 77:19
77:23, 78:6
85:21, 90:19
97:10, 98:13
100:7, 100:7
100:8, 100:9
104:13, 104:25
**good** 4:3, 5:20
38:6, 53:12
**governed** 50:14

50:17
grab 46:23, 47:2
95:19, 96:14
grabbed 30:12
grabbing 36:6
44:23, 46:11
48:2
Graham 49:2
49:8, 49:17
49:20, 49:24
50:5, 50:14
50:21, 50:23
51:15
grasp 43:24
46:6, 48:4
48:13, 96:15
grip 45:9
ground 83:7
87:20, 88:9
88:10, 88:14
88:17, 91:20
92:5
group 62:15
guess 5:23
15:10, 31:10
guided 101:1
gunshots 58:15
GUYNN 2:16
guys 52:24

**H**

hand 45:19
48:4, 92:6
95:15, 96:5
96:6, 106:16
handcuffed 76:9
handcuffs 70:18
76:4, 98:15
handed 59:12
handler 16:18
handler's 16:21
18:6
hands 65:20
66:4, 76:19
95:3, 95:11

95:21
hands-on 95:1
Hang 104:5
happen 15:13
56:6, 81:25
87:5
happened 57:25
84:18
happening
79:23
happens 56:8
harm 19:12
19:13, 34:22
head 7:21, 82:3
hear 58:15
76:13, 76:16
79:16, 84:11
88:7
heard 75:1, 75:8
79:15, 84:12
held 4:13, 42:11
42:25
help 95:19
95:23
Henderson 1:25
2:5, 4:5, 106:2
106:23
hey 95:18, 96:5
96:6
history 73:15
73:16, 73:17
73:19, 75:12
91:16, 102:6
102:9, 103:8
103:9
hit 82:2
home 93:25
honestly 104:18
104:18
hope 53:12
hopping 83:5
hospital 18:18
33:3, 33:6
hospitalization
18:17, 33:1
human 80:19

hurt 82:8
husband 90:1
hypothetically
57:17
hypotheticals
44:9

**I**

IA 56:8
IAPro 55:9
55:12, 55:13
55:16, 56:14
56:18, 56:19
56:22, 56:25
57:2
IBR 55:2, 57:18
idea 72:10
identical 47:4
47:8, 47:11
identification
10:16, 14:4
20:3
identify 59:2
83:11
identifying
83:10
identity 14:14
immediate 49:4
imminent 17:6
19:9, 19:12
impair 98:5
impede 98:4
implies 79:22
imply 46:10
important 52:8
imposed 58:20
in-person 24:3
incident 12:3
12:8, 13:14
17:10, 21:25
22:2, 28:3
28:10, 28:13
29:19, 32:22
40:4, 44:19
55:2, 61:18

64:22, 65:12
67:10, 74:2
78:9, 83:3
83:25, 84:2
84:19, 102:5
incidents 12:10
12:12, 53:15
54:2
include 28:21
incorporate
49:23, 50:5
50:19, 50:21
indicate 20:25
indicated 21:20
66:19, 94:4
94:9
indicates 31:11
indication 14:19
indicators 14:21
individual 10:17
10:23, 10:24
10:25, 30:21
36:19, 36:22
37:2, 37:3
43:10, 58:3
58:4
information 5:9
15:1, 17:6
24:14, 90:14
98:1, 99:16
100:1, 100:8
inherently 98:2
initially 95:25
injured 18:16
33:1
inner 25:23
input 60:25
instills 101:3
instruct 82:19
92:10
instructed 91:19
101:6
instructing 81:6
82:15, 82:16
82:17, 82:19
82:21

integrated
55:11, 57:5
intended 91:14
intent 45:21
69:22
interest 98:22
interested
106:14
interim 52:12
internal 24:8
24:10, 61:2
61:21, 64:10
64:16
internally 60:19
61:13, 62:22
interpretation
102:4
interrupt 47:18
interruption
47:16
interview 58:2
58:3
introduce 4:16
investigate
53:22, 54:10
investigated
33:9, 54:2
64:24
investigating
60:3
investigation
54:8, 55:7
55:14, 55:19
56:15, 57:9
57:14, 59:8
59:12, 60:19
61:2, 61:21
63:3, 67:2
67:14, 67:25
74:1, 74:2, 74:6
103:19, 103:21
investigations
54:21, 56:23
61:24
invitation 81:18
involve 28:13

**involved** 23:12
23:18, 23:22
24:12, 27:15
58:4, 59:24
63:4
**involves** 6:17
**involving** 9:14
9:18, 22:2
22:21, 22:24
36:17, 64:23
**issue** 62:25, 63:1
88:7
**issued** 93:15
93:16, 93:17
93:17, 93:18
**issues** 7:12, 7:12
13:1, 90:17

**J**

**JAMES** 2:12
**January** 6:19
7:17
**John** 2:18, 4:21
**johnf@guynnw...**
2:18
**July** 24:17
**jump** 83:12
**June** 24:17
86:14
**justification**
102:20, 103:7
103:11
**justified** 60:12
102:25

**K**

**K9** 6:25, 7:13
8:4, 8:9, 8:23
10:21, 10:22
10:23, 10:25
15:4, 15:5
16:11, 16:18
16:19, 16:20
18:5, 20:12

22:15, 23:15
30:24, 37:8
49:25, 50:24
53:17, 92:24
93:5
**K9s** 6:19, 8:11
8:15, 8:16, 8:21
9:6, 9:8, 9:14
9:19, 9:22
16:15, 16:20
16:23, 17:2
18:5, 47:6
53:16
**keep** 42:6, 74:13
74:24, 78:6
87:19, 88:1
91:19
**keeps** 23:20
97:13
**kid** 17:17, 38:24
**Kim** 4:5
**Kimberly** 1:25
2:4, 106:2
106:23
**kind** 57:5, 74:7
83:4, 83:4, 85:7
94:18
**kinds** 44:9
**knew** 14:3
14:22
**know** 5:13, 5:13
7:14, 7:20, 8:8
11:3, 23:19
24:5, 24:15
24:20, 25:22
26:4, 27:15
31:15, 32:19
32:20, 32:21
32:23, 37:11
41:17, 51:15
57:24, 64:4
66:16, 66:17
66:25, 69:22
70:4, 71:8
71:13, 71:14
72:9, 77:25

77:25, 87:25
88:4, 91:18
98:8, 98:9
98:24, 100:22
101:2, 103:18
103:24, 104:6
104:18, 105:1
**Knox** 11:6
12:16, 13:18
13:18, 27:11
29:21, 30:15
30:16, 41:5
50:13, 50:13
53:17, 68:6
80:16, 81:6
91:19

