CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

4/9/2026
LAURA A. AUSTIN, CLERK
BY:  s/ ARLENE LITTLE
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA**
LYNCHBURG DIVISION

|  |  |
|---|---|
| CALVIN WESLEY,<br><br>                                            *Plaintiff,*<br><br>           v.<br><br>THE CITY OF LYNCHBURG AND LPD<br>OFFICER SETH REED,<br><br><br>*Defendants.* | CASE NO. 6:24-CV-00032<br><br><br>**MEMORANDUM OPINION**<br><br><br>JUDGE NORMAN K. MOON |

Calvin Wesley ("Wesley") claims that Lynchburg Police Officer Sergeant Seth Reed ("Reed") violated his constitutional rights in violation of 42 U.S.C. § 1983 and assaulted him in violation of Virginia law. Dkt. 1. Wesley alleges that on two separate occasions—March 11, 2021 and December 20, 2021—Reed allowed police K-9 Knox ("Knox") to attack, bite, and severely injure him. *Id.* He also claims Reed falsified a warrant leading to his unlawful arrest. *Id.* He argues the City of Lynchburg (the "City") is also liable for these alleged constitutional violations because it has policies or practices that allow excessive force and because it fails to train its officers. *Id.* He seeks monetary damages on all claims. *Id.*

Both Reed and the City argue they are entitled to summary judgment. Dkts. 34, 36. Reed argues he is entitled to summary judgment because (1) his uses of force against Wesley on March 11 and December 20, 2021 were objectively reasonable under the circumstances; and (2) he is otherwise entitled to qualified immunity. Dkt. 35. The City argues it is entitled to summary judgment because (1) no reasonable jury could find the City had a policy of allowing unconstitutional uses of force; and (2) no reasonable jury could find that the City has a constitutionally deficient training policy. Dkt. 37. Wesley opposes both motions. Dkts. 40, 41.

For the following reasons, the City's motion for summary judgment will be granted. Fkt. 36. However, Reed's motion will be denied. Dkt. 34.

## FACTS

### A. Reed's Previous Involvement with Wesley

Reed's history with Wesley began years before either arrest at issue in this case. In 2017, Reed pursued Wesley on foot as he fled from the scene of a three-car crash on Fort Avenue. Dkt. 35-1 ("Reed Depo") 18:7-20. Wesley ducked into an alley, coming face to face with a concrete wall. *Id.* 19:2-5. So, he turned and began to fight with Reed; the two men ended up on the ground engaged in mutual combat. *Id.* 19:3-11. Wesley "pull[ed] [Reed's] . . . testicles" during the altercation and attempted to grab his taser. *Id.* 19:12-20:2. Wesley also "ended up having [Reed's] fingers . . . inside of his mouth" and "bit[] [them]" with enough force to break Reed's skin. *Id*. at 20:3-17. Officers eventually controlled and arrested Wesley. *Id.* 20:11-13. Reed did not receive leave or counseling following this incident. *Id.* 21:2-11.[1]

### B. March 11, 2021 Incident

On March 11, 2021, at around 1:13pm, Reed heard a call on the police scanner for additional officers to report to Grace Street in Lynchburg, Virginia, Reed Depo 26:8-24, because other officers had encountered a civilian with an outstanding warrant for misdemeanor domestic assault and battery. Reed Depo. 31:14-25. Reed determined the involved individual was Calvin Wesley and self-dispatched to the scene because he had "one tool on our shift that nobody else

---

[1]      In his deposition testimony, Reed testified to a 2018 incident between Calvin Wesley and Officer Brandon Clark. Reed Depo 22:4-6. Reed recalled that they two men "had physically fought" but did not recall if he was ever told about the specifics of the fight. *Id.* 23:1-2. Reed told supervisors that Wesley had previously punched Officer Clark in the face. *Id.* 24:16-21.

[had]—" Knox. *Id.* at 27:4-9, 19-25. He believed Knox was necessary for officer safety because of Wesley's "history with fighting the police." *Id.* at 29:6-9.

When Reed arrived at Grace Street, he got Knox out of the car and began running toward the scene. Dkt. 35-2 ("Reed March BWC") 0:48. He was the first officer who arrived. *Id.* Wesley was sitting in the passenger seat of a gray truck. *Id.* 0:58-59. Reed opened the truck's door and instructed Wesley to get out. *Id.* 1:00-1:07. Wesley complied. *Id.* As he was getting out of the truck, two other officers arrived on the scene. Wesley began asking why he was being arrested; no officer answered his question.[2] *Id.* 1:07-1:14.[3] Wesley complied with Reed's instruction to turn around, and the two other officers—one on each side—began attempting to handcuff him. *Id.* 1:14-1:23. They pushed Wesley, facing backwards, up against the truck's open door, leaving him no reasonable means or ability to escape the interaction. *Id.* 1:25.[4]

After about fifteen seconds of struggle, including officers instructing Wesley to put his hands behind his back (though they already were), Reed stepped in and grabbed Wesley's right forearm, attempting to force his arms into a position so that he could be handcuffed. Reed March BWC 1:37-1:44; 1:53. Reed stepped back, and two more officers joined the situation—for a total of four plus Reed and Knox watching from about four feet away. *Id.* One officer stood behind Wesley's car door, and another officer stood to his right. *Id.* Reed issued a verbal warning telling Wesley that if he did not comply, Knox would bite him. Reed Depo 46:20-47:13; *Id.* 1:30-1:45.

---

[2]    Reed, later during the arrest, responded to Wesley's question about why he was being arrested by saying "we don't have to explain that to you." Reed Depo 85:13-87:10.

[3]    Reed knew Wesley had a misdemeanor assault and battery warrant. Reed Depo 87:2-4.

[4]    The Court's view from the body-worn camera is that Wesley is shorter than many of the officers surrounding him, though Wesley appears to be a stockier man.