**L**

**laceration** 33:4
**lady** 72:1, 72:8
**landlady** 98:18
**Large** 2:7, 106:1
106:5, 106:24
**law** 4:14, 7:14
14:14, 25:24
39:1
**lay** 13:14, 37:19
37:19
**leading** 56:10
**leash** 20:20
**leave** 104:20
**left** 69:16
**legal** 2:12, 13:7
24:8
**legitimate** 98:22
**letter** 21:19
22:10, 23:3
26:12
**lieutenant** 65:1
67:3, 103:5
103:21, 103:21
**limit** 6:18, 8:21
9:6
**limited** 76:2
95:4

**line** 93:7
**link** 92:2
**list** 103:22
**listed** 103:6
**listen** 10:20
**listened** 85:1
**literally** 95:21
**little** 5:14, 13:14
44:20, 45:10
53:3, 63:14
64:6, 74:8, 96:9
101:12
**long** 88:13
**look** 12:23, 26:3
41:14, 41:17
44:18, 51:7
78:8
**looked** 71:16
102:12, 102:23
103:19
**looking** 6:22
7:15, 8:8, 8:18
12:21, 12:22
51:2, 51:12
89:22
**loose** 11:5, 11:9
68:15, 69:24
87:16
**lot** 83:6, 84:7
**LPD** 16:16, 21:9
23:8, 33:12
33:24, 36:11
38:8, 41:7
100:19
**lunch** 52:25
53:8, 53:13
67:20
**lying** 92:19
**Lynchburg** 1:2
1:6, 1:13, 2:9
2:13, 4:9, 4:12
4:14, 4:15, 5:10
6:5, 6:8, 9:7
13:5, 25:20
26:5, 26:10
27:4, 29:10

34:18, 35:15
37:4, 42:9
42:12, 43:22
44:17, 48:15
50:4, 50:20
53:23, 55:8
62:4, 62:9
64:11, 64:16
64:22, 67:15
73:23, 99:11
103:9
**Lynchburg's**
47:5

**M**

**maintain** 32:9
**man** 13:19
14:20, 29:21
30:1, 31:4
31:16, 31:23
32:1, 32:4, 32:8
32:25, 41:5
48:3, 48:3, 51:4
73:2
**manager** 25:25
26:8, 26:11
**March** 12:3
12:9, 28:7
28:11, 28:11
29:9, 40:5, 50:1
50:10, 51:3
64:23, 80:14
83:25, 91:20
91:22, 91:24
**marked** 3:9
**match** 65:14
65:23, 66:1
**matter** 4:8
15:12, 58:21
83:11, 85:25
**mean** 31:10
39:11, 44:8
45:7, 51:16
51:25, 53:2
57:15, 60:25

61:7, 61:17
75:23, 77:17
77:20, 91:1
91:9, 95:17
96:15, 96:15
96:16, 97:8
97:18, 97:22
100:19, 102:24
103:14
meaning 34:24
means 16:11
27:20, 61:3
61:5, 61:10
72:23, 95:10
meant 29:13
meetings 23:24
24:3, 24:4
Melissa 2:20
4:4
memorandum
7:22, 9:24, 10:2
10:4, 11:12
12:6, 12:13
15:24, 15:25
21:18, 52:2
52:3, 52:11
52:20
mere 45:13
merely 43:23
messaging 24:1
mind 13:13
63:14, 70:3
82:25, 87:9
mindful 16:19
18:4
minor 49:13
minute 26:18
27:17, 30:19
minutes 101:11
misconduct
54:25
misdemeanor
14:16, 15:1
16:9, 20:9
21:12, 28:14
28:19, 32:2

33:25, 34:3
34:7, 34:21
36:14, 37:5
37:6, 38:1, 39:2
39:3, 39:17
49:13, 66:21
86:17, 88:20
98:3
misdemeanors
27:24, 28:21
30:9, 36:18
missed 29:1
missing 94:5
money 82:2
months 24:17
morning 4:3
move 15:14
56:18, 69:20
94:11
moved 55:16
68:22, 68:23
92:4
movement 69:2
moving 27:10
69:13, 83:3
83:21
mv@vbclegal.c...
2:14

N

name 4:4, 10:16
10:18, 14:12
27:3, 44:12
narrative 54:12
84:13, 84:13
near 21:1, 30:1
necessary 16:25
need 77:15
90:13, 101:13
needed 10:12
neither 106:12
nervous 10:17
nevertheless
17:15
new 101:2

101:3
nine 27:13
27:14
nonarrest 17:4
19:6, 19:15
19:16
Notarial 106:16
Notary 2:6
106:4, 106:5
106:23
notice 2:3, 5:24
53:21
November
106:6
number 4:9
7:10, 53:15
53:20, 64:25
74:4, 106:5

O

object 8:24
11:21, 12:18
13:9, 13:22
17:18, 19:21
20:14, 21:15
24:19, 25:17
26:13, 28:23
31:7, 33:17
36:15, 37:10
38:12, 39:5
39:8, 39:12
39:19, 42:2
43:4, 44:7
45:25, 47:10
47:15, 49:19
50:7, 50:15
64:12, 72:17
80:1, 82:5
82:13, 84:4
84:15, 87:12
91:21, 92:12
92:15, 92:21
97:2, 97:16
99:8, 100:17
Objection 73:21

87:21
observatory
30:1
observe 66:4
66:7, 66:10
70:12, 79:24
observed 29:25
31:2, 31:5
31:12, 31:18
31:20, 31:23
72:25, 73:6
77:2, 84:10
84:11
observes 39:3
39:18
obstruction
14:10
obtain 5:8, 5:9
obvious 44:21
58:11
obviously 28:2
47:20, 58:10
61:17, 62:24
90:19
occasion 18:10
occurred 6:23
9:23, 9:24, 10:7
29:9, 29:10
84:8
occurs 55:19
October 106:17
office 24:12
officer 10:7
10:12, 10:21
10:21, 11:8
11:13, 12:16
13:3, 13:5
13:18, 15:4
15:4, 19:1, 19:3
21:1, 21:5
29:20, 30:11
30:14, 30:22
30:23, 30:23
31:2, 31:11
33:11, 34:14
34:22, 35:2

35:3, 35:7
35:10, 35:21
36:2, 36:4, 36:6
36:23, 36:24
37:6, 38:2, 38:3
38:9, 38:10
38:15, 39:2
39:3, 39:15
40:13, 40:21
41:5, 41:22
41:23, 41:24
41:25, 42:11
42:12, 42:13
42:16, 42:21
42:25, 43:1
43:3, 43:8
43:25, 44:16
44:23, 45:1
45:2, 45:9
45:14, 45:17
45:18, 45:22
45:24, 45:24
46:3, 46:12
47:8, 47:22
47:22, 48:2
48:16, 49:16
57:8, 57:16
58:8, 58:19
65:20, 66:5
66:8, 67:2, 67:5
67:14, 67:24
68:5, 69:16
69:17, 69:18
73:4, 73:6
76:13, 78:15
78:17, 78:21
79:17, 80:8
80:13, 80:14
80:15, 87:16
91:18, 92:7
92:9, 92:18
93:22, 95:8
95:20, 101:2
101:5, 101:7
102:10, 103:7
103:18, 103:20