Wesley complained "my shoulder, my shoulder" as officers successfully placed a handcuff on his left wrist. Reed March BWC 1:50-2:04. Wesley raised his left elbow up, after which, the officer to the right joined in the attempt to handcuff him. Reed March BWC 2:05-2:10.[5] Wesley continued to not comply with being handcuffed for approximately ten more seconds. *Id.* 2:10-2:20. Reed then instructed one of the officers out of the way and deployed Knox with the attack command "packen." *Id.* 2:23-2:26; Reed Depo 57:18-25.[6]

Knox lunged and bit Wesley's right buttock. Reed March BWC 2:26. Wesley fell to the ground with Knox still biting him and Reed still saying "packen." *Id.* 2:26-2:31. Once Wesley was on the ground, Reed again said "packen." *Id.* 2:33. Reed then gave Knox six release commands ("aus"/"nein"/"phui"), which Knox disobeyed for approximately ten seconds before eventually releasing his grip from Wesley's buttock and upper leg.[7],[8] *Id.* 2:37-2:42; Reed Depo 91:4-22. Four officers continued to huddle around Wesley as he lay on the ground. *Id.* 4:15-4:21. Emergency medical technicians arrived on the scene, and both Reed and Knox returned to the police vehicle. *Id.* 13:08-14:11.

---

[5]     Reed claimed in his deposition that Wesley "elbowed" him during the arrest. Reed Depo 102:14-103:2. The Court sees no evidence of the alleged elbowing in the body-worn camera footage.

[6]     Every officer on the scene also had a taser. None of the five officers made any move toward using their tasers during the entire arrest.

[7]     The officers successfully handcuff Wesley's right arm while he is on the ground, but the exact timestamp of that action is unclear as Wesley fell out of view of Reed's body-worn camera.

[8]     Reed testified that Knox is "very responsive to commands," "has three days of training a month," and is "trained[ed] . . . to release on the first command." Reed Depo 80:19-20, 82:1-3; 203:3-12. The Court notes Knox did not appear to follow his training during either arrest at issue in this case. During the March incident, Knox ignored the release command six times; and during the December incident he ignored the release command ten times and refused to release altogether requiring Reed to pull Knox off Wesley.

4

After circling the block, Reed returned to the scene. Reed March BWC 15:34. Reed exited the vehicle, spoke with the officers around Wesley (who was now standing handcuffed and bandaged), and stayed on the scene until Wesley was placed on a stretcher and placed in the ambulance. 15:36-16:51. Based on allegations made by Reed, Wesley was charged with felony assault on an officer following this arrest; however, the charge was later dismissed on the prosecution's motion for *nolle prosequi* on December 22, 2022. Reed Depo at 101:4-10; Dkt. 35-7 at 4.

### C. December 20, 2021 Incident

On the evening of December 20, 2021, Reed arrived at 2550 Anthony Place, Number 19. Reed Depo 103:13-104:8.[9] Upon arrival, Reed and Knox exited the vehicle and spoke with Wesley's wife, who explained he was making threats toward her, but that he had left the location on foot. *Id.* 108:22-109:9. Reed testified that he had been advised Wesley had an outstanding misdemeanor warrant and additionally suspected Wesley was in violation of a protective order. *Id.* 115:16-116:10. Reed did not believe he had any outstanding felony warrants or that he was otherwise armed. *Id.*

After canvassing the area, Reed found Wesley walking down Anthony Place from Old Forest Road. *Id.* 109:11-14. Wesley entered an apartment; Reed and Officer Bryant approached where he had entered.[10] *Id.* 109:4-12. An individual standing outside said Wesley, a friend of his, had gone into the apartment. *Id.* 110:9-12; Dkt. 32-10 ("Reed Dec BWC") 1:44-2:36. Reed "ascertained [Wesley] had jumped out of a window . . . in the back of [the] apartment." Reed Depo

---

[9]    Reed did not recall in the deposition if he was dispatched or if he self-dispatched. Reed Depo 104:7-9.

[10]    Officer Bryant appeared to be dispatched in a separate vehicle from Reed. Reed Dec BWC 0:00-1:14.

110:9-18; Reed Dec BWC 3:10-12. Both officers, and Knox, began pursuing Wesley through the woods. Reed Depo 111:20-112:6; Reed Dec BWC 3:28-4:17.

From about 40 yards away, Reed found Wesley and yelled, "do not run, I have a warrant for your arrest Calvin! If you run, the dog will bite you." Reed Dec BWC 4:18-4:21. Wesley yelled back, though his exact words cannot be understood on the body-worn camera footage. Reed, while continuing to pursue Wesley on foot, then yelled "do not run, I have a warrant for your arrest! You are wanted. The dog will bite you Calvin." *Id.* 4:23-4:30. Reed then gave a command to Knox, "zits,"[11] and again said "Calvin, if you run the dog will bite you." *Id.* 4:34-4:37. Wesley, again, yelled something indistinguishable back; Reed responded by saying "get on the ground, or the dog will bite you." *Id.* 4:39-4:43. Reed continued running toward Wesley, and again said "Calvin, get on the ground." *Id.* 4:49-4:52. Wesley began running toward a gray vehicle. *Id.* 4:56-4:58.

Reed then gave Knox several commands, "nein, "phui,"[12] and "packen, packen, packen," and released his hold on Knox's leash. Reed Dec BWC 4:54-4:59. Knox pursued Wesley, who was attempting to get in the rear passenger door of the gray vehicle. *Id.* Knox bit Wesley's right forearm as Reed continued to yell "packen" "get on the ground," and "don't hurt the dog." *Id.* 4:59-5:06. The gray vehicle drove away, leaving only Knox, Wesley, and Reed at the scene. *Id.* 5:03-5:06. Knox continued biting Wesley as Reed yelled "get on the ground, you are wanted," to which Wesley responded, "for what?" *Id.* 5:06-5:12. Wesley yelled "get the dog" and "get the fuckin' dog off me" and thrashed, trying to get Knox off his arm. *Id.* 5:07-5:17. Reed continued yelling "get on the ground," and Wesley collapsed to the ground. *Id.* 5:18-5:20.