103:22
**officer's** 17:4
19:5, 43:24
44:23, 46:3
46:7, 46:8
46:11, 46:15
46:18, 48:4
48:13, 70:17
**officers** 10:16
16:19, 16:24
18:4, 25:21
49:4, 52:18
52:19, 53:22
55:7, 59:24
69:9, 70:20
73:1, 73:10
73:23, 75:4
75:10, 75:14
76:4, 76:12
76:21, 76:22
76:23, 78:11
79:6, 79:17
89:15, 93:19
95:14, 95:17
95:18, 96:11
96:12, 96:25
99:20, 102:5
**offices** 2:8, 4:14
**official** 35:14
35:16, 35:18
35:22, 48:14
50:20, 99:10
99:18, 100:14
100:19
**officially** 52:15
**oh** 72:12, 98:2
104:14
**okay** 6:2, 6:15
8:10, 8:18, 9:20
10:2, 13:7
15:20, 18:8
19:7, 20:1, 20:7
21:8, 21:14
21:23, 24:11
24:15, 25:12
27:10, 29:8

31:18, 31:22
31:25, 32:20
36:22, 37:2
38:6, 38:18
38:21, 40:22
40:22, 42:23
43:12, 43:12
43:21, 48:2
48:9, 48:25
50:1, 50:10
51:20, 52:7
54:6, 54:19
55:1, 58:18
58:24, 59:5
59:15, 62:12
64:4, 64:20
65:11, 66:7
66:16, 67:13
67:22, 69:12
71:4, 74:25
75:2, 75:20
76:3, 77:4, 77:8
83:2, 83:20
84:2, 85:6
86:13, 88:20
90:23, 91:18
93:11, 98:17
100:24, 100:24
101:9, 101:14
101:15, 103:14
104:2, 104:24
105:5, 105:10
**Old** 85:9
**once** 6:2, 55:14
56:15, 95:3
97:19, 99:3
**open** 69:12
78:18
**opened** 69:8
**opening** 69:6
**operational**
7:22, 9:24, 10:2
10:4, 15:25
52:2
**opinion** 60:22
**opinions** 5:14

**opposite** 45:20
45:20, 91:5
**option** 95:14
95:20, 96:19
96:22
**options** 16:25
76:2, 95:4, 95:7
95:8
**order** 17:4, 19:6
19:10, 21:5
21:10, 32:11
53:24, 85:20
85:22, 85:23
86:6, 86:9
86:12, 88:2
89:3, 90:20
91:5
**ordered** 32:12
32:14, 32:21
87:19, 88:1
88:14
**orders** 102:7
**outcome** 63:2
**outside** 55:2
60:16, 64:15
**outstanding**
86:4
**overpower** 35:8
35:9, 35:11
41:23
**overpowering**
35:2
**override** 25:9
25:15, 25:20
26:5
**overriding** 61:5
**overturn** 61:5
61:20, 63:7
**owner** 72:1

**P**

**P.C** 2:16
**p.m** 1:12, 53:6
53:10, 63:17
63:20, 101:16

105:14, 105:17
**packages** 55:5
**packen** 32:17
32:21, 81:6
88:3, 88:3
**PAGE** 3:2
**Page/Line** 107:5
**paired** 55:10
**panel** 62:14
**panels** 62:6
**paragraph** 26:1
53:20, 64:25
74:4, 83:4
**paragraphs**
5:25
**Pardon** 74:21
80:4
**Parrish** 103:22
**Parrish's**
103:21
**part** 18:22, 38:3
103:23
**particular** 5:22
18:10, 29:9
33:15, 44:19
53:17, 60:11
61:18, 65:12
68:12, 70:10
70:12, 74:17
75:8, 83:11
89:13, 90:15
**particularly**
85:7
**party** 106:13
**passenger** 10:15
13:19, 14:25
71:18, 71:20
**Paul** 2:14, 4:19
73:21, 77:10
**people** 23:18
54:7, 56:9
70:16, 72:22
78:25, 84:3
84:6, 99:16
99:16, 100:25
**pepper** 93:18

95:10
**percent** 94:8
**permissible**
9:22, 16:7
**permit** 39:2
**permits** 37:8
**permitted** 7:1
7:2, 33:15
**person** 11:17
12:17, 16:13
16:15, 17:3
17:7, 17:12
19:5, 20:21
27:3, 36:1, 38:9
38:11, 42:1
61:7, 66:5
66:11, 66:14
78:15, 95:20
97:11, 97:12
100:2, 100:2
100:3, 100:5
**personal** 19:5
100:8
**personally** 31:5
31:11, 31:18
31:20, 39:3
39:18
**persons** 16:17
**perspective**
15:18
**persuading**
61:11
**physical** 16:11
16:13, 16:21
17:5, 17:7, 18:6
19:8, 23:1, 34:5
35:5, 35:7, 35:9
35:12, 35:23
37:21, 40:13
42:4, 42:7
42:14, 42:18
42:21, 43:6
43:8, 43:11
44:1, 44:3
44:21, 47:20
47:21, 48:6

68:14, 74:10
**physically** 22:20
28:18, 30:21
31:14, 33:21
34:1, 35:2
35:13, 38:15
38:17, 38:18
38:21, 46:2
70:8, 72:19
73:7, 75:25
77:4
**pin** 37:23
**place** 11:12
11:24, 20:10
70:18
**Plaintiff** 1:4, 2:3
2:15
**plan** 98:13
**platform** 55:20
**play** 7:15, 49:9
49:21
**please** 4:16
27:3, 47:19
70:14, 70:15
84:6, 84:13
84:20, 84:20
**Plus** 79:1
**point** 10:20
11:1, 11:14
11:19, 13:3
14:3, 14:22
14:24, 15:11
18:16, 19:18
30:14, 31:1
31:6, 31:25
32:7, 33:1
38:23, 40:14
40:16, 40:20
41:4, 58:24
59:8, 59:12
85:4, 85:12
86:15, 86:25
94:21, 95:5
99:4, 99:12
**police** 5:10, 6:6
6:9, 6:10, 6:19