---

[11]    No deposition testimony or other evidence was provided about the meaning of this term.

[12]    According to Reed's deposition, "phui" is a command stronger than "nein" that was issued because Knox nipped Reed. Reed Depo 140:7-20.

Reed said "stand by" twice as Wesley continued to yell "get the dog off me!" Reed Dec BWC 5:20-5:24. Once Wesley fell to the ground, Reed approached him and Knox. *Id.* 5:20. He reached for Knox's leash, but could not grab it, as Knox was dragging Wesley by his arm out of Reed's reach. *Id.* 5:20-5:26. He then grabbed Knox's leash and gave the command for Knox to release, "aus" and "nein"/"phui" approximately 10 times before Knox complied. *Id.* 5:31-53. Wesley laid still once he was on the ground besides adjusting himself so that Officer Rowland began handcuffing him before Knox released. *Id.* 5:31-5:54. Knox continued biting Wesley for twenty seconds after Reed issued the first release command and for approximately forty seconds after Wesley fell to the ground. *Id.*

### D. LPD Training and Policies

The Lynchburg Police Department ("LPD") maintains a use of force policy, which requires all excessive force claims to be investigated by a supervising officer, ranked as sergeant or higher, who was not involved in the initial incident. Dkt. 37-1 at CITY000584. This policy applies to uses of force involving a K-9. *Id.* at CITY000581-82. The initial investigation is referred to as a "Blue Team" due to the software used to catalog the records. *Id.* at CITY000584; Ex. 37-2 ("Byrne Depo") 54:7-18. These investigations include taking statements from the involved parties and uploading all relevant evidence, such as Axon body-worn camera footage and other documents, to a central portal. Byrne Depo 54:14-18. Once a Blue Team investigation is completed and approved, it is then moved into "IAPro," a database cataloging all uses of force across the department that the captain's deputy chief then reviews. *Id.* 55:9-17.

LPD likewise maintains a use of K-9 force policy, which allows officers to deploy K-9s as a means of "physical restraint and control;" "apprehending or subduing a person resisting arrest by fleeing or physical actions;" or "defense of any person." Dkt. 37-1 at CITY000581. According

to the policy, K-9s may not be used "as a threat to make a person comply with an officer's verbal order 1) in a non-arrest situation, or 2) when no physical threat or violence appears imminent." *Id.* at CITY000582. The policy requires both handlers and canines to complete a course of instruction approved by the Chief of Police. *Id.* at CITY000593.

## LEGAL STANDARD

"[I]f the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," a court must grant summary judgment. Fed. R. Civ. P. 56. To avoid summary judgment, the nonmoving party must demonstrate a genuine dispute of material fact, meaning a fact that "might affect the outcome of the suit under the governing law," that would allow a reasonable jury to return a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

When considering a Rule 56 motion for summary judgment, a court must both view the record as a whole and also draw all reasonable inferences in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). In arguing for dismissal of a Rule 56 motion, the nonmoving party may not rely on beliefs, conjecture, speculation, or conclusory allegations, but rather must present evidence that meets "the substantive evidentiary standard of proof that would apply at a trial on the merits." *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992); *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

## ANALYSIS

8

Under the Fourth Amendment of the U.S. Constitution, individuals are protected from unlawful searches and seizures, including "seizures effectuated by excessive force." *See* U.S. Const. amend. IV; *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006). The legal vehicle for remedying a constitutional violation is 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Wesley seeks § 1983 relief, as well as relief under Virginia state law, arguing the City and Reed violated his constitutional rights on both March 11 and December 20, 2021. Dkt. 1.

### A.  City's Motion for Summary Judgment

The City seeks summary judgment on the excessive force claims (Counts 4 and 5) as well as the failure to train claims (Counts 6 and 7), arguing that no reasonable jury could find that: (1) the City has a policy, custom or practice of allowing unconstitutional use of force; and (2) the City has a policy of constitutionally deficient training with respect to the use of force. Dkt. 37 at 9, 12. The Court will address each of these arguments in turn.

### 1.  *Monell* Liability

Within the meaning of § 1983, a municipality is a "person" and may be held independently liable for constitutional violations it commits when the municipality's acts "may fairly be said to represent official policy" and "inflict[] injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Wesley alleges the City is liable for Reed's conduct due to its "failure to properly train officers" and its "persistent and widespread" practice that is "permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 691; *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003); Dkt. 1.

9

### a. Excessive Force Claim

Wesley first argues "LPD officers routinely engage in unconstitutional customs and practices regarding excessive use of force in general, and excessive use of force by police dogs in particular." Dkt. 1 ¶ 172. In support of this allegation, Wesley identifies fifteen instances where he believes LPD officers used excessive force—beginning in 2001 and continuing through 2020. *Id.* ¶ 131. Yet, Wesley appears to have not conducted any discovery to substantiate these allegations; indeed, his summary judgment opposition is completely silent as to either the pattern of excessive force or the City's liability for either arrest at issue in this case. As such, Wesley failed to establish a "duration and frequency" that indicates the City (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their "deliberate indifference." *Spell v. McDaniel*, 824 F.2d 1380, 1386-91 (4th Cir. 1987).

Without information beyond his complaint's allegations, Wesley fails to establish this claim by a "substantive evidentiary standard of proof that would apply at a trial on the merits." *See Baber*, 977 F.2d at 874-75. The Court will grant summary judgment as to Counts IV and V.