7:8, 8:21, 9:6
9:7, 13:5, 16:11
16:15, 16:19
16:20, 16:23
17:2, 18:5, 24:1
25:3, 25:13
25:15, 25:24
26:10, 27:4
27:6, 34:18
34:19, 35:15
37:4, 39:15
42:9, 43:23
44:17, 48:15
50:3, 50:12
50:20, 53:16
53:23, 55:8
56:24, 62:2
62:5, 62:15
62:15, 64:11
64:16, 64:22
66:5, 66:8
71:23, 73:23
74:3, 76:22
79:1, 80:16
81:6, 91:10
91:12, 97:9
99:11, 103:9
**policies** 6:17
6:23, 6:24, 7:4
7:5, 7:15, 9:5
26:9, 27:7, 50:4
52:16, 53:18
**policy** 6:11, 7:1
7:2, 7:22, 8:1
8:2, 8:4, 8:7
8:14, 8:15, 8:15
8:17, 8:20, 8:23
8:23, 9:9, 9:17
9:21, 10:8, 10:9
10:10, 10:12
11:20, 11:24
12:2, 12:23
12:23, 13:2
13:4, 13:6
15:23, 15:25
16:2, 17:11

17:16, 18:20
18:22, 18:23
19:1, 20:10
20:11, 21:9
21:18, 23:8
23:10, 23:12
23:21, 24:24
25:6, 25:16
25:20, 26:5
26:12, 33:12
33:16, 33:24
34:11, 34:18
35:14, 35:16
35:16, 35:19
35:22, 36:12
37:4, 37:9, 40:9
41:8, 41:24
42:9, 42:12
42:20, 42:23
42:23, 42:24
44:17, 46:1
47:5, 47:6
47:24, 48:14
48:21, 48:23
49:23, 50:17
50:19, 50:20
50:24, 51:6
51:20, 51:24
52:1, 52:5, 52:5
52:10, 52:11
52:12, 52:21
56:11, 57:8
58:20, 58:22
60:5, 60:9, 61:5
65:3, 67:15
68:6, 88:23
90:16, 92:18
98:11, 99:6
99:10, 99:13
99:17, 99:18
100:12, 100:14
100:20, 102:13
**policymaker** 6:8
6:13, 25:10
26:3, 27:4, 27:8
**pose** 34:13

**posed** 17:12
**poses** 49:3
**posing** 34:22
**position** 38:8
43:22, 68:23
**positioned**
78:17
**possible** 37:24
37:25, 38:1
96:17
**Possibly** 69:2
95:24
**potentially**
16:21, 18:2
18:6, 20:12
96:20
**power** 61:15
62:20, 62:21
63:6
**practice** 83:15
83:15, 83:16
99:15, 99:19
99:21, 99:24
100:21, 100:23
100:24, 100:25
101:1, 101:3
**preceded** 12:12
**prepared** 9:12
94:13
**present** 2:20
21:1, 78:11
**presented** 62:19
**presenting** 64:2
**pressed** 69:9
**pretty** 64:20
**prevent** 71:6
**prevented** 69:13
**preventing** 73:8
**previously**
89:24
**primarily** 56:25
**primary** 54:21
**Princeton** 30:4
30:5
**principle** 83:15
**prior** 5:7, 7:21

10:7, 13:3, 28:4
28:5, 28:6, 28:8
31:19, 53:25
91:7, 102:6
102:9
**privacy** 100:11
100:15
**probable** 20:2
20:5, 20:8
**probably** 53:3
**probe** 5:16
**problem** 95:9
**procedurally**
57:15
**Procedures**
53:21
**proceeding**
106:14
**process** 23:11
23:23, 60:17
75:18
**processed** 99:3
99:4, 99:7
**professional** 2:5
55:11, 56:17
56:24, 57:1
106:3
**progress** 22:20
**prohibit** 19:2
**prohibited**
39:16
**prolonged** 65:24
**protect** 100:11
100:15
**protective** 85:20
85:22, 85:23
86:5, 86:9
86:11, 89:3
90:20, 91:5
102:6
**prove** 16:24
**provide** 10:9
98:1
**provided** 105:13
**providing** 10:15
10:18, 14:4

14:5, 14:7
**public** 2:6, 99:2
99:3, 99:12
106:4, 106:23
**pull** 30:3, 30:23
32:4, 35:21
36:8, 36:23
37:6, 37:23
38:2, 40:25
41:3, 41:21
41:22, 41:24
42:11, 43:1
44:16, 45:5
45:6, 45:11
45:19, 48:8
48:13, 49:15
73:1, 73:3, 75:1
75:4, 79:6
**pulled** 30:21
71:18
**pulling** 35:11
35:20, 41:11
43:23, 45:2
45:12, 45:13
46:2, 46:5, 46:7
46:10, 46:11
46:15, 46:18
46:24, 46:25
47:3, 70:22
71:1
**purpose** 5:8
77:24, 97:8
97:22, 102:24
**purposes** 74:9
**pursuant** 2:3
**pursued** 85:12
**pushing** 44:22
44:25
**put** 11:12, 17:16
25:5, 51:23
51:25, 65:20
66:4, 70:21
76:4, 76:18
81:20, 81:20
92:1
**puts** 57:21

**putting** 71:7
73:8

**Q**

**question** 12:3
12:8, 21:25
25:23, 28:24
29:20, 31:9
37:15, 37:16
40:5, 43:20
66:2, 67:22
67:23, 74:24
76:10, 77:9
82:12, 86:19
86:21, 92:23
93:12, 98:22
104:7
**questions** 77:17
77:18, 77:20
77:23, 78:3
78:4, 78:5
101:22
**quick** 63:15
77:11
**quite** 7:19, 70:7
70:13
**quote** 47:7, 47:8

**R**

**radio** 58:11
58:16, 76:19
**ran** 13:20, 15:2
15:3, 18:11
18:12, 30:15
40:17, 40:20
86:20
**Randolph** 29:12
29:13, 29:13
29:14, 29:15
29:16, 30:2
38:24
**reach** 56:10
96:13
**react** 75:19

**read** 17:23
17:24, 18:3
40:18, 66:18
104:16, 104:23
105:9
**Reading** 105:16
**ready** 10:19
**real** 63:15
**really** 5:16, 6:7
51:8, 63:5
**reason** 93:22
94:2, 98:10
102:9, 103:23
107:5
**recall** 16:18
81:7
**received** 31:22
53:25, 85:18
**recess** 26:22
53:8, 63:18
101:17
**recognize** 83:19
**record** 4:17
5:17, 26:18
26:21, 26:24
31:10, 53:6
53:7, 53:10
53:13, 63:17
63:20, 86:3
99:2, 99:4
99:12, 101:16
101:19, 104:9
104:12, 105:7
105:15
**recorded** 77:1
**recording** 84:21
**recovered** 66:13
**recruit** 101:3
**Reed** 10:21
11:8, 11:13
13:3, 13:4
13:18, 15:4
17:15, 20:11
21:1, 21:5, 21:9
23:7, 29:20
30:11, 30:14