### b. Failure to Train Claim

Wesley next asserts that "[i]t is obvious that LPD has failed to properly train officers in the use of force because of the multitude of instances in which officers have used force in violation of policy" and that this lack of training "caused LPD officers to believe that a police dog can be used to secure an unarmed fleeing suspect." Dkt. 1 ¶ 133-34. However, as with his excessive force claim against the City, Wesley provides no additional information from discovery to substantiate these allegations. As such, he has failed to establish that the City failed to update its training and thus "consciously disregard[ed]" its officers' use of K-9s to inflict excessive force during arrests. *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

10

Again, the Court cannot rely on mere allegations when ruling on summary judgment. As Wesley has not met his required evidentiary burden, the Court will grant summary judgment as to Counts VI and VII.

### B. Reed's Motion for Summary Judgment

Like the City, Reed moves for summary judgment on Wesley's § 1983 claims from both March and December, arguing no reasonable jury could find he used excessive force against Wesley, and in the alternative, that he is entitled to qualified immunity. Dkt. 35 at 11. Under the Fourth Amendment, an objective reasonableness standard applies to excessive force claims and, in assessing reasonableness, courts consider (1) the "severity of the crime" that is subject to the stop or arrest, (2) "whether the suspect poses an immediate threat to the safety of the officer or other," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *See Graham v. Connor*, 490 U.S. 86, 395-96 (1989); *see also Benton v. Layton*, 139 F.4th 281, 288 (4th Cir. 2025). Excessive force is determined by considering "the totality of the circumstances" "from the perspective of a reasonable officer on the scene." *Aleman v. City of Charlotte*, 80 F.4th 264, 285 (4th Cir. 2023); *Graham*, 490 U.S. at 396.

### 1. March 11, 2021 Excessive Force Claim

#### a. Merits of the Claim

##### i. Severity of the Crime

Officers first approached Wesley on March 11, 2021 because he had an outstanding warrant for misdemeanor domestic assault and battery. Reed Depo 31:14-25. Typically, misdemeanors require officers to adjust the level of force used in an arrest as misdemeanors do not usually indicate a suspect is a threat to officer safety. *M.Y.M. v. Chavis*, F. Supp. 3d 323, 334 (E.D. Va. 2022). However, this factor is "intended as a proxy for determining whether 'an officer [had] any reason

11

to believe that [the subject of a seizure] was a potentially dangerous individual.'" *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 900 (4th Cir. 2016) (quoting *Jones v. Buchanan*, 325 F.3d 520, 528 (4th Cir. 2003)) (cleaned up).

Though assault and battery is a misdemeanor, it is not a "nonviolent" offense of a "relatively minor nature." *See Smith v. Ray*, 781 F.3d 95, 102 (4th Cir. 2015) (citing *Younger v. County of Los Angeles*, 655 F.3d 1156, 1165 n.8) (9th Cir. 2011). Offenses like "robbery or assault" pose a "risk of danger to the arresting officer." *Parker v. Gerrish*, 547 F.3d 1, 9 (1st Cir. 2008). Likewise, Reed had been injured by Wesley during a 2017 arrest and knew Wesley had fought with another officer during a 2018 arrest. Reed Depo 20:3-17. Therefore, the first *Graham* factor cuts in favor of Reed.

### ii.   Threat to the Officers or Others

The second *Graham* factor, which is "particularly important," focuses on the "immediate threat" that officers face on the scene. *Smith*, 781 F.3d at 102; *Benton*, 139 F.4th at 289 (quoting *Franklin v. City of Charlotte*, 64 F.4th 519, 529 (4th Cir. 2023)). When analyzing this factor, courts consider variables such as body sizes differences between the officer and suspect; if the suspect is armed; and if the suspect has made any threats. *M.Y.M.*, 582 F. Supp. 3d at 335; *Lewis v. Caraballo*, 98 F.4th 521, 532 (4th Cir. 2024). Whether a suspect is "insolent or frustrated does not change this conclusion" if the totality of the circumstances indicate officers are not at risk. *Parker*, 547 F.3d at 10.

Here, the Court first considers the sizes of the parties involved. Reed asserts Wesley had the physical advantage due to his size and his reputation "on the streets as 'Big Man.'" Dkt. 35 at 1. As previously discussed, the body-worn camera footage indicates Wesley is shorter, though stockier, than many of the officers effectuating his March arrest. However, due to the number of

officers surrounding Wesley, and because he was sandwiched between the officers and the truck's door, Wesley had no physical advantage. Reed March BWC 1:14-1:23; 1:53. Wesley was also unarmed and did not make any threats.

Although Wesley was panicked and questioning why he was being arrested, his "insol[ence]" and "frustrat[ion]" did not indicate the officers were at risk based on the immediate situation at hand. *Parker*, 547 F.3d at 10. In fact, Wesley quickly complied after being asked to exit his vehicle but complained of pain after officers pulled his arms behind his back. Reed March BWC 1:00-1:12; 1:50-2:04. Even considering Wesley's history of fighting with officers, and his physical size, he did not pose a threat to the officers when he was surrounded by five officers, a K-9, and a truck door and was initially compliant by voluntarily exiting his vehicle. As such, the second *Graham* factor cuts in favor of Wesley and against granting summary judgment for Reed.

### iii. Actively Resisting or Evading Arrest

Reed's body-worn camera footage demonstrates that Wesley did not comply as the officers attempted to handcuff him and that he repeatedly questioned the officers as to why he was being arrested while also complaining about shoulder pain. Reed March BWC 1:07-2:31. Reed regards Wesley's actions as resisting arrest. Dkt. 35 at 13. A reasonable jury could disagree.