30:22, 30:23
30:23, 31:2
31:11, 32:7
33:11, 40:5
40:13, 40:21
41:5, 50:13
51:3, 67:2, 67:5
67:14, 67:24
68:5, 68:5
78:21, 80:8
80:14, 80:15
81:3, 81:5
85:12, 85:14
86:15, 87:1
87:3, 87:16
88:7, 91:18
92:7, 92:9
102:10, 103:18
103:20, 103:22
**Reed's** 12:16
49:17, 103:7
**refer** 54:7
**referred** 54:3
**referring** 12:7
**refers** 94:25
**refresh** 77:14
**refuse** 97:1
97:7
**refused** 97:7
**regard** 9:3, 9:21
22:9, 26:9, 37:3
42:7, 42:23
47:5, 61:25
93:3, 93:3
**regarding** 7:5
12:24, 54:8
62:1, 102:4
102:13
**Registered** 2:5
106:3
**Registration**
106:5
**regular** 104:15
**regulate** 6:18
8:21, 9:6
**rehash** 6:3

**reinvent** 83:7
**related** 54:17
57:5, 106:13
**release** 87:1
87:6, 87:8, 88:4
88:15, 88:23
**released** 30:15
**remain** 88:13
**remember**
78:16, 78:18
85:2, 92:3
**remove** 16:18
**render** 44:3
**rendered** 55:24
**repeat** 13:10
50:8
**report** 20:25
29:21, 31:22
40:12, 40:25
90:5, 90:7, 90:9
**REPORTED**
1:25
**reporter** 2:5
4:5, 4:17, 106:3
**Reporting** 55:2
**reports** 89:6
89:9, 89:11
89:17, 89:23
**request** 79:17
104:21
**requested** 80:18
80:21, 107:1
**required** 18:17
**requirement**
34:16
**requiring** 33:1
**reserved** 105:16
**resist** 35:21
36:21, 37:1
38:5, 43:11
44:24, 70:19
72:19, 74:11
**resistance** 65:8
**resisted** 28:17
28:18, 70:17
77:4

resisting 16:13
22:20, 22:25
34:2, 34:5
34:15, 34:21
34:23, 34:24
34:25, 37:20
38:22, 42:4
42:20, 43:17
49:6, 70:8, 73:7
75:25, 77:7
respond 58:1
responded
29:20, 85:14
restraint 16:12
16:25
restricted 57:2
result 12:16
12:21
retaining 16:17
retaliation 17:7
retrieve 93:25
return 91:14
reverse 64:17
review 7:18
41:13, 59:22
62:6, 62:7, 64:3
67:1, 67:4, 67:9
83:24, 102:21
reviewed 67:7
67:8, 67:11
67:24, 84:25
103:5
reviewer 60:13
reviews 62:14
revision 52:15
right 5:8, 5:11
5:20, 5:22, 6:15
6:15, 6:24, 7:2
7:19, 7:25, 9:1
9:3, 9:4, 9:7, 9:9
11:6, 11:12
12:10, 12:15
13:12, 13:16
13:18, 14:13
14:16, 14:18
14:23, 15:14

15:15, 15:23
16:9, 16:10
17:8, 17:10
17:14, 17:22
18:13, 18:15
18:19, 19:10
19:12, 19:16
20:4, 20:25
22:7, 23:10
24:23, 25:2
25:4, 25:10
25:14, 27:10
27:19, 27:21
28:10, 28:19
29:6, 29:11
29:17, 29:23
30:2, 30:3, 30:6
30:7, 30:10
30:15, 30:25
31:6, 31:16
32:12, 32:16
33:2, 33:5, 33:8
33:14, 35:18
35:18, 36:25
37:5, 37:7
37:17, 38:23
39:4, 39:7
39:24, 40:4
40:9, 40:14
40:17, 41:1
41:3, 41:5, 41:7
41:10, 41:11
41:20, 41:21
42:6, 42:15
42:17, 42:22
43:16, 43:18
46:9, 46:17
46:17, 46:25
47:3, 47:24
48:22, 48:24
49:11, 49:13
49:14, 49:15
50:25, 51:2
52:23, 53:12
53:23, 55:18
55:20, 55:22

57:7, 57:17
57:19, 57:20
58:16, 58:17
58:18, 58:22
59:8, 59:10
60:12, 61:25
62:6, 62:9
63:13, 64:8
64:23, 65:4
65:17, 67:19
68:4, 68:17
69:1, 69:17
69:21, 69:25
70:11, 70:15
71:1, 71:23
72:4, 72:21
72:23, 72:24
73:16, 75:7
76:5, 76:10
76:25, 77:23
78:2, 78:21
78:24, 78:25
79:1, 79:3, 79:6
79:8, 79:11
79:20, 80:7
80:7, 80:17
81:24, 82:1
82:4, 82:9, 83:2
83:22, 84:21
84:22, 84:24
85:11, 85:11
85:14, 85:17
85:24, 86:10
86:15, 86:16
86:19, 86:20
86:22, 87:2
87:10, 87:10
87:17, 87:20
87:24, 88:6
88:21, 90:12
92:9, 93:6
93:13, 94:11
95:2, 95:6
95:12, 96:2
96:3, 97:25
98:25, 101:9

101:15, 103:25
104:4
rights 61:23
rip 26:12
risk 19:12
19:12
RIVER 2:12
Rivermont
10:15, 13:20
18:11, 29:16
Road 2:12, 85:9
rookie 101:2
RPR 1:25
Rule 5:7
run 6:4, 10:19
10:22, 10:23
15:5, 15:6
15:13, 37:7
43:1, 87:15
running 85:5
85:6, 86:24
91:1, 91:8
91:10, 91:11
91:11

**S**

safe 16:18
safety 49:4
sake 83:21
Salem 2:17
satisfaction
74:23
satisfied 74:25
saw 65:22
65:25, 78:14
84:3, 84:14
87:23
saying 52:10
74:13, 81:15
93:10, 95:12
97:13, 98:2
says 18:20
18:23, 19:14
20:19
scene 58:1, 58:2

58:25, 73:24
77:1, 85:15
86:20, 89:10
95:18
Science 60:24
se 62:14
seal 106:16
seat 71:18
71:20, 72:1
72:4
second 6:16
6:16, 18:25
67:19, 75:18
75:21
seconds 79:12
section 6:5, 8:5
8:9, 8:16
see 6:22, 10:17
51:13, 57:13
62:25, 63:1
66:6, 78:13
78:25, 84:11
86:21, 88:2
88:3, 93:23
94:3, 94:9
103:19
seeing 81:7
85:2, 92:3
seen 68:2, 96:14
segued 74:8
self-report 58:9
58:10, 58:21
sent 93:25
separated 67:20
September 1:11
2:8, 4:1, 4:6
9:25, 21:18
21:20, 21:23
22:10, 22:10
23:5, 23:20
24:16, 51:21
51:22, 107:3
sergeant 1:10
2:1, 3:3, 4:7, 5:1
5:5, 27:2, 53:14
54:1, 63:23