Courts draw a line between "active" and "passive" resistance for purposes of the *Graham* test. *U.S. v. Aparicio-Soria*, 740 F.3d 152, 164 (4th Cir. 2014) ("The word 'resisting' itself means the application of active force, not mere passive noncompliance.") (Wilkinson, J., dissenting). Courts typically find active resistance when a suspect "engage[s] in a physical altercation" with officers; "act[s] erratically . . . hold[s] [a weapon] . . . [and] advanc[es] toward the officers;" or "scratch[es], spit[s] [on], bit[es], and kick[s]" officers. *Hicks v. City of Lynchburg*, 696 F. Supp. 3d

211, 226 (W.D. Va. 2023); *Meyers v. Baltimore Cnty. Md..*, 713 F.3d 723, 733 (4th Cir. 2013); *Bates ex rel. Johns v. Chesterfield Cnty., Va.*, 216 F.3d 367, 372 (4th Cir. 2000).

In contrast, a suspect passively resists arrest when "behaving nonviolently," even if the behavior is "noncompliant" with an officer's instructions. *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1005-06 (6th Cir. 2024). Courts often find suspects to be passively, not actively, resisting when pulling their hands away from officers rather than presenting them to be handcuffed. *Id.* ("[D]espite the fact that the plaintiff pulled his hands away rather than present them for handcuffing, we held that these actions constituted only non-threatening verbal resistance and physical noncompliance, rather than active resistance"); *Smith*, 781 F.3d at 102-03 (affirming denial of summary judgment where suspect passively resisted arrest by "instinctively attempting to pull herself from [the officer's] grasp"); *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2019) (finding summary judgment inappropriate where defendant "refused to release his arms for handcuffing"); *Parker*, 547 F.3d at 10 (finding suspect was not actively resisting when refusing to release grip on his own hands to allow handcuffing).

On the body-worn camera footage, Wesley willingly steps out of the truck and willingly turns around when asked to do so by Reed. Reed March BWC 1:00-1:12 Turning over his left shoulder, he then asks why he is being arrested, which the officers do not answer. *Id.* Officers then attempt to handcuff Wesley for approximately a minute (which he does not comply with) successfully handcuffing his left wrist before deploying Knox. *Id.*1:12-2:23. It is a close factual question whether Wesley's conduct is more akin to active or passive resistance. He is not seen "scratching, spitting, biting, and kicking" officers; however, he does not immediately comply with officers' instructions regarding handcuffing. *Bates*, 216 F.3d at 372.

14

As explained above, the *Graham* test considers the "totality of the circumstances"—put differently, "taken in the light most favorably to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Graham*, 490 U.S. at 396; *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). As Wesley asserted injury in this case, we evaluate Reed's conduct in the light most favorable to Wesley. Because of this burden,[13] and because the "particularly important" second factor of the *Graham* test weighs in favor of Wesley, a reasonable jury could find that Reed used excessive force by deploying Knox. *Benton*, 139 F.4th at 289. However, the conclusion that a reasonable jury could return a verdict in Wesley's favor on his excessive force claim does not fully resolve Reed's summary judgment motion. The Court must still consider whether Reed is entitled to qualified immunity.

### b.  Qualified Immunity

Qualified immunity protects government officials from civil lawsuits "insofar as their conduct does not violate clearly established ... rights of which a reasonable person would have known;" it seeks to shield officials from liability when (1) there is no constitutional violation, or (2) the constitutional right was not "clearly established" "at the time of the alleged violation." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). However, qualified immunity provides no shield when officers have acted "incompetent[ly]" or have "knowingly violate[d] the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (Powell, J., concurring in part).

As the Court has already found that sufficient admissible evidence exists for a reasonable jury to find a violation of Wesley's right to be free from unlawful seizure and excessive force, one

---

[13]    This burden pairs with the summary judgment standard we are required to apply at this stage of the litigation, requiring all reasonable inferences to be drawn in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 330 n.2.

questions remains—whether the law was sufficiently clear that a reasonable officer would have known that Reed's actions on March 11, 2021 violated Wesley's constitutional rights. For an officer to fall outside qualified immunity's protections, it must have been "apparent" that the conduct in question violated a "pre-existing" statute or constitutional law; put simply, the conduct must be outside of a legal "gray area." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Marciariello v. Summer*, 973 F.2d 295, 298 (4th Cir. 1992). Qualified immunity "allow[s] some room for discretionary judgment in what are indisputably difficult circumstances." *See Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 357 (citing *Gooden v. Howard Cnty.*, 954 F.2d 960, 967 (4th Cir. 1992)). Granting summary judgment on qualified immunity is "improper as long as there remains any material factual dispute regarding the actual conduct of the defendants." *Buonocore v. Harris*, 65 F.3d 347, 359-60 (4th Cir. 1995).

Reed argues "no reasonable officer . . . would have known he would be violating Wesley's Fourth Amendment rights by utilizing a K-9 to effect his arrest when he was actively resisting and/or fleeing and was known to be a violent and dangerous individual." Dkt. 35 at 21. A reasonable jury could disagree.

**i. It is a clearly established right that officers cannot use gratuitous force against suspects during an arrest.**

It is clearly established that officers who use "gratuitous" force against an "unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." *See Bailey v. Kennedy*, 349 F.3d 731, 744-45 (4th Cir. 2003); *Valladores v. Cordero*, 552 F.3d 384, 390-91 (4th Cir. 2009); *Yates v. Terry*, 817 F.3d 877, 888 (4th Cir. 2016); *Kane v. Hargis*, 987 F.2d 1005, 1008 (4th Cir. 1993) (per curiam); *Lawhon v. Mayes*, 2021 WL 5294931, at *2 (4th Cir. Nov. 15, 2021) (unpublished). And further, "[a]ssaulting a[n] . . . arrestee after officers have mitigated the immediate threat to themselves is objectively unreasonable." *Lewis v.*

16

*Caraballo*, 98 F.4th 521, 534 (4th Cir. 2024). Specifically, *Yates* acknowledged that, since at least 2008, police officers use gratuitous force if they "repeatedly tas[e] a nonviolent misdemeanant" who "presented no threat" while laying on the ground without handcuffs.[14] 817 F.3d at 887.[15]

Flowing from this right, in the Fourth Circuit, it is clearly established that officers cannot use gratuitous K-9 force to effectuate an arrest. *Kopf v. Wing*, 942 F.2d 265, 269 (4th Cir. 1991) (finding excessive force when multiple officers used a police K-9, "blackjack blows to [the suspect's head and clavicle]," and blows with "flashlights" to detain an unarmed "armed robbery" suspect). Although *Kopf* admittedly involved other methods of force (*i.e.*, nightsticks), "a consensus of cases of persuasive authority from *other jurisdictions*" also establishes this right. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 545 (4th Cir. 2017) (*quoting Wilson v. Layne*, 526 U.S. 603, 617 (1999)); *Lewis*, 98 F.4th at 534 ("To determine if a constitutional right is clearly established, we look to 'controlling authority' or to a robust 'consensus of cases of persuasive authority.'") (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 746 (2011)).