84:20, 92:23
92:24, 93:7
101:20, 102:3
105:13, 107:2
107:19
**serious** 99:23
**seriousness**
51:16
**serve** 85:16
**served** 14:11
52:4
**Seth** 13:3, 13:4
13:18, 17:15
20:11, 21:5
21:9, 23:7
29:20, 40:5
50:13, 51:3
68:5, 80:14
80:14, 80:15
81:3, 81:5
85:12, 85:14
86:15, 87:1
87:3, 88:7
**Severity** 49:3
**Shanna** 89:25
**shoot** 15:14
**shooting** 60:23
**Shortly** 10:22
**showing** 58:16
**side** 78:16
78:18, 79:25
96:3
**sidewalk** 92:2
92:4, 92:11
92:20
**sign** 6:11, 27:6
104:16, 104:23
105:9
**signature**
105:16
**significance**
102:19, 102:21
103:2
**significant** 65:8
65:9, 65:14
65:22

**similar** 47:12
82:7
**single** 93:22
**sit** 41:13
**sitting** 71:22
**situation** 5:15
12:25, 16:5
17:5, 19:6
19:15, 19:17
44:19, 46:23
47:2, 76:1, 95:9
95:25, 96:23
98:16
**situations** 21:21
22:16, 45:8
46:23, 47:9
**Skipping** 64:19
**slip** 48:3, 48:7
48:10
**Smith** 65:1, 67:3
**software** 54:4
54:9, 54:11
54:19, 55:5
55:9, 55:15
55:19, 57:6
**somebody** 26:4
91:9
**somebody's**
89:4
**someone's** 100:7
**Sorry** 47:18
**sort** 38:5
**sounds** 81:22
**speak** 92:24
**speaking** 22:13
**speaks** 9:11
18:22
**specific** 8:9
9:18, 22:18
32:23, 72:24
99:22
**specifically** 25:1
84:7, 84:8
**specifics** 93:4
93:9
**speculate** 78:1

**speculation** 5:14
71:13, 72:10
72:12, 72:16
75:7
**speed** 53:24
**split** 75:18
75:21
**split-second**
79:7, 79:10
**spoken** 84:12
**spray** 93:18
95:10
**squad** 76:23
**stakeholders**
23:15, 23:17
**standard** 8:22
9:9, 9:16
**standards** 55:11
56:17, 56:24
57:1
**standing** 69:1
69:18, 78:15
78:22, 79:4
95:21, 96:3
**start** 46:24
**state** 7:9
**stated** 103:20
**statement** 15:9
15:15, 15:19
58:5, 59:23
81:13, 81:15
81:20, 82:4
82:7
**statements**
54:13, 59:5
59:16, 67:1
67:5, 67:24
**States** 1:1, 4:10
**statute** 39:16
**stay** 77:17
**step** 57:10
57:11, 57:14
57:15, 96:2
**Stephens** 2:20
4:4
**stepped** 68:21

**steps** 35:6, 96:4
**sterile** 48:18
**stipulation**
36:20
**stood** 79:11
**stop** 10:14
79:18, 81:10
85:24, 87:2
87:15
**stopped** 64:1
64:5
**store** 59:19
**street** 2:9, 4:15
52:19, 57:16
**strike** 36:24
66:8
**strikes** 35:3
35:7
**striking** 41:22
79:22
**strong** 45:9
**struck** 79:24
**structure** 6:5
26:2
**struggled** 32:9
**struggling** 76:8
**study** 23:13
**subcategories**
6:22
**subduing** 16:12
**subject** 16:7
16:8, 18:11
18:16, 18:16
20:13, 21:6
21:22, 28:14
30:6, 30:15
34:20, 34:20
35:20, 37:5
38:1, 40:13
40:16, 41:20
42:25, 43:1
44:15, 47:7
57:17, 88:21
92:19
**subjects** 5:22
5:23, 27:12

**submitted** 55:25
**substantially**
64:20
**suitable** 81:22
**summary** 84:14
**supervisor**
23:15, 56:1
56:2, 56:2
57:23, 57:24
58:6, 58:16
58:24, 59:11
59:14, 60:3
60:8
**supervisor's**
59:2
**sure** 13:15, 22:5
26:19, 27:3
29:1, 30:20
37:18, 52:8
58:13, 58:15
59:21, 64:6
66:17, 67:21
105:4
**surrounded**
76:22
**surveillance**
59:19
**suspect** 11:17
21:11, 21:11
28:16, 45:10
46:19, 46:21
49:3, 49:5, 74:4
74:5
**suspected** 11:1
11:18, 12:17
13:21, 16:8
21:11, 27:24
28:14, 28:16
29:22, 30:9
31:3, 32:1, 37:5
49:12, 51:4
**suspects** 27:15
**suspicion** 14:2
**swear** 4:17
**switch** 83:20
**sworn** 5:2

106:8
**synopsis** 59:25
**system** 23:20
  55:3

**T**

**take** 2:4, 26:17
  27:18, 44:12
  52:25, 59:5
  59:23, 62:13
  63:14, 67:21
  77:11, 78:6
  83:16, 98:14
**taken** 2:2, 4:8
  18:18, 33:5
  67:10, 107:3
**talk** 5:21, 44:2
  44:9, 64:21
**talked** 53:14
**talking** 24:17
  25:23, 43:13
  43:13, 44:14
  44:25, 45:1
  45:1, 45:3
  51:14, 51:15
  53:16, 53:18
  62:2, 76:20
  93:4, 102:8
**taser** 93:17
**team** 54:3, 54:4
  54:7, 54:19
  55:6, 55:11
  55:15, 55:18
  55:19, 56:6
  56:9, 56:12
  57:3, 57:22
**techniques**
  94:14, 94:16
**tell** 13:15, 21:3
  25:21, 52:23
  84:2, 84:6, 92:6
  97:1, 97:7, 97:7
  97:19, 98:1
  98:18, 98:20
  98:21, 101:10