---

[14]     *Mullenix v. Luna*, 577 U.S. 7 (2015) and subsequent Supreme Court cases emphasize that a right is only clearly established when another case has held that an "officer acting under *similar* circumstances ... violated the Constitution." *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026) (emphasis added). Courts must define rights to give reasonable officers "fair warning" that the challenged conduct in unconstitutional—balancing the "tension" between defining rights too generally, as reasonable officers would not know what conduct is permissible, or with too much granularity, as obviously unlawful conduct may then receive qualified immunity's protections. *See Mockeridge v. Harvey*, 149 F.4th 826, 836 (6th Cir. 2025); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). After *Yates*, reasonable officers are fairly warned that they cannot use a weapon against a generally compliant, non-violent suspect. Interpreting the right with more granularity may lead to absurd results.

[15]     *Mullenix* only requires factual similarity—not an exact factual match. *See Cooper v. Doyle*, 163 F.4th 64, 79 (4th Cir. 2025) ("A right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity.") (quoting *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 221 (4th Cir. 2018)). To be clearly established, though, existing case law must put the "constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017).

Specifically, this "consensus of cases of persuasive authority" establishes that officers cannot order a K-9 to attack a non-threatening or non-fleeing suspect. [16] *See Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994); *Cooper v. Brown*, 844 F.3d 517, 524–25 (5th Cir. 2016) (holding that police violated a clearly-established right by deploying a K-9 on a drunk-driving suspect who had initially fled but was not resisting arrest, especially because the officer permitted the K-9 to bite until the suspect was handcuffed, even though he was already subdued); *Becker v. Elfreich*, 821 F.3d 920, 927 (7th Cir. 2016) (holding officer is not entitled to qualified immunity when he deployed a K-9 against a suspect who was surrendering); *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1172 (10th Cir. 2021) ("In 2017, a reasonable officer would have been on notice that . . . releasing a dog to attack him, after he was already apprehended by two officers, was unconstitutional."); *Morn v. City of San Diego*, 2026 WL 874405, at *9 (S.D. Cal. Mar. 30, 2026); *Davis v. Allen*, No. 21-CV-565-WMC, 2023 WL 2914807, at *5 (W.D. Wis. Apr. 12, 2023); *Keammerer v. Eldridge*, 2021 WL 4893585, at *3–4 (N.D. Ind. Oct. 20, 2021); *Bell v. Cnty. of Los Angeles*, 2011 WL 13257840, at *3 (C.D. Cal. Mar. 14, 2011). Thus, it was clearly established by March 11, 2021 that Wesley had a right to be free from gratuitous K-9 force.

### 1. Reed's initial use of K-9 force

During the March arrest, officers placed Wesley between the truck's open door and cabin, "effectively corner[ing]" him. *Maney v. Garrison*, 681 F. App'x 210, 217 (4th Cir. March 9, 2017) (unpublished) (discussing *Kopf*); Reed March BWC 1:14-1:23. Three officers attempted to handcuff Wesley and successfully handcuffed his left wrist. *Id.* 1:58-2:10; *see also Maney*, 681 F. App'x at 217 ("[H]e was also being subdued by three officers.") (citing *Kopf*, 942 F.2d at 269).

---

[16]     To the extent *Mullenix*, 577 U.S. at 7 requires a nearly perfect factual match (*i.e.*, a K-9 case for a K-9 case), the Court relies upon the persuasive out-of-circuit K-9 cases cited herein.

Another officer stood to Wesley's right, and Reed and Knox stood behind him. *Id.* Due to the number of officers surrounding Wesley, and due to how Wesley was positioned, a reasonable factfinder could conclude that Wesley was "restrained" when Reed deployed Knox and could conclude Reed's initial deployment of Knox was gratuitous as Wesley was already surrounded by officers. *Byrd v. City of Bossier*, 624 F. App'x 899, 905 (5th Cir. 2015); *Bailey*, 349 F.3d at 744-45; *Kopf*, 942 F.2d at 269; *Lewis*, 98 F.4th at 534.[17]

### 2. Reed's additional attack command

After Reed deployed Knox, Wesley fell to the ground. *Id.* 2:23-2:30. Once Welsey had fallen, Reed issued another attack command. *Id.* 2:33. A reasonable jury could conclude Wesley was "restrained," "subdued," or had "surrendered" once he fell to the sidewalk. *Yates*, 817 F.3d at 888. Therefore, a reasonable jury could find that Reed's additional attack command violated Wesley's clearly established constitutional right to be free from gratuitous force once "restrained." *Bailey*, 349 F.3d at 744-45; *Kopf*, 942 F.2d at 269; *Lewis*, 98 F.4th at 534. This jury issue further precludes summary judgment on qualified immunity grounds.