**tells** 19:1
**temporarily**
  52:5
**tenor** 6:21
**term** 47:21
**testified** 5:2
  79:5, 102:4
  103:15
**testify** 8:20, 9:4
  9:12, 93:3
  94:12, 94:13
**testimony** 53:25
  105:13, 106:10
**thank** 5:5, 5:20
  26:25, 63:21
  81:1, 101:20
**thereof** 106:15
**thing** 43:16
  63:24, 73:4
  74:14, 75:2
  83:10, 86:2
  98:14
**things** 53:24
  71:2, 71:4
  72:25, 75:9
  84:8, 94:17
**think** 30:4, 38:6
  53:18, 64:19
  65:13, 70:7
  70:13, 76:18
  83:4, 101:11
  101:12, 101:12
**thought** 10:18
  75:6, 86:2
  103:14, 103:16
**threat** 15:8
  15:17, 17:3
  17:5, 17:12
  19:4, 19:8, 49:4
  81:22, 82:9
  82:10, 82:24
  87:9
**threaten** 81:11
  81:14
**threatened** 15:6
  73:13, 87:1

**threatening**
  89:12, 90:2
  90:3
**threats** 89:13
  89:14
**three** 27:25
  28:1, 28:20
  28:20, 29:2
  29:2, 76:22
  92:6, 96:4
**tighten** 10:10
**tightened** 10:13
**Timberlake**
  2:12
**time** 4:6, 11:9
  11:11, 14:13
  14:18, 16:6
  20:11, 26:20
  26:23, 27:18
  33:12, 38:8
  41:8, 41:9
  50:23, 52:24
  53:4, 53:6, 53:9
  60:15, 63:16
  63:19, 67:7
  67:21, 69:14
  78:25, 79:15
  80:7, 81:2, 81:5
  88:8, 88:16
  91:2, 98:12
  101:16, 101:18
  101:22, 103:1
  105:14
**timeline** 24:21
**times** 27:11
  27:13, 27:14
  27:20, 28:21
  92:6
**title** 21:19
**today** 5:6, 5:21
  9:4, 9:13, 53:25
**today's** 4:5
  105:13
**told** 10:20
  79:18, 81:9
  89:16, 92:5

97:3, 98:6
**top** 7:20, 25:14
  44:13
**totality** 102:22
**tough** 78:4, 78:5
**traffic** 10:14
**trained** 16:16
  99:20, 99:21
  101:1
**training** 99:22
  101:5, 101:7
**transcribed** 2:2
**transcript**
  106:10
**Transparency**
  62:24
**treatment** 33:6
**tribunal** 61:11
**tried** 32:4, 72:15
  87:15
**tries** 35:20, 38:9
  41:23, 42:11
  43:1, 44:15
**truck** 75:7
  98:19
**true** 86:1, 86:2
  106:9
**try** 13:12, 34:1
  35:7, 37:24
  38:1, 40:10
  41:22, 83:20
**trying** 5:15
  5:16, 10:10
  31:14, 31:25
  33:21, 36:23
  36:23, 37:6
  37:23, 38:4
  40:19, 41:23
  46:13, 47:18
  48:3, 48:12
  48:13, 49:14
  49:15, 68:14
  68:15, 69:20
  69:23, 70:2
  70:4, 70:24
  71:6, 71:7, 71:9

71:10, 71:11
  71:14, 71:16
  72:7, 72:10
  72:12, 72:21
  72:24, 73:1
  73:3, 73:20
  75:1, 75:4, 75:6
  79:5, 83:5, 83:6
  83:7, 86:25
  94:20
**turned** 11:5
  11:8, 18:11
**two** 12:10, 29:2
  46:20, 46:22
  47:25, 67:11
  76:3, 76:21
  78:14, 79:16
**type** 16:5
  104:19
**Typically**
  104:14

**U**

**ultimately** 6:10
  25:2, 56:3
  60:10, 64:8
  65:2, 66:23
  68:4
**unarmed** 16:8
  20:10, 21:10
  27:21, 27:23
  34:20, 37:7
  49:14, 74:3
  74:5, 92:14
  92:19
**unclear** 13:2
**understand**
  5:18, 19:19
  19:23, 38:7
  39:1, 39:7, 40:1
  46:13, 52:1
  52:7, 52:8
  65:25, 83:18
  94:21
**understanding**

13:17, 13:24
13:25, 35:19
93:1
**uninvolved**
90:21
**unit** 56:17
**United** 1:1, 4:10
**unleashed** 18:1
**unrelated** 89:5
**updated** 24:25
52:6, 52:11
**URL** 54:15
60:1
**use** 6:19, 6:25
7:5, 8:4, 8:4, 8:6
8:7, 8:11, 8:14
8:14, 8:15, 8:16
8:17, 8:21, 8:22
9:6, 9:8, 9:9
9:14, 9:16, 9:16
9:18, 9:22
11:14, 11:16
16:4, 16:7
16:20, 16:22
16:23, 18:4
18:7, 18:9
18:23, 19:1
20:12, 22:22
22:24, 23:20
31:13, 35:6
35:23, 37:7
37:21, 42:12
42:14, 42:17
42:20, 43:24
44:6, 44:16
45:6, 47:5, 48:5
48:16, 50:3
50:24, 51:4
51:14, 53:22
54:1, 54:4, 54:5
54:8, 54:10
54:13, 54:17
54:20, 55:14
55:25, 56:4
56:11, 57:7
57:12, 57:16

58:7, 58:21
60:5, 60:11
60:19, 61:3
64:2, 65:3
67:17, 69:25
70:12, 74:3
74:6, 75:2, 75:3
75:9, 75:15
81:11, 81:18
89:21, 89:23
90:5, 90:7
90:15, 93:5
95:19, 102:10
102:12, 102:20
102:23, 102:25
103:2, 103:6
103:12
**uses** 54:23, 55:7
55:12, 55:17
57:8, 58:11
60:13, 62:7
62:18, 64:3
**usually** 94:25
**utilize** 16:16
16:24

**V**

**Valois** 2:14, 3:4
3:6, 4:19, 4:19
5:4, 8:25, 12:1
12:19, 13:11
13:23, 17:21
19:22, 20:16
21:16, 24:22
25:18, 26:17
26:25, 27:1
29:3, 31:8
33:19, 36:16
37:13, 38:13
39:6, 39:9
39:14, 39:20
42:5, 43:7
44:11, 46:4
47:13, 47:17
49:22, 50:9

50:18, 52:23
53:2, 53:11
63:13, 63:21
63:22, 64:13
72:20, 73:25
74:12, 77:12
77:15, 77:22
78:7, 80:3, 82:6
82:14, 82:18
82:23, 83:14
83:19, 83:23
84:5, 84:16
87:13, 87:22
91:23, 92:13
92:16, 92:25
97:5, 97:17
99:9, 100:18
101:9, 101:20
102:17, 103:25
104:4, 104:6
104:10, 104:14
104:25, 105:6
105:10
**van** 72:7
**vehicle** 68:18
71:19, 90:21
96:1
**verb** 81:20
81:21
**verbal** 17:4
17:7, 19:5
19:14
**versus** 4:9, 49:2
49:8
**video** 44:18
51:12, 59:17
59:19, 65:17
65:21, 66:3
67:9, 70:7
70:13, 70:15
70:16, 72:23
73:6, 76:13
76:20, 77:2
77:6, 78:2, 78:9
78:19, 81:8
83:24, 84:11