### 2. December 20, 2021 Excessive Force Claim

#### a. Merits of the Claim

##### i. Severity of the Crime

---

[17]    Additionally, and as analyzed above, it is a close factual question whether Wesley was "actively resisting" arrest during this time due to his non-compliance with the officer's instructions about handcuffing. *See supra* section 2(B)(1)(a)(iii). This question is a "genuine issue of material fact," as it "might affect the outcome" of Wesley's excessive force claim and a "reasonable [factfinder] could return a verdict" for Wesley. *Variety Stores*, 888 F.3d at 659. Because "material factual dispute" exists as to whether Reed's force in initially deploying Knox was excessive, granting summary judgment on qualified immunity grounds is "improper." *Buonocore v. Harris*, 65 F.3d 347, 359-60 (4th Cir. 1995).

Officers first approached Wesley on December 20, 2021 because they were called to the scene for a domestic disturbance; additionally, Reed was advised Wesley had an outstanding misdemeanor warrant and suspected he was in violation of a protective order. Reed Depo 115:16-116:10. As discussed above, the first *Graham* factor cuts in favor of Reed as Wesley's history and the nature of these misdemeanors worked together to allow officers to suspect he was a "potentially dangerous individual." *Estate of Armstrong*, 810 F.3d at 900.

### ii. Threat to the Officers or Others

The second *Graham* factor cuts in favor of Wesley. As with his first arrest, the body-worn camera footage demonstrates Wesley is shorter and stockier than the officers involved in his December arrest. Reed Dec BWC 6:00-6:03; Rowland Dec BWC 3:20-3:22. However, as there were three officers on the scene in addition to Knox, Wesley had no physical advantage. Further, Wesley was unarmed, and Reed testified he never knew Wesley "to be armed." Reed Depo 25:11-13. Wesley was also not making threats. Although Wesley escalated the situation by fleeing, "flight does not necessarily indicate that the officer is dealing with an armed and dangerous individual." *Illinois v. Wardlow*, 528 U.S. 119, 127 n.2 (2000) (Stevens, J., concurring). Even considering Wesley's history of fighting with officers, and his physical size, a reasonable jury could conclude he did not pose a threat when he was being pursued by three officers and a K-9. This "particularly important" factor cuts in favor of Wesley and against granting summary judgment. *Benton*, 139 F.4th at 289.

### iii. Actively Resisting or Evading Arrest

Wesley's flight from Reed is squarely "attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Thus, Reed's initial release of Knox, under a totality of the circumstances, was not excessive force. However, uses of force must be evaluated "at every stage of [an] incident." *Bates*,

20

216 F.3d at 371; *see also Hopkins v. Andaya*, 958 F.2d 881, 886-88 (9th Cir. 1992) (*per curiam*) (dividing a several-minute encounter into two segments and holding that even if the first application of force was constitutional, the second may not have been). Therefore, the Court must evaluate Reed's continued force throughout the next stage of the incident, when Knox continued to bite Wesley once he was on the ground.

Once Wesley fell to the ground, Reed approached him and Knox. Reed Dec BWC at 5:20. He reached for Knox's leash, but could not initially grab it, as Knox had begun dragging Wesley by his arm across the road and was out of reach. *Id.* 5:20-5:26. Reed regained hold of Knox's leash, waited several seconds, and then began commanding Knox to release. *Id.* 5:26-5:31. Wesley laid still once he was on the ground (besides flipping from his stomach to side), and Officer Rowland began handcuffing him before Knox released. *Id.* 5:31-5:54.

Because Wesley was on the ground, and largely unmoving, he was not actively resisting arrest. *See supra* section 2(B)(1)(a)(iii). He also was no longer "attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Therefore, once Wesley was on the ground, the third *Graham* factor cuts in favor of denying summary judgment. Because the "particularly important" second factor and the third factor of the *Graham* test weighs in favor of Wesley, we conclude a reasonable jury could find that Reed used excessive force by allowing force to continue once Wesley was on the ground. *Benton*, 139 F.4th at 289.

### b. Qualified Immunity

#### i. It is a clearly established right that officers cannot use gratuitous force against suspects during an arrest.

As analyzed above, it was clearly established by December 20, 2021 that officers are not protected by qualified immunity if they use gratuitous force when arresting a suspect, which

21

included extending a bite longer than necessary to restrain the suspect. *See supra* section 2(B)(1)(b).

### 1. Excessive bite duration

Wesley fell to the ground once Reed deployed Knox, and Knox bit his right forearm. Reed Dec BWC 4:59-5:18. Once Wesley fell to the ground—fully surrendering—the question becomes when allowing the attack to continue became a gratuitous use of force.[18] Here, Knox continued biting Wesley for almost forty seconds after he fell. *Id.* 5:18-54. Reed commanded Knox ten times to release and eventually had to pull Knox off Wesley. *Id.* 5:52-55.

It is clearly established that an officer cannot gratuitously extend a dog bite beyond the time reasonable to subdue a suspect. *Watkins v. City of Oakland*, 145 F.3d 1087, 1090-93 (9th Cir. 1998); *Vette*, 989 F.3d at 1172 (10th Cir. 2021).[19] The amount of time constituting a "gratuitous extension" of a dog bite is an intensely factual question that should be resolved by a jury—not by a judge as a matter of law. [20]

---

[18]    A reasonable jury could find that, once Wesley fell, he was "restrained," "subdued," or "surrendered." *Yates*, 813 F.3d at 888

[19]    In *Maney v. Garrison*, the Fourth Circuit found officers were protected by qualified immunity because under the factual circumstances of that case they "reasonably, even if mistakenly . . . believed" that a K-9 bite of "eight or so seconds" was lawful under the standard established in *Kopf*. 681 Fed. App'x at 218 (unpublished). As the bite during Wesley's December arrest lasted almost 40 seconds once Wesley fell (five times as long as the bite analyzed in *Maney*), the Court finds this case factually distinguishable and more akin to *Kopf*. And further, by establishing officers could "mistakenly" believe a bite of short duration was lawful, the Fourth Circuit implied that these types of bites could also constitute excessive force.