84:12, 84:21
84:25, 86:22
87:23, 95:22
96:14
**videographer**
2:20, 4:3, 4:4
26:20, 26:23
53:5, 53:9
63:16, 63:19
101:15, 101:18
104:2, 104:5
104:8, 105:5
105:12
**videorecorded**
1:9, 2:1, 4:7
**videos** 68:1
68:2, 94:4
**view** 15:11
**viewing** 84:3
**violate** 90:20
91:4
**violated** 17:16
91:6
**violating** 85:20
85:21, 85:22
89:3, 102:6
**violence** 17:5
17:12, 19:9
89:10, 89:12
89:14, 90:10
**violent** 22:19
22:23, 103:8
**Virginia** 1:1
1:13, 2:7, 2:9
2:13, 2:17, 4:12
4:15, 39:15
106:1, 106:5
106:17, 106:24
**voice** 16:21
18:6, 20:19

**W**

**WADDELL**
2:16
**Wait** 104:11

**want** 5:13, 6:3
6:7, 13:15
37:12, 37:14
37:18, 37:19
42:7, 52:25
53:4, 77:16
77:20, 78:1
78:3, 78:6, 78:6
82:8, 84:24
84:24, 85:1
97:23, 98:14
104:20, 105:6
**wanted** 12:25
14:11, 89:2
**warehouse**
54:17
**warned** 15:3
15:4
**warning** 87:3
**warrant** 39:10
39:18, 66:21
76:23, 85:17
85:19, 86:4
86:7, 97:4, 97:9
98:3, 98:3, 98:6
98:23
**warrants** 14:10
61:19
**watched** 65:16
78:8
**watching** 70:16
72:22
**way** 24:16, 63:9
64:9, 64:9
64:10, 64:14
64:14, 81:21
88:25, 90:18
90:25, 101:4
**we've** 6:2, 7:20
53:18, 64:19
74:7
**weapons** 15:2
34:9, 66:10
66:13, 93:14
93:15, 94:7
**went** 9:25, 10:3

22:10, 33:3
103:2
**Wesley** 1:3, 4:8
4:20, 12:7, 12:9
28:6, 50:3
50:12, 64:23
65:3, 65:9
65:19, 66:4
66:7, 66:11
66:14, 67:18
68:7, 68:10
68:19, 68:21
69:9, 76:4, 76:8
79:3, 80:9
80:12, 80:16
81:2, 81:9, 85:5
86:20, 88:18
89:25, 90:1
91:19, 92:1
97:1
**Wesley's** 70:3
102:6, 103:8
**Western** 1:1
4:11
**whatever's**
100:8
**wheel** 83:8
**white** 35:17
**wife** 85:19
89:15, 89:18
**wit** 106:1
**witness** 3:2
4:18, 11:23
13:10, 17:19
20:15, 24:20
26:15, 28:25
33:18, 37:11
39:13, 42:3
43:5, 44:8, 46:1
47:11, 47:16
49:20, 50:8
50:16, 53:1
65:16, 65:19
72:18, 74:10
77:21, 80:2
82:11, 91:22

92:22, 97:3
104:24
**witnesses** 57:12
58:2, 58:3, 59:3
**woman** 86:5
91:2
**wondering**
73:22
**wooded** 85:7
**woods** 86:24
**word** 32:17
32:17, 32:23
79:22, 81:19
**words** 77:1
84:12
**work** 23:23
**workings** 25:24
**works** 25:25
26:7, 63:25
**wrestling** 65:14
65:23, 66:1
79:12
**write** 54:12
57:18, 59:24
88:16
**written** 50:20
52:6
**wrong** 13:15
103:15

**Y**

**yeah** 29:15, 30:5
32:11, 39:25
41:9, 53:2
57:23, 58:14
59:14, 63:12
65:25, 66:18
74:15, 83:9
86:11, 86:13
86:13, 88:11
91:24, 97:6
**young** 13:19
14:19, 29:21
30:1, 31:4
31:16, 31:23

32:1, 32:4, 32:8
32:25, 48:3
48:3, 51:4, 73:2

**Z**

**Zuidema** 25:3
25:5

**1**

**1** 26:1
**1:43** 53:10
**1:56** 63:17
**10** 101:11
**10:00** 77:18
**100** 94:8
**102** 3:5, 3:6
**11** 5:25
**11:32** 1:12, 2:7
4:1, 4:6
**11th** 12:4, 28:11
50:2, 50:11
64:23, 80:15
**12** 5:25
**12:03** 26:20
**12:13** 26:23
**12:47** 53:6
**12th** 28:11, 29:9
40:5, 51:3
**13** 5:25
**14th** 106:17
**16** 83:4, 93:3
**17** 93:14
**18** 94:11, 94:13
**1st** 6:20, 7:17

**2**

**2** 8:19, 9:4
68:24
**2:01** 63:20
**2:44** 101:16
**2:55** 101:18
**2012** 6:20, 7:17
9:21

**2021** 12:4, 12:9
12:10, 16:10
40:5, 50:2, 50:2
50:10, 50:11
50:12, 80:15
90:16
**2022** 10:5, 21:24
23:5
**2023** 10:1
**2025** 1:11, 2:8
4:1, 4:6, 106:6
106:18, 107:3
**20th** 50:11, 83:3
83:25, 90:15
**21** 7:20, 7:21
7:22, 8:3, 8:12
17:9, 22:4, 22:6
22:7, 86:14
**22** 1:11, 2:8, 4:1
7:20, 7:22, 7:23
8:3, 8:12, 9:25
107:3
**22nd** 4:6
**23** 7:23, 51:24
**24153** 2:17
**24502** 2:13
**24504** 4:15
**25** 7:24
**26th** 23:5

**3**

**3** 68:24, 74:4
**3:01** 1:12
105:14, 105:17
**30** 79:12, 106:6
**30(b)(6** 1:9, 2:1
5:7
**30th** 22:6, 22:7
23:6, 24:16
28:2
**359658** 106:6

**4**

**4** 53:20

**415** 2:16
**434.845.4529**
2:13

**5**

**5** 3:4, 64:19
101:11
**540.387.2320**
2:17

**6**

**6** 64:20
**6:22-cv-00031**
1:5, 4:10

**7**

**7** 64:25
**7601** 2:12

**9**

**9/26/22** 23:7
**9:00** 77:18
**900** 2:9, 4:15
**911** 89:25