[20]    The number of seconds a dog bite lasts (just like the number of punches or kicks that may be landed) is not the be-all and end-all when evaluating the excessiveness of the force and the clarity of the constitutional violation. Given the unique factual circumstances governing each dog bite case, it would be impossible to draw arbitrary lines that 30 seconds is too much, but 29 seconds is not. The appropriate question is whether the officer used more force than was necessary to restrain the suspect under the circumstances.

A reasonable jury could find that Reed failed to command Knox to release in a timely manner and unlawfully extended the attack, thereby violating Wesley's clearly established constitutional right for officers to not use gratuitous force on "restrained" suspects. *Bailey*, 349 F.3d at 744-45; *Kopf*, 942 F.2d at 269; *Lewis*, 98 F.4th at 534. A reasonable jury could also conclude that the duration of the bite—either because Knox failed to timely release Wesley or because Reed failed to pull Knox off Wesley earlier during the encounter—was a "gratuitous extension" of the bite that violates Wesley's rights described above. These jury issues preclude summary judgment on qualified immunity grounds for the December incident.

### 3. Malicious Prosecution

Wesley also brings a § 1983 claim for malicious prosecution against Reed as Reed filed a felony assault on an officer charge against Wesley following the March 11, 2021 arrest. Dkt. 1 ¶¶ 156-69. Similarly to excessive force claims, malicious prosecution claims under § 1983 are "properly understood as a Fourth Amendment claim for unreasonable seizure;" to survive summary judgment, a plaintiff must establish that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *See Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012); *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000). When charges are dismissed on *nolle prosequi*, courts consider them to have "terminated favorably" for plaintiffs. *Bonnell v. Beach*, 401 F. Supp. 3d 663, 675 (E.D. Va. 2019); *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 390 (4th Cir. 2014) ("Because the grant of a new trial does not trigger the limitations period for a malicious prosecution claim, the statute of limitations on Owen's 1983 claims did not begin to run

23

on the date was . . . the date a malicious prosecution claim became ripe at common law, i.e., the date on which the *nolle prosequi* was entered.").[21]

Here, Reed brought a felony arrest warrant against Wesley on March 11, 2021, which later "terminated favorably" for Wesley as it was dismissed on a *nolle prosequi* motion. Dkt. 35-7 at 4. Thus, the open question that remains is causation. Reed is correct that a superseding decision by a judicial officer to issue a warrant can complicate the but-for and proximate causation requirements of malicious prosecution. *See Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012); *Snider v. Seung Lee*, 584 F.3d 193, 206 (4th Cir. 2009) (Stamp, J., concurring) ("A law enforcement officer ... is insulated from a malicious prosecution claim where [an] intermediary makes an independent decision to pursue prosecution or issue a warrant, thereby breaking the causal chain between the officer's conduct and the prosecution."); *Wray v. City of New York,* 490 F.3d 189, 195 (2d Cir. 2007). However, police officers cannot mislead a judicial officer or prosecutor and then hide behind the neutral party's actions. *See Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 556 (4th Cir. 2017), as amended (Aug. 22, 2017) (a plaintiff can state a malicious prosecution case were "the officer(s) deliberately or with a reckless disregard for the truth made material false statements in the warrant application."). Police officers "may be held to have caused the seizure" "when they have lied to or misled the prosecutor, failed to disclose exculpatory evidence to the prosecutor; or unduly pressured the prosecutor to seek the indictment." *Evans*, 703 F.3d 636, 647-48 (4th Cir. 2012).

---

[21]    Virginia's two-year statute of limitations applies to malicious prosecution claims. Va. Code § 8.01-243. Wesley's charges were dismissed on the prosecution's motion for *nolle prosequi* on December 21, 2022, and his complaint was filed on June 20, 2024. Dkt. 35 at 22 n.16; Dkt. 1. It is timely.

Based on the body-worn camera footage, a reasonable jury could find Reed misled the magistrate and prosecutors about Wesley assaulting him. Jurors could determine that Wesley was standing several feet away from Reed during the arrest and had no opportunity to strike him. Reed March BWC 1:06-2:26. Put differently, summary judgment must be denied as to Wesley's malicious prosecution claim because: (1) a genuine issue of material fact exists as to the causation of Wesley's prosecution, and (2) if Reed misled the magistrate and prosecutors in order to cause Wesley's arrest, he violated Wesley's clearly established right to be free from a false prosecution. *See Humbert*, 866 F.3d at 562 ("It [is] clearly established that the Constitution [does] not permit a police officer deliberately, or with reckless disregard for the truth, to make material misrepresentations or omissions to seek a warrant that would otherwise be without probable cause.").[22]

4.   **State Law Claims**

Reed concedes that his "assault and battery claims rise and fall with his Fourth Amendment excessive force claims." Dkt. 35 at 23. As the Court previously discussed, a reasonable jury could find that Reed used excessive force during both arrests, and further, that he is not entitled to qualified immunity on that claim. *See supra* section 2. Because of this conclusion, the result is no different for his assault and battery and gross negligence claims. Accordingly, Reed is not entitled to summary judgment on his claims.

---

[22]    Reed argues he is otherwise entitled to qualified immunity on the malicious prosecution claim. Dkt. 35 at 23. Because granting summary judgment on qualified immunity is "improper as long as there remains any material factual dispute regarding the actual conduct of the defendants," and because there is a genuine issue of fact as to whether Reed misled the magistrate or prosecutor, granting summary judgment is improper on this claim. *Buonocore v. Harris*, 65 F.3d 347, 359-60 (4th Cir. 1995).

<u>CONCLUSION</u>

Because Wesley failed to produce any admissible evidence to support his *Monell* claims against the City, the City's motion for summary judgment will be granted. Dkt. 36.

Because a reasonable jury could find Reed violated Wesley's clearly established Fourth Amendment right(s) and likewise violated state law during both arrests, Reed's motion for summary judgment will be denied. Dkt. 34.

A separate order will issue.

Entered this __9th__ day of April, 2026.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

